# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF FLORIDA
# TALLAHASSEE DIVISION

NATIONAL RIFLE ASSOCIATION
OF AMERICA, INC, *and*

RADFORD FANT,

     *Plaintiffs*,

     v.                           Case No. 4:17-CV-128-MW-CAS

RICK SWEARINGEN, in his Official
Capacity as Commissioner of the Florida
Department of Law Enforcement, *and*

ASHLEY MOODY, in her Official Capacity
as Attorney General of Florida,

     *Defendants*.

_____/

## DEFENDANTS' MOTION TO DISMISS AND INCORPORATED MEMORANDUM OF LAW

## MOTION TO DISMISS

Pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), Defendants move to dismiss with prejudice Plaintiffs' Second Amended Complaint (DE54). For the reasons discussed below, Plaintiffs fail to state a claim as to either their facial Second Amendment challenge or their facial Equal Protection challenge. Setting aside Plaintiffs' failure to state a claim, moreover, Florida's Attorney General should be dismissed as an improper party.

## MEMORANDUM OF LAW

## INTRODUCTION

On February 14, 2018, a 19-year-old used a lawfully purchased firearm to kill 17 students and faculty members, and to injure many others, at Marjory Stoneman Douglas High School in Parkland, Florida. Responding to that and other incidents of gun violence, the Florida Legislature enacted the Marjory Stoneman Douglas High School Public Safety Act, which, among other things, prohibits the purchase of firearms by persons under the age of 21. *See* Fla. Stat. § 790.065(13).

The Court should dismiss Plaintiffs' complaint because it fails to state a claim upon which relief may be granted. Reviewing the types of sources on which the Supreme Court relied in *Heller* establishes that Florida's age qualification is fully consistent with the historical understanding of the scope of the Second Amendment right. Even if the Court were to conclude that Florida's age qualification burdens conduct protected by the Second Amendment—and it does not—courts considering similar challenges have concluded that, at most, intermediate scrutiny applies to the kind of law at issue here. Florida does not ban 18-to-20-year-olds from possessing firearms, and a prohibition on those individuals' purchase of firearms expires once they reach 21. In light of the important governmental objective at stake and the carefully targeted age qualification, the statute easily passes intermediate scrutiny.

Plaintiffs' Equal Protection challenge also fails as a matter of law. It is hornbook law that age-based classifications such as Florida's age qualification are subject only to rational-basis review, and for the reasons that the statute passes intermediate scrutiny, it passes rational-basis review.

Finally, setting aside that Plaintiffs have not stated a claim, Plaintiffs have sued an improper party. The Court should dismiss Florida's Attorney General because she is not authorized to enforce the challenged provision.

## BACKGROUND

The National Rifle Association of America, Inc. ("NRA") filed this lawsuit against the Commissioner of the Florida Department of Law Enforcement and the Florida Attorney General; both defendants were sued in their official capacities. The complaint alleged that Florida's age qualification[1] violates the Second Amendment and Equal Protection Clause of the United States Constitution on both facial and as-applied bases. DE1. Originally, the NRA was the sole plaintiff. DE1 ¶ 8. The NRA then sought leave to amend its complaint to add a new plaintiff (Jane

---

[1] The full text of § 790.065(13) provides:

A person younger than 21 years of age may not purchase a firearm. The sale or transfer of a firearm to a person younger than 21 years of age may not be made or facilitated by a licensed importer, licensed manufacturer, or licensed dealer. A person who violates this subsection commits a felony of the third degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084. The prohibitions of this subsection do not apply to the purchase of a rifle or shotgun by a law enforcement officer or correctional officer, as those terms are defined in s. 943.10(1), (2), (3), (6), (7), (8), or (9), or a servicemember as defined in s. 250.01.

Doe) and refer to an NRA member (John Doe), as well as leave to allow those two individuals to proceed pseudonymously. DE18, DE19. This Court denied Plaintiffs leave to proceed under pseudonyms (DE32), and the NRA appealed; after briefing, the Eleventh Circuit granted the NRA's motion to dismiss its appeal.

Upon returning to this Court, the NRA amended its complaint again. DE54. In its Second Amended Complaint, the NRA (1) added a new plaintiff, Radford Fant; and (2) narrowed its complaint to two causes of action. Plaintiffs now assert only facial challenges to Section 790.065(13) under both the Second Amendment and the Equal Protection Clause of the United States Constitution. DE54 ¶¶ 25-33.

## LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). It is appropriate to assess Plaintiffs' claims on a motion to dismiss. *See*, *e.g.*, *Hamilton v. Pallozzi*, 848 F.3d 614 (4th Cir. 2017) (affirming dismissal of Second Amendment complaint for failure to state a claim); *Wilson v. Lynch*, 835 F.3d 1083 (9th Cir. 2016) (same); *Drake v. Filko*, 724 F.3d 426 (3d Cir. 2013) (same).

## ARGUMENT

### I.   FLA. STAT. § 790.065(13) DOES NOT VIOLATE THE SECOND AMENDMENT.

Like its sister circuits,[2] the Eleventh Circuit "employ[s] a two-step inquiry when faced with Second Amendment challenges." *United States v. Focia*, 869 F.3d 1269, 1285 (11th Cir. 2017). First, the Court must "ask if the restricted activity is protected by the Second Amendment in the first place." *Id.* (quoting *GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244, 1260 n.34 (11th Cir. 2012). "If the challenged regulation does not burden conduct within the scope of the Second Amendment as historically understood, then the law comports with the Second Amendment." *Id.* "But if it does, then [the Court] must apply an appropriate form of means-end scrutiny." *Id.* Plaintiffs must show that the challenged law "is unconstitutional in all applications to prevail in their facial challenge." *GeorgiaCarry.Org*, 687 F.3d at 1260-61 (citing *United States v. Salerno*, 481 U.S. 739 (1987)).

Section 790.065(13) does not burden conduct within the scope of the Second Amendment and, even if it does, it survives the applicable level of scrutiny—

---

[2] *See, e.g.*, *Gould v. Morgan*, 907 F.3d 659, 669 (1st Cir. 2018); *Young v. Hawaii*, 896 F.3d 1044, 1051 (9th Cir. 2018); *Nat'l Rifle Ass'n v. BATFE*, 700 F.3d 185, 194-95 (5th Cir. 2012); *United States v. Greeno*, 679 F.3d 510, 518 (6th Cir. 2012); *Heller v. District of Columbia*, 670 F.3d 1244, 1252 (D.C. Cir. 2011) ("*Heller II*"); *Ezell v. City of Chicago*, 651 F.3d 684, 701-04 (7th Cir. 2011); *United States v. Chester*, 628 F.3d 673, 680 (4th Cir. 2010); *United States v. Reese*, 627 F.3d 792, 800-01 (10th Cir. 2010); *United States v. Marzzarella*, 614 F.3d 85, 89 (3d Cir. 2010).

intermediate scrutiny. At a minimum, Plaintiffs' facial claims fail because the challenged age qualification is not unconstitutional in all applications.

### A.   Fla. Stat. § 790.065(13) does not burden conduct protected by the Second Amendment as historically understood.

Plaintiffs' facial Second Amendment challenge fails at the first step of the analysis because prohibiting those under 21 years old from purchasing firearms does not burden conduct protected by the Second Amendment.

1. "Like most rights, the right secured by the Second Amendment is not unlimited." *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008). In *Heller*, for example, the Court disclaimed any intent to cast doubt on "laws imposing conditions and qualifications on the commercial sale of arms" or other "presumptively lawful regulatory measures." *Id.* at 626-27 & n.26. In addition, certain classes of individuals do not enjoy Second Amendment rights. *See id.* at 626 (declining to cast doubt on "longstanding prohibitions on the possession of firearms by felons and the mentally ill"). And the Second Amendment's core guarantee extends to "law-abiding, *responsible* citizens." *Heller*, 554 U.S. at 635 (emphasis added).

In assessing the handgun ban at issue in *Heller*, the Court measured it against "the historical understanding of the scope of the right," *id.* at 625; to determine this historical understanding, the Court examined framing-era dictionaries and other writings, and "how the Second Amendment was interpreted

from immediately after its ratification through the end of the 19th century." *Id.* at 605. In particular, the Court examined early state constitutions and laws, early judicial decisions, and early commentary. *See generally* 554 U.S. at 576-619, 626-29; *see also id.* at 595 (looking to both "text and history").

But the Court did not confine its inquiry to framing-era—or even 19th-century—sources. Instead, it looked to post-ratification sources through the post-Civil War period, *see id.* at 614-19, and it recognized as limitations on the Second Amendment's scope a non-exhaustive list of "longstanding" regulations of significantly more modern vintage. 554 U.S. at 626-27 & n.26; *see BATFE*, 700 F.3d at 196 ("*Heller* considered firearm possession bans on felons and the mentally ill to be longstanding, yet the current versions of these bans are of mid-20th century vintage."); *Fyock v. Sunnyvale*, 779 F.3d 991, 997 (9th Cir. 2015); *United States v. Skoien*, 614 F.3d 638, 640-41 (7th Cir. 2010) (en banc); C. Kevin Marshall, *Why Can't Martha Stewart Have a Gun?*, 32 Harv. J.L. & Pub. Pol'y 695, 698 (2009) ("The federal 'felon' disability" that *Heller* approved as longstanding "is less than fifty years old.").

2. Applying *Heller*'s approach makes clear that the historical understanding of the scope of the Second Amendment right does not include a guarantee that those under 21 may purchase firearms.

*Early Legislation.* During the 1800s and early 1900s, many states prohibited the sale or transfer of deadly weapons to minors. *See United States v. Rene E.*, 583 F.3d 8, 14 (1st Cir. 2009). "[B]y the end of the 19th century, nineteen States and the District of Columbia had enacted laws expressly restricting the ability of persons under 21 to purchase or use particular firearms, or restricting the ability of 'minors' to purchase or use particular firearms while the state age of majority was set at age 21." *BATFE*, 700 F.3d at 202 & n.14 (citing laws dating between 1856 and 1897). Often, these prohibitions expressly targeted handguns, *see Rene E.*, 583 F.3d at 14—which *Heller* dubbed "the quintessential self-defense weapon" entitled to core Second Amendment protection, 554 U.S. at 629—and some criminalized their "mere *possession*," *Rene E.*, 583 F.3d at 14.

Some of these laws extended further still. For example, Delaware prohibited "'knowingly sell[ing] a deadly weapon to a minor other than an ordinary pocket knife.'" *BATFE*, 700 F.3d at 202 (quoting *State v. Quail*, 92 A. 859, 859 (Del. 1914)); *Rene E.*, 583 F.3d at 14 (same); *see also* ch. 548, § 1, 1881, 16 Del. Laws 716, 716. By 1923, 23 jurisdictions had imposed restrictions on minors' access to deadly weapons. *BATFE*, 700 F.3d at 202. Importantly, 21 was the age of majority at the time these early statutes were enacted; it was not until the 1970s that states enacted legislation to lower the age of majority to 18. *BATFE*, 700 F.3d at 201, 204.

A more general tradition of regulations aimed at "particular groups for public safety reasons" and "disarming select groups for the sake of public safety" extends back to the Framing and even the colonial period. *BATFE*, 700 F.3d at 200; *see id.* at 201 (concluding that framing-era attitudes were consistent with firearm age restrictions); *Rene E.*, 583 F.3d at 15-16 (same); *United States v. Bena*, 664 F.3d 1180, 1183-84 (8th Cir. 2011) (citing scholarship concluding that "children" are among those whose access to firearms may be restricted).

*Early Courts and Commentators*. Early courts and commentators, including some that *Heller* relied upon, "maintained that age-based restrictions on the purchase of firearms—including restrictions on the ability of persons under 21 to purchase firearms—comported with the Second Amendment." *BATFE*, 700 F.3d at 202-03; *see Powell v. Tompkins*, 926 F. Supp. 2d 367, 388 (2013) (D. Mass. 2013), *aff'd*, 783 F.3d 332 (1st Cir. 2015) ("Case law from jurisdictions across the country confirms that during the late nineteenth and early twentieth centuries, minors' capacity to purchase and own firearms was significantly curtailed."). For example, Thomas Cooley, a well-respected 19th-century judge and professor upon whose treatise *Heller* relied, *see* 554 U.S. at 616-17, "agreed that 'the State may prohibit the sale of arms to minors." *BATFE*, 700 F.3d at 203 (quoting Thomas M. Cooley, *Treatise on Constitutional Limitations* 740 n.4 (5th Ed. 1883)).

Several early court decisions concurred with Cooley's assessment. In *State v. Callicutt*, the Tennessee Supreme Court—whose understanding of the right to arms *Heller* repeatedly endorsed, *see* 554 U.S. at 603, 608, 613-14, 629—upheld a state law that criminalized the selling, giving, or loaning of pistols to minors. 69 Tenn. 714, 714-15 (1878). At the time, the age of majority was 21. *BATFE*, 700 F.3d at 203. The court explained that it did not "deem it necessary to do more than say that [it] regard[ed] the [challenged statute] not only constitutional as tending to prevent crime but wise and salutary in all its provisions." *Callicutt*, 69 Tenn. at 716-17.

Similarly, the Alabama Supreme Court—whose right-to-arms decisions *Heller* also approvingly cited, *see* 554 U.S. at 627, 629—upheld a conviction under a nearly identical state law. *See Coleman v. State*, 32 Ala. 581, 582-83 (1858). And an early Georgia appellate decision upheld against a state constitutional challenge even a ban on juvenile handgun *possession*. *See Glenn v. State*, 72 S.E. 927 (Ga. 1911); *see Heller*, 554 U.S. at 612-13, 626, 629 (citing *Glenn* with approval). And a few years after *Glenn*, the Illinois Supreme Court held that a city ordinance effectively banning all minors from purchasing handguns was consistent with the Second Amendment and the Illinois Constitution's right-to-arms guarantee. *Biffer v. City of Chicago*, 116 N.E. 182, 184-85 (Ill. 1917).

*Modern Legislation. Heller* also treated as relevant to the scope of the Second Amendment right more modern regulations that bear enough resemblance to early regulations that they may be considered "longstanding." 554 U.S. at 626-27 & n.26; *see BATFE*, 700 F.3d at 196; *Fyock*, 779 F.3d at 997; *Skoien*, 614 F.3d at 641; Marshall, *Why Can't Martha Stewart Have a Gun?*, 32 Harv. J.L. & Pub. Pol'y at 698. Current federal and state laws confirm that an age qualification for purchasing firearms—and a 21-year-old age qualification, in particular—is well-established.

For example, federal law prohibits those under 21 from purchasing handguns from licensed dealers and—with narrow exceptions—prohibits those under 18 years of age from possessing them. *See* 18 U.S.C. § 922(b)(1); 18 U.S.C. § 922(x)(2), (5). It also prohibits dealers from selling any firearm to those under the age of 18. 18 U.S.C. § 922(b)(1). Several states have gone further and established 21 as the minimum age (with narrow exceptions) for handgun or long-gun possession. *E.g.*, Haw. Rev. Stat. Ann. § 134-2(a), (d); 430 Ill. Comp. Stat. 65/2(a)(1), 65/4(a)(2)(i); D.C. Code Ann. §§ 7-2502.03, D.C. Mun. Regs. tit. 24, § 2301.1.

Moreover, in enacting permissive concealed-carry regimes, Florida, like most shall-issue states, requires licensees to be 21 years of age; few states allow concealed carry by those under 21. *See* § 790.06(2)(b), Fla. Stat.; Clayton E.

Cramer & David B. Kopel, *"Shall Issue": The New Wave of Concealed Handgun Permit Laws*, 62 Tenn. L. Rev. 679, 688-706 (1995); Allen Rostrom, *The Second Amendment on Campus*, 14 Geo. J.L. & Pub. Pol'y 245, 259 n.101 (2016). This reflects a well-established understanding among states recognizing broad carry rights that only those 21 and older are responsible enough to carry firearms in public.

 *Post*-Heller *case law*. Recent judicial decisions support the conclusion that those under 21 have no Second Amendment right to purchase firearms. In *BATFE*, the Fifth Circuit held that the federal 21-year-old age minimum for purchasing handguns from licensed dealers did not burden a Second Amendment right. Based on a lengthy historical analysis, the court concluded that "a representative citizen of the founding era conceived of a 'minor' as an individual who was unworthy of the Second Amendment guarantee, and conceived of [those under age 21] as 'minors'"; that the challenged law was "consistent with a longstanding tradition of targeting select groups' ability to access and to use arms for the sake of public safety"; and that the challenged law "appear[ed] consistent with a longstanding tradition of age- and safety-based restrictions on the ability to access arms." 700 F.3d at 202, 203; *see Hirschfeld v. BATFE*, No. 3:18-cv-103, 2019 WL 4923955 (W.D. Va. Oct. 4, 2019) (rejecting facial challenge to same after canvassing similar evidence of historical understanding).

The Fifth Circuit found this reasoning fully applicable when it later upheld a state law prohibiting those under 21 from carrying handguns in public, *see National Rifle Ass'n of America, Inc. v. McCraw*, 719 F.3d 338, 347 (5th Cir. 2013), and other courts have employed it to uphold similar 21-year-old age conditions on firearm carry, *e.g.*, *Powell v. Tompkins*, 926 F. Supp. 2d 367, 387-90 (D. Mass. 2013) (upholding a similar state 21-year-old age condition on firearm carry); *Illinois v. Mosley*, 33 N.E.3d 137, 155 (Ill. 2015) (same).

In addition, the First Circuit has upheld an age restriction on the same reasoning. In *Rene E.*, the court upheld a federal ban on handgun possession by those under 18 years of age. 583 F.3d at 9, 11-19. The court conducted a lengthy historical analysis, *id.* at 14-16, "rest[ing] [its] conclusion on the existence of a longstanding tradition of prohibiting juveniles from both receiving and possessing handguns," *id.* at 12. The court found numerous examples of 19th- and early 20th-century restrictions on juvenile firearm possession, *id.* at 14-15, as well as "evidence that the founding generation would have shared the view that public-safety-based limitations of juvenile possession of firearms were consistent with the right to keep and bear arms," *id.* at 15. These sources arose during a time when 21 was deemed the age of adulthood. *BATFE*, 700 F.3d at 203-04; *see* Black's Law Dictionary (10th ed. 2014) (defining "infant" as "a person under the age of twenty-one years").

13

*Constitutional doctrine more generally*. Excluding persons under the age of 21 from a Second Amendment right to purchase firearms accords not only with the historical understanding of the scope of the Second Amendment, *Heller*'s framework, and post-*Heller* case law, but also with constitutional doctrine more generally. The Supreme Court has "recognized three reasons justifying the conclusion that the constitutional rights of children cannot be equated with those of adults: the peculiar vulnerability of children; their inability to make critical decisions in an informed, mature manner; and the importance of the parental role in child rearing." *Bellotti v. Baird*, 443 U.S. 622, 634 (1979). There is no reason to think that the Second Amendment should be any different. *See*, *e.g.*, *Rene E.*, 583 F.3d at 16 n.8.

3.  Florida's age qualification falls under *Heller*'s "longstanding" regulations exception to the Second Amendment. *Heller*, 554 U.S. at 626-27. Such "longstanding" regulations are limitations on the scope of the right, rather than regulations that trigger but pass heightened judicial scrutiny. *See Focia*, 869 F.3d at 1285-86 (noting that *Heller*'s "longstanding" regulations "comport with the Second Amendment because they affect individuals or conduct unprotected by the right to keep and bear arms"); *accord Drake v. Filko*, 724 F.3d 426, 431 (3d Cir. 2013); *Fyock*, 779 F.3d at 996-97; *Bena*, 664 F.3d at 1183.

Consistent with longstanding historical practice, Florida has required adulthood as a "condition" or "qualification" on the purchase of firearms. Florida's statute follows a long tradition of laws conditioning the purchase of firearms on the purchaser's having obtained the traditional age of majority—21 years of age. *See BATFE*, 700 F.3d at 201, 204. And Florida's statute does not prevent those between the ages of 18 and 20 from *possessing* firearms, but only from purchasing them. Fla. Stat. §§ 790.065(13), 790.22(3) (2018).

A careful review of the historical understanding of the Second Amendment and the sources that *Heller* teaches courts to look to demonstrates that Florida's age qualification for purchasing firearms does not burden Plaintiffs' Second Amendment rights. As a result, it is facially constitutional.

4. What is more, "to prevail in their facial challenge," Plaintiffs must show that the challenged statute "is unconstitutional in all applications." *GeorgiaCarry.Org*, 687 F.3d at 1260-61 (citing *Salerno*, 481 U.S. 739). They cannot do so. For example, although one might envision a plaintiff whose interest in obtaining a firearm for the purpose of engaging in self-defense in the home is in fact burdened by Florida's age qualification—for example, an 18-to-20-year-old who cannot obtain a firearm through any other means but purchase—Plaintiffs do not and cannot dispute that many persons between the ages of 18 and 20 may have other lawful means of obtaining access to firearms. In other words, because the

statute places an age qualification only on *purchasing* a firearm, in many instances an 18-to-20-year-old will be able to exercise the core Second Amendment right to self-defense in the home by possessing firearms obtained through other legal means. Thus, even if the Court were to hold that Florida's age qualification may burden *some* conduct protected by the Second Amendment, Plaintiffs cannot establish that it is unconstitutional in all applications, as circuit precedent demands.

**B.     Even if Fla. Stat. § 790.065(13) burdens conduct protected by the Second Amendment, the statute satisfies the applicable standard of review.**

In Defendants' view, Plaintiffs' claims fail as a matter of law because the challenged state statute does not, as a categorical matter, violate the Second Amendment. If the Court disagrees and finds that Florida's age restriction "substantially burden[s]" conduct protected by the Second Amendment, the Court must "apply an appropriate form of means-end scrutiny." *Focia*, 869 F.3d at 1286. As explained below, courts considering similar challenges have concluded that, at most, intermediate scrutiny applies to the kind of law at issue here. Section 790.065(13) survives intermediate scrutiny.

**1.     Assuming that Plaintiffs' claims do not fail based on a categorical analysis, intermediate scrutiny applies.**

Because the Eleventh Circuit has upheld every firearm regulation it has considered on the ground that the law does not burden conduct protected by the Second Amendment, the court has not yet determined what level of means-end

scrutiny applies to a law of this kind. *See*, *e.g.*, *GeorgiaCarry.Org, Inc. v. U.S. Army Corps of Engineers*, 788 F.3d 1318, 1328 (11th Cir. 2015). But "the prevailing view" among the courts of appeals to have considered the issue is "that the appropriate level of scrutiny 'depends on the nature of the conduct being regulated and the degree to which the challenged law burdens the right.'" *BATFE*, 700 F.3d at 205 (quoting *United States v. Chester*, 628 F.3d 673, 682 (4th Cir. 2010)).[3]

Accordingly, the courts of appeals have held that "[a] regulation that threatens a right at the core of the Second Amendment—for example, the right of a law-abiding, responsible adult to possess and use a handgun to defend his or her home and family—triggers strict scrutiny." *BATFE*, 700 F.3d at 195 (quoting *Heller,* 554 U.S. at 635, and citing *Heller II*, 670 F.3d at 1257, *Masciandaro*, 638 F.3d at 470, and *Chester,* 628 F.3d at 682). "A less severe regulation—a regulation that does not encroach on the core of the Second Amendment—requires a less demanding means-ends showing." *Id.* And several circuits have held that, at most, intermediate scrutiny applies to regulations that, like Section 790.065(13), "impos[e] conditions and qualifications on the commercial sale of arms," *Heller*,

---

[3] *See also Heller v. D.C.*, 670 F.3d 1244, 1257 (D.C. Cir. 2011); *United States v. Masciandaro,* 638 F.3d 458, 470 (quoting *Chester*, 628 F.3d at 682); *United States v. Marzzarella*, 614 F.3d 85, 96 (3d Cir. 2010).

554 U.S. at 626-27 & n.26 (emphasis added); *see BATFE*, 700 F.3d at 206; *McCraw*, 719 F.3d at 348; *Horsley v. Trame*, 808 F.3d 1126, 1134 (7th Cir. 2015).

In *BATFE*, the Fifth Circuit considered, in the alternative, whether the federal prohibition on most handgun sales to those under 21 survived the second step of the analysis. The court concluded that such "laws trigger nothing more than 'intermediate scrutiny,'" *BATFE*, 700 F.3d at 205, because they do not "substantial[ly] burden" core rights protected by the Second Amendment, *id.* at 195. Although the regulations at issue were narrower than Florida's age qualification provision, the Fifth Circuit's reasoning applies here.

*First*, like the federal regulations at issue there, Section 790.065(13) establishes an age qualification, not a prohibition. "As with felons and the mentally ill," even "categorically restricting the presumptive Second Amendment rights of 18-to-20-year-olds does not violate the central concern of the Second Amendment." *BATFE*, 700 F.3d at 206 (emphasis added). That is because "[t]he Second Amendment, at its core, protects 'law-abiding, *responsible*' citizens.'" *Id.* (quoting *Heller*, 554 U.S. at 635 (emphasis in original)). And Florida's age qualification requirement is merely a determination as to which citizens are "responsible." Such laws demand, at most, "an 'intermediate' level of scrutiny because they regulate commercial sales through an age qualification with *temporary effect*. Any 18-to-20-year-old subject to the ban will soon grow up and

18

out of its reach," and "[t]he temporary nature of the burden reduces its severity." *BATFE*, 700 F.3d at 207 (emphasis added). Moreover, the specific age Florida chose—21—is tailored to the common law age of majority. *See id.* at 201.

*Second*, like Congress, Florida did not "categorically" restrict whatever Second Amendment rights, if any, persons under the age of 21 may have. Florida expressly avoided "strik[ing] the core of the Second Amendment because [it] do[es] not prevent 18-to-20-year-olds from possessing and using handguns 'in defense of hearth and home.'" *BATFE*, 700 F.3d at 206 (citing *Heller*, 554 U.S. at 628-30); *see also Heller II,* 670 F.3d at 1255, 1258 (applying intermediate scrutiny to registration requirements that "make it considerably more difficult for a person lawfully to acquire and keep a firearm, including a handgun, for the purpose of self-defense in the home—the 'core lawful purpose' protected by the Second Amendment," but that do not "prevent[] an individual from possessing a firearm in his home or elsewhere, whether for self-defense or hunting, or any other lawful purpose" (quoting *Heller*, 554 U.S. at 630)). Instead, Florida followed the Supreme Court's guidance and imposed a "qualification[] on the commercial *sale* of arms." *BATFE*, 700 F.3d at 206 (citing *Heller*, 554 U.S. at 626-27) (emphasis added).

For these reasons, if the Court proceeds to the second step of the constitutional analysis, it should apply intermediate scrutiny.

### 2. Fla. Stat. § 790.065(13) satisfies intermediate scrutiny.

In the Second Amendment context, the courts of appeals have held that intermediate scrutiny "requires the government to show a reasonable fit between the law and an important government objective." *BATFE*, 700 F.3d at 205; *see Heller*, 670 F.3d at 1269 (same); *Chester*, 628 F.3d at 682 (same). "'[T]he fit between the challenged regulation and the asserted objective [must] be reasonable, not perfect.'" *Marzzarella*, 614 F.3d at 98 (citing *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 556 (2001), and *Bd. of Trustees v. Fox*, 492 U.S. at 480, 481 (1989)).

> ### i. Fla. Stat. § 790.065(13) serves an important government objective.

Florida's age qualification is intended to further "[t]he 'legitimate and compelling state interest' in protecting the community from crime." *Schall v. Martin*, 467 U.S. 253, 264 (1984). The legislature's express purpose was to "comprehensively address the crisis of gun violence, including . . . on school campuses." S.B. 7026, § 2. The courts of appeals have repeatedly held that this interest satisfies intermediate scrutiny. *See*, *e.g.*, *Gould v. Morgan*, 907 F.3d 659, 673 (1st Cir. 2018) ("It cannot be gainsaid that [the state] has compelling governmental interests in both public safety and crime prevention."); *Horsley v. Trame*, 808 F.3d 1126, 1132 (7th Cir. 2015) ("It is clear that Illinois has an important and compelling interest in its citizens' safety."); *BATFE*, 700 F.3d at 209

("[C]urbing violent crime perpetrated by young persons under 21—by preventing such persons from acquiring handguns from FFLs—constitutes an important government objective."); *Heller*, 670 F.3d at 1258 (holding that the District of Columbia had "two important governmental interests" supporting firearm regulation—"to protect police officers and to aid in crime control").

> ii.  *There is a "reasonable fit" between Fla. Stat. § 790.065(13) and Florida's interest in preventing gun violence and crime.*

Florida's age qualification is a reasonable fit for addressing this important government objective.

*First*, the qualification is a temporary restriction. "Any 18-to-20-year-old subject to the ban will soon grow up and out of its reach." *BATFE*, 700 F.3d at 207. And, brief though the restriction is, it is virtually certain to advance Florida's interest in preventing gun violence and crime. Years before the Florida legislature considered Section 790.065(13), the Fifth and Seventh Circuits considered the same age group and held—as a matter of law—that "[t]he goal of protecting public safety is supported by studies and data regarding persons under 21 and violent and gun crimes." *Horsley v. Trame*, 808 F.3d 1126, 1133 (7th Cir. 2015) (affirming summary judgment); *BATFE*, 700 F.3d at 209-10 (same).

As the Fifth Circuit explained:

Congress conducted a multi-year investigation that revealed a causal relationship between the easy availability of firearms to young people

under 21 and the rise in crime. . . . Indeed, at a hearing held in connection with Congress's inquiry, a law enforcement official reported, "The greatest growth of crime today is in the area of young people, juveniles, and young adults. The easy availability of weapons makes their tendency toward wild, and sometimes irrational behavior that much more violent, that much more deadly."

*BATFE*, 700 F.3d at 207 (citations omitted). The court continued:

The legislative record illustrates that Congress was concerned not only with "juveniles" under the age of 18, but also with "minors" under the age of 21. . . . Congress's investigation had shown that "juveniles account for some 49 percent of the arrests for serious crimes in the United States," while "minors account for 64 percent of the total arrests in this category." Specifically, "minors under the age of 21 years accounted for 35 percent of the arrests for the serious crimes of violence including murder, rape, robbery, and aggravated assault," and 21 percent of the arrests for murder.

*Id.* at 207-08 (citations omitted). Although the government undertook this analysis in the late 1960s, the Fifth Circuit explained that the cause for concern had continued unabated: "Those aged 18-20 accounted for 22 percent of all arrest[s] for murder in 1997." *Id.* at 209 (citation omitted). And "[s]tudies show that one in four gun murders are committed by people aged 18 to 20." *Id.* (citation omitted).

The Seventh Circuit recounted the same data, and observed that "more recent data reflects similar trends":

An FBI analysis of crime in 2014 reflects that 18-to-20-year-olds were responsible for more than 15.8% of all charges issued for murder and nonnegligent manslaughter. When forcible rape, robbery, and aggravated assault are added, 18-to-20-year-olds account for about 11% of charges brought for violent crime. That is true even though that age group represented only about 4.1% of the country's total population and 5.4% of the population over the age of 14.

*Horsley*, 808 F.3d at 1133 (citations omitted).

*Second*, Florida's age qualification is reasonably calculated to advance the state's interest because it applies only to the *purchase* of firearms. Any law-abiding person over the age of 18 may gift, loan, or allow the use of a firearm to an otherwise qualified person over the age of 18, who may in turn keep and use that firearm for any lawful purpose, including home defense, hunting, sport, and practice shooting. The sale-gift distinction is aimed at a uniquely dangerous problem—the purchase of firearms by 18-to-20-year-olds absent the judgment of a parent, guardian, or other law-abiding adult that the individual is prepared for the responsibility of gun ownership. As the Fifth Circuit explained, "[t]he clandestine acquisition of firearms by juveniles and minors is a most serious problem facing law enforcement and the citizens of this country." *BATFE*, 700 F.3d at 199 (quoting S. Rep. No. 90-1097, at 79 (1968), 1968 U.S.C.C.A.N. 2112, 2167) (defining "minors" as persons under the age of 21). "At the most," therefore, the statute "could cause minor inconveniences to certain youngsters who are mature, law abiding, and responsible, by requiring that a parent or guardian over 21 years of age make a handgun purchase for any person under 21." *BATFE*, 700 F.3d at 199 (quoting 114 Cong. Rec. 12279, at 12309 (1968) (Sen. Dodd)). And even in such rare cases, any inconvenience is temporary.

Thus, because Florida's age qualification seeks to address an important government interest and is a reasonable fit for addressing that interest, it survives intermediate scrutiny and is facially constitutional.

## II.   PLAINTIFFS' EQUAL PROTECTION CLAIM FAILS AS A MATTER OF LAW.

Plaintiffs' claim under the Equal Protection Clause should be dismissed with prejudice because the Florida's age-based classification easily satisfies rational-basis review.

### A.   Rational-basis review applies to Plaintiffs' Equal Protection claim.

Plaintiffs argue that Florida's age qualification violates the Equal Protection Clause because it treats 18-to-20-year-olds differently from adults. Compl. ¶ 32. Rational-basis review applies to Plaintiffs' claim because "age is not a suspect classification under the Equal Protection Clause." *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 83 (2000). The Constitution permits legislatures to "draw lines on the basis of age when they have a rational basis for doing so at a class-based level." *Id.* at 86.

That Plaintiffs' claim involves the Second Amendment does not change the level of scrutiny. "[E]qual protection does not provide [an] additional safeguard for Second Amendment rights." *Dearth v. Lynch*, 791 F.3d 32, 38 (D.C. Cir. 2015). Thus, where a statute does not violate the Second Amendment and does not involve a suspect classification, rational-basis review applies. *Mance v. Sessions*,

896 F.3d 699, 711 (5th Cir. 2018) (explaining that without suspect classification, Equal Protection claim in case involving Second Amendment right was subject to rational-basis review); *see Nordyke v. King*, 681 F.3d 1041, 1043 n.2 (9th Cir. 2012) (en banc); *Hightower v. City of Boston*, 693 F.3d 61, 83 (1st Cir. 2012); *BATFE*, 700 F.3d 185, 212 (5th Cir. 2012).

### B.    Section 790.065(13) easily passes rational-basis review.

Plaintiffs cannot meet their burden to establish that the Legislature's actions were irrational. "The rational basis test asks (1) whether the government has the power or authority to regulate the particular area in question, and (2) whether there is a rational relationship between the government's objective and the means it has chosen to achieve it. This standard is easily met." *Leib v. Hillsborough Cty. Pub. Transp. Comm'n*, 558 F.3d 1301, 1306 (11th Cir. 2009). In fact, "when conducting rational basis review," a court "will not overturn" legislation "unless the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that [the court] can only conclude that the [government's] actions were irrational." *Kimel*, 528 U.S. at 84 (internal quotation marks omitted); *see McGowan v. Maryland*, 366 U.S. 420, 425-26 (1961) (explaining that the Equal Protection Clause "is offended only if the classification rests on grounds wholly irrelevant to the achievement of the State's objective").

And because age classifications are "presumptively rational," Plaintiffs "bea[r] the burden of proving that the facts on which the classification is apparently based could not reasonably be conceived to be true by the governmental decisionmaker." *Kimel*, 528 U.S. at 84 (citation and internal punctuation omitted). Meanwhile, the government may "rely on age as a proxy for other qualities, abilities, or characteristics that are relevant to the State's legitimate interests." *Id.* at 84.

For the same reasons that the statute's age classification is reasonably adapted to an important state interest, *see supra* Part I.B.2, it is rationally related to a legitimate state interest. *See BATFE*, 700 F.3d at 212. In other words, because the statute meets intermediate scrutiny, it necessarily passes rational-basis review. *See McCraw*, 719 F.3d at 350 (holding that statute passed rational-basis review because "the scheme survive[d] the more stringent intermediate scrutiny").

## III.   THE ELEVENTH AMENDMENT BARS PLAINTIFFS' CLAIMS AGAINST THE ATTORNEY GENERAL OF FLORIDA.

The Attorney General of Florida is entitled to sovereign immunity under the Eleventh Amendment because she does not have enforcement authority over the provision that Plaintiffs challenge. As a result, this Court should dismiss her from the suit as an improper party.

A.   **Only state officials with authority to enforce a statute are proper defendants in an action challenging the constitutionality of that statute.**

Under the Eleventh Amendment, a state may not be sued in federal court unless it waives its sovereign immunity or its immunity is abrogated by an act of Congress under section 5 of the Fourteenth Amendment. *Grizzle v. Kemp*, 634 F.3d 1314, 1319 (11th Cir. 2011). Under *Ex Parte Young*, 209 U.S. 123 (1908), certain suits alleging violations of the federal constitution, filed against a state official in her official capacity for injunctive relief on a prospective basis, are not considered to be suits against the state that violate the Eleventh Amendment.

This exception, however, has been read narrowly. A state official is subject to suit in his official capacity only "when his office imbues him with the responsibility to enforce the law or laws at issue in the suit." *Grizzle*, 634 F.3d at 1319; *see Wusiya v. City of Miami Beach*, 614 F. App'x 389, 393 (11th Cir. 2015) (same). In other words, "federal courts have refused to apply *Ex [P]arte Young* where the officer who is charged has no authority to enforce the challenged statute." *Summit Med. Assocs., P.C. v. Pryor*, 180 F.3d 1326, 1342 (11th Cir. 1999). That authority must be specific, as opposed to the official's "general executive power," which is "not a basis for jurisdiction in most circumstances." *Women's Emergency Network v. Bush*, 323 F.3d 937, 949 (11th Cir. 2003); *see ACLU v. Florida Bar*, 999 F.2d 1486, 1490 (11th Cir. 1993) (Florida Bar was

proper defendant because of its "authority to seek sanctions" for violations of ethics rules).

As for suits against a state attorney general in particular, the Supreme Court explained that if state statutes could be challenged by suing the attorney general on the theory that she "might represent the state in litigation involving the enforcement of its statutes," it would eviscerate "the fundamental principle that [States] cannot, without their assent, be brought into any court at the suit of private persons." *Ex Parte Young*, 209 U.S. at 157.

### B. The Florida Attorney General lacks authority to enforce the challenged provision.

Here, the Attorney General is not a proper party because she is not authorized to enforce the challenged provision. The Attorney General is Florida's "chief state legal officer." Art. IV, s. 4(b), Fla. Const. But contrary to Plaintiffs' allegation that the Attorney General "is responsible for directing and supervising the prosecution of all offenses against Florida's criminal law" (Compl. ¶ 11), Florida law does not vest the Attorney General with authority to direct or supervise the prosecution of crimes (with the limited exceptions discussed below), and the Attorney General does not have authority to prosecute the particular crime at issue here.[4] Nor does any provision in the Florida Statutes. And indeed, Plaintiffs

---

[4] By contrast, the Eleventh Circuit has held that Georgia's governor was a proper party because he was "responsible for law enforcement" and he "ha[d] the residual power to

identify no constitutional provision or statute authorizing the Attorney General to enforce Section 790.065(13). Thus, because the Attorney General does not "have any relationship to the enforcement of [the challenged] provision, . . . the *Ex Parte Young* doctrine does not apply." *Summit Med. Assocs.*, 180 F.3d at 1342.[5]

Instead, under Florida's Constitution, it is the locally elected state attorney—not the Attorney General—who is "the prosecuting officer of all trial courts in [each judicial] circuit," subject only to exceptions not applicable here.[6] Art. V, s. 17, Fla. Const.; *State v. Barritt*, 531 So. 2d 338, 342 (Fla. 1988) ("[T]he state attorney has complete discretion in deciding whether and how to prosecute."); *see Freiberg*, 2006 WL 2362046, at *6. In general, "[w]ith respect to the prosecution of crimes, the State acts exclusively through the offices of the state attorneys," and

commence criminal prosecutions" and to "direct the Attorney General to 'institute and prosecute.'" *Luckey v. Harris*, 860 F.2d 1012, 1016 (11th Cir. 1988).

[5] *See also Okpalobi v. Foster*, 244 F.3d 405, 422-25 (5th Cir. 2001) (en banc) (constitutional challenge to state statute not viable under *Ex Parte Young* because no enforcement connection existed between Governor or Attorney General and the statute); *Bolbol v. Brown*, 120 F. Supp. 3d 1010, 1018 (N.D. Cal. 2015) (finding an allegation that California's Attorney General, as its "chief legal officer," has "[a] 'general duty to enforce California law'" to be "plainly insufficient to invoke the *Ex Parte Young* exception to Eleventh Amendment immunity"); *June Med. Servs., LLC v. Caldwell*, No. 3:14-cv-525, 2014 WL 4296679, at *3 (M.D. La. Aug. 31, 2014) (Louisiana Attorney General's "broad power" as the state's chief legal officer is insufficient to trigger *Ex Parte Young* exception).

[6] Those exceptions include "violations of municipal ordinances," Art. V, s. 17, Fla. Const.; and "violations of criminal laws occurring or having occurred, in two or more judicial circuits as part of a related transaction, or when any such offense is affecting or has affected two or more judicial circuits as provided by general law," Art. IV, s. 4(b), Fla. Const.; neither of which is relevant here. Section 790.065(13) is not a municipal ordinance, and the statewide prosecutor is authorized by statute to prosecute only the offenses enumerated in Section 16.56, Fla. Stat., a list that does not include Section 790.065(13).

"[n]o other officers or agencies of the State are vested with that responsibility or power." *Cook v. State*, 921 So. 2d 631, 644 (Fla. 2d DCA 2005) (Canady, J.).[7]

The Attorney General does have considerable authority to act in the public interest and, when necessary, to defend state statutes. She is the only official authorized to represent Florida's state interests in federal court, and she may intervene in cases "in which the state may be a party, or in anywise interested." *See State of Florida ex rel. Shevin v. Exxon Corp.*, 526 F.2d 266 (5th Cir. 1976); *State ex rel. Landis, Attorney General v. S.H. Kress & Co.*, 155 So. 823 (Fla. 1934); *State ex rel. Shevin v. Weinstein*, 353 So. 2d 1251, 1254 (Fla. 3d DCA 1978); §§ 16.01(4), (5), Fla. Stat. But that authority is wholly discretionary. *See Mallory v. Harkness*, 923 F. Supp. 1546, 1553 (S.D. Fla. 1996), *aff'd without opinion*, 109 F.3d 771 (11th Cir. 1997) ("It has long been recognized that the [Attorney General] is not a necessary party each time the constitutionality of a statute is drawn into question . . . The [Attorney General] is thus not affirmatively required to intervene every time an entity challenges the constitutionality of a statute." (citations omitted)). And forcing the Attorney General to defend the constitutionality of a

---

[7] *See also Johnson v. State*, 314 So. 2d 573, 577 (Fla. 1975) ("In both the adult and juvenile divisions of our court system, the State Attorney is the prosecuting officer."); *Austin v. State ex rel. Christian*, 310 So. 2d 289, 292 (Fla. 1975) ("A state attorney in Florida is not merely a prosecuting officer in the circuit in which he is elected, he is also an officer of the State in the general matter of enforcement of the criminal law.").

statute would effectively eliminate her unreviewable discretion to intervene. *See State ex rel. Landis v. S. H. Kress & Co.*, 155 So. 823, 826 (Fla. 1934).

At most, the Attorney General's statutory authority to intervene vests only general executive power that does not constitute a "sufficient connection" to permit the exercise of jurisdiction. *Women's Emergency Network*, 323 F.3d at 949-50; *see Osterback v. Scott*, 782 F. App'x 856, 859 (11th Cir. 2019) (holding that Florida Governor's "general authority to enforce Florida's laws" did not make him a proper party). The Court should therefore dismiss the Attorney General from this suit.

In fact, several district courts in Florida have dismissed the Attorney General from similar suits challenging the constitutionality of state statutes for that very reason. For example, in *Roberts v. Bondi*, the court dismissed Florida's Attorney General in a case challenging the constitutionality of another provision of the law at issue here on the basis that she did not have authority to enforce it. No. 8:18-cv-1062, 2018 WL 3997979, at *3 (M.D. Fla. Aug. 21, 2018). Although merely persuasive, *Roberts* is directly on point. The court explained that state attorneys, not the Attorney General, enforce the criminal law in Florida, and that although the Attorney General is entitled to be heard if she so chooses, "that does not mean enforcing this statute is her duty for *Ex Parte Young* purposes." *Id.* at *2. *See also Jones-El v. Fla.*, No. 8:18-cv-1621, 2018 WL 6983499, at *4-5 (M.D. Fla. Dec. 3,

2018) (dismissing Attorney General as party where plaintiff failed to plead any facts showing that Attorney General had enforcement authority over challenged provision); *Freiberg v. Francois*, No. 4:05-cv-177, 2006 WL 2362046, at *6 (N.D. Fla. Aug. 15, 2006) (dismissing Attorney General as party where Attorney General had "no role" in the "enforcement of the [challenged] criminal statute").

Recent cases where this Court concluded that Florida's Secretary of State had sufficient enforcement authority over challenged statutes also confirm that the Attorney General is not a proper party here. In *Florida Democratic Party v. Scott*, the Court held that the Secretary of State was a proper party because he was "vested with the power to issue orders directing compliance with the election code or prohibiting violations thereof." 215 F. Supp. 3d 1250, 1255 (N.D. Fla. 2016). The Attorney General has no comparable power as to the challenged statute here. *See also Madera v. Detzner*, 325 F. Supp. 3d 1269, 1277-78 (N.D. Fla. 2018) (holding that Secretary of State was a proper party because of his specific power and duty to enforce Department regulations); *Fla. Democratic Party v. Detzner*, No. 4:16-cv-607, 2016 WL 6090943, at *5 (N.D. Fla. Oct. 16, 2016) (holding that Secretary of State was a proper party because he had power "to order supervisors of elections to perform specific duties" relevant to the challenged statute).

This Court has also articulated a separate reason why an official without enforcement power over a challenged statute is not a proper party. "If relief is

sought against an official who cannot remedy the plaintiff's alleged injury, there is no 'case or controversy between himself and the defendant[s] within the meaning of Art[icle] III.'" *Gallardo by & through Vassallo v. Senior*, No. 4:16-cv-116, 2017 WL 3081816, at *6 (N.D. Fla. July 18, 2017); *see Lewis v. Governor of Alabama*, 944 F.3d 1287 (11th Cir. 2019) (en banc) (holding that plaintiffs challenging state statute lacked standing to sue Alabama's Attorney General, who had "no enforcement role" as to challenged statute); *Socialist Workers Party v. Leahy*, 145 F.3d 1240, 1248 (11th Cir. 1998) (dismissing, for lack of standing, supervisors of elections who had "no source of power" to enforce provision at issue). The order that Plaintiffs seek, enjoining the Attorney General "from enforcing FLA. STAT. § 790.065(13)" (Compl. ¶ 34(b)), would not prevent state attorneys from prosecuting Plaintiffs' members for violating Section 790.065(13). Thus, the Attorney General should be dismissed as a party for lack of standing as well.

## CONCLUSION

This Court should dismiss the Complaint with prejudice, as to both defendants, because it fails to state a claim on which relief may be granted. In the alternative, the Court should dismiss the Complaint with prejudice as to the Attorney General on the ground that she is an improper defendant.

Respectfully submitted.

ASHLEY MOODY
ATTORNEY GENERAL

*/s/ Christopher J. Baum*
CHRISTOPHER J. BAUM (FBN 1007882)
Deputy Solicitor General

AMIT AGARWAL (FBN 125637)
Solicitor General
ELIZABETH TEEGEN (FBN 833274)
Chief Assistant Attorney General
BARBARA JEAN THRONE (FBN 776505)
Senior Assistant Attorney General
TIMOTHY NEWHALL (FBN 391255)
Senior Assistant Attorney General

Office of the Attorney General
State of Florida
1 SE 3rd Ave Suite 900
Miami, FL 33131
(786) 792-6269
(850) 410-2672 (fax)
christopher.baum@myfloridalegal.com

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I certify that on this 21st day of January, 2020, a copy of the foregoing was served on all counsel of record through the Court's CM/ECF Notice of Electronic Filing System.

/s/ *Christopher J. Baum*
Christopher J. Baum

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 7.1(F) of the Local Rules of the Northern District of Florida, I certify that the foregoing Motion and Incorporated Memorandum contains 7,894 words.

/s/ *Christopher J. Baum*
Christopher J. Baum