# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRCT OF FLORIDA

| | |
|---|---|
| NATIONAL RIFLE ASSOCIATION OF AMERICA, INC., RADFORD FANT, <br><br> *Plaintiffs*, <br><br> v. <br><br> RICK SWEARINGEN, in his official capacity as Commissioner of the Florida Department of Law Enforcement, ASHLEY MOODY, in her official capacity as Attorney General of Florida, <br><br> *Defendants*. | Civil Action No.: <br> 4:18-CV-00137-MW-CAS |

**BRIEF OF *AMICI CURIAE* GIFFORDS LAW CENTER TO PREVENT GUN VIOLENCE, BRADY, TEAM ENOUGH, ORANGE RIBBONS FOR GUN SAFETY, AND MARCH FOR OUR LIVES ACTION FUND**

# **TABLE OF CONTENTS**

**Page**

INTEREST OF THE *AMICI CURIAE* ....................................................................1

INTRODUCTION AND SUMMARY OF THE ARGUMENT ...............................4

ARGUMENT .........................................................................................................8

I.  AT MOST, SECTION 13 IS SUBJECT TO INTERMEDIATE
    SCRUTINY ...............................................................................................10

II. SOCIAL SCIENCE AND LEGISLATIVE HISTORY SHOW THAT
    SECTION 13 EASILY SURVIVES INTERMEDIATE SCRUTINY .........12

  A.  Scientific Research Confirms That Section 13 Is a Data-Driven
      Solution to Promote Public Safety by Reducing Gun Violence ..............13

      1.  Eighteen-to-Twenty-Year-Old Minors Are Generally More
          Impulsive Than Older Cohorts.......................................................14

      2.  Eighteen-to-Twenty-Year-Olds Are Disproportionately
          Likely to Commit Violent Crimes, Including Homicide, by
          Firearm ...........................................................................................17

      3.  Eighteen-to-Twenty-Year-Olds Attempt Suicide at
          Disproportionately High Rates and Access to Firearms
          Increases the Likelihood and Lethality of Those Suicide
          Attempts ..........................................................................................19

      4.  State-Level Gun Control Measures, Including Age
          Restrictions, Are Effective..............................................................21

  B.  Legislative History Demonstrates That Section 13 Is a
      Commonsense and Evidence-Based Response to a Grave Public
      Safety Risk.................................................................................................24

CONCLUSION ....................................................................................................27

## <u>CORPORATE DISCLOSURE STATEMENTS</u>

Giffords Law Center to Prevent Gun Violence, Brady, Team ENOUGH, Orange Ribbons for Gun Safety, and March For Our Lives Action Fund state that none of these organizations have parent corporations.  None of these organizations have stock, and therefore no publicly held company owns 10% or more of any organization's stock.

## INTEREST OF THE *AMICI CURIAE*

*Amicus curiae* Giffords Law Center to Prevent Gun Violence ("Giffords Law Center") is a non-profit policy organization dedicated to researching, writing, enacting, and defending laws and programs proven to effectively reduce gun violence.  The organization was founded more than a quarter-century ago following a gun massacre at a San Francisco law firm and was renamed Giffords Law Center in October 2017 after joining forces with the gun-safety organization founded by former Congresswoman Gabrielle Giffords.  Today, Giffords Law Center provides free assistance and expertise to lawmakers, advocates, legal professionals, law enforcement officials, and citizens who seek to improve the safety of their communities.  Giffords Law Center has provided informed analysis as an *amicus* in many firearm-related cases, including in *Hirschfeld* v. *Bureau of Alcohol, Tobacco, Firearms & Explosives*, 2019 WL 4923955 (W.D. Va. Oct. 4, 2019), *District of Columbia* v. *Heller*, 554 U.S. 570 (2008), and *McDonald* v. *City of Chicago*, 561 U.S. 742 (2010).[1]

---

[1]    Several courts have cited research and information from Giffords Law Center's *amicus* briefs in Second Amendment rulings.  *E.g.*, *Hirschfeld*, 2019 WL 4923955, at \*5, \*9; *Ass'n of N.J. Rifle & Pistol Clubs* v. *AG N.J.*, 910 F.3d 106, 121-22 (3d Cir. 2018); *Md. Shall Issue* v. *Hogan*, 353 F. Supp. 3d 400, 403-05 (D. Md. 2018); *Stimmel* v. *Sessions*, 879 F.3d 198, 208 (6th Cir. 2018); *Peruta* v. *Cty. of San Diego*, 824 F.3d 919, 943 (9th Cir. 2016) (*en banc*) (Graber, J., concurring).  Giffords Law Center filed the latter two briefs under its former name, the Law Center to Prevent Gun Violence.

*Amicus curiae* Brady (formerly the Brady Center to Prevent Gun Violence) is a non-profit organization dedicated to reducing gun violence through education, research, and legal advocacy. Brady has a substantial interest in ensuring that the Constitution and state laws are properly interpreted to allow strong government action to prevent gun violence. Through its Legal Action Project, Brady has filed numerous briefs in support of government regulation of firearms.

*Amicus curiae* Team ENOUGH is a youth-led, Brady-sponsored initiative that educates and mobilizes young people in the fight to end gun violence. Team ENOUGH is committed to bringing a fresh perspective and a common-sense approach to America's gun policy, and has an interest in promoting laws that seek to help bring an end to gun violence. Team ENOUGH has a particular interest in laws affecting Florida: it represents the interests of dozens of Florida students, who are members of three chapters at Florida schools, including two executive council members who lost friends and family in the Marjory Stoneman Douglas shooting.

*Amicus curiae* Orange Ribbons for Gun Safety is a non-profit organization dedicated to pursuing gun safety. On February 14th, 2018, Jaime Guttenberg was murdered at Marjory Stoneman Douglas High School in Parkland, Florida. Following her murder and the loss of 16 others, Fred Guttenberg started Orange Ribbons for Gun Safety. The mission of Orange Ribbons for Gun Safety is to advocate for candidates, law, and policy supportive of a common sense approach

to reducing the gun violence death rate.  In addition to strongly supporting laws like the Marjory Stoneman Douglas High School Public Safety Act, Orange Ribbons For Gun Safety's mission includes working across the country to help protect laws that have been passed in the interest of public safety and to enact new laws that will bring down the gun violence death rate.

*Amicus curiae* March For Our Lives Action Fund ("MFOL") is a non-profit organization of young people from across the country who are fighting for sensible gun violence prevention policies that will save lives. After the mass shooting at Marjory Stoneman Douglas High School in Parkland, Florida, on February 14, 2018, MFOL was formed and immediately began advocating in the state legislature for the Marjory Stoneman Douglas High School Public Safety Act to ensure what happened there would never again occur in Florida. Weeks later, hundreds of thousands of people joined MFOL in Washington, D.C. and sibling marches all over the world for one of the largest single days of protest in history.[2] Since then, students seeking to effect change have formed hundreds of MFOL chapters across the country.  These young people have a vital interest in ensuring

---

[2]     "[T]he March for Our Lives event brought out 1,380,666 to 2,181,886 people at 763 locations."  Kanisha Bond et al., *Did You Attend the March for Our Lives? Here's What It Looked Like Nationwide*, WASH. POST (Apr. 13, 2018), https://www.washingtonpost.com/news/monkey-cage/wp/2018/04/13/did-you-attend-the-march-for-our-lives-heres-what-it-looked-like-nationwide/.

that the Constitution is interpreted to allow the enactment of gun violence prevention measures that will protect all Americans, in all communities.

## INTRODUCTION AND SUMMARY OF THE ARGUMENT[3]

On February 14, 2018, 19-year-old Nikolas Cruz used an AR-15 semi-automatic rifle to kill 14 students and three instructors at Marjory Stoneman Douglas High School in Parkland, Florida.[4]  He purchased the AR-15 *legally*.  It was one of "at least seven rifles" he purchased after turning 18 in September 2016.[5]  The massacre in Parkland was "one of the deadliest mass shootings in modern US history,"[6] which stole the futures of 17 innocent victims, forever changing the lives

---

[3]    No counsel for a party authored this brief in whole or in part.  No person other than *amici* or their counsel contributed money to fund this brief's preparation or submission.

[4]    Florida Senate, Bill Analysis and Fiscal Impact Statement of 7026 at 3 (Feb. 28, 2018) (Hereinafter "Florida Senate Bill Analysis of SB 7026"), *available at* https://www.flsenate.gov/Session/Bill/2018/7026/Analyses/2018s07026.ap.PDF; Laurel Wamsley et al., *17 People Died in the Parkland Shooting. Here Are Their Names*, NPR (Feb. 15, 2018), https://www.npr.org/sections/thetwo-way/2018/02/15/586095587/17-people-died-in-the-parkland-shooting-here-are-their-names.  Upon being enacted, SB 7026 became the Marjory Stoneman Douglas High School Public Safety Act.

[5]    Florida Senate Bill Analysis of SB 7026 at 4.

[6]    Joe Sterling, *After Deadly Shooting, Florida Governor Calls for Raising Minimum Age to Buy Guns*, CNN (Feb. 23, 2018, 6:41 PM), https://www.cnn.com/2018/02/23/us/florida-governor-reforms/index.html.

of their classmates, students, and families.  These are the 17 innocent victims shot to death that day:

- Alyssa Alhadeff (age 14);
- Scott Beigel (age 35);
- Martin Duque Anguiano (age 14);
- Nicholas Dworet (age 17);
- Aaron Feis (age 37);
- Jaime Guttenberg (age 14);
- Chris Hixon (age 49);
- Luke Hoyer (age 15);
- Cara Loughran (age 14);
- Gina Montalto (age 14);
- Joaquin Oliver (age 17);
- Alaina Petty (age 14);
- Meadow Pollack (age 18);
- Helena Ramsay (age 17);
- Alex Schachter (age 14);
- Carmen Schentrup (age 16); and
- Peter Wang (age 15).[7]

The Parkland tragedy ignited an unprecedented movement of young people—led by the students at Marjory Stoneman Douglas and others across the nation—who are calling on legislatures to enact sensible gun-safety measures.[8]  The Florida Legislature responded by sending Governor Rick Scott a bipartisan bill to "address the crisis of gun violence" in the state, with a particular focus on preventing

---

[7]      Wamsley, *supra* note 4.

[8]      Emily Witt, *How the Survivors of Parkland Began the Never Again Movement*, THE NEW YORKER (Feb. 19, 2018), https://www.newyorker.com/news/news-desk/how-the-survivors-of-parkland-began-the-never-again-movement.

"gun violence on school campuses."[9]  And on March 9, 2018, less than one month after the massacre, Governor Scott signed into law the Marjory Stoneman Douglas High School Public Safety Act (the "Act"), *see* FLA. STAT. § 790.065 (2018). Among several public safety provisions, the Act generally prohibits anyone under the age of 21 from purchasing a firearm.  FLA. STAT. § 790.065(13) (2018) ("Section 13").[10]

Governor Scott—a Republican and longtime defender of gun rights[11]— nevertheless recognized that Section 13 was one of several "common-sense solutions"[12] that would "dramatically improve school safety in hopes of never seeing another tragedy like [the Parkland shooting] again."[13]   The vast majority of

---

[9]     Florida Senate Bill Analysis of SB 7026 at 4.

[10]     This restriction has several exceptions, including for rifle or shotgun purchases by a "law enforcement officer," "correctional officer" or "servicemember."  FLA. STAT. § 790.065(13).

[11]     Michael Scherer, *Florida Gov. Rick Scott Breaks with NRA to Sign New Gun Regulations*, WASH. POST (Mar. 9, 2018), https://www.washingtonpost.com /powerpost/florida-gov-rick-scott-breaks-with-nra-to-sign-new-gun-regulation/2018/03/09/e5d1f02e-23b2-11e8-86f6-54bfff693d2b_story.html (noting that Governor Scott had "previously received an A-plus rating" from the National Rifle Association ("NRA")).

[12]     *Id.*

[13]     The Florida Channel, *3/9/18 Bill Signing of SB 7026 – Public Safety*, Statement of Governor Rick Scott, https://thefloridachannel.org/videos /3-9-18-bill-signing-sb-7026-public-safety/ (last visited Jan. 23, 2020).

Floridians agreed.  A Quinnipiac poll released in February 2018 found that 78% of Floridians—including 68% of Republicans—supported raising the minimum age for gun purchases to 21.[14]

Just a few hours after Governor Scott signed the Act into law, Plaintiffs filed this lawsuit.  (ECF No. 1.)  They contend that Section 13 prevents them from exercising rights conferred by the Second Amendment.  (ECF No. 54 ("Pls.' Am. Compl") ¶¶ 1-4.)  That objection ignores well-established Second Amendment doctrine, which has long permitted sensible firearm regulations like the Act so long as those regulations substantially relate to the state's interest in promoting public safety.  *See infra*.

The Act's restriction on 18-to-20-year-olds' ability to purchase firearms reflects the Florida Legislature's well-founded and data-driven solution to address a grave problem of gun violence.  *Amici* submit this brief to provide the Court with data demonstrating that young people aged 18-to-20 are at higher risk of using firearms to commit crime and attempt suicide, and are also disproportionately likely to be the victim of firearm-related violence.  Because their brains are still developing, minors tend to be more impulsive than adults, which makes them more

---

[14]     Quinnipiac University Poll, *Florida Voters Oppose Teachers with Guns, Quinnipiac University Poll Finds; Support for "Assault Weapon" Ban Almost 2-1*, at 7 (Feb. 28, 2018), https://poll.qu.edu/images/polling/fl/fl02282018_fqlv16.pdf/.

likely to use guns irresponsibly. This may explain why researchers have found a connection between similar age restrictions and a decline in firearm-related adolescent deaths. *See infra* Section II.A.4. In light of this data, the Florida Legislature crafted a well-calibrated solution that easily passes constitutional muster.

For these reasons, Section 13 of the Marjory Stoneman Douglas High School Public Safety Act comports with the Second Amendment.

## ARGUMENT

Like every federal Court of Appeals to consider the issue,[15] the Eleventh Circuit uses a two-step framework to analyze Second Amendment claims. First, a court must "ask if the restricted activity is protected by the Second Amendment in the first place." *GeorgiaCarry.Org, Inc.* v. *U.S. Army Corps of Eng'rs*, 788 F.3d 1318, 1322 (11th Cir. 2015) (quoting *GeorgiaCarry.Org, Inc.* v. *Georgia*, 687 F.3d 1244, 1260 n.34 (11th Cir. 2012)). "If the challenged regulation does not burden conduct within the scope of the Second Amendment as historically

---

[15]    *Gould* v. *Morgan*, 907 F.3d 659, 669 (1st Cir. 2018); *N.Y. State Rifle & Pistol Ass'n* v. *Cuomo*, 804 F.3d 242, 254 (2d Cir. 2015); *United States* v. *Marzzarella*, 614 F.3d 85, 89 (3d Cir. 2010); *United States* v. *Chester*, 628 F.3d 673, 680 (4th Cir. 2010); *Nat'l Rifle Ass'n of Am., Inc.* v. *Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 195 (5th Cir. 2012); *United States* v. *Greeno*, 679 F.3d 510, 518 (6th Cir. 2012); *Ezell* v. *City of Chicago*, 651 F.3d 684, 703-04 (7th Cir. 2011); *United States* v. *Chovan*, 735 F.3d 1127, 1136 (9th Cir. 2013); *United States* v. *Reese*, 627 F.3d 792, 800-01 (10th Cir. 2010); *Heller* v. *District of Columbia*, 670 F.3d 1244, 1252 (D.C. Cir. 2011) ("*Heller II*").

understood, then the law comports with the Second Amendment." *United States* v.

*Focia*, 869 F.3d 1269, 1285 (11th Cir. 2017).  Second, and only if it finds that the

law does impose such a burden, the court should "apply the appropriate level of

scrutiny." *Id.* (quoting *GeorgiaCarry.Org*, 687 F.3d at 1260 n.34).

Section 13 easily passes this test.  Defendants have correctly explained

that history and tradition show that state and federal governments have regulated 18-

to-20-year-olds' access to firearms since the founding of this nation.  (*See* ECF No.

73 (Defs.' Mot. to Dismiss) at 6-16.)[16]  Section 13 is therefore constitutional at the

---

[16]     Furthermore, it is well established that the legislature may draw minimum age limits for vatious activities. *See, e.g.*, U.S. CONST. art. I, § 2, cl. 2 ("No Person shall be a Representative who shall not have attained to the Age of twenty five Years . . . ."); *id.*, art. I, § 3, cl. 3 ("No Person shall be a Senator who shall not have attained to the Age of thirty Years . . . ."); *id.*, art. II, § 1, cl. 5 (no person shall be eligible for the office of President "who shall not have attained to the Age of thirty five Years"); *see also* FLA. STAT. § 562.111(1) ("It is unlawful for any person under the age of 21 years . . .  to have in her or his possession alcoholic beverages."); *S. Dakota* v. *Dole*, 483 U.S. 203, 206 (1987) (upholding Congress's authority "to encourage uniformity in the States' drinking ages" as 21 years of age); *Gabree* v. *King*, 614 F.2d 1, 2 (1st Cir. 1980) (recognizing that "eighteen to twenty-one year olds have historically been denied full rights of adulthood while shouldering such burdens of citizenship as military service" and rejecting equal protection challenge to state law raising drinking age to 20); *United States* v. *Olson*, 473 F.2d 686, 687-88 (8th Cir. 1973) (upholding prior version of federal law setting 21 as the age for jury service after Congress amended law to lower minimum age for jury service to 18); Jacqueline Howard, *The US Officially Raises the Tobacco Buying Age to 21*, CNN (Dec. 27, 2019), https://www.cnn.com/2019/12/27/health/us-tobacco-age-21-trnd/index.html ("President Donald Trump signed the new minimum age into law . . . [T]he FDA noted on its website that 'it is now illegal for a retailer to sell any tobacco product -- including cigarettes, cigars and e-cigarettes -- to anyone under 21.'").

threshold inquiry, and the Court need not proceed further.  *Amici* do not repeat those arguments here.

Should the Court, perhaps out of an abundance of caution, proceed to step two, then at most, intermediate scrutiny applies because Section 13 does not substantially burden the core of the Second Amendment.  (*See* ECF No. 73 (Defs.' Mot. to Dismiss) at 16-19.)   Scientific data and the law's legislative history demonstrate that Section 13 easily survives such scrutiny:  Section 13's restrictions are more than substantially related to Florida's paramount interests in public safety.

## I.   AT MOST, SECTION 13 IS SUBJECT TO INTERMEDIATE SCRUTINY.

As the Supreme Court has explained, at its "core," the Second Amendment protects the "right of law-abiding, *responsible* citizens to *use* arms in defense of hearth and home."  *District of Columbia* v. *Heller*, 554 U.S. 570, 635 (2008) (emphasis added).   Unless a challenged restriction "implicate[s]" or "substantially burden[s]" that core right, courts "may apply intermediate scrutiny." *United States* v. *Focia*, 2015 WL 3672161, at *4 (M.D. Ala. June 12, 2015), *aff'd*, 869 F.3d 1269 (11th Cir. 2017) (quoting *Jackson* v. *City and Cty. of San Francisco*, 746 F.3d 953, 961 (9th Cir. 2014)); *see also Kolbe* v. *Hogan*, 849 F.3d 114, 138 (4th Cir. 2017).  Indeed, "there has been near unanimity in the post-*Heller* case law that, when considering regulations that fall within the scope of the Second Amendment, intermediate scrutiny is appropriate." *United States* v. *Torres*, 911 F.3d 1253, 1262

(9th Cir. 2019) (internal quotes omitted).[17]  This case is no exception: Section 13 is a common-sense measure that does not substantially burden the core Second Amendment right of responsible citizens to use arms in self-defense.

*First*, Section 13 applies for a limited duration to a limited group of people—minors under the age of 21—who historically have not fallen within the Second Amendment's core protections.  *See* ECF No. 73 (Defs.' Mot. to Dismiss) at 6-19; *see also Nat'l Rifle Ass'n*, 700 F.3d at 207 ("Any 18–to–20–year–old subject to the ban will soon grow up and out of its reach. . . . The temporary nature of the burden reduces its severity.").

---

[17]     *See Worman* v. *Healey*, 922 F.3d 26, 38 (1st Cir. 2019); *N.Y. State Rifle & Pistol Ass'n*, 804 F.3d at 260-61; *Drake* v. *Filko*, 724 F.3d 426, 435-36 (3d Cir. 2013); *Chester*, 628 F.3d at 682-83; *Nat'l Rifle Ass'n*, 700 F.3d at 207 (federal laws prohibiting FFLs from selling handguns to 18-to-20-year-olds "demand only an 'intermediate' level of scrutiny because they regulate commercial sales through an age qualification with temporary effect"); *Stimmel* v. *Sessions*, 879 F.3d 198, 206 (6th Cir. 2018) ("[A]pplying intermediate scrutiny in this context strikes an appropriate balance between affording Congress considerable flexibility in regulating gun safety while still requiring the government to justify its firearms restrictions."); *Kanter* v. *Barr*, 919 F.3d 437, 442 (7th Cir. 2019) ("We have consistently described step two [of the Second Amendment analysis] as 'akin to intermediate scrutiny' . . . ."); *Torres*, 911 F.3d at 1262; *Bonidy* v. *U.S. Postal Serv.*, 790 F.3d 1121, 1126 (10th Cir. 2015) ("Intermediate scrutiny makes sense in the Second Amendment context. . . . The risk inherent in firearms and other weapons distinguishes the Second Amendment right from other fundamental rights that have been held to be evaluated under a strict scrutiny test . . . ."); *Heller II*, 670 F.3d at 1256-58 (applying intermediate scrutiny and upholding prohibition on assault weapons).

*Second*, Section 13 is a commercial regulation on firearm sales—a type of restriction that *Heller* expressly recognized as presumptively valid.  554 U.S. at 626-27.  The law does not prohibit 18-to-20-year-olds from *possessing* firearms.  (*See* ECF No. 73 (Defs.' Mot. to Dismiss) at 15-16, 19.)  Furthermore, Section 13 has several exemptions, including for "a law enforcement officer or correctional officer . . . or a servicemember" to purchase a rifle or shotgun, despite being under 21.  FLA. STAT. § 790.065(13).  This is a far cry from a "blanket ban."  (Pls.' Am. Compl. ¶ 4.)

## II.   SOCIAL SCIENCE AND LEGISLATIVE HISTORY SHOW THAT SECTION 13 EASILY SURVIVES INTERMEDIATE SCRUTINY.

In the Second Amendment context, a court must uphold a law under intermediate scrutiny if it is "substantially related to an important governmental objective."  *GeorgiaCarry.Org, Inc.*, 788 F.3d at 1328 (quoting *Heller II*, 670 F.3d at 1258).  To "assess[] the fit between the challenged regulation and the government's asserted objective," courts may consider "empirical data" and legislative history.  *Id.*; *see Pena* v. *Lindley*, 898 F.3d 969, 979 (9th Cir. 2017).  Importantly, a court evaluating a law's constitutionality "must accord substantial deference to the predictive judgments of [the legislature]" and is "not at liberty to substitute [its] judgment for the reasonable conclusion of a legislative body."  *Turner Broad. Sys., Inc.* v. *F.C.C.*, 520 U.S. 180, 195, 212 (1997) (quoting *Turner Broad. Sys., Inc.* v. *F.C.C.*, 512 U.S. 622, 665 (1994)).

-12-

Here, neuroscience and social science show that 18-to-20-year-olds are at higher risk of violence due to their developing adolescent brains. Furthermore, the legislative history of the Act confirms that the Florida Legislature was motivated by the paramount governmental interest of ensuring public safety, including school safety. *Alford* v. *Walton County*, 2017 WL 8785115, at *7 (N.D. Fla. Nov. 22, 2017) ("It is well-settled that public safety is a significant interest."). Thus, the empirical evidence and the legislative history confirm that the Act's minimum-age provision is more than "substantially related" to the Legislature's public safety objective.

### A. Scientific Research Confirms That Section 13 Is a Data-Driven Solution to Promote Public Safety by Reducing Gun Violence.

Neuroscience and social science research confirm that 18-to-20-year-olds with easy access to firearms pose a substantial risk to themselves and others, and that the Legislature acted appropriately to craft a tailored solution to address that risk. The Fifth Circuit, Seventh Circuit, and a district court in the Fourth Circuit have relied on this research in rejecting challenges similar to the one here.[18] This Court should do the same.

---

[18] *See Nat'l Rifle Ass'n*, 700 F.3d at 210 n.21; *Horsley* v. *Trame*, 808 F.3d 1126, 1133 (7th Cir. 2015); *Hirschfeld*, 2019 WL 4923955 at *9.

    *1.     Eighteen-to-Twenty-Year-Old Minors Are Generally More Impulsive Than Older Cohorts.*

    The scientific literature is clear that the human brain does not finish developing until the mid-to-late twenties.[19]  The *last* part of the brain to mature is the prefrontal cortex, which is responsible for impulse control, judgment, and long-range planning.[20]  The prefrontal cortex matures well after the limbic system, which controls basic emotions like fear, anger, and pleasure.  This delay results in a period of reduced self-control and decision making in the late teens and early twenties.[21]  As a result, 18-to-20-year-olds are prone to take risks and deprioritize long-term

---

[19]    Adam Winkler et al., *There's a Simple Way to Reduce Gun Violence: Raise the Gun Age*, WASH. POST (Jan. 6, 2016), https://www.washingtonpost.com/posteverything/wp/2016/01/06/there-a-simple-way-to-fight-mass-shootings-raise-the-gun-age/?utm_term=.e8adc7e6c1da ("The scientific literature over the past two decades has demonstrated repeatedly that the brain does not fully mature until the mid-to-late 20s.").

[20]    *Id.*; *see also* Mariam Arain et al., *Maturation of the Adolescent Brain*, 9 NEUROPSYCHIATRIC DISEASE AND TREATMENT 449, 453, 456 (2013) ("Behavioral control requires a great involvement of cognitive and executive functions.  These functions are localized in the prefrontal cortex, which matures independent of puberty and continues to evolve up until 24 years of age.").

[21]    Arain, *supra* note 20, at 453 ("[S]tudies involv[ing] comparing a teen brain to an adult brain determined that adolescents' prefrontal cortices are used less often during interpersonal interactions and decision making than their adult counterparts . . . . Thus, an understanding of how the limbic system and the prefrontal cortex are used has provided a partial explanation for certain characteristics of adolescents and adolescent behaviors, such as quickness to anger, intense mood swings, and making decisions on the basis of 'gut' feelings.").

outcomes.  *See Nat'l Rifle Ass'n*, 700 F.3d at 210 n.21 ("[M]odern scientific research supports the commonsense notion that 18-to-20-year-olds tend to be more impulsive than young adults aged 21 and over."); *id.* (quoting submission from the American Medical Association: "The brain's frontal lobes are still structurally immature well into late adolescence, and the prefrontal cortex is 'one of the last brain regions to mature.'  This, in turn, means that 'response inhibition, emotional regulation, planning and organization . . . continue to develop between adolescence and young adulthood.'"); *Horsley*, 808 F.3d at 1133 ("The evidence now is strong that the brain does not cease to mature until the early 20s in those relevant parts that govern impulsivity, judgment, planning for the future, foresight of consequences, and other characteristics that make people morally culpable." (quoting Declaration of Ruben C. Gur, Ph.D., http://www.americanbar.org/content/dam/aba/publishing/ criminal_justice_section_newsletter/crimjust_juvjus_Gur_affidavit.authcheckdam. pdf)).

In addition, minors are uniquely prone to negative emotional states.[22] These  negative states are "frequent," and adolescents' responses to them "tend to

---

[22]     Leah H. Somerville et al., *A Time of Change: Behavioral and Neural Correlates of Adolescent Sensitivity to Appetitive and Aversive Environmental Cues*, 72 BRAIN AND COGNITION 124, 125 (2010).

be more intense, variable and subject to extremes relative to adults."[23]   Scientists have reasoned that "[f]eeling sad, depressed, or hopeless may be associated with the heightened rates of affective disorders, attempted and completed suicide, and addiction also observed during adolescence."[24]   Because their limbic systems have matured while their cerebral cortexes are still developing, minors are also more prone to act on aggressive negative emotions, *e.g.*, rage, when confronted by a stressful situation.[25]

Because their brains are still developing, 18-to-20-year-olds are at a higher risk of violence when they have unfettered access to firearms.  *See, e.g.*, Michael Dreyfuss et al., *Teens Impulsively React Rather Than Retreat from Threat*, 36 DEVELOPMENTAL NEUROSCIENCE 220, 220 (2014) ("Adolescents commit more crimes per capita than children or adults in the USA and in nearly all industrialized cultures.  Their proclivity toward . . . risk taking has been suggested to underlie the

---

[23]     *Id.* at 125.

[24]     *Id.*; *see also* Richard A. Friedman, *Why Are Young Americans Killing Themselves? Suicide is now their second-leading cause of death*, N.Y. TIMES (Jan. 6, 2020), https://www.nytimes.com/2020/01/06/opinion/suicide-young-people.html ?action=click&module=Opinion&pgtype=Homepage ("While young people are generally physically healthy, they are psychiatrically vulnerable. Three-quarters of all the mental illness that we see in adults has already occurred by age 25.").

[25]     Arain, *supra* note 20, at 458 ("The adolescent brain is structurally and functionally vulnerable to environmental stress.").

inflection in criminal activity observed during this time."). Indeed, educational institutions serving this age group—such as colleges and military academies, which arguably admit only the most responsible young adults—recognize this risk. *See, e.g.*, U.S. Military Academy Regulation 190-3 at § II.1-6(b)(1) ("No pistols or handguns may be registered or carried by anyone under the age of twenty-one (21) to include Cadets.") (on file with counsel); Matthew Miller et al., *Guns and Gun Threats at College*, 51 J. AM. COLL. HEALTH 57, 64 (2002) ("[O]ur findings also suggest that students who report having guns at college disproportionately engage in behaviors that put themselves and others at risk for injury.").

> 2.   *Eighteen-to-Twenty-Year-Olds Are Disproportionately Likely to Commit Violent Crimes, Including Homicide, by Firearm.*

Eighteen-to-twenty-year-olds account for a disproportionate share of violent crimes and homicides—both as victims and as perpetrators. The statistics are stark:

- Arrests for homicide, rape, and robbery are highest among 18-to-20-year-olds.[26]

---

[26]   U.S. Department of Justice, *Crime in the United States*, Arrests, by Age, 2017, at Table 38, https://ucr.fbi.gov/crime-in-the-u.s/2017/crime-in-the-u.s.-2017/topic-pages/tables/table-38.

- Though 18-to-20-year-olds make up under 5% of the population, they account for over 15% of homicide and manslaughter arrests.[27] Moreover, FBI data suggests that this age group accounts for 17% of known homicide offenders.[28]

- This general pattern has persisted over time. The following chart, showing homicide offending rate by age in 2009, vividly illustrates the disproportionate share of homicides committed by minors that year:[29]



---

[27]    *Id.*; U.S. Census Bureau, *Current Population Reports*, Population Projections of the United States by Age, Sex, Race, and Hispanic Origin: 1995 – 2050 at 76, *available at* https://www.census.gov/prod/1/pop/p25-1130/p251130.pdf.

[28]    Calculated using data from the FBI's Supplementary Homicide Reports and US Census Bureau. Uniform Crime Reporting Program: Supplementary Homicide Reports (SHR), Washington, DC: Department of Justice, Federal Bureau of Investigation; US Census Bureau Population Estimates.

[29]    Daniel W. Webster et al., *The Case for Gun Policy Reforms in America*, JOHNS HOPKINS CTR. FOR GUN POLICY & RESEARCH 1, 5 (2012), https://www.jhsph.edu/research/centers-and-institutes/johns-hopkins-center-for-gun-policy-and-research/publications/WhitePaper020514_CaseforGunPolicyReforms.pdf.

- "Firearm homicides and violent crimes disproportionately involve individuals under age 21, both as perpetrators and as victims."[30]

3.   *Eighteen-to-Twenty-Year-Olds Attempt Suicide at Disproportionately High Rates and Access to Firearms Increases the Likelihood and Lethality of Those Suicide Attempts.*

Suicide risk "increase[s] steeply during the first few years after" an individual's first contact with psychiatric services,[31] and many major psychiatric conditions first develop in adolescence.[32] Data from the Centers for Disease Control and Prevention show that suicide accounts for a higher percentage of deaths for 15-to-24-year-olds than for any other age group.[33] Indeed, suicide is the second-most

---

[30]   RAND Corporation, *The Science of Gun Policy: A Critical Synthesis of Research Evidence on the Effects of Gun Policies in the United States* 1, 145 (2018); *see also People* v. *Fields*, 24 N.E.3d 326, 344 (Ill. App. Ct. 2014) ("We also note that the 18-to-20-year-old age group is more likely to be directly interacting with and, thus, endangering juveniles under 18 years of age.").

[31]   Merete Nordentoft et al., *Absolute Risk of Suicide After First Hospital Contact in Mental Disorder*, 68 ARCHIVES OF GENERAL PSYCHIATRY 1058, 1061 (2011).

[32]   *See* Tomáš Paus et al., *Why Do Many Psychiatric Disorders Emerge During Adolescence?*, 9 NATURE REVIEWS NEUROSCIENCE 947, 952 (2008) ("Anxiety disorders, bipolar disorder, depression, eating disorder, psychosis (including schizophrenia) and substance abuse all most commonly emerge during adolescence."); *Mental Health Disorder Statistics*, JOHNS HOPKINS MEDICINE, https://www.hopkinsmedicine.org/health/  wellness-and-prevention/mental-health-disorder-statistics (explaining that schizophrenia typically "first appears in men during their late teens or early twenties") (last visited Jan. 23, 2020).

[33]   Centers for Disease Control and Prevention, Web-based Injury Statistics Query and Reporting System (WISQARS), Leading Cause of Death Reports, https://webappa.cdc.gov/sasweb/ncipc/leadcause.html.

common cause of death among 18-to-20-year-olds.[34]

"Access to firearms is a key risk factor for suicide"[35] because firearm suicide is the method with the highest fatality rate:  85% of Americans who attempt suicide with a firearm die from the attempt.[36]  By contrast, only 4% of suicide attempts by other means are fatal.[37]  Because most do not keep attempting suicide— more than 90% of people who survive a suicide attempt do not later die by suicide[38]—the involvement of a firearm in a minor's or other person's suicide attempt is a dispositive factor in whether the person dies or recovers.

Eighteen-to-twenty-year-olds are particularly at risk for suicides involving long guns.  Of suicides where the firearm type is known, most adults are

---

[34]   *Id.*

[35]   American Public Health Association, *Reducing Suicides by Firearms* (2018), https://www.apha.org/policies-and-advocacy/public-health-policy-statements/policy-database/2019/01/28/reducing-suicides-by-firearms.

[36]   Matthew Miller et al., *Suicide Mortality in the United States: The Importance of Attending to Method in Understanding Population-Level Disparities in the Burden of Suicide*, 33 ANN. REV. PUB. HEALTH 393, 397 (2012).

[37]   *Id.*  In 2001, there were 333,765 non-firearm suicide attempts and 13,753 fatalities.  *Id.*

[38]   *Id.* at 402-03.

twice as likely to die by handgun suicide as they are by long gun suicide.[39]  But 18-to-20-year-olds are much more likely to die by *long gun* suicides than other groups, likely at least in part because, in other states and in Florida prior to the effective date of the Act, they have had easier access to long guns compared to handguns.[40]  A recent study found that, while handguns are used in most suicides, long gun use is relatively higher among adolescents compared with adults.[41]  In fact, 18- and 19-year-olds are the only groups more likely to die by long gun suicide than handgun suicide.[42]  Long guns pose a unique risk to the 18-to-20-year-old age group.  The Act's age restriction addresses this risk.

> 4.     *State-Level Gun Control Measures, Including Age Restrictions, Are Effective.*

Studies also show that Section 13 is substantially related to Florida's safety objectives.  *See GeorgiaCarry.Org, Inc.*, 788 F.3d at 1328 (quoting *Heller II*,

---

[39]     Thomas J. Hanlon et al., *Type of Firearm Used in Suicides: Findings from 13 States in the National Violent Death Reporting System*, 2005–2015, 65 J. ADOLESCENT HEALTH 366, 367 (2019).

[40]     *See infra* Section II.B. (discussing federal restrictions on 18-20-year-olds' ability to purchase handguns, but not long guns).

[41]     *Id.*

[42]     Centers for Disease Control and Prevention, Wide-ranging Online Data for Epidemiologic Research (WONDER), https://wonder.cdc.gov/controller/datarequest?stage=search&action=current.

670 F.3d at 1258).  Studies have found a connection between age restrictions such as Section 13's and a decline in firearm-related adolescent deaths, especially suicides and unintentional shootings.  For instance, an August 2004 study found that state laws raising the minimum legal age to purchase a handgun to 21 were associated with a nine percent decline in firearm suicide rates among 18-to-20-year-olds.[43]  A survey of convicted gun offenders in 13 states also found that 17% of the offenders would have been prohibited from obtaining firearms at the time of the crime if the minimum legal age in that state had been 21 years, a finding that, according to the authors, "underscore[d] the importance of minimum-age restrictions."[44]

State gun control measures more generally have also proven effective in reducing gun violence among young people, including in the 18-to-20-year-old range.  An August 2019 study examined the 21,241 firearm-related deaths among U.S. children from 2011 to 2015.  Eighteen-to-21-year-olds made up more than half of these deaths (68.7%).  But state laws make a difference: the study found that every 10-point increase in a score measuring the strictness of a state's gun control laws "decreases the firearm-related mortality rate in children by 4%" in its fully adjusted

---

[43]     Daniel W. Webster et al., *Association between Youth-Focused Firearm Laws and Youth Suicides*, 292 JAMA 594, 598 (2004).

[44]     Katherine A. Vittes et al., *Legal Status and Source of Offenders' Firearms in States with the Least Stringent Criteria for Gun Ownership*, 19 INJURY PREVENTION 26, 29-30 (2013).

model.[45]  Another study published in August 2019 examined states using the same gun-law scores and found that the quartile of states with the strictest laws "have an annual pediatric firearm mortality rate of 2.563 per 100,000 [children aged 0-to-19-years-old] compared with states in the lowest quartile [with the least strict laws], where the mortality rate is almost twice as high at 5.005 per 100,000."[46]

Finally, research demonstrates that most mass shooters obtain their weapons lawfully.  In a report examining active shootings from 2000 to 2013, the FBI concluded that "only very small percentages [of shooters] obtain[ed] a firearm illegally,"[47] indicating that these perpetrators are seeking easy access to weapons and are not necessarily sophisticated participants in the firearms black market. Lawmakers therefore can, and should, assume that restricting access to long guns will deter criminal use of long guns—precisely the type of reasonable assumption

---

[45]     Monika K. Goyal et al., *State Gun Laws and Pediatric Firearm-Related Mortality*, 144 PEDIATRICS No. 2, at 3 & tbl. 1 (2019).

[46]     Sriraman Madhavan et al., *Firearm Legislation Stringency and Firearm-Related Fatalities Among Children in the US*, 229 J. AM. COLLEGE SURGEONS 150, 152 (2019).

[47]     U.S. Dep't of Justice, Federal Bureau of Investigation, *A Study of the Pre-Attack Behaviors of Active Shooters in the United States Between 2000 and 2013*, at 7 (June 2018), https://www.fbi.gov/file-repository/pre-attack-behaviors-of-active-shooters-in-us-2000-2013.pdf/view.

that underlies virtually all laws aimed at regulating dangerous products.[48]   *Accord,*

*e.g.*, *Nat'l Paint & Coatings Ass'n* v. *City of Chicago*, 45 F.3d 1124, 1128-29 (7th

Cir. 1995) ("Legislatures often enact laws that reduce but cannot eliminate the

effects of movements across municipal and state borders.").

**B.      Legislative History Demonstrates That Section 13 Is a Commonsense and Evidence-Based Response to a Grave Public Safety Risk.**

Section 13's legislative history shows that the Florida Legislature

sought to address the public safety risk of 18-to-20-year-olds purchasing firearms.

Courts routinely consult legislative history to determine whether a challenged

regulation survives intermediate scrutiny.  *See, e.g.*, *Craig* v. *Boren*, 429 U.S. 190,

197, 200 n.7 (1976) (applying intermediate scrutiny and noting that "statutory

history materials" would have helped the Court to determine the government

objectives served by the challenged law); *Jackson*, 746 F.3d at 968-69 (reviewing

"legislative history" to "define the governmental interest" and "determine whether

it is substantial"); *United States* v. *Chapman*, 666 F.3d 220, 226 (4th Cir. 2012)

(finding, while applying intermediate scrutiny, that "the government identifies

---

[48]      Indeed, the Florida Legislature considered the fact that the weapon employed against students and teachers at Marjory Stoneman Douglas High School was one of many that Cruz had purchased legally since turning 18.  Florida Senate Bill Analysis of SB 7026 at 4 ("[T]he Parkland shooter began *legally* buying firearms, including the one used during the Valentine's Day shooting, on or around his eighteenth birthday.") (emphasis added).

reducing domestic gun violence as the substantial governmental objective of [the challenged law].  [The challenged law]'s legislative history is fully consistent with this position.").

In enacting Section 13, the Florida Legislature was careful to strike a constitutional balance.[49]  It noted that "there is a need to comprehensively address the crisis of gun violence, including, but not limited to, gun violence on school campuses," and that the Act would achieve this end by "provid[ing] law enforcement, the courts, and schools with the tools to enhance public safety."[50]

In particular, as discussed above, a large body of neuroscience and social science research supports the Legislature's conclusion that Section 13 would promote "public safety."  *See supra* Section II.A.  As the Legislature noted, federal law *already* prohibits Federal Firearm Licensees ("FFLs") from selling handguns to a person less than 21 years of age.[51]  And as to the two respects in which the Act supplements federal law—(i) prohibiting 18-to-20-year-olds from purchasing all

---

[49]     In fact, the Florida Legislature expressly considered the two-step framework when it crafted and debated Section 13, highlighting that "overbroad prohibitions on gun possession have been struck down, but more narrowly tailored restrictions . . . have been upheld."  *See* Florida Senate Bill Analysis of SB 7026 at 3.

[50]     *Id.* at 1, 4.

[51]     *Id.* at 12; *see* 18 U.S.C. § 922(b)(1).  Notably, this restriction was recently upheld in the face of a similar challenge.  *Hirschfeld*, 2019 WL 4923955 at *1.

firearms (not just handguns) and (ii) prohibiting purchases from anyone (not just federal firearms licensees, or "FFLs")—the Florida Legislature amply justified the substantial connection to public safety.

*First*, the Florida Legislature noted that Parkland shooter Cruz was 19 years old, and that he "used an AR-15 semi-automatic rifle during the shooting spree, the same type of firearm used during the Sandy Hook shooting and the Pulse Nightclub shooting in Orlando that left 49 dead and 53 injured on June 12, 2016."[52] Moreover, the Legislature emphasized that Cruz "began *legally* buying firearms, including the one used [at Parkland], on or around his eighteenth birthday" and that "he had collected at least seven rifles [since] that time."[53]  In light of long guns' role in recent mass shootings, including when the shooters were 18-to-20-year-olds, the Florida Legislature determined (correctly) that prohibiting both handgun and long gun purchases by individuals in that age group was a justifiable means to promote public safety.

*Second*, as to the Act's prohibition on purchasing firearms from *anyone* (not just FFLs), the Florida Legislature explained the unique risks associated with firearm purchase from private sellers.  While an FFL "is licensed by the Federal

---

[52]   Florida Senate Bill Analysis of SB 7026 at 3.

[53]   *Id.* at 4 (emphasis added).

Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) to sell or transfer a firearm," "[a] private citizen does not necessarily have to follow the processes required of FFLs."[54]  The Florida Legislature further explained that, while "[an] FFL must have [Florida Department of Law Enforcement] conduct a background check for all firearm purchases and deliveries and wait 3 days between the purchase and delivery of [the firearm,] a person conducting a private transaction is not subject [to] these requirements."[55]  Firearm purchases from private, unlicensed sellers raise unique public safety risks compared with purchases from FFLs.

Together with the neuroscience and social science summarized above, the legislative history confirms that the Act's minimum-age provision is more than "substantially related" to the "important governmental objective" of public safety. *GeorgiaCarry.Org, Inc.*, 788 F.3d at 1328 (quoting *Heller II*, 670 F.3d at 1258).

## **CONCLUSION**

One week after the tragic shooting at Marjory Stoneman Douglas High School, Governor Scott committed to take action to address mass shootings, including by raising the minimum age to purchase a firearm.[56]  His message was

---

[54]     *Id.* at 6.

[55]     *Id.* at 6-7.

[56]     Sterling, *supra* note 6.

simple: "We must take care of our kids."[57]   That imperative has been echoed by thousands of students and citizens across the country who have asked their leaders to enact commonsense measures, like Section 13, which enjoy broad public support and have extraordinary potential to save lives.  Plaintiffs, in contrast, ask this Court to step in and strip legislatures of their power to respond.  Nothing in the Second Amendment requires that result.  As Judge Wilkinson, speaking for the Fourth Circuit, said:  "This is serious business.  We do not wish to be even minutely responsible for some unspeakably tragic act of mayhem because in the peace of our judicial chambers we miscalculated as to Second Amendment rights."[58]

<p style="text-align:center">*   *   *</p>

Section 13 of the Marjory Stoneman Douglas High School Public Safety Act is a bipartisan, commonsense, calibrated, and data-driven solution with enormous potential to save lives that does not substantially burden Second Amendment rights.

---

[57]    *Id.; see also Shooting Incident Graphs*, THE K-12 SCHOOL SHOOTING DATABASE, https://www.chds.us/ssdb/incidents-by-year/ (last visited Jan. 23, 2020) (recording 368 shootings on school campuses from 2015-2019).

[58]    *United States* v. *Masciandaro*, 638 F.3d 458, 475 (4th Cir. 2011).

Dated: January 23, 2020

*Of Counsel for* Amicus Curiae *Giffords Law Center to Prevent Gun Violence:*

Hannah Shearer
Hannah Friedman
GIFFORDS LAW CENTER TO
PREVENT GUN VIOLENCE
268 Bush St. # 555
San Francisco, CA 94104
(415) 433-2062

Robert A. Sacks
Leonid Traps
Angela N. Ellis
Jackson Froliklong
Rachel H. VanGelder
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004-2498
(212) 558-4000

*Of Counsel for* Amici Curiae *Brady* and *Team ENOUGH:*

Jonathan Lowy
Kelly Sampson
BRADY
840 First Street, NE, Suite 400
Washington, DC 20002
(202) 289-7319

Respectfully submitted,

/s/ *J. Adam Skaggs*
J. Adam Skaggs
NYS Bar No. 4211173
GIFFORDS LAW CENTER TO
PREVENT GUN VIOLENCE
223 West 38th St. # 90
New York, NY 10018
(917) 680-3473
askaggs@giffords.org

*Counsel for* Amici Curiae *Giffords Law Center to Prevent Gun Violence, Brady, Team ENOUGH, Orange Ribbons for Gun Safety, and March For Our Lives Action Fund*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 23, 2020, I electronically filed the foregoing with the Clerk of the Court using the Court's CM/ECF filing system, which will send notification of electronic filing (NEF) to all counsel of record.

<div style="margin-left: 50%;">

<u>/s/ *J. Adam Skaggs*</u>
J. Adam Skaggs
NYS Bar No. 4211173
GIFFORDS LAW CENTER TO
PREVENT GUN VIOLENCE
223 West 38th St. # 90
New York, NY 10018
(917) 680-3473
askaggs@giffords.org

*Counsel for* Amici Curiae *Giffords Law Center to Prevent Gun Violence, Brady, Team ENOUGH, Orange Ribbons for Gun Safety, and March For Our Lives Action Fund*

</div>

## <u>CERTIFICATE OF COMPLIANCE</u>

I certify that the foregoing brief of *Amici Curiae* Giffords Law Center

to Prevent Gun Violence, Brady, Team ENOUGH, Orange Ribbons for Gun Safety,

and March For Our Lives Action Fund contains 6670 words.

/s/ *J. Adam Skaggs*
J. Adam Skaggs
NYS Bar No. 4211173
GIFFORDS LAW CENTER TO
PREVENT GUN VIOLENCE
223 West 38th St. # 90
New York, NY 10018
(917) 680-3473
askaggs@giffords.org

*Counsel for* Amici Curiae *Giffords Law Center to Prevent Gun Violence, Brady, Team ENOUGH, Orange Ribbons for Gun Safety, and March For Our Lives Action Fund*