NATIONAL RIFLE ASSOCIATION
OF AMERICA, Inc., *et al.*,

    *Plaintiffs*,

    v.                    Case No. 4:18-CV-137-MW-MAF

RICK SWEARINGEN, in his official
capacity as Commissioner of the Florida
Department of Law Enforcement,

    *Defendant*.

_____/

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND INCORPORATED MEMORANDUM OF LAW

## MOTION FOR SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56, Defendant moves for summary judgment as to each claim in Plaintiffs' Second Amended Complaint (DE54). For the reasons discussed below, Defendant is entitled to judgment as a matter of law on Count 1—Plaintiffs' facial Second Amendment claim—and on Count 2—Plaintiffs' facial Equal Protection claim.

## MEMORANDUM OF LAW

### INTRODUCTION

On February 14, 2018, a 19-year-old used a lawfully purchased firearm to kill 17 students and faculty members, and to injure many others, at Marjory

Stoneman Douglas High School in Parkland, Florida. Responding to that and other incidents of gun violence, the Florida Legislature enacted the Marjory Stoneman Douglas High School Public Safety Act, which, among other things, prohibits the purchase of firearms by persons under the age of 21. *See* Fla. Stat. § 790.065(13).

The Court should grant Defendant judgment on both of Plaintiffs' claims. Florida does not prohibit 18-to-20-year-olds from *possessing* firearms, and they may *purchase* firearms themselves once they reach 21. The types of sources on which the Supreme Court relied in *Heller* establish that this age qualification is consistent with the historical understanding of the Second Amendment. Even if the Court were to conclude that Florida's age qualification burdens conduct protected by the Second Amendment, at most, intermediate scrutiny applies. In light of the important governmental objective at stake, and the undisputed scientific evidence establishing a reasonable fit between the carefully targeted age qualification and that objective, the statute satisfies intermediate scrutiny.

Plaintiffs' Equal Protection claim also fails as a matter of law. It is hornbook law that age-based classifications such as Florida's age qualification are subject only to rational-basis review, and for the same reasons the statute passes intermediate scrutiny, it passes rational-basis review.

# BACKGROUND

The original complaint filed by the National Rifle Association of America, Inc. ("NRA") alleged that Florida's age qualification violates the Second Amendment and Equal Protection Clause of the United States Constitution on both facial and as-applied bases. DE1. The operative complaint (the Second Amended Complaint (DE54)) added a new plaintiff, Radford Fant, and dropped the as-applied claims. Plaintiffs now claim only that Section 790.065(13) is facially unconstitutional under both the Second Amendment and the Equal Protection Clause of the U.S. Constitution. DE54 ¶¶ 25-33.

The full text of Section 790.065(13) provides that:

> A person younger than 21 years of age may not purchase a firearm. The sale or transfer of a firearm to a person younger than 21 years of age may not be made or facilitated by a licensed importer, licensed manufacturer, or licensed dealer. A person who violates this subsection commits a felony of the third degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084. The prohibitions of this subsection do not apply to the purchase of a rifle or shotgun by a law enforcement officer or correctional officer, as those terms are defined in s. 943.10(1), (2), (3), (6), (7), (8), or (9), or a servicemember as defined in s. 250.01.

In enacting this age qualification, the Legislature expressly found "a need to comprehensively address the crisis of gun violence, including but not limited to, gun violence on school campuses." Ch. 2018-3, § 2, Laws of Fla.

**LEGAL STANDARD**

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" only if the record establishes that a reasonable fact-finder could find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And facts are "material" only if they might affect the outcome of the case under the governing substantive law. *Id.*

**ARGUMENT**

This is not the first case challenging an age-based restriction on the purchase, possession, or use of firearms. Other courts have considered similar claims, and they have consistently held that such age qualifications are constitutionally valid. *See*, *e.g.*, *Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 188 (5th Cir. 2012) ("*BATFE*"); *National Rifle Ass'n of America, Inc. v. McCraw*, 719 F.3d 338, 347 (5th Cir. 2013) (upholding state law prohibiting those under 21 from carrying handguns in public); *United States v. Rene E.*, 583 F.3d 8, 16 (1st Cir. 2009) (rejecting challenge to federal prohibition on handgun possession by minors after employing historical analysis); *Hirschfeld v. BATFE*, 417 F. Supp. 3d 747, 749 (W.D. Va. 2019) (rejecting facial challenge to same after canvassing similar evidence of historical understanding); *Powell v. Tompkins*, 926 F. Supp. 2d 367, 387-90 (D. Mass. 2013) *aff'd*, 783 F.3d 332 (1st

Cir. 2015) (upholding state 21-year-old age condition on firearm carry); *Illinois v. Mosley*, 33 N.E.3d 137, 155 (Ill. 2015) (same).

In *BATFE*, for example, the Fifth Circuit upheld a federal law prohibiting certain sales of handguns to "persons under the age of 21." 700 F.3d at 187. That regulation, the court found, is "consistent with a longstanding tradition of age- and safety-based restrictions on the ability to access arms." *Id.* at 203. The court explained that judicial and scholarly authorities have long recognized that "the State may prohibit the sale of arms to minors pursuant to the State's police power." *Id.* Importantly, "[t]he age of majority at common law was 21," and relatively recent *statutes* lowering that age for purposes *other* than gun purchases do not and cannot give minors under the age of 21 a *constitutional* right to purchase firearms. *Id.* at 199 n.11, 201, 204 n.17.

Finally, courts should exercise caution before second-guessing legislative policy judgments implicating public safety—particularly when, as here, such judgments are consistent with longstanding historical practice. As Congress recognized long before the modern spate of tragic mass shootings, including in our Nation's schools, "[t]he clandestine acquisition of firearms by juveniles and minors is a most serious problem facing law enforcement and the citizens of this country." *Id.* at 199. If the common-law age of majority should be changed in light of

evolving social science and contemporary needs, the Legislature is in a better position to draw that line than unelected and politically unaccountable courts.

For these reasons and those discussed below, the Court should grant Defendant's motion for summary judgment.

## I. FLA. STAT. § 790.065(13) DOES NOT VIOLATE THE SECOND AMENDMENT.

Like its sister circuits, the Eleventh Circuit "employ[s] a two-step inquiry when faced with Second Amendment challenges." *United States v. Focia*, 869 F.3d 1269, 1285 (11th Cir. 2017). First, the Court must "ask if the restricted activity is protected by the Second Amendment in the first place." *Id.* "If the challenged regulation does not burden conduct within the scope of the Second Amendment as historically understood, then the law comports with the Second Amendment." *Id.* "But if it does, then [the Court] must apply an appropriate form of means-end scrutiny." *Id.* Plaintiffs must show that the challenged law "is unconstitutional in all applications to prevail in their facial challenge." *GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244, 1260-61 (11th Cir. 2012) (citing *United States v. Salerno*, 481 U.S. 739 (1987)).

Section 790.065(13) does not burden conduct within the scope of the Second Amendment as historically understood and, even if it does, it survives the applicable level of scrutiny—intermediate scrutiny. At a minimum, Plaintiffs'

facial claims fail because the challenged age qualification is not unconstitutional in all applications.

### A. Fla. Stat. § 790.065(13) does not burden conduct protected by the Second Amendment as historically understood.

Plaintiffs' facial Second Amendment challenge fails at the first step of the analysis because the sale of firearms to minors—as 18-to-20-year-olds were at common law—is not protected by the Second Amendment.

> 1. *In assessing whether age-based restrictions burden conduct protected by the Second Amendment, courts have relied on early legislation, early courts and commentators, and more modern legislation.*

When the U.S. Supreme Court found unconstitutional the categorical ban on handguns in *District of Columbia v. Heller*, 554 U.S. 570 (2008), it disclaimed any intent to cast doubt on "laws imposing conditions and qualifications on the commercial sale of arms" or other "presumptively lawful regulatory measures." *Id.* at 626-27 & n.26. In addition, certain classes of individuals do not enjoy the same Second Amendment protections as others. *See id.* at 626 (declining to cast doubt on "longstanding prohibitions on the possession of firearms by felons and the mentally ill"). And the Second Amendment's core guarantee extends to "law-abiding, *responsible* citizens." *Id.* at 635 (emphasis added).

The Court measured the law at issue in *Heller* against "the historical understanding of the scope of the right." *Id.* at 625. To determine this historical

understanding, the Court examined framing-era dictionaries and other writings, and "how the Second Amendment was interpreted from immediately after its ratification through the end of the 19th century." *Id.* at 605. In particular, the Court examined early state constitutions and laws, early judicial decisions, and early commentary. *See generally id.* at 576-619, 626-29; *see also id.* at 595 (looking to both "text and history").

But the Court did not confine its inquiry to framing-era—or even 19th-century—sources. Instead, it looked to post-ratification sources through the post-Civil War period, *see id.* at 614-19, and it recognized as limitations on the Second Amendment's scope a non-exhaustive list of "longstanding" regulations of significantly more modern vintage. 554 U.S. at 626-27 & n.26; *see BATFE*, 700 F.3d at 196 ("*Heller* considered firearm possession bans on felons and the mentally ill to be longstanding, yet the current versions of these bans are of mid-20th century vintage."); *Fyock v. Sunnyvale*, 779 F.3d 991, 997 (9th Cir. 2015); *United States v. Skoien*, 614 F.3d 638, 640-41 (7th Cir. 2010) (en banc).

2.    *Applying this well-settled approach makes clear that the Second Amendment does not include a guarantee that those under 21 may purchase firearms.*

*Early Legislation.* During the 1800s and early 1900s, many states prohibited the sale or transfer of deadly weapons to minors. *See Rene E.*, 583 F.3d at 14. "[B]y the end of the 19th century, nineteen States and the District of Columbia had

enacted laws expressly restricting the ability of persons under 21 to purchase or use particular firearms, or restricting the ability of 'minors' to purchase or use particular firearms while the state age of majority was set at age 21." *BATFE*, 700 F.3d at 202 & n.14 (citing laws dating between 1856 and 1897). Often, these prohibitions expressly targeted handguns, *see Rene E.*, 583 F.3d at 14—which *Heller* dubbed "the quintessential self-defense weapon," 554 U.S. at 629—and some criminalized their "mere *possession*," *Rene E.*, 583 F.3d at 14.

Some of these laws extended further still. For example, Delaware prohibited "'knowingly sell[ing] a deadly weapon to a minor other than an ordinary pocket knife.'" *BATFE*, 700 F.3d at 202 (quoting *State v. Quail*, 92 A. 859, 859 (Del. 1914)); *Rene E.*, 583 F.3d at 14 (same); *see also* ch. 548, § 1, 1881, 16 Del. Laws 716, 716. By 1923, 23 jurisdictions had imposed restrictions on minors' access to deadly weapons. *BATFE*, 700 F.3d at 202. Importantly, 21 was the age of majority at the time these early statutes were enacted; it was not until the 1970s that states enacted legislation to lower the age of majority to 18. *BATFE*, 700 F.3d at 201, 204.

A more general tradition of regulations aimed at "particular groups for public safety reasons" and "disarming select groups for the sake of public safety" extends back to the Framing and even the colonial period. *BATFE*, 700 F.3d at

200; *see id.* at 201 (concluding that framing-era attitudes were consistent with firearm age restrictions); *Rene E.*, 583 F.3d at 15-16 (same).

It is no answer to say that these early regulations are "later authorities" that are less probative. DE93, at 15. Those laws have been in existence substantially longer than the restrictions characterized in *Heller* as "longstanding." 554 U.S. at 626. Moreover, framing-era sources—such as the Militia Clause of the Second Amendment and the Militia Act of 1792, 1 Stat. 271 (1792)—have little to say about the *purchase* of firearms by minors. Instead, they establish, at most, only that some 18-to-20-year-old males were able to bear arms in the highly regulated context of military service, which (particularly in light of *Heller*'s "decoupling" of the right to bear arms from militia service, *BATFE*, 700 F.3d at 204 n.17) does not shed light on their rights outside of that context. *See State v. Callicutt*, 69 Tenn. 714, 716-17 (Tenn. 1878).

What is more, those under 21 were not treated as full adults *even for purposes of militia service*. The Militia Act allowed states to exempt those under 21 from militia service. *See*, *e.g.*, 1 Stat. 271, § 1, Militia Act; *id.* at 272, § 2. For example, the Massachusetts Supreme Court held that "it is competent for the State legislature by law to exempt from enrolment in the militia, all persons under twenty-one." *In re Opinion of the Justices*, 39 Mass. 571, 576, 1838 WL 2804 at **4 (Mass. 1838); *see also United States v. Anderson*, 3 Tenn. 143 (C.C.D. Tenn.

1812) (No. 14,449) (granting parental habeas petition regarding son who joined military without parental consent when he was about "eighteen years of age").

In other words, at the time of the founding, 18-to-20-year-olds were not uniformly permitted to serve in the militia. *See Tompkins*, 926 F. Supp. 2d at 387 n.18 ("The minimum age for militia service varied wildly across the colonies and early states, ranging from as low as sixteen to as high as twenty-one." (collecting statutes)). Some legislatures established a minimum age of 21 that was lowered during times of exceptional need. *See* Ex. 2, DE106-2, at 2-5. Others, including Delaware, Georgia, Kansas, New Jersey, North Carolina, Ohio, and Pennsylvania, enrolled only those over 21 from the late 18th century through the mid-19th century. *See* Ex. 3, DE106-3, at 2-4. Some states required parental consent. *See* Ex. 4, DE106-4, at 2.

And when those under 21 did serve in militias, Congress and state legislatures frequently expected their parents to furnish them with firearms. Congress, for example, considered in 1790 whether the United States should provide firearms to those unable to obtain them. During that debate, Representative John Vining "asked by what means minors[1] were to provide themselves with the requisite articles?" 2 Annals of Cong. 1854-55 (Dec. 16, 1790), Ex. 5, DE106-5, at 2-3; Representative Jeremiah Wadsworth responded that "as to minors, their

---

[1] As explained above, during the framing era, those under 21 were considered "minors." *See BATFE*, 700 F.3d at 201, 204.

parents or guardians would prefer furnishing them with arms themselves." *Id.* at 1855-56, Ex. 5, DE106-5, at 3. Similarly, Massachusetts acknowledged in 1784 that minors "under the control of parents, masters or guardians" were not expected to keep their own firearms. *See United States v. Miller*, 307 U.S. 174, 180 (1939) (citing General Court of Massachusetts, January Session 1784 (Laws and Resolves 1784, c. 55, pp. 140, 142) ("[E]very non-commissioned officer and private soldier of the said militia not under the control of parents, masters or guardians, and being of sufficient ability therefor . . . shall equip himself, and be constantly provided with a good fire arm, &c."). In fact, many states, including Delaware, Massachusetts, New Hampshire, Vermont, North Carolina, Maine, and Missouri *required* parents to provide the firearms for their minor child's militia duty. *See* Ex. 6, DE106-6, at 2-5.

Thus, at the founding, 18-to-20-year-olds were not uniformly required or permitted to serve in militias, and when they did, the expectation was that they would obtain firearms from their parents or guardians. By contrast, Plaintiffs have not identified any evidence that 18-to-20-year-olds were required or even expected to *purchase* firearms for their militia service rather than obtain them from their parents.

*Early Courts and Commentators*. Early courts and commentators, including some that *Heller* relied upon, "maintained that age-based restrictions on the

purchase of firearms—including restrictions on the ability of persons under 21 to purchase firearms—comported with the Second Amendment." *BATFE*, 700 F.3d at 202-03; *see Powell*, 926 F. Supp. 2d at 388 ("Case law from jurisdictions across the country confirms that during the late nineteenth and early twentieth centuries, minors' capacity to purchase and own firearms was significantly curtailed."). For example, Thomas Cooley, a well-respected 19th-century judge and professor upon whose treatise *Heller* relied, *see* 554 U.S. at 616-17, "agreed that 'the State may prohibit the sale of arms to minors.'" *BATFE*, 700 F.3d at 203 (quoting Thomas M. Cooley, *Treatise on Constitutional Limitations* 740 n.4 (5th ed. 1883)).

Several early court decisions concurred with Cooley's assessment. In *Callicutt*, the Tennessee Supreme Court—whose understanding of the right to arms *Heller* repeatedly endorsed, *see* 554 U.S. at 603, 608, 613-14, 629—upheld a state law that criminalized the selling, giving, or loaning of pistols to minors. 69 Tenn. at 714-15. At the time, the age of majority was 21. *BATFE*, 700 F.3d at 203. The court explained that it did not "deem it necessary to do more than say that [it] regard[ed] the [challenged statute] not only constitutional as tending to prevent crime but wise and salutary in all its provisions." *Callicutt*, 69 Tenn. at 716-17.

Similarly, the Alabama Supreme Court—whose right-to-arms decisions *Heller* also approvingly cited, *see* 554 U.S. at 627, 629—upheld a conviction under a nearly identical state law. *See Coleman v. State*, 32 Ala. 581, 582-83 (1858). And

the Illinois Supreme Court held that a city ordinance effectively banning all minors from purchasing handguns was consistent with the Second Amendment and the Illinois Constitution's right-to-arms guarantee. *Biffer v. City of Chicago*, 116 N.E. 182, 184-85 (Ill. 1917).

It is true, but not persuasive, that in many states and for certain purposes, the age of majority *today* is 18. *See* DE93, at 15. For much of this country's history, states set the age of majority at 21,[2] and in many cases prohibited the purchase or possession of firearms by "minors" under that age, which is powerful evidence that the Second Amendment does not require that those under 21 be permitted to purchase firearms.

*Modern Legislation. Heller* also treated as relevant more modern regulations that bear enough resemblance to early regulations that they may be considered "longstanding." 554 U.S. at 626-27 & n.26; *see BATFE*, 700 F.3d at 196; *Fyock*, 779 F.3d at 997; *Skoien*, 614 F.3d at 641.

Current federal and state laws confirm that an age qualification for purchasing firearms—and a 21-year-old age qualification, in particular—is well-

---

[2] *E.g.*, *Walker v. Walker*, 17 Ala. 396, 396 (Ala. 1850); *Jones v. Wells*, 2 Houst. 209, 222 (Del. Super. Ct. 1860); *Womack v. Greenwood*, 6 Ga. 299, 301 (Ga. 1849); *Peters v. Jones*, 35 Iowa 512, 520 (Iowa 1872); *Burgett v. Barrick*, 25 Kan. 526, 527 (Kan. 1881); *Blackard v. Blackard*, 426 S.W.2d 471, 472 (Ky. 1968); *Fitz-Gerald v. Bailey*, 58 Miss. 658, 659 (Miss. 1881); *Crouch v. Crouch*, 187 S.E.2d 348, 349 (N.C. Ct. App. 1972); *Whitt v. Whitt*, 490 S.W.2d 159, 160 (Tenn. 1973); *Memphis Trust Co. v. Blessing,* 58 S.W. 115, 117 (Tenn. 1899); *Bullock v. Sprowls*, 54 S.W. 657, 659-60 (Tex. Civ. App. 1899); *Doe v. Archdiocese of Milwaukee*, 700 N.W.2d 180, 188 (Wis. 2005).

established. For example, federal law prohibits those under 21 from purchasing handguns from licensed dealers and—with narrow exceptions—prohibits those under 18 years of age from possessing them. *See* 18 U.S.C. § 922(b)(1); 18 U.S.C. § 922(x)(2), (3) (5). It also prohibits dealers from selling any firearm to those under the age of 18. 18 U.S.C. § 922(b)(1). Several states have gone further and established 21 as the minimum age (with narrow exceptions) for handgun or long-gun possession. *See* Haw. Rev. Stat. Ann. § 134-2(a), (d); 430 Ill. Comp. Stat. 65/2(a)(1), 65/4(a)(2)(i); D.C. Code Ann. §§ 7-2502.03, D.C. Mun. Regs. tit. 24, § 2301.1.

Moreover, in enacting permissive concealed-carry regimes, Florida, like most shall-issue states, requires licensees to be 21 years of age; few states allow concealed carry by those under 21. *See* § 790.06(2)(b), Fla. Stat.; Clayton E. Cramer & David B. Kopel, *"Shall Issue": The New Wave of Concealed Handgun Permit Laws*, 62 Tenn. L. Rev. 679, 688-706 (1995); Allen Rostrom, *The Second Amendment on Campus*, 14 Geo. J.L. & Pub. Pol'y 245, 259 n.101 (2016). This reflects a well-established view among the states that the Second Amendment permits laws that impose gun-related regulations on minors under the age of 21.

3. Heller*'s mode of historical analysis establishes that Florida's age qualification is constitutional.*

As the Court in *Heller* stressed, the Second Amendment does not prohibit certain "longstanding" regulations adopted to protect public safety, including "laws

imposing conditions and qualifications on the commercial sale of arms." *Heller*, 554 U.S. at 626-27. As a categorical matter, such regulations "comport with the Second Amendment because they affect individuals or conduct unprotected by the right to keep and bear arms." *Focia*, 869 F.3d at 1285-86. Thus, courts considering challenges to such regulations should not apply heightened judicial scrutiny. *See id.*; *accord Drake v. Filko*, 724 F.3d 426, 431 (3d Cir. 2013); *Fyock*, 779 F.3d at 996-97.

Florida's statute follows a long tradition of laws conditioning the purchase of firearms on the purchaser's having obtained the traditional age of majority—21. *See BATFE*, 700 F.3d at 201, 204. And Florida's statute does not prevent those between 18 and 20 from *possessing* firearms, but only from purchasing them. Fla. Stat. §§ 790.065(13), 790.22(3) (2018).

In this respect, Florida's age qualification is similar to the federal age restriction on commercial sales of handguns to those under 21. As the Senate Report for that restriction noted, "a minor or juvenile would not be restricted from owning, or learning the proper usage of [a] firearm, since any firearm which his parent or guardian desired him to have could be obtained for the minor or juvenile by the parent or guardian." S. Rep. No. 90-1097, at 50, Ex. 7, DE106-7, at 51. Thus, "[a]t the most," the restriction "could cause minor inconveniences to certain youngsters who are mature, law abiding, and responsible, by requiring that a parent

or guardian over 21 years of age make a handgun purchase for any person under 21." 114 Cong. Rec. 12279, 12309 (1968) (Sen. Dodd). And in an opinion letter, ATF has noted that the restrictions "prevent juveniles from acquiring firearms without their parents' or guardian's knowledge," and do not prevent them "from possessing, owning, or learning the proper usage of firearms." Ex. 8, DE106-8, at 3, 4.

The same is true here. Parents are free to give their 18-to-20-year-old children firearms, and those children are free to possess and use them.

\* \* \*

A careful review of the historical understanding of the Second Amendment, including the sources that *Heller* teaches courts to consider, demonstrates that Florida's age qualification for purchasing firearms does not burden Plaintiffs' Second Amendment rights. At bottom, Plaintiffs appear to argue that various *statutes* changing, for certain specified purposes, the age of majority to 21—which were enacted in the 1970s—somehow changed the *constitutional* scope of the Second Amendment. That approach to the Second Amendment is inconsistent with the historical approach of the *Heller* Court, finds no support in law or logic, and should be rejected. Section 790.065(13) is facially constitutional.

4.    Heller *also establishes that Florida's age qualification is not facially unconstitutional.*

"[T]o prevail in their facial challenge," Plaintiffs must show that Section 790.065(13) "is unconstitutional in all applications." *GeorgiaCarry.Org*, 687 F.3d at 1260-61 (citing *Salerno*, 481 U.S. 739). Even if 18-to-20-year-olds possessed the same Second Amendment rights as adults, the Second Amendment protects only the "keep[ing]" and "bear[ing]" of arms. Keeping arms means "to have weapons." *Heller*, 554 U.S. at 582. And bearing arms means "the carrying of weapons." *Id.* 585. Because a restriction on sale does not prohibit either having weapons or carrying them, Plaintiffs' theory must be that the challenged law indirectly burdens either the having or carrying of weapons. But this question is necessarily fact-specific, and so Plaintiffs cannot prevail in their facial challenge.

For example, Plaintiffs cannot dispute that many between 18 and 20 have other lawful means of obtaining access to firearms. In other words, because the statute places an age qualification only on *purchasing* a firearm, in many instances an 18-to-20-year-old will be able to exercise the core Second Amendment right to self-defense by possessing firearms obtained through other legal means, such as from their parents. Even if an age qualification for purchase burdened conduct protected by the Second Amendment, therefore, the extent to which a particular 18-to-20-year-old's Second Amendment right was burdened would vary widely

depending on whether they already own firearms or are able to possess or obtain them. Thus, even if the Court held that Florida's age qualification may burden *some* conduct protected by the Second Amendment, Plaintiffs cannot establish that it is unconstitutional in *all* applications, as circuit precedent demands.

**B.     Even if Fla. Stat. § 790.065(13) burdens conduct protected by the Second Amendment, the statute satisfies the applicable standard of review.**

Even if the Court concludes that Florida's age restriction "substantially burden[s]" conduct protected by the Second Amendment in every application, the Court must "apply an appropriate form of means-end scrutiny." *Focia*, 869 F.3d at 1286. Courts considering similar challenges have concluded that, at most, intermediate scrutiny applies to the kind of law at issue here, and Section 790.065(13) survives intermediate scrutiny.

1.     *Intermediate scrutiny applies.*

Because the Eleventh Circuit has upheld every firearm regulation it has considered on the ground that the law does not burden conduct protected by the Second Amendment, the court has not determined what level of means-end scrutiny applies to a law of this kind. *See*, *e.g.*, *GeorgiaCarry.Org, Inc. v. U.S. Army Corps of Engineers*, 788 F.3d 1318, 1328 (11th Cir. 2015). But "the prevailing view" among the courts of appeals is "that the appropriate level of scrutiny 'depends on the nature of the conduct being regulated and the degree to

which the challenged law burdens the right.'" *BATFE*, 700 F.3d at 205 (quoting *United States v. Chester*, 628 F.3d 673, 682 (4th Cir. 2010)).[3]

Accordingly, the courts of appeals have held that "[a] regulation that threatens a right at the core of the Second Amendment—for example, the right of a law-abiding, responsible *adult* to possess and use a handgun to defend his or her home and family—triggers strict scrutiny." *BATFE*, 700 F.3d at 195 (emphasis added). "A less severe regulation—a regulation that does not encroach on the core of the Second Amendment—requires a less demanding means-ends showing." *Id.* And several circuits have held that, at most, intermediate scrutiny applies to regulations that, like Section 790.065(13), "impos[e] conditions and qualifications on the commercial sale of arms," *Heller*, 554 U.S. at 626-27 & n.26 (emphasis added); *see BATFE*, 700 F.3d at 206; *McCraw*, 719 F.3d at 348; *Horsley v. Trame*, 808 F.3d 1126, 1134 (7th Cir. 2015).

In *BATFE*, the Fifth Circuit considered, in the alternative, whether the federal prohibition on most handgun sales to those under 21 survived the second step of the analysis. The court concluded that such "laws trigger nothing more than 'intermediate scrutiny,'" *BATFE*, 700 F.3d at 205, because they do not "substantial[ly] burden" core rights protected by the Second Amendment, *id.* at

---

[3] *See also Heller v. D.C.*, 670 F.3d 1244, 1257 (D.C. Cir. 2011); *United States v. Masciandaro,* 638 F.3d 458, 470 (quoting *Chester*, 628 F.3d at 682); *United States v. Marzzarella*, 614 F.3d 85, 96 (3d Cir. 2010).

195. Although the regulations at issue were narrower than Florida's age qualification provision, the Fifth Circuit's reasoning applies here.

*First*, like the federal regulations at issue there, Section 790.065(13) establishes an age qualification, not a prohibition. Courts have found that even "categorically restricting the presumptive Second Amendment rights of 18-to-20-year-olds does not violate the central concern of the Second Amendment." *BATFE*, 700 F.3d at 206. That is because "[t]he Second Amendment, at its core, protects 'law-abiding, *responsible*" citizens.'" *Id.* (quoting *Heller*, 554 U.S. at 635 (emphasis in original)). And Florida's age qualification requirement is merely a determination as to which citizens are "responsible." Such laws demand, at most, "an 'intermediate' level of scrutiny because they regulate commercial sales through an age qualification with temporary effect. Any 18-to-20-year-old subject to the ban will soon grow up and out of its reach," and "[t]he temporary nature of the burden reduces its severity." *BATFE*, 700 F.3d at 207. Moreover, the specific age Florida chose—21—is tailored to the common law age of majority. *See id.* at 201.

*Second*, like Congress, Florida did not "categorically" restrict whatever Second Amendment rights, if any, persons under the age of 21 may have. Florida expressly avoided "strik[ing] the core of the Second Amendment because [it] do[es] not prevent 18-to-20-year-olds from possessing and using handguns 'in

defense of hearth and home.'" *Id.* at 206 (citing *Heller*, 554 U.S. at 628-30); *see also Heller II,* 670 F.3d at 1255, 1258 (applying intermediate scrutiny to registration requirements that "make it considerably more difficult for a person lawfully to acquire and keep a firearm, including a handgun, for the purpose of self-defense in the home—the 'core lawful purpose' protected by the Second Amendment," but that did not "preven[t] an individual from possessing a firearm in his home or elsewhere, whether for self-defense or hunting, or any other lawful purpose" (quoting *Heller*, 554 U.S. at 630)). Instead, Florida followed the Supreme Court's guidance and imposed a "qualificatio[n] on the commercial *sale* of arms." *BATFE*, 700 F.3d at 206 (citing *Heller*, 554 U.S. at 626-27) (emphasis added).

Moreover, Plaintiffs bring only a *facial* challenge. In many instances, 18-to-20-year-olds will be able to obtain firearms through means other than purchase—e.g., a parental gift—meaning that those individuals' presumed right to bear arms has not been burdened *at all*. That the age qualification prohibits purchase, not possession, therefore counsels in favor of applying intermediate scrutiny in this facial challenge.

### 2. *Fla. Stat. § 790.065(13) satisfies intermediate scrutiny.*

In this context, the courts of appeals have held that intermediate scrutiny "requires the government to show a reasonable fit between the law and an important government objective." *BATFE*, 700 F.3d at 205; *see Heller II,* 670 F.3d

at 1262 (same); *Chester,* 628 F.3d at 683 (same). "'[T]he fit between the challenged regulation and the asserted objective [must] be reasonable, not perfect.'" *Marzzarella,* 614 F.3d at 98 (citing *Lorillard Tobacco Co. v. Reilly,* 533 U.S. 525, 556 (2001), and *Bd. of Trustees v. Fox,* 492 U.S. at 480, 481 (1989)).

        i.    Fla. Stat. § 790.065(13) serves an important government objective.

Florida's age qualification is intended to further "[t]he 'legitimate and compelling state interest' in protecting the community from crime." *Schall v. Martin,* 467 U.S. 253, 264 (1984). The Legislature's express purpose was to "comprehensively address the crisis of gun violence, including . . . on school campuses." S.B. 7026, § 2. The courts of appeals have repeatedly held that this interest satisfies intermediate scrutiny. *See*, *e.g.*, *Gould v. Morgan*, 907 F.3d 659, 673 (1st Cir. 2018) ("It cannot be gainsaid that [the state] has compelling governmental interests in both public safety and crime prevention."); *Horsley v. Trame*, 808 F.3d 1126, 1132 (7th Cir. 2015) ("It is clear that Illinois has an important and compelling interest in its citizens' safety."); *BATFE*, 700 F.3d at 209 ("[C]urbing violent crime perpetrated by young persons under 21—by preventing such persons from acquiring handguns from [federally licensed firearms dealers]— constitutes an important government objective."); *Heller*, 670 F.3d at 1258 (holding that the District of Columbia had "two important governmental interests"

supporting firearm regulation—"to protect police officers and to aid in crime control").

> ii. There is a "reasonable fit" between Fla. Stat. § 790.065(13) and Florida's interest in preventing gun violence and crime.

Florida's age qualification is a reasonable fit for addressing this important government objective. It is a temporary restriction, carefully targeted at preventing the unsupervised acquisition of firearms by those in a particularly high-risk group: those between 18 and 21.

Selecting those between 18 and 21 for differential treatment is "thoroughly justified from the perspective of neuroscience." Ex. 1, DE106-1, at 10. Three parts of the brain are relevant: The frontal cortex, the nucleus accumbens, and the amygdala. The frontal cortex is associated with cognitive control, which is "voluntary control over one's own actions exercised following a consideration of the long-term consequences of such actions." Ex. 1, DE106-1, at 12. Meanwhile, the nucleus accumbens and the amygdala are "associated with behaviors that are motivated by emotions, risk and reward," or "impulsive judgements." Ex. 1, DE106-1, at 20.

Between the ages of 18 to 21, a "developmental 'mismatch'" between the maturity of the frontal cortex and the maturity of the nucleus accumbens and the

amygdala exists.[4] Ex. 1, DE106-1, at 3. For example, "[i]n 18-year old adolescents the frontal cortex is yet to acquire its mature features whereas the nucleus accumbens and amygdala are overactive and immature"; the mismatch "fades away in adults, by 21 years of age." Ex. 1, DE106-1, at 3, 20. The result of this developmental mismatch is that the impulsive judgements that are driven by the nucleus accumbens and amygdala "are not easily 'reined in'" or subject to "cognitive control" by "the frontal cortex" in the average 18-year-old. Ex. 1, DE106-1, at 14.

In sum, modern neuroscience establishes what parents have known for generations, that "on average 18-year old individuals are more likely to engage in behaviors that are impulsive, emotional, risky and that offer immediate or short-time reward compared to 21-year old individuals, on average." Ex. 1, DE106-1, at 21. And "18-year old individuals are more likely to react impulsively under emotional situations and in situations that they perceive as threatening, compared to 21-year old adults." Ex. 1, DE106-1, at 21.

Empirical evidence bears out that because 18-to-20-year-olds are uniquely likely to engage in impulsive, emotional, and risky behaviors that offer immediate or short-term rewards, drawing the line for legal purchase of firearms at 21 is a

---

[4] Dr. Bhide defines "maturity of brain function as the ability of the individual to exercise control over his/her actions, suppress impulsive judgements, and exercise judgements that weigh the cost *versus* benefit of one's actions." Ex. 1, DE106-1, at 11.

reasonable method of addressing the Legislature's public safety concerns. Census data from 2018 shows that 18-to-20-year-olds represented only 3.8% of the population, while FBI data from 2018 indicates that 18-to-20-year-olds were responsible for 9.4% of all arrests for violent crimes.[5] Plaintiffs previously pointed to evidence that they contend "suggests violent crime among 18-to-20-year-old adults is low." DE93, at 25-26.[6] The relevant inquiry for the Legislature, however, was not whether the proportion of 18-to-20-year-old adults who commit crimes is "low" when measured in a vacuum; it was the level of violent crime among that cohort *as compared to other age groups*.

Years before the Legislature considered Section 790.065(13), the Fifth and Seventh Circuits considered the same age group and held that "[t]he goal of protecting public safety is supported by studies and data regarding persons under 21 and violent and gun crimes." *Horsley*, 808 F.3d at 1133 (affirming summary judgment); *BATFE*, 700 F.3d at 209-10 (same). As the Fifth Circuit explained regarding Congress's prohibiting federally licensed firearms dealers from selling handguns to those under 21:

---

[5] FBI, Table 38, Arrests by Age (2018), *available at* https://ucr.fbi.gov/crime-in-the-u.s/2018/crime-in-the-u.s.-2018/tables/table-38; U.S. Census Bureau, Table 1, Population by Age and Sex (2018), *available at* https://www.census.gov/data/tables/2018/demo/age-and-sex/2018-age-sex-composition.html.

[6] Notably, Plaintiffs' expert undercounts violent crime by this cohort because his definition of violent crime does not include rape (*see* DE93-1, at 3 n.1); the FBI data on which he relies categorizes rape as a violent crime and includes it in its violent crime figures.

The legislative record illustrates that Congress was concerned not only with "juveniles" under the age of 18, but also with "minors" under the age of 21. . . . Congress's investigation had shown that "juveniles account for some 49 percent of the arrests for serious crimes in the United States," while "minors account for 64 percent of the total arrests in this category." Specifically, "minors under the age of 21 years accounted for 35 percent of the arrests for the serious crimes of violence including murder, rape, robbery, and aggravated assault," and 21 percent of the arrests for murder.

*BATFE*, 700 F.3d at 207-08 (citations omitted). Although the government undertook this analysis in the late 1960s, the Fifth Circuit explained that the cause for concern had continued unabated: "Those aged 18-20 accounted for 22 percent of all arrest[s] for murder in 1997." *Id.* at 209 (citation omitted). And "[s]tudies show that one in four gun murders are committed by people aged 18 to 20." *Id.* (citation omitted).

The Seventh Circuit recounted the same data, and observed that "more recent data reflects similar trends":

An FBI analysis of crime in 2014 reflects that 18-to-20-year-olds were responsible for more than 15.8% of all charges issued for murder and nonnegligent manslaughter. When forcible rape, robbery, and aggravated assault are added, 18-to-20-year-olds account for about 11% of charges brought for violent crime. That is true even though that age group represented only about 4.1% of the country's total population and 5.4% of the population over the age of 14.

*Horsley*, 808 F.3d at 1133 (citations omitted).

Plaintiffs also previously argued that "long-guns are rarely used in crime." DE93, at 25-26. Yet they are frequently used in mass shootings and school

shootings, including the shooting that motivated the Legislature to enact the age qualification. Moreover, in light of the federal ban on those under 21 purchasing handguns from licensed dealers, would-be criminals or mass shooters might have no alternative but to use long guns. And Plaintiffs' pointing out that the age qualification does not require a "connection to school campuses" (DE93, at 22, 27, 29-30) blinks reality, as school shooters are not always current students at those schools: Nikolas Cruz, the suspect who legally purchased long guns at the age of 18 and who has been charged with the mass shooting at Marjory Stoneman Douglas High School, was 19 at the time, and had been banned from the school for disciplinary reasons.

Florida's age qualification is also a reasonable fit because it is a temporary restriction. "Any 18-to-20-year-old subject to the ban will soon grow up and out of its reach." *BATFE*, 700 F.3d at 207. And as explained above, brief though the restriction is, it is virtually certain to advance Florida's interest in preventing gun violence and crime.

Moreover, Florida's age qualification is reasonably calculated to advance the state's interest because it applies only to the *purchase* of firearms. Any law-abiding person over the age of 18 may gift, loan, or allow the use of a firearm to an otherwise qualified person over the age of 18, who may in turn keep and use that firearm for any lawful purpose, including home defense, hunting, sport, and

practice shooting. The sale-gift distinction is aimed at a uniquely dangerous problem—the purchase of firearms by 18-to-20-year-olds absent the judgment of a parent, guardian, or other law-abiding adult that the individual is prepared for the responsibility of gun ownership.

It is not persuasive to argue that the age qualification requires 18-to-20-year-olds to obtain firearms in "the unregulated sphere of loans and gifts." DE93, at 30. This argument ignores that firearms are expensive, and common sense suggests that most loans and gifts of firearms will come from family members or close friends, who will have a basis to judge whether the individual is prepared for firearm possession or ownership—unlike sellers, who are often strangers. And even without the age qualification, this age cohort *already* has the ability to obtain firearms via loan or gift. This tailoring also reflects the historical practice of states, which encouraged minors enrolled in the militia to obtain their firearms from their parents or guardians. Indeed, Congress relied on the same rationale in enacting the federal age restrictions.

Thus, because Florida's age qualification seeks to address an important government interest and is a reasonable fit for addressing that interest, it survives intermediate scrutiny and is facially constitutional. Even if the Court applies strict scrutiny, the challenged law is constitutional for substantially the same reasons.

## II.   PLAINTIFFS' EQUAL PROTECTION CLAIM FAILS AS A MATTER OF LAW.

The Court should also grant summary judgment for Defendants on Plaintiffs' claim under the Equal Protection Clause because Florida's age-based classification easily satisfies rational-basis review.

### A.   Rational-basis review applies to Plaintiffs' Equal Protection claim.

Plaintiffs argue that Florida's age qualification violates the Equal Protection Clause because it treats 18-to-20-year-olds differently from adults. Compl. ¶ 32. Rational-basis review applies to Plaintiffs' claim because "age is not a suspect classification under the Equal Protection Clause." *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 83 (2000). The Constitution permits legislatures to "draw lines on the basis of age when they have a rational basis for doing so at a class-based level." *Id.* at 86. Indeed, the Constitution expressly mandates certain distinctions based on age, *see*, *e.g.*, U.S. Const., art. I, § 2 ("No Person shall be a Representative who shall not have attained to the Age of twenty five Years"), reflecting the Framers' understanding that age may serve as a proxy for maturity and responsibility.

That Plaintiffs' claim involves the Second Amendment does not change the level of scrutiny. Where a statute does not violate the Second Amendment and does not involve a suspect classification, rational-basis review applies. *Mance v. Sessions*, 896 F.3d 699, 711 (5th Cir. 2018) (explaining that without suspect classification, Equal Protection claim in case involving Second Amendment right

was subject to rational-basis review); *see Nordyke v. King*, 681 F.3d 1041, 1043 n.2 (9th Cir. 2012) (en banc); *Hightower v. City of Boston*, 693 F.3d 61, 83 (1st Cir. 2012).

In ruling on Defendants' motion to dismiss, the Court rightly concluded that its "analysis of Plaintiffs' Equal Protection claims will be intertwined with its analysis of Plaintiffs' Second Amendment claims." DE94, at 7 (citing *Morrissey v. United States*, 871 F.3d 1260, 1268 (11th Cir. 2017)). As explained above, Florida's age qualification does not violate the Second Amendment and thereby "impermissibly interfer[e] with the exercise of a fundamental right," so strict scrutiny does not apply. *Morrissey*, 871 F.3d at 1268. And because no suspect class is implicated, rational-basis review applies. *Id.*

### B.    Section 790.065(13) easily passes rational-basis review.

Plaintiffs cannot meet their burden to establish that the Legislature's actions were irrational. "The rational basis test asks (1) whether the government has the power or authority to regulate the particular area in question, and (2) whether there is a rational relationship between the government's objective and the means it has chosen to achieve it. This standard is easily met." *Leib v. Hillsborough Cty. Pub. Transp. Comm'n*, 558 F.3d 1301, 1306 (11th Cir. 2009). In fact, "when conducting rational basis review," a court "will not overturn" legislation "unless the varying treatment of different groups or persons is so unrelated to the achievement of any

combination of legitimate purposes that [the court] can only conclude that the [government's] actions were irrational." *Kimel*, 528 U.S. at 84 (internal quotation marks omitted); *see McGowan v. Maryland*, 366 U.S. 420, 425-26 (1961) (explaining that the Equal Protection Clause "is offended only if the classification rests on grounds wholly irrelevant to the achievement of the State's objective").

And because age classifications are "presumptively rational," Plaintiffs "bea[r] the burden of proving that the facts on which the classification is apparently based could not reasonably be conceived to be true by the governmental decisionmaker." *Kimel*, 528 U.S. at 84 (citation and internal punctuation omitted). Meanwhile, the government may "rely on age as a proxy for other qualities, abilities, or characteristics that are relevant to the State's legitimate interests." *Id.* at 84.

Because Section 790.065(13) meets intermediate scrutiny, it necessarily passes rational-basis review. *See McCraw*, 719 F.3d at 350 (holding that statute passed rational-basis review because "the scheme survive[d] the more stringent intermediate scrutiny"); *BATFE*, 700 F.3d at 212.

## CONCLUSION

This Court should enter judgment as a matter of law for Defendant on both claims in Plaintiffs' Second Amended Complaint.

Respectfully submitted.

ASHLEY MOODY
ATTORNEY GENERAL

*/s/ Christopher J. Baum*
CHRISTOPHER J. BAUM (FBN 1007882)
Senior Deputy Solicitor General

AMIT AGARWAL (FBN 125637)
Solicitor General
JAMES H. PERCIVAL (FBN 1016188)
Chief Deputy Solicitor General
ELIZABETH TEEGEN (FBN 833274)
Chief Assistant Attorney General
TIMOTHY NEWHALL (FBN 391255)
Senior Assistant Attorney General

Office of the Attorney General
State of Florida
1 SE 3rd Ave Suite 900
Miami, FL 33131
(786) 792-6269
(850) 410-2672 (fax)
christopher.baum@myfloridalegal.com

*Counsel for Defendant*

## CERTIFICATE OF SERVICE

I certify that on this 3rd day of September, 2020, a copy of the foregoing was served on all counsel of record through the Court's CM/ECF Notice of Electronic Filing System.

/s/ *Christopher J. Baum*
Christopher J. Baum

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 7.1(F) of the Local Rules of the Northern District of Florida, I certify that the foregoing Motion and Incorporated Memorandum contains 7,365 words.

/s/ *Christopher J. Baum*
Christopher J. Baum