# EXHIBIT 4

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA

NATIONAL RIFLE ASSOCIATION
OF AMERICA, Inc., *et al*.,

     *Plaintiffs*,

     v.                      CASE NO.: 4:18-cv-137-MW/CAS

RICK SWEARINGEN, in his official
capacity as Commissioner of the
Florida Department of
Law Enforcement,

     *Defendant*.

_____/

## DECLARATION OF PROFESSOR WILLIAM ENGLISH

I, William English, declare:

1.     My name is William English, Ph.D. I am over 21 years of age, and I am fully competent to make this declaration in support of Plaintiff's Motion for Summary Judgment.

2.     I have been retained by Plaintiffs' counsel as an expert witness in the above-captioned matter.

3.     I prepared an expert report, dated March 12, 2020, for this matter. I certify that a true and correct copy of my expert report is attached here as **Appendix A**. I incorporate this expert report in its entirety into this declaration.

4.     As described in my report, in forming my opinions, I relied upon the materials identified in the report and my education, training, and experience.

5.     My report accurately states the subject matters on which I expect to testify at trial, the substance of the opinions about which I expect to testify, and a summary of the grounds for each opinion to which I expect to testify at trial.

6.     In my report, I conclude that (a) Florida Statute 790.065 Subsection 13 is unlikely to improve public safety and may actually harm it and (b) the law denies a constitutionally protected right to a class of citizens in a manner that is inconsistent with principles of moral and legal equality.

7.     With regard to public safety, I evaluate both the likely costs and benefits of the law. The benefits of the law are doubtful and, at best, small for the following reasons:

8.     **The law will be ineffective at preventing 18–20-year-old criminals from accessing firearms.** A large study published by the U.S. Department of Justice's Bureau of Justice Statistics has shown that 90% of guns used in crime are not obtained through licensed, retail sales, but rather the majority of these guns are obtained through informal and illegal sources. The vast majority are obtained through explicitly illegal means: 6.4% come from "Theft," 6.9% are "Found at location of crime/victim," and 43.2% are from "Off the street/underground market" defined as "Illegal sources of firearms that include markets for stolen goods,

middlemen for stolen goods, criminals or criminal enterprises, or individuals or groups involved in sales of illegal drugs." Only 8% were "Purchased/traded from family/friend," and it is important to note that such acquisitions could still continue under 790.065 (13) if criminals simply claimed that these involved "gifts" rather than purchases. Thus, criminals clearly do not depend on legal sales to obtain most of the firearms that they employ in crime. Moreover, since Federal law has long restricted licensed sales of handguns to those under 21, the main impact of 790.065 (13) will be to prohibit 18-20-year-olds from purchasing long guns. However, long guns are very rarely used in crime and are employed in only 7.5% percent of homicides. Of the estimated 30-100 individuals aged 18-20 implicated in firearms involved homicides each year in Florida, these statistics suggest that, on average, only 2-8 employ long guns, of which less than 1 came from a retail sale to the perpetrator. To put this in perspective, Florida is a state with approximately 21 million residents where some 400 people die each year from accidental drowning. With regard to violent crime of any kind perpetrated with a firearm in Florida by those aged 18-20 each year, only about 15 incidents are estimated to involve a long gun purchased from a retail source. While 790.065 (13) now prevents such sales, the study cited above also makes clear that criminals can readily obtain firearms from alternative sources. In summary, 790.065 (13) will do little to prevent criminals' access to firearms.

9.      **The law is unlikely to have a significant impact on firearms suicides and firearms accidents in Florida, which are already very low.** Florida has a suicide rate lower than the average state, and the suicide rate for those aged 18-20 is the 12th lowest in the nation, both overall and for gun-related suicides (examining data from 1999-2016). On average, about 33.6 individuals in this age demographic commit suicide with a firearm each year, with cases evenly split between handguns and long guns for those instances where type of firearm was recorded. As already mentioned, those aged 18–20 have long been prohibited from purchasing handguns from licensed dealers under Federal law, which raises the question as to how half of suicides in this age demographic could involve handguns. Presumably, this is because these individuals were able to access handguns from other sources. These figures likewise raise the question of whether 790.065 (13)'s ban on long gun sales would be expected to have any impact on the ~17 individuals in this age range who on average commit suicide with a long gun each year. Given that those who intend to commit suicide have multiple means available for doing so and that the most optimistic research has only suggested that policies that restrict firearms access yield small reduction in suicide, there are reasons to expect that the impact of 790.065 (13) will be minimal on what is already a very small population to begin with. The number of accidental firearms deaths in the 18–20-year-old demographic is even lower. According to the Center

4

for Disease Control's Underlying Cause of Death database, over the last 20 years an average of 1.85 individuals in Florida age 18–20 die each year from a firearms accident. To put this number in perspective, about three times as many 18–20-year-olds in Florida are killed each year riding bicycles and more than six times as many 18–20-year-olds in Florida die each year from accidentally drowning. In summary, there is little reason to believe that 790.065 (13) will have a meaningful impact on the already very low rates of firearms accidents and suicides in Florida in this age demographic.

10.     While the likely benefits of 790.065 (13) are small or doubtful, the costs it imposes are significant for the following reasons:

11.     **The law will prevent one of the most victimized groups in the U.S. – law-abiding citizens aged 18–20 – from purchasing a firearm for the purpose of defending themselves**. Of all of the age groups 12 years and older assessed by the Bureau of Justice Statistics, those age 18–24 are victimized the most by violent crime, constituting about 25.3% of all victimization. While 790.065 (13) can be expected to do little to nothing to prevent criminals from accessing guns, the law will prevent law abiding citizens who are most vulnerable to violent crime from purchasing a firearm for the purpose of defending themselves. Gun owners do frequently use firearms for self-defense. As noted by a 2013 report commissioned by the Obama Administration and overseen by the

Centers for Disease Control in collaboration with the National Research Council, "Almost all national survey estimates indicate that defensive gun uses by victims are at least as common as offensive uses by criminals, with estimates of annual uses ranging from about 500,000 to more than 3 million (Kleck, 2001a), in the context of about 300,000 violent crimes involving firearms in 2008 (BJS, 2010)." Moreover, a general population survey I conducted last year of Vermont residents found that almost a third of gun owners (29.3%) reported having used a firearm to defend themselves or their property. These included many instances in which individuals defended themselves from animals, demonstrating that defensive use of firearms encompasses more than just defense against criminals. Given that defensive uses of firearms are more common than offensive uses of firearms, as studies have indicated, then even if 790.065 (13) succeeded in completely prohibiting all 18-20 year olds from accessing firearms (which it will not), the net effect would likely be to increase the number of people successfully victimized. In summary, while this law will do little to prevent criminals from accessing firearms, it will prevent those in a particularly vulnerable demographic from purchasing firearms to defend themselves, likely increasing victimization.

12. **The law prohibits law-abiding citizens aged 18–20 from purchasing firearms for hunting and target shooting, which are activities that tens of thousands of Floridians aged 18–20 have traditionally participated in.**

6

The use of firearms for sporting purposes in Florida is common amongst a large number of citizens. According to a National Survey of Fishing, Hunting, and Wildlife-Associated Recreation conducted by the U.S. Fish & Wildlife Service, "there were 329 thousand Floridians 16 years old and older and 41 thousand Floridians 6 to 15 years old who hunted." This would suggest that tens of thousands of Florida residents age 18-20 hunt but are now not legally allowed to purchase a firearm for hunting. Similarly, a survey by The Outdoor Foundation for the "2017 Outdoor Participation Report" estimates that in 2016 about 4.7% of those age 6+ participated in target shooting, which would suggest that more than 36,000 Florida residents aged 18-20 engage in target shooting each year, who are now prohibited from purchasing firearms for this purpose. The law's prohibition on purchasing firearms is a significant burden to impose upon ten of thousands of law-abiding hunters and target shooters.

13.     **The law's targeting of 18–20-year-olds is not well justified given that other age demographics commit violent crimes at higher rates and most 18–20-year-olds handle firearms responsibly.** According to the Department of Justice's National Center for Juvenile Justice, arrest rates for violent crime in the US are actually greatest amongst those aged 21, 22, 23, and 24, not the age groups targeted by 790.065 (13). While psychologists and neuroscientists may highlight the developmental changes that are still occurring in the brains of 18–20-year-olds,

the claim that this maturation process makes 18–20-year-olds uniquely incapable of responsibly owning and using firearms is not supported by the data. Those in this age range do not commit violent crime at rates higher than those aged 21-23, nor are the homicide rates substantially different between these two groups in recent years. Moreover, the historical practice of conscripting 18–20-year-olds into military service and the fact that 84% of Marine recruits today are age twenty or younger are both inconsistent with the claim that those in this age demographic cannot generally handle firearms responsibly. The same can be said of the fact that tens of thousands of Floridians in this age group have historically used firearms for hunting and target shooting with extraordinarily low levels of firearms accidents and suicides.

14. **The law denies a constitutionally protected right to a class of citizens in a manner that is inconsistent with principles of moral and legal equality.** 790.065 (13) prohibits fully enfranchised citizens from exercising an enumerated constitutional right. From an ethical perspective, this raises the question of what could justify such a restriction on a class of citizens. For example, if African Americans are arrested for murder at six times the rate of others in Florida, would that permit the state of Florida to deny African Americans, as a group, the right to purchase firearms, or to require them to undergo a test establishing their mental maturity and self-control before being allowed to make

such a purchase? Given the normative commitments of our constitutional order, such restrictions would strike most as morally repugnant. However, there is precedent and good justification for prohibiting those with severe mental illness from owning firearms if they are "adjudicated as a mental defective or committed to a mental institution." As indicated above, however, the data does not support the judgment that 18–20-year-olds generally suffer from this sort of severe mental incapacity by virtue of their age. The law thus deprives enfranchised citizens of a constitutional right with little compelling theoretical or empirical justification, which is inconsistent with basic principles of moral and legal equality.

15.     In light of the considerable costs of this law and its doubtful benefits, I conclude that 790.065 (13) is unlikely to improve public safety, and may actually harm it, and that it deprives fully enfranchised citizens of an enumerated constitutional right in a manner inconsistent with the ethical principles of moral and legal equality.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this ___31___ day of August, 2020.

_____

William English

# APPENDIX A

National Rifle Association of America, Inc. and Radford Fant, *Plaintiffs*,
v.
Rick Swearingen et al. *Defendants*.
Case 4:18-cv-00137-MW-CAS

William English, PhD
Expert Report

ASSIGNMENT

I have been asked by counsel for the plaintiffs in the above-described matter to provide my opinion on the merits of Florida Statute 790.065 Subsection 13, which prohibits those below the age of 21 from purchasing a firearm. This report sets forth my qualifications and foundation for my opinions on that question, which I offer to a reasonable degree of scientific certainty. A list of data, facts, and references relied upon are listed in Exhibit A. My qualifications, curriculum vitae, and a list of publications are included as Exhibit B. A list of cases in which have provided expert testimony is included as Exhibit C. Finally, a statement of compensation is included as Exhibit D. I am willing and able to testify as to the contents of this report.

SUMMARY OF OPINIONS:

- Florida Statute 790.065 Subsection 13 is unlikely to improve public safety.

- The law will be ineffective at preventing 18-20 year old criminals from accessing firearms because firearms are readily obtainable through informal and illegal channels. Indeed, 90% of guns used in crime are not obtained through licensed, retail sales.

- Because Federal law has long restricted licensed sales of handguns to those under 21, the main impact of 790.065 (13) will be to prohibit 18-20 year olds from purchasing long guns, which are rarely used in crime.

- 790.065 (13) will prohibit 18-20 year olds from purchasing firearms for self-defense, which is likely to have a substantial and negative effect on the safety of this highly victimized demographic. Multiple studies have found that firearms are used defensively more than offensively, and thus the net effect of 790.065 (13) is likely to be to increase victimization of 18-20 year olds.

- Tens of thousands of Floridians aged 18-20 have historically participated in hunting and target shooting each year, and 790.065 (13) will prohibit these individuals from purchasing firearms for these and other lawful purposes.

- Rates of firearms suicide amongst those aged 18-20 have historically been low in Florida and there is little reason to believe that 790.065 (13) will lower them. Handguns and long guns have been used to commit suicide in equal proportions by those aged 18-20 in Florida, despite the historical prohibition on licensed sales of handguns to those in this age group.

- Accidental firearms deaths are extraordinarily rare amongst those aged 18-20 in Florida and indeed are much rarer than accidental deaths from common activities such as bicycling and swimming.

- Those aged 18-20 are capable of responsibly using firearms, which is forcibly demonstrated by the fact that those in this age group have historically served in the military. Indeed, 84% of Marine recruits are age 20 or younger.

- 790.065 (13) prohibits fully enfranchised citizens from exercising an enumerated constitutional right. Given that the benefits of this law for public safety are unlikely to outweigh its costs, there is no compelling rationale for this infringement of rights.

- 790.065 (13) denies a constitutionally protected right to a class of citizens in a manner that is inconsistent with principles of moral and legal equality.


OPINIONS AND ANALYSIS:

Florida Statute 790.065 Subsection 13, which was recently passed into law, prohibits those below the age of 21 from purchasing a firearm. The text of the statute reads:

> A person younger than 21 years of age may not purchase a firearm. The sale or transfer of a firearm to a person younger than 21 years of age may not be made or facilitated by a licensed importer, licensed manufacturer, or licensed dealer. A person who violates this subsection commits a felony of the third degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084. The prohibitions of this subsection do not apply to the purchase of a rifle or shotgun by a law enforcement officer or correctional officer . . . or a servicemember . . . .

2

I have been asked to evaluate this law. I approach this assignment as a political scientist trained in the history of american political thought, political ethics, and basic principles of constitutional jurisprudence. I also approach it as a practicing social scientist who is well equipped to evaluate empirical arguments for and against the costs and benefits of this law. For reasons that I spell out at greater length below, it's important that both perspectives - the empirical and the normative - inform an evaluation of this law.

Presumably, the state and those who passed this law believe that it will have some benefits for public health and rates of crime. While I find the evidence for this belief dubious, we must also consider what sort of benefits would be necessary to justify this law within the larger normative commitments of our constitutional order. This is because constitutional rights, and civil rights more generally, have value that can not be overridden by a simplistic utilitarian calculus and the vote of a majoritarian faction. For example, even if it were true that African Americans in Florida were arrested for murder at a rate six times greater than rest of the population in 2016, would it be appropriate to strip African Americans, as a group, of their constitutional right to keep and bear arms? Our constitutional system rightly rejects stripping rights from classes of people based on features that may characterize a group as a whole but do not characterize most of its individual members.

In this report, I first examine the question of whether this law is likely to have a significant impact on crime, safety, and public health. I find little evidence that this law will, particularly given that the vast majority of firearms used in crime do not come from licensed, retail sales (90% of criminals obtain their firearms from other sources). Moreover, since the sale of handguns to those under 21 is already restricted by Federal law, the primary effect of 790.065 (13) will be to restrict the the sale of long guns, which are in fact used in crime at very low rates (accounting for less than 15% of gun related crime). Finally, those aged 18, 19, and 20, do not commit violent crime at greater rates than those aged 21, 22, and 23, raising questions about the rationale for targeting the former and not the latter. While the law is unlikely to erect any significant barriers to young people obtaining firearms for criminal purposes, it will deprive a population that is particularly vulnerable to criminal victimization from obtaining firearms to defend themselves. Indeed, a large body of research suggests that the costs to law abiding citizens are likely to be significant. Finally, I also examine whether this law might significantly decrease suicide or accidental firearms deaths. In fact, both are rare amongst the age group in question, and the prohibitions of 790.065 (13) are unlikely to make a significant impact on these incidents that do occur. Moreover, many other common items and activities pose a much greater risk. In summary, I find little reason to believe that this law will have significant benefits for public health or rates of crime, while it will generate substantial costs for law abiding citizens, depriving them of constitutionally enumerated rights and the ability to obtain firearms for personal defense.

In the second section, I examine the larger question of what could justify depriving enfranchised adults of constitutionally enumerated rights. I approach this not as a narrow legal question but rather through broader considerations of the moral and political principles that animate our understanding of rights and equality before the law. Given that 790.065 (13) is unlikely to make a positive contribution to public safety, it is difficult to justify the burden it imposes on the right to keep and bear arms. However, even if 790.065 (13) did promise some public benefits, the bar for denying rights to a class of citizens is very high, and analogous restrictions on other rights would be soundly rejected as illegitimate. With the 26th Amendment having established that enfranchisement begins at age 18, and 18 year olds having historically served in militias, the only rationale that could justify depriving 18-20 year olds of the right to purchase a firearm would depend on the claim that those in this age group are uniquely unfit to handle firearms responsibly, akin to those with severe mental illness. Not only does the data not support this claim, but it is also profoundly contradicted by the US's practice and history of enlisting and conscripting individuals into military service at age 18 and above. In my opinion, not only will 790.065 (13) not advance public safety, but the law also deprives a class of citizens of rights in a manner that is deeply inconsistent with principle of equality and political legitimacy that undergird our constitutional order.

Evaluating the Likely Impact of 790.065 (13) on Crime, Safety, and Public Health.

In evaluating the overall merits of 790.065 (13), it's important to first consider what, if any, benefits the law may have. The first sentence of the larger act that made 790.065 (13) law declares the act to be "relating to public safety." What public safety benefits could the prohibition of firearms sales to those age 18-20 yield? I first examine the likely effects on crime, and then the likely effects on suicides and firearms accidents .

In nearly every society around the globe and throughout history, men in their 20's are disproportionately involved in violent crime.[1] However, according to the Department of Justice's National Center for Juvenile Justice, arrest rates for violent crime in the US are actually greatest amongst those aged 21, 22, 23, and 24, not the age groups targeted by 790.065 (13).[2] If the rationale for this law is to restrict firearms access to age groups mostly likely to commit violent crime, it is interesting to consider whether the law would be better tailored for that purpose if it prohibited those aged 21-25 from purchasing firearms.

---

[1] https://www.unodc.org/documents/data-and-analysis/gsh/Booklet1.pdf
[2] OJJDP Statistical Briefing Book. Online. Available:
https://www.ojjdp.gov/ojstatbb/crime/qa05301.asp?qaDate=2017 . Released on December 13, 2019.

It's helpful to develop a rough estimate of the kind of impact that this law could have in the very best case scenario, if it in fact prevented criminals aged 18-20 from accessing firearms. According to the Census Bureau, Florida has about 21 million residents, with a total of about 775,000 who are age 18, 19, and 20 (roughly 258,000 in each cohort year).[3] Nationally, the Department of Justice's National Center for Juvenile Justice estimates that the arrest rate for violent crime for those aged 18, 19, and 20 is about 382 per 100,000, which would translate to about 3,000 arrests in this age range in Florida per year.[4] According to Florida's own statistics on Total Reported Firearm-Involved Violent Crimes and Manslaughter in Florida in 2016, about a third of violent crime in Florida involves firearms, and firearms involved murders constitute about one percent.[5] This would suggest that around 1,000 individuals aged 18- 20 are arrested each year for firearm involved violent crime in Florida, and about 30 are implicated in firearms involved murders. This is a rough estimate. If Florida had a proportional share of the nationally reported firearms homicide offenders in this age range, the number would be closer to 100 (or .00048% of the Florida population).[6] To put this number in perspective, in 2016 over 400 people died in Florida by accidentally drowning.[7]

While these numbers may seem small in a state of 21 million inhabitants, the impact of this law on crime and homicide is likely to be even smaller to non-existent for two reasons. First, according to a recent report published by the U.S. Department of Justice's Bureau of Justice Statistics, the vast majority of firearms used by criminals do not come from retail sales. The study found that 90% of criminals who had possessed or used a firearm during their offense did not obtain it from a retail source, with only about 8% purchasing the gun from a licensed firearms dealer and less than 7% using their own names for the purchase.[8] Moreover, about half of criminals obtained their guns by theft or on the underground market. Thus, for homicides perpetrated by 18-20 year olds in Florida, this would suggest that only 3-10 guns per year have initially been obtained from retail sales. However, the more significant conclusion to be drawn from this study is just how easy it is for criminals to access guns through illegal and informal channels. Put simply, there is little reason to believe that by removing legal avenues for a narrow age group to purchase firearms, which very few criminals ever avail themselves of in the first place, 790.065 (13) will be effective in preventing young criminals from obtaining firearms if they wish to do so.

---

[3] https://data.census.gov/cedsci/table?g=0400000US12&tid=ACSDP1Y2018.DP05&hidePreview=false&cid=DP05_0001E&vintage=2018

[4] OJJDP Statistical Briefing Book. https://www.ojjdp.gov/ojstatbb/crime/qa05301.asp?qaDate=2017 Also, note that they define violent crimes to include the offenses of murder and nonnegligent manslaughter, robbery, and aggravated assault.

[5] https://www.fdle.state.fl.us/FSAC/Data-Statistics/UCR-Offense-Data.aspx

[6] https://www.ojjdp.gov/ojstatbb/ezashr/asp/off_selection.asp

[7] https://wonder.cdc.gov/

[8] https://www.bjs.gov/content/pub/pdf/suficspi16.pdf

A second reason to expect that 790.065 (13) will have little impact on crime has to do with the kinds of gun sales the law will effectively prohibit in practice. Handguns are by far the most common type of firearm used in crime. The same report by the U.S. Department of Justice's Bureau of Justice Statistics referenced above finds that handguns constitute 85.5% of the firearms used in crime.[9] Moreover, according to the FBI's Expanded Homicide Data from 2008-2018, 92.5% of homicides involved handguns.[10] However, the sale of handguns by licensed firearms dealers to those under 21 has effectively been illegal under federal law since 1968 (the law still allows private, unlicensed sales, but as the BJS report shows, these are rare).[11] Thus, those aged 18-20 have already been prohibited from purchasing handguns from licensed dealers for decades. The most significant impact of 790.065 (13) will therefore be to prohibit licensed sales of long guns to those aged 18-20. Given that long guns are implicated in only 14.5% of gun crime, and less than 7.5% of homicides, the impact of this law would be minimal even if it were true that criminals relied on retail sales from licensed firearms dealers to obtain their weapons, which we have established they do not.

While 790.065 (13) errects no substantial barriers to criminals' access to guns, the law does prohibit law abiding citizens aged 18-20 from purchasing firearms, effectively denying them the ability to obtain guns for both sporting uses and self-defense. The use of firearms for sporting purposes in Florida is common amongst a large number of citizens. According to a National Survey of Fishing, Hunting, and Wildlife-Associated Recreation conducted by the U.S. Fish & Wildlife Service, "there were 329 thousand Floridians 16 years old and older and 41 thousand Floridians 6 to 15 years old who hunted."[12] This would suggest that tens of thousands of Florida residents age 18-20 hunt, but are now not legally allowed to purchase a firearm for hunting. Similarly, a survey by The Outdoor Foundation for the "2017 Outdoor Participation Report" estimates that in 2016 about 4.7% of those age 6+ participated in target shooting, which would suggest that more than 36,000 Florida residents aged 18-20 engage in target shooting each year, who are now prohibited from purchasing firearms for this purpose.[13] Incidentally, while Florida law makes specific allowances for conditions under which minors may possess firearms for hunting and target shooting, it is arguably unclear whether the transfer of a firearm for these purposes to

---

[9] https://www.bjs.gov/content/pub/pdf/suficspi16.pdf
[10] https://crime-data-explorer.fr.cloud.gov/explorer/national/united-states/shr
[11] Gun Control Act of 1968, Pub. L. No. 90-618, 82 Stat.1213-2 (1968), codified at 18 U.S.C. Ch. 44 § 921 (2018). Text can be viewed at: https://www.govinfo.gov/content/pkg/STATUTE-82/pdf/STATUTE-82-Pg1213-2.pdf
[12] https://www2.census.gov/programs-surveys/fhwar/publications/2011/fhw11-fl.pdf
[13] https://outdoorindustry.org/wp-content/uploads/2017/05/2017-Outdoor-Recreation-Participation-Report_FINAL.pdf

someone aged 18-20 is allowable by law, particularly if the person who transfers the firearm happens to have a federal firearms license.

Perhaps the greatest impact of 790.065 (13) is that it prohibits those aged 18-20 from buying a firearm for the purpose of self-defense. This is particularly troubling given that, of all of the age groups 12 years and older assessed by the Bureau of Justice Statistics, those age 18-24 are victimized the most by violent crime, constituting about 25.3% of all victimization.[14] While we have already established that 790.065 (13) can be expected do little to nothing to prevent criminals from accessing guns, the law will prevent law abiding citizens who are most vulnerable to violent crime from purchasing a firearm for the purpose of defending themselves.

Gun owners do frequently use firearms for purposes of self defense. As noted by a 2013 report commissioned by the Obama Administration and overseen by the Centers for Disease Control in collaboration with the National Research Council, "Almost all national survey estimates indicate that defensive gun uses by victims are at least as common as offensive uses by criminals, with estimates of annual uses ranging from about 500,000 to more than 3 million (Kleck, 2001a), in the context of about 300,000 violent crimes involving firearms in 2008 (BJS, 2010)."[15] Moreover, a general population survey I conducted last year of Vermont residents found that almost a third of gun owners (29.3%) reported having used a firearm to defend themselves or their property.[16] Note that if defensive uses of firearms are more common than offensive uses of firearms, as studies have indicated, then even if 790.065 (13) succeeded in completely prohibiting all 18-20 year olds from accessing firearms, the net effect would likely be to increase the number of people successfully victimized. Again, however, we have little reason to believe that the law will in fact hinder criminals' ability to obtain guns. Thus, while the law's benefits are likely to be little to non-existent, the costs to 18-20 year olds who desire to purchase a firearm for self defense are likely to be significant. The net impact of 790.065 (13) on crime and victimization rates is thus likely to be a negative one for public safety.

Since the majority of firearms deaths in the United States are from suicides, rather than crime, we should also consider whether Florida has a unique problem with firearms suicides in the 18-20 year old demographic, which 790.065 (13) might help address.

---

[14] https://www.bjs.gov/content/pub/pdf/cv18.pdf
[15] Institute of Medicine and National Research Council. 2013. Priorities for Research to Reduce the Threat of Firearm-Related Violence. Washington, DC: The National Academies Press. https://doi.org/10.17226/18319.
[16] Expert Witness Report of William English, PhD Vermont Federation of Sportsmens Clubs v. Birmingham, No. 224-4-18 Wncv (Sup. Ct. Wash. Unit) June 16, 2019. Note that respondents were instructed not to count incidents that were due to military service, police work, or work as a security guard. Also, Vermont has one of the lowest violent crime rates in the nation.

According to the Center for Disease Control's Underlying Cause of Death database, Florida not only has a suicide rate lower than the average state, but the suicide rate for those aged 18-20 is the 12th lowest in the nation, both overall and for gun-related suicides (examining data from 1999-2016).[17] Moreover, only 2% of firearms suicides in Florida occur in the 18-20 year old demographic. On average, about 33.6 individuals in this age demographic commit suicide with a firearm each year, with cases evenly split between handguns and long guns for those instances where type of firearm was recorded.

As already mentioned, those aged 18-20 have long been prohibited from purchasing handguns from licensed dealers under Federal law, which raises the question as to how half of suicides in this age demographic could involve handguns. Presumably, this is because these individuals were able to access handguns from other sources. These figures likewise raise the question of whether 790.065 (13)'s ban on long gun sales would be expected to have any impact on the ~17 individuals in this age range who on average commit suicide with a long gun each year. This is ultimately an empirical question that can only be answered using data that is not yet publicly available. However, given that those who intend to commit suicide have multiple means available for doing so and that the most optimistic research has only suggested that policies that restrict firearms access yield small reduction in suicide,[18] there are reasons to expect that the impact of 790.065 (13) will be minimal on what is already a very small population to begin with.

Finally, we should consider the number of accidental firearms deaths that afflict those aged 18-20 in Florida and whether 790.065 (13) could promise to make a significant impact in preventing them. The number of accidental firearms deaths in this demographic is, in fact, vanishingly small. According to the Center for Disease Control's Underlying Cause of Death database, over the last 20 years an average of 1.85 individuals in Florida age 18-20 die each year from a firearms accident. To put this number in perspective, about three times as many 18-20 year olds in Florida are killed each year riding bicycles, more than six times as many 18-20 year olds in Florida die each year from accidentally drowning, and over 30 times as many 18-20 year olds in Florida die each year from accidental drug and alcohol overdoses.

---

[17] United States Department of Health and Human Services (US DHHS), Mortality Statistics Branch, Division of Vital Statistics, National Center for Health Statistics (NCHS), Centers for Disease Control and Prevention (CDC), "Underlying Cause of Death data". https://wonder.cdc.gov/ Unless otherwise indicated, death statistics in this report come from this source.

[18] Ludwig, Jens, and Philip J. Cook. "Homicide and suicide rates associated with implementation of the Brady Handgun Violence Prevention Act." *Jama* 284.5 (2000): 585-591.

In summary, the number of incidents that 790.065 (13) could plausibly frustrate in the most optimistic estimation is small. As the figures I've cited earlier suggest, out of 1,000 violent criminals aged 18-20 who use a firearm, some 150 are likely to use long guns, and only 15 of those likely to have come from licensed sales. Out of 100 firearm-involved murders, 8 are likely to have employed long guns, and less than are 1 likely to have been acquired from a licensed sale. Again, there is little reason to believe that any individual who is intent on committing violent crime cannot easily obtain a firearm through informal or illegal means, which is in fact the source of most firearms used in crime. While some 17 suicides may be committed each year with long guns of unknown origins, other means are readily available. And accidental deaths by firearms in this demographic are extraordinarily rare at around one or two per year, which is far less than result from familiar activities such as biking and swimming.

Meanwhile, 790.065 (13) prevents those who are in the most victimized demographic in the U.S. from purchasing a firearm to defend themselves in a context where multiple studies have concluded that firearms are used more frequently in self-defense than by criminals in offense. The law also deprives tens of thousands of hunters and shooters in Florida age 18-21 from purchasing a firearm. For all of these reasons, it is my opinion that, with regard to public safety, the net costs of this law exceed its benefits. As a simple matter of public policy, I would not recommend 790.065 (13) as a method for improving public safety. Indeed, I suspect it will increase successful victimization of 18-20 year olds. However, there are further considerations that counsel against 790.065 (13) based on the logic of rights that are due enfranchised citizens and principles of legal equality, which I explore in the next section.

<u>The Logic of Rights and Equal Protection - Can Enfranchised Citizens be Deprived of Basic RIghts and Liberties Based on Age?</u>

Prohibiting the sale of firearms to those aged 18-21 raises two related sets of questions. In general, when is it permissible to deny constitutionally protected rights to a class of people? In particular, is there any compelling rationale or precedent for denying rights to enfranchised citizens based on age or similar characteristics?

As I am not a lawyer, I do not intend to offer detailed legal analysis of these questions. However, as a political theorist and student of American political development, there are important normative considerations that need to be taken into account in evaluating this law.

As Madison famously noted in *Federalist 10*, democratic forms of government can allow majoritarian factions to "invade the rights of other citizens."[19] While Madison and other Federalists in the founding era initially hoped that rights could be protected in an extended republic through both representation and divisions of power complemented by checks and balances, concerns raised by Anti-Federalist eventually led to the creation of the Bill of Rights to further constrain the government's power. One way in which such rights function is that they limit the extent to which utilitarian considerations can justify sacrificing the interests of some individuals for the interests of others. For example, the state could undoubtedly reduce crime by randomly searching houses in high crime neighborhoods without a warrant. However, the Fourth Amendment's recognition of a right to be secure in one's house and its prohibition on warrantless searches prevents the state from improving public safety in this manner.

Thus, when considering a constitutionally enumerated right, such as the right to freedom of speech, the right to a trial, or the right to keep and bear arms, the state is not entitled to violate that right simply because it can show that some public benefit will result. Rather, rights require the state to meet a much higher bar in order to justify their curtailment, and the theoretical apparatus of "levels of scrutiny" has been developed precisely for the purpose of trying to articulate such standards in a coherent manner.

However, the constitutional concern with 790.065 (13) is not only that infringes an enumerated right with very doubtful benefits for public safety, but also that the law targets a class of citizens in a manner that runs afoul of another right enumerate by the Constitution and fundamental to modern political legitimacy, namely the right to "due process" guaranteed by the 5th and 14th amendments.

The moral essence of due process, a concept which dates back at least to the Magna Carta, is that it guarantees everyone's protection by the law and recognizes everyone's equality before the law. Indeed, the 14th Amendment makes the connection between due process and equal protection explicit: "No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."[20] The context for the 14th Amendment's ratification was, of course, the post Civil War Reconstruction era, and part of its aim was to make sure that freed slaves would not become second class citizens. Put simply, all citizens are entitled to the same rights.

---

[19] The Federalist No. 10 (James Madison).
[20] https://www.archives.gov/founding-docs/amendments-11-27

This moral principle is what makes many forms of discrimination illegitimate. For example, a law that stipulated that white citizens cannot be subject to warrantless searches, but that black citizens can, would rightly be condemned. That would involve denying a constitutional right to one class of citizens. Note that this would still be illegitimate even if it were true that denying some group this right would improve public safety. It would be similarly illegitimate if the state of Florida, for example, prohibited African Americans from owning firearms because members of this demographic have been arrested for murder at higher rates than others.

There is a class of individuals in the US who, on the basis of age, do not fully enjoy equal rights, namely minors. While minors are afforded most constitutional rights, our legal system has carved out various exceptions informed by considerations of dependency and agency. However, the question of who qualifies to be a fully enfranchised citizen has been clearly settled by the 26th Amendment, which states: "The right of citizens of the United States, who are eighteen years of age or older, to vote shall not be denied or abridged by the United States or by any State on account of age."[21] One of the core arguments for this Amendment was that those who were "old enough to fight" were also "old enough to vote."[22] This alluded to the fact that 18 year olds have historically been called upon to fight in America's wars and thus deserved equal political rights. The 26th Amendment and its swift ratification stands as a clear confirmation that full political enfranchisement in the U.S. begins at age 18.[23]

There are unique circumstances under which otherwise enfranchised citizens can be deprived of constitutionally enumerated rights on the basis of a compelling state interest. Felons, for example, may not possess firearms, and in some states they may not vote. However, this is in virtue of something they did, which has been individually adjudicated in each case according to due process. A more interesting case is that of people who have been "adjudicated as a mental defective or committed to a mental institution."[24] Such individuals who suffer from extreme forms of mental illness that make them a threat to themselves and to others and who cannot manage their own affairs have been prohibited from purchasing firearms since the passage of the Gun Control Act of 1968.[25] Note that such forms of mental illness are generally not something that afflicted individuals bear any

---

[21] https://www.archives.gov/founding-docs/amendments-11-27

[22] Cusack, Mike. "The struggle that won 18-year-olds the right to vote." *Scholastic Update*, vol. 119, 20 Oct. 1986, p. 12+.

[23] It may be helpful to note that the 21st amendment, which repealed prohibition, did not create a "right to drink" but explicitly acknowledged the ability of States to set policy. It would be inappropriate, therefore, to draw an analogy between restrictions on drinking and restrictions on the right to keep and bear arms.

[24] 18 U.S.C. § 922(g)(4).

[25] Gun Control Act of 1968, Pub. L. No. 90-618, 82 Stat.1213-2 (1968), codified at 18 U.S.C. Ch. 44 § 921 (2018).

responsibility for. However, this group is singled out as ineligible for purchasing firearms because of their inability to exercise agency and the specific threat they pose to themselves and others, either of which must be duly adjudicated.

Ultimately, the moral and constitutional question raised by 790.065 (13) is whether those aged 18-20 are, as a group, generally incapable of using firearms responsibly in a manner akin to "mental defectives." Any arguments that young adults are, including arguments that attempt to leverage brain science, are immediately faced with two devastating counterarguments. The first, already covered by the statistics above, is that tens of thousands of Floridians aged 18-20 have historically used firearms responsibly each year for hunting, target shooting, and self-defense, while rates of crime and suicide amongst this age group are no worse, and sometimes slightly better, than other age groups that are still allowed to purchase firearms. The second, powerful argument against the claim that 18-20 are unfit to use firearms responsibly is the fact that this age group has historically been recruited or conscripted into military service precisely for the purpose of bearing arms.

While the precise age of conscription has varied in different conflicts throughout US history (and often changed over the course of those conflicts), those aged 18, 19, and 20 have been repeatedly asked or required to serve in the military dating back to the earliest militias. This fact has been extensively documented in Kopel and Greenlee's recent law review articles, "History and Tradition in Modern Circuit Cases on the Second Amendment Rights of Young People"[26] and "The Second Amendment Rights of Young Adults."[27] The basic truth of the vast array of citations and examples that they assemble is summarized well by a decision issued by the Supreme Court of Appeals of Virginia in 1847. In response to a case in which a young man who had enlisted in the military attempted to have his obligation voided on account of his being too young to make this decision, the court concluded, "We know, as a matter of fact, that at the age of eighteen, a man is capable intellectually and physically of bearing arms."[28]

Today, 84% of Marine recruits are age twenty or younger.[29] The claim that 18-20 year olds are generally incapable of responsibly keeping and bearing firearms is wholly inconsistent with this fact.

---

[26] Kopel and Greenlee. "History and Tradition in Modern Circuit Cases on the Second Amendment Rights of Young People." 43 S. Ill. U. L.J. 119
[27] Kopel and Greenlee. "The Second Amendment Rights of Young Adults." 43 S. Ill. U. L.J. 495
[28] United State v. Blakeney, 44 Va. (3 Gratt.) 405 (1847).
[29] https://www.cfr.org/article/demographics-us-military

In conclusion, not only is 790.065 (13) of dubious value for public safety, but it denies constitutional rights to a class of citizens in a manner that is inconsistent with legal and moral equality. In my opinion this law is not good public policy.

I hereby declare that the foregoing is true and correct to the best of my knowledge and belief.

3/12/2020

## EXHIBIT A

REFERENCES:

Mariel Alpher, Ph.D., & Lauren Glaze, U.S. Department of Justice Bureau of Justice Statistics, "Source and Use of Firearms Involved in Crimes: Survey of Prison Inmates, 2016" (January 2019), https://www.bjs.gov/content/pub/pdf/suficspi16.pdf.

Cusack, Mike. "The struggle that won 18-year-olds the right to vote." *Scholastic Update*, vol. 119, 20 Oct. 1986, p. 12+.

Expert Witness Report of William English, Ph.D., *Vermont Federation of Sportsmens Clubs v. Birmingham*, No. 224-4-18 Wncv (Sup. Ct. Wash. Unit), dated June 16, 2019.

Federal Bureau of Investigation, Crime Data Explorer, "Expanded Homicide Data" (March 12, 2020), https://crime-data-explorer.fr.cloud.gov/explorer/national/united-states/shr.

Gun Control Act of 1968, Pub. L. No. 90-618, 82 Stat.1213-2 (1968), codified at 18 U.S.C. Ch. 44 § 921 (2018).

Institute of Medicine and National Research Council, "Priorities for Research to Reduce the Threat of Firearm-Related Violence" (2013), Alan I. Leshner, et al., eds.

David Kopel & Joseph Greenlee, "History and Tradition in Modern Circuit Cases on the Second Amendment Rights of Young People," 43 S. Ill. U. L.J. 119 (2019).

David Kopel & Joseph Greenlee, "The Second Amendment Rights of Young Adults," 43 S. Ill. U. L.J. 495 (2019).

Ludwig, Jens, and Philip J. Cook. "Homicide and suicide rates associated with implementation of the Brady Handgun Violence Prevention Act." *Jama* 284.5 (2000): 585-591.

Rachel E. Morgan, Ph.D., & Barbara A. Oudekerk, Ph.D., U.S. Department of Justice Bureau of Justice Statistics, "Criminal Victimization, 2018" (September 2019), https://www.bjs.gov/content/pub/pdf/cv18.pdf.

Madison, James. "The Federalist Papers : No. 10 https://avalon.law.yale.edu/18th_century/fed10.asp

George M. Reynolds and Amanda Shendruk, "Demographics of the U.S. Military," Council on Foreign Relations (March 12, 2020), https://www.cfr.org/article/demographics-us-military

The Outdoor Foundation, "2017 Outdoor Participation Report" https://outdoorindustry.org/wp-content/uploads/2017/05/2017-Outdoor-Recreation-Participation-Report_FINAL.pdf

United Nations Office on Drugs and Crime, "Global Study on Homicide" (2019), https://www.unodc.org/documents/data-and-analysis/gsh/Booklet1.pdf.

U.S. Department of the Interior, U.S. Fish & Wildlife Service, "2011 National Survey of Fishing, Hunting, and Wildlife-Associated Recreation-Florida" (2011), https://www2.census.gov/programs-surveys/fhwar/publications/2011/fhw11-fl.pdf

U.S. Department of Justice, Office of Juvenile Justice and Delinquency Prevention, Statistical Briefing Book, "Age-Specific Arrest Rate Trends" (March 12, 2020), https://www.ojjdp.gov/ojstatbb/crime/qa05301.asp.

U.S. Department of Justice Office of Juvenile Justice and Delinquency Prevention, "Easy Access to the FBI's Supplementary Homicide Reports: 1980–2016" (March 12, 2020), https://www.ojjdp.gov/ojstatbb/ezashr/asp/off_selection.asp.

United States Department of Health and Human Services (US DHHS), Mortality Statistics Branch, Division of Vital Statistics, National Center for Health Statistics (NCHS), Centers for Disease Control and Prevention (CDC), "Underlying Cause of Death data". https://wonder.cdc.gov/

**EXHIBIT B**

BACKGROUND AND QUALIFICATIONS

I am currently employed as an Assistant Professor of Strategy, Economics, Ethics, and Public Policy at the McDonough School of Business at Georgetown University, a position I have held since 2016. Prior to that I was employed at Harvard University for five years, first as a research fellow and later as the research director of the Edmond J Safra Center for Ethics. I also served as research associate with the Harvard Initiative for Learning and Teaching and as the executive director of The Abigail Adams Institute, an educational non-profit located in Cambridge, MA from 2014-2016. Before coming to Harvard I held a one-year postdoctoral research fellowship at Brown University with the Political Theory Project. I received my PhD in Political Science from Duke University in 2010 and an MSt in ethics from Oxford University in 2004. In 2003, I graduated Duke University with a Bachelors of Science in Economics and a Bachelors of Arts in Mathematics. For two summers I was employed as a laboratory technician with the Office of Law Enforcement Standards at the National Institute of Standards and Technology, where I assisted with the revision of standards for body armor and autoloading pistols for police officers issued by the National Institute of Justice. Throughout high school and college I was involved with competitive shooting sports and I have followed developments in the firearms industry and recreational shooting sports closely for over 20 years.

My scholarly research has focused on empirical methods in the social sciences, behavioral economics, and regulatory policy. I am in the process of conducting research on the impact of various firearms laws within the United States. I have authored or co-authored the following publications:

- "The origin of wealth matters: Equity norms trump equality norms in the ultimatum game with earned endowments." Journal of Economic Behavior & Organization. 2018. (with Benjamin Barber)

- "Varieties of Citizenship and the Moral Foundations of Politics" in The Ethics of Citizenship in the 21st Century, David Thunder (Eds): Springer International Publishing, 2017 DOI:10.1007/978-3-319-50415-5

- Paying People to Make Healthy Choices" eLS, John Wiley & Sons Ltd, February, 2017.

- "Two Cheers for Nudging" Georgetown Journal of Law and Public Policy, Vol. 14, 2016: 829.

- "The Logic of Gift: Inspiring Behavior in Organizations Beyond the Limits of Duty and Exchange" Business Ethics Quarterly. April 2016: Vol 26 (2), 159180. (with Tomas Baviera and Manuel Guillen)

- "The Demographic Challenge to Entitlements: A Comment, Criticism, and Caveat" in Science, Virtue, and the Future of Humanity, Peter Augustine Lawler and Marc D. Guerra (Eds), Lexington Books: 2015.

- "Economic and Ideological Corruptions of the Regulatory State" Society, May/June, 2014: Volume 51, Issue 3.

- "Institutional Corruption and the Crisis of Liberal Democracy" Edmond J. Safra Working Papers, No. 15. June, 2013.

- "Locke, Hegel, and the Economy" Society, October, 2013: Volume 50, Issue 6.

- "Corruption in Bioethics'' Compendium of Global Bioethics. Edited by ten-Have and Gordijn. Springer, 2013. (with Jennifer Miller).

- "Genopolitics and the Science of Genetics" American Political Science Review. April 2013: Vol 107 (2), 382-395. (with Evan Charney)

- "Why Genes Don't Predict Voting Behavior: when it comes to complex behaviors, gene variants don't count for much" Scientific American. Nov 2012 (with Evan Charney).

- "Candidate Genes and Political Behavior" American Political Science Review. February 2012: Vol 106(1), 1-34. (with Evan Charney)

- "Demystifying Trust: Experimental Evidence from Thailand and Cambodia." Journal of Theoretical Politics. April 2012 vol. 24 no. 2 172-209.

- "The Ethics of Competition" in the Harvard Ethics Center Research in Action Blog. http://ethics.harvard.edu/blog/william-english-ethics-competition August, 2012.

- "Still Awaiting Redemption" review of Redeeming Economics: Rediscovering the Missing Element by John D. Mueller in The Intercollegiate Review, Spring 2011 (p.57-60).

- "Can Neuroscience Tell Us Anything About Virtue?" review of The Social Animal: The Hidden Sources of Love, Character, and Achievement by David Books in Public Discourse, Sept 23, 2011.

- "Unlocking the Secrets of Human Biology: Implications for Diplomacy, Security, and War" in Rose McDermott and Peter K. Hatemi, eds. H-Diplo ISSF Roundtable on "Biology and Security", H-Diplo ISSF Roundtable Reviews Volume I, Number 2 (April 2010) (p. 6-34).

- "Illiberal Arguments" review of James Kalb's The Tyranny of Liberalism (part of a larger symposium) in First Principles May 13, 2009.

- "The Compartmentalization of Moral Inspiration," Proceedings of the 36th St. Gallen Symposium, Switzerland: St. Gallen Press, 2006. (p. 103-107).

**EXHIBIT C**

PREVIOUS EXPERT WITNESS WORK

I have written reports and, in most cases, been deposed as an expert witness on topics related to firearms in the following case:

- Expert Witness Report of William English, PhD John Doe #1, et al. v. Putnam County, 16-CV-8191 July 22, 2019..

- Expert Witness Report of William English, PhD Vermont Federation of Sportsmens Clubs v. Birmingham, No. 224-4-18 Wncv (Sup. Ct. Wash. Unit) June 16, 2019.

- Rebuttal Report of William English, Rupp, et al. v. Becerra United States District Court Central District of California, Southern Division Case No.: 8:17-cv-00746- JLS-JDE.

- Expert Witness Report of William English, PhD Rupp, et al. v. Becerra United States District Court Central District of California, Southern Division Case No.: 8:17-cv-00746-JLS-JDE October 25, 2018.

**EXHIBIT D**

COMPENSATION

I am being compensated for my work on this case at the rate of $350 an hour plus reimbursement for any reasonably necessary travel costs that I might incur as a direct result of this work.