# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA

NATIONAL RIFLE ASSOCIATION
OF AMERICA, Inc., *et al.*,

    *Plaintiffs*,

    v.                        CASE NO.: 4:18-cv-137-MW/CAS

RICK SWEARINGEN, in his official
capacity as Commissioner of the
Florida Department of
Law Enforcement,

    *Defendant*.

_____/

## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
## AND INCORPORATED MEMORANDUM OF LAW

Plaintiffs National Rifle Association of America, Inc. (the "NRA") and Radford Fant ("Fant") respectfully move for summary judgment on Plaintiffs' claims under Fed. R. Civ. P. 56, Local Rule 56.1, and this Court's Second Amended Scheduling and Mediation Order (ECF No. 89).

## MEMORANDUM OF LAW

Florida has prohibited anyone 18 to 20 years of age from purchasing any type of firearm—handgun, rifle or shotgun—from anyone, including a federally licensed dealer or a private source (the "Ban"). This unprecedented draconian measure banning an entire class of law-abiding, responsible adults from exercising their

Second Amendment rights is as unconstitutional as it is ill-suited for its stated purpose.

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In *District of Columbia v. Heller*, 554 U.S. 570, 592, 635 (2008), the Supreme Court held this amendment guarantees law-abiding, responsible citizens the individual right to possess and carry firearms for self-defense and other lawful purposes—a right that pre-dated the Founding. Moreover, the Second Amendment "right to possess firearms for protection implies a corresponding right to acquire and maintain proficiency in their use." *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011).

"*Heller* commands that, in passing on a Second Amendment claim, courts must read the challenged statute in light of the historical background of the Second Amendment." *GeorgiaCarry.org, Inc. v. Georgia,* 687 F.3d 1244, 1261 (11th Cir. 2012). At the time of the Founding and ratification of the Second Amendment, 18-to-20-year-old adults were understood to have all the protections provided by the Second Amendment. Nothing in *Heller* can be read to exclude these adults from the Second Amendment's guarantees.

The Ban is unconstitutional *per se* because it has no support in the text, history, and tradition of the Second Amendment and infringes on the core individual

right to keep and bear arms for self-defense and other lawful purposes. Because the Ban is not narrowly tailored, it fails any level of scrutiny traditionally applied to fundamental rights. And because the Ban impermissibly discriminates against similarly situated citizens because of an age classification, it violates the Equal Protection Clause of the Fourteenth Amendment. U.S. Const. amend. XIV.

Plaintiffs respectfully request this Court enter summary judgment for Plaintiffs and declare unconstitutional and unenforceable Florida's law banning 18-to-20-year-old law-abiding, responsible adult citizens from purchasing firearms for self-defense or other lawful purposes.

## STATEMENT OF FACTS

### I. Florida's Ban on firearm purchases by 18-to-20-year-old adults.

In 2018, Senate Bill 7026 amended Section 790.065, Fla. Stat., to add:

> A person younger than 21 years of age may not purchase a firearm. The sale or transfer of a firearm to a person younger than 21 years of age may not be made or facilitated by a licensed importer, licensed manufacturer, or licensed dealer. A person who violates this subsection commits a felony of the third degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084. The prohibitions of this subsection do not apply to the purchase of a rifle or shotgun by a law enforcement officer or correctional officer . . . or a servicemember . . . .

Fla. Stat. § 790.065 (13). An individual who purchases any firearm in violation of this Ban is subject to imprisonment for up to 5 years, a fine of up to $5,000, or both. Fla. Stat. §§ 775.082, 775.083.

Florida law independently limits access to firearms for individuals who are considered unsafe. For example, a firearm generally may not be purchased or possessed by: (1) any individual who has ever been convicted of a felony, *id.* § 790.23(1)(a); (2) anyone who is subject to an injunction against committing acts of domestic violence, *id.* § 790.233; (3) minors under the age of 18, *id.* § 790.22(3); or (4) individuals who have been adjudicated mentally defective or are committed to a mental institution, *id.* § 790.065(2)(a)(4).

Federal law also indirectly constrains the right of adult citizens under the age of 21 to purchase some firearms. A federally licensed firearm dealer ("FFL") may not sell a handgun to any individual under the age of 21, 18 U.S.C. § 922(b)(1), though a private seller may do so. Federal law does not otherwise restrict the exercise by 18-to-20-year-old law-abiding, responsible adults of their right to acquire a firearm.

Florida's new ban broadens these preexisting limits to prohibit all 18-to-20-year-old adult citizens from purchasing any firearms, including long-guns and handguns, from any source at all.

## II. The Plaintiffs.

The NRA, founded in 1871, is the oldest civil rights organization in America and the Nation's foremost defender of Second Amendment rights. (Declaration of Joshua Savani, ECF No. 108-1 ¶ 5.) Its mission is "To protect and defend the

4

Constitution of the United States, especially . . . the God-given inalienable right of the individual American Citizen guaranteed by such Constitution to acquire . . . and enjoy the right to keep and bear arms . . . ." (*Id*. ¶ 6.) The NRA promotes the safe and responsible purchase, possession, and use of firearms by law-abiding, responsible adults for lawful purposes, such as self-defense, target practice, marksmanship competition, and hunting. (*Id*. ¶ 7.) The NRA has a membership of approximately five million persons. (*Id*.) The NRA's membership includes over 300,000 members in the State of Florida, including at least 276 members between ages 18-to-20. (*Id*. ¶ 8.) But for a reasonable fear of prosecution under Florida's Ban, some of these 18-to-20-year-old law-abiding, responsible adult citizens would purchase handguns, long-guns, or both for self-defense and other lawful purposes. (*Id.* ¶ 9.)

Plaintiff Fant is a law-abiding, responsible adult citizen and resident of Florida between the ages of 18 and 21. (Declaration of Radford Fant, ECF No. 108-2.) Fant is a member of the NRA. (*Id.*) But for the challenged Ban, he could lawfully purchase a firearm under Florida and federal law. (*Id.*) He is not a law-enforcement officer, correctional officer, or servicemember and is not exempt from the Ban. (*Id.*) Mr. Fant desires to exercise his constitutionally protected right to purchase a handgun and long gun for self-defense and other lawful purposes. (*Id.*) But for a

reasonable fear of prosecution under the Ban, he would lawfully purchase these firearms. (*Id.*)

## LEGAL STANDARD

Summary judgment should be granted when the record shows there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). Material facts are those that may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Id.* Initially, the moving party bears the burden of showing the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. If the movant meets its burden, the nonmoving party must produce sufficient evidence to rebut the movant's claim and create a genuine issue of material fact. *Id.* at 322–23. The government bears the burden of proving the constitutionality of its actions. *United States v. Alvarez*, 567 U.S. 709, 715–17 (2012)*; Ray v. Comm r, Alabama Dep t of Corr.*, 915 F.3d 689, 698 (11th Cir. 2019).

## ARGUMENT

**I. Florida's Ban on firearm purchases by 18-to-20-year-old adult citizens impermissibly infringes their constitutional right to purchase arms.**

In *Heller*, the Supreme Court determined that challenges under the Second Amendment should be analyzed based upon the text, history, and tradition of that

amendment, which includes assessing Founding-Era firearm restrictions. *Heller*, 554 U.S. at 605, 626–27, 634–35. "We look to [the historical background of the Second Amendment] because it has always been widely understood that the Second Amendment, like the First and Fourth Amendments, codified a pre-existing right." *Id*. at 592. "Constitutional rights are enshrined with the scope they were understood to have when the people adopted them." *Id.* at 634–35. The historical background demonstrates that adults over the age of 18 are guaranteed Second Amendment rights, and there is no historical analogue prohibiting them the right to purchase firearms. By broadly prohibiting 18-to-20-year-old adults from purchasing any type of firearm from any source, the Ban severely burdens their right to possess firearms.

Though *Heller* set forth a text, history, and tradition test to assess the validity of firearm restrictions under the Second Amendment, the Eleventh Circuit has adopted a two-part test for analyzing the Second Amendment challenges. This test requires the Court to determine if "the restricted activity is protected by the Second Amendment in the first place," and, if so, what level of scrutiny to apply. *GeorgiaCarry.Org,* 687 F.3d at 1260 n.34. None of the cases before the Eleventh Circuit thus far have implicated protected conduct. This case unquestionably does and, even if the Court were to apply the two-part test, the Ban cannot pass constitutional muster.

**A. The Second Amendment guarantees 18-to-20-year-old adult citizens the right to possess arms.**

*Heller* held that law-abiding, responsible citizens have a right to possess firearms in their homes for lawful purposes, including self-defense. *Heller* affirmed the Second Amendment protects a preexisting "individual right to possess and carry weapons in case of confrontation." *Id.* at 592; *see also McDonald v. City of Chicago*, 561 U.S. 742, 767–768, 778 (2010) (holding the "central component of the Second Amendment right" is "individual self-defense," a right that is "deeply rooted in this Nation's history and tradition" and is among the "fundamental rights necessary to our system of ordered liberty"). This individual right of "the people" to keep and bear arms applies to "law-abiding, responsible citizens." *Heller*, 554 U.S. at 635.

The text, history, and tradition of the Second Amendment demonstrate that these rights fully vest at least by age 18. At the time the States ratified the Second Amendment, 18-to-20-year-old adult citizens were among the law-abiding, responsible citizens whose right to keep and bear arms was guaranteed. "'The people' protected by the Fourth Amendment, and by the First and Second Amendments, and to whom rights and powers are reserved in the Ninth and Tenth Amendments, refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection to be considered part of that community." *Heller*, 554 U.S. at 580. Use of the phrase "the people" means "the Second Amendment right is exercised individually and belongs to all Americans."

8

*Id.* at 581. "The right of the whole people, *old and young, men, women and boys, and not militia only*, to keep and bear arms of every description and not such merely as are used by the militia, shall not be infringed, curtailed, or broken in upon, in the smallest degree." *Id*. at 612–13 (citations omitted) (emphasis added)).

The Supreme Court has made evident that 18-to-20-year-old adults are among "the people" and the Second Amendment applies to them. The only question that remains is whether this age group enjoys Second Amendment protections to the same extent as all other law-abiding, responsible adult citizens. The historical record demonstrates they do.

At ratification, the militia included 18-to-20-year-old adult citizens, who were expected to keep and train with their own arms at home and to bear those lawful arms if called to serve. The Second Amendment's prefatory clause—"A well regulated Militia, being necessary to the security of a free State"—"announces the purpose for which the right was codified: to prevent elimination of the militia." *Heller*, 554 U.S. at 599. Though the Second Amendment right to keep and bear arms exists outside militia purposes, the Framers' understanding of its relationship to the militia is highly probative in determining whether 18-to-20-year-old adults enjoy the full protection of the right as well.

As the Court explained, "'the Militia comprised all males physically capable of acting in concert for the common defense.'" *Heller*, 554 U.S. at 595 (quoting

*United States v. Miller*, 307 U.S. 174, 179 (1939)). And the militia was expected to supply its own arms: "the conception of the militia at the time of the Second Amendment's ratification was the body of all citizens capable of military service, who would bring the sorts of lawful weapons that they possessed at home to militia duty." *Heller*, 554 U.S. at 627. During the Founding Era, including at the time of the Second Amendment's ratification, every colony and state militia included 18-to-20-year-old males. *See* David B. Kopel & Joseph G.S. Greenlee, *The Second Amendment Rights of Young Adults*, 43 S. Ill. L.J. 495, 533–595 (2019) (analyzing the Founding-Era militia enactments). The first federal militia organized under the Militia Act of 1792 (Uniform Militia Act), 1 Stat. 271 (1792), also included 18-to-20-year-old adult males. Thus, these citizens were part of the militia and were required to supply their own arms—which presupposed an ability to acquire those arms by purchase or otherwise. *See Nat'l Rifle Ass'n, Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives* ("*BATFE II*"), 714 F.3d 334, 339 (5th Cir. 2013) (Jones, J., *dissenting from denial of rehearing en banc*) ("Eighteen year olds were required by the 1792 Militia Act to be available for service, and militia members were required to furnish their own weapons . . . .").

These enactments reflect a consensus that, at the time of the Founding and ratification of the Second Amendment, 18-to-20-year-old citizens were guaranteed the right to keep and bear arms. *See id.* ("When we turn to the properly relevant

historical materials, they couldn't be clearer: the right to keep and bear arms belonged to citizens 18 to 20 years old at the crucial period of our nation's history.").

The text, history, and tradition of the Second Amendment establish that its guarantees extend fully to law-abiding, responsible 18-to-20-year-old adults.

### B. The Second Amendment guarantees 18-to-20-year-old adult citizens the right to acquire firearms.

The constitutional right to keep and bear arms for self-defense, hunting, recreation, or other lawful purposes necessarily encompasses the corresponding constitutional right to acquire them. Because 18-to-20-year-old adults have the right to possess firearms, the Florida Legislature cannot restrict the exercise of that right by prohibiting the purchase of firearms.

Restrictions on the purchase of instruments, or access to services, necessary to exercise a constitutional right are largely indistinguishable from outright restrictions of the right itself. *See, e.g., Carey v. Population Servs. Int'l*, 431 U.S. 678, 689 (1977) ("Limiting the distribution of nonprescription contraceptives to licensed pharmacists clearly imposes a significant burden on the right of the individuals to use contraceptives if they chose to do so."); *see also Lamont v. Postmaster General*, 381 U.S. 301, 307 (1965) (stating that a restriction on an addressee's right to receive literature "amounts . . . to an unconstitutional abridgment of the addressee's First Amendment rights"); *see also City of Ladue v. Gilleo*, 512 U.S. 43, 51 (1994) (holding otherwise permissible time, place, and manner

restrictions "are subject to attack on the ground they simply prohibit too much speech").

The Seventh Circuit has already addressed the issue in the Second Amendment context. In *Ezell*, the Seventh Circuit considered a challenge to a Chicago ordinance that required training at a firing range as a prerequisite to lawfully possessing a firearm but banned all firing ranges within the city limits. 651 F.3d at 689–90. Striking down the municipal ordinance as unconstitutional under the Second Amendment, the court held the "right to possess firearms for protection implies a corresponding *right to acquire* and maintain proficiency in their use." *Id.* at 704 (emphasis added). The Chicago ordinance was held to be "a serious encroachment on the right to maintain proficiency in firearm use, an important corollary to the meaningful exercise of the core right to possess firearms for self-defense." *Id.* at 708.

The constitutional right to possess firearms for self-defense and other lawful purposes necessarily entails the corresponding constitutional right to acquire them. *Cf. Teixeira v. County of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017) (en banc) ("[T]he Second Amendment protects ancillary rights necessary to the realization of the core right to possess a firearm for self-defense"); *see also id.* at 682 ("Commerce in firearms is a necessary prerequisite to keeping and possessing arms for self-defense . . . ."); *Maryland Shall Issue, Inc. v. Hogan*, No. 19-1468, 2020 WL

4664810, at *1 (4th Cir. Aug. 3, 2020) (holding FFL has standing to bring a Second Amendment claim as to its customers' right to purchase firearms); *and see Illinois Ass'n of Firearms Retailers v. City of Chicago*, 961 F. Supp. 2d 928, 930 (N.D. Ill. 2014) ("[T]he right to keep and bear arms for self-defense under the Second Amendment . . . must also include the right to *acquire* a firearm."). *See also Elhert v. Settle*, CL20000582, Circuit for the City of Lynchburg, 3–4 (24th Va. Cir., July 14, 2020) (overturning a restriction on private purchases of handguns by 18-to-20-year-olds because "[t]he lack of a right to buy and sell arms would negate the right to keep arms . . .") (ECF No. 108-3 at 3–4.) That has been the law in this country for a century and a half. *Andrews v. State*, 50 Tenn. 165, 178 (1871) (cited in *Heller*, 554 at 608) ("The right to keep arms, necessarily involves the right to purchase them.").

There is no historical tradition restricting the right of 18-to-20-year-old adult citizens to purchase firearms. As noted, *supra* Part I(A), at the time of the Founding and ratification of the Second Amendment, 18-to-20-year-olds were entitled—and sometimes even required—to acquire firearms. Accordingly, the Ban does not resemble any historical prohibition on the Second Amendment.

Nor does the decision upholding the federal handgun ban on FFL handgun sales to anyone under age 21, 18 U.S.C. § 922(b)(1), (c)(1), legitimize the Ban at issue here. In *Nat'l Rifle Ass'n, Inc. v. Bureau of Alcohol, Tobacco, Firearms, &*

*Explosives* ("*BATFE I*"), 700 F.3d 185 (5th Cir. 2012), the Fifth Circuit conducted an historical assessment and identified restrictions on the right to keep and bear arms during the Founding Era—none of which restricted the right of 18–20-year-old adults to purchase firearms. *Id.* at 200–01 (discussing restrictions relating to the storage of gun powder, registration, militia service, and restricting firearm use on certain occasions and in certain places and by Loyalists). The Fifth Circuit also cited 19th and 20th Century legislative enactments—coming decades after the ratification of the Second Amendment—that restricted the rights of those under 21 from purchasing or using firearms. *Id.* at 202–03. Relying on these inapt historical restrictions, the Fifth Circuit upheld the federal handgun ban. *Id.* at 211. Critically, the Fifth Circuit recognized that the federal handgun ban did not preclude private sales or the sale of other firearms to the restricted age group. *Id.* at 209.

As *Heller* made clear, however, these Founding Era restrictions are not analogous to a ban on the exercise of the right to self-defense, 554 U.S. at 630-35, and these later authorities "do not provide as much insight into [the Second Amendment's] original meaning as earlier sources." *Id.* at 614. The Fifth Circuit's historical assessment failed to find any statutes contemporaneous with the Founding Era or the ratification of the Second Amendment restricting the right of 18-to-20-year-old, responsible adult citizens to purchase, possess, or use firearms for self-defense and other lawful purposes.

*BATFE I* also assumed 21 was the age of majority at the common law or in late-19th and early 20th Century statutes. 700 F.3d at 201–02. But the Fifth Circuit did not identify a single statute from the Founding Era or at the time of ratification like the Ban at issue here. As shown, *supra* Part I(A), regardless of the age of majority at the time, 18-to-20-year-old citizens were part of the militia at the Founding and had Second Amendment protections. *See* 1 *Blackstone Commentaries* *463 (noting that under the common law, minimum age requirements were "different for different purposes"). Recently, relying on the erroneous reasoning in *BATFE I*, *Mitchell v. Atkins*, C19-05106-RBL, 2020 WL 5106723, *5 (W.D. Wash., Aug. 31, 2020), upheld a Washington statute prohibiting the sale of semi-automatic rifles to 18-to-20-year-olds. Unlike the Florida Ban, the Washington statute allowed the purchase of other firearms, as did the handgun ban at issue in *BATFE I*. *Id*.

The First Circuit's decision in *United States v. Rene E.*, 583 F.3d 8 (1st Cir. 2009), underscores the distinction between 18-to-20-year-old adults and juveniles under 18. *Rene E.* involved a challenge to a statute banning handgun possession by minor children *under* the age of 18, not 18-to-20-year-old adults. The First Circuit's conclusion that there is a "longstanding tradition of prohibiting juveniles," i.e., minor children, "from both receiving and possessing handguns," demonstrates the important difference between the Second Amendment rights historically accorded 18-to-20-year-old adult citizens but denied to juveniles. 583 F.3d at 12.

In the modern era, 18-to-20-year-olds are considered to be adults for essentially all purposes and certainly for the purposes of exercising fundamental constitutional rights. All males over the age of 17 and under the age of 45 are part of the militia. 10 U.S.C. § 246. At age 18, citizens are eligible to serve in the military, 10 U.S. § 505(a); be drafted, 50 U.S.C. § 3803(a); and vote, U.S. Const. amend. XXVI.

In Florida, the age of majority is 18, which means an 18-to-20-year-old may serve on a jury, enter into contracts, sue and be sued, get married, and own property, all without parental consent. Fla. Stat. § 743.07. The ownership of property is particularly relevant considering *Heller*'s pronouncement that "the home [is] where the need for defense of self, family, and property is most acute." *Heller*, 554 U.S. at 628. An 18-to-20-year-old may also be tried as an adult for all crimes, Fla. Stat. § 985.557, and obtain an abortion without parental consent, Fla. Stat. § 390.01114. *See also Roper v. Simmons*, 543 U.S. 551, 568 (2005) (recognizing the age of 18 as the dividing line between childhood and adulthood and concluding the age of 18 is the age at which an individual becomes eligible for the death penalty). Florida citizens 18 and older can enlist in the National Guard, 32 U.S.C. § 313, while those 19 and older may serve in a law enforcement capacity, Fla. Stat. § 943.13, both of which positions exempt them from the Ban. Fla. Stat. § 790.065 (13). (*See* Declaration of Expert Professor William English, ECF No. 108-4 ¶ 13 (noting the

16

historical practice of conscripting 18-to-20-year-old adults and that 84% of United States Marine Corps enlistees are 20 or younger).)

The Ban is no mere "condition" or qualification" on the commercial sale of firearms, *Heller*, 554 U.S. at 626–27, like a background check. It prohibits all firearms purchases, whether in a commercial or private transaction, by 18-to-20-year-old adults who are otherwise fully entitled to exercise Second Amendment rights.

Once again, the Seventh Circuit's reasoning in *Ezell* is instructive. In *Ezell*, the Seventh Circuit distinguished between laws that merely regulate Second Amendment rights from those that restrict them. 651 F.3d at 708. The court determined the ordinance was a "sweeping array of firearms restrictions" masquerading as a regulation, that imposed a restriction and therefore violated the Second Amendment. *Id*. at 690, 708, 711; *and see id*. at 703 (stating both "*Heller* and *McDonald* suggest that broadly prohibitory laws restricting the core Second Amendment right are categorically unconstitutional.").

The Ban eliminates all avenues for these adults to legally purchase firearms. If the wholesale prohibition of the right to purchase firearms by a group of otherwise qualified citizens were permissible, it would effectively eviscerate *Heller's* core holding. *Heller*, 554 U.S. at 592, 628–30; *see also United States v. Marzzarella*, 614 F.3d 85, 92 n.8 (3d Cir. 2010) (observing a law "prohibiting the commercial sale of

firearms" "would be untenable under *Heller*").

The right to keep and bear firearms under the Second Amendment must encompass the ability to purchase firearms to exercise that right. Florida's Ban on all firearm purchases by 18-to-20-year-old adults violates the fundamental guarantees of the Second Amendment.

### C. Florida may not infringe the core right of 18-to-20-year-old adult citizens to possess firearms by banning their right to purchase them.

Because there is no historical antecedent to the Ban from the Founding Era or ratification of the Second Amendment, it is unconstitutional under the text, history and tradition of the Second Amendment. In *Heller*, the Court established a text, history, and tradition standard for determining the scope of Second Amendment protection. 554 U.S. at 576–627. The Supreme Court reaffirmed *Heller's* text, history, and tradition analysis in *McDonald*, 561 U.S. at 768. *See also Caetano v. Massachusetts*, 136 S. Ct. 1027, 1027–28 (2016) (per curiam) (remanding case for failure to properly apply *Heller* to state stun gun ban).

When reviewing the constitutionality of a firearm ban, *Heller* mandates the use of a text, history, and tradition analysis, instead of adopting means/ends or judicial balancing tests. *See, e.g., Heller*, 554 U.S. at 634 (rejecting dissenting Justice Breyer's proposed "judge-empowering 'interest-balancing inquiry'" and stating "[we] know of no other enumerated constitutional right whose core protection has been subjected to a freestanding 'interest balancing' approach'"); *McDonald*, 561

U.S. 742, 790–91 (2010) (controlling opinion of Alito, J.) (rejecting assessments of "the costs and benefits of firearms restrictions" and noting that, in *Heller*, while Justice Breyer "recommended an interest-balancing test, the Court specifically rejected that suggestion"); *Duncan v. Becerra*, No. 19-55376, 2020 WL 4730668, at *5 (9th Cir. Aug. 14, 2020) (conducting historical analysis of the right to keep-and-bear arms); *Heller v. District of Columbia*, 670 F.3d 1244, 1271 (D.C. Cir. 2011) (Kavanaugh, J., dissenting) (noting "*Heller* and *McDonald* leave little doubt that courts are to assess gun bans and regulations based on text, history, and tradition"). The Second Amendment itself "is the very *product* of an interest balancing by the people." *Heller*, 544 U.S. at 635.

As demonstrated, *supra* Part I(B), there is no historical analogue to the Ban from the Founding Era or ratification of the Second Amendment. Accordingly, the right of 18-to-20-year-old adult citizens to purchase firearms for self-defense and other lawful purposes is supported by the text, history, and tradition of the Second Amendment, and the Ban is an unconstitutional infringement on that right.

### D. Even if the Court were to apply a two-part inquiry, the Ban would fail.

The Eleventh Circuit has adopted a two-part test for analyzing the Second Amendment challenges it has reviewed, which it recently summarized: "first, we ask if the restricted activity is protected by the Second Amendment in the first place; and then, if necessary, we would apply the appropriate level of scrutiny."

*GeorgiaCarry.Org,* 687 F.3d at 1260 n.34. Plaintiffs respectfully request the Court employ the text, history, and tradition test set forth in *Heller* because the two-part test is inappropriate for such a sweeping restriction on the core right like the Ban. But, even if the Court were to apply the two-part test, the Ban cannot pass constitutional muster under any level of scrutiny.

The Eleventh Circuit has upheld a variety of firearm regulations under this two-part test, but none of them implicated *Heller's* text, history and tradition approach because none of those regulations restricted conduct protected by the Second Amendment. *See United States v. Rozier*, 598 F.3d 768 (11th Cir. 2010) (upholding statute disqualifying felons from possessing firearms); *United States v. White*, 593 F.3d 1199 (11th Cir. 2010) (upholding statute disqualifying domestic abusers from possessing firearms); *GeorgiaCarry.Org*, 687 F.3d at 1264 (upholding statute barring unrestricted carrying of firearms in specific locations, including houses of worship, against property owner's consent); *GeorgiaCarry.Org, Inc., v. U.S. Army Corps of Engineers*, 788 F.3d 1318 (11th Cir. 2015) (upholding regulation prohibiting carrying of firearms on Corps of Engineers property); *United States v. Focia*, 869 F.3d 1269 (11th Cir. 2017) (upholding statute prohibiting dealing in firearms without a license).

As demonstrated, *supra* Part I(A), the right of 18-to-20-year-old responsible, adult citizens to purchase firearms for self-defense and other lawful purposes lies

squarely within the core Second Amendment right identified in *Heller*. The first step of the two-part test is satisfied, and the Court must move to the second step and determine which level of scrutiny to apply. And under either form of heightened scrutiny, a challenged law is presumed unconstitutional, and the government bears the burden of justifying it. *See, e.g.*, *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992) (content-based speech regulations are presumptively invalid); *United States v. Chester*, 628 F.3d 673, 680 (4th Cir. 2010) ("unless the conduct at issue is not protected by the Second Amendment at all, the government bears the burden of justifying the constitutional validity of the law").

### 1. Because Florida's ban burdens the core right of self-defense, the Court should apply strict scrutiny and invalidate Florida's Ban.

The Ban restricts the right of law-abiding, responsible adult citizens to purchase firearms for the exercise of their Second Amendment rights, including the core right of self-defense. *Heller*, 554 U.S. at 592, 628. And the burden the Ban imposes on this core right is the most severe kind: a prohibition on the purchase of firearms under any circumstances. Because the Ban severely burdens conduct protected by the Second Amendment, it must satisfy some form of heightened scrutiny. *See, e.g., Heller*, 554 U.S. at 628–29, 634–35 (holding a categorical ban on the possession of handguns fails under any level of heightened scrutiny); *and see Ezell*, 651 F.3d at 708 (noting a categorical ban requires more than intermediate scrutiny "if not quite 'strict scrutiny'").

21

Strict scrutiny applies "when government action impinges upon a fundamental right protected by the Constitution." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 54 (1983); *see also San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 16 (1973) (holding that when a restriction impedes "fundamental constitutional rights," a court should apply "strict judicial scrutiny"); *see also Williams v. Pryor*, 240 F.3d 944, 947 (11th Cir. 2001) ("Statutes that infringe fundamental rights . . . are subject to strict scrutiny . . . ."). "The right to keep and bear arms was considered no less fundamental by those who drafted and ratified the Bill of Rights." *McDonald*, 561 U.S. at 768. And in this context, strict scrutiny applies if a statute burdens the Second Amendment core right of self-defense in the home. *Duncan*, 2020 WL 4730668, at *12; *Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Attorney Gen. New Jersey*, 910 F.3d 106, 117 (3d Cir. 2018); *BATFE I*, 700 F.3d 185 at 195; *Ezell*, 651 F.3d at 708; *United States v. Masciandaro*, 638 F.3d 458, 470 (4th Cir. 2011). Because Florida's Ban severely burdens the fundamental right for 18-to-20-year-old adult citizens to purchase firearms for self-defense or other lawful purposes, strict scrutiny is the only appropriate analysis under the second part of the two-part test.

Strict scrutiny requires the government to "prove that the restriction 'furthers a compelling interest and is narrowly tailored to achieve that interest.'" *Citizens United v. Fed. Election Com'n*, 558 U.S. 310, 340 (2010) (citations omitted); *see*

*also Williams*, 240 F.3d at 947–48. Under strict scrutiny, narrow tailoring requires the government to use "the least restrictive means" of achieving that "compelling government interest." *Burk v. Augusta-Richmond County*, 365 F.3d 1247, 1251 (11th Cir. 2004) (citations omitted). This is an extremely demanding standard. *Williams*, 240 F.3d at 948.

The only hint of the interest behind the Ban is in the text of the bill itself: "The legislature's express purpose was to 'comprehensively address the crisis of gun violence, including . . . on school campuses.'" (S.B. 7026 § 2; *see also* Bill Analysis and Fiscal Impact Statement for S.B. 7026, ECF No. 108-5 at 13–14.) While Florida has an interest in promoting public safety, particularly in schools, it cannot show that the Ban is the least restrictive means to advance that interest. Nor could any ban be. *Cf. Heller*, 554 U.S. at 629, 634–35 (noting that violence involving handgun use by criminals was a significant issue but rejecting the argument that it could justify a ban on the exercise of Second Amendment rights).

The Ban infringes the right of all 18-to-20-year-olds to purchase firearms for the exercise of their Second Amendment rights, even for self-defense in the home. The Ban does not just limit the right, it obliterates it. The Ban could not possibly be the least restrictive alternative. Nor is there evidence in the record that the Legislature considered the availability of less restrictive alternatives. *Ray*, 915 F.3d at 699 (holding the court may not rely on "unexplained *ipse dixit* of the state that

there are no less restrictive means" and that "[i]t remains the state's burden to demonstrate that there are no other less restrictive means by which to protect its interests"). (*See* Bill Analysis, ECF No. 108-5.)

Because the government cannot meet its burden of demonstrating the Ban is the least restrictive alternative, the Ban should be struck down.

### 2. Even if the Court were to apply intermediate scrutiny, the Ban fails because it is not narrowly tailored to achieve the governmental interest.

Ultimately, this case does not depend on the level of heightened scrutiny applied because the Ban cannot survive even intermediate scrutiny. Intermediate scrutiny requires that a law affecting a fundamental right "be narrowly tailored to serve a significant governmental interest." *McCullen v. Coakley*, 573 U.S. 464, 486 (2014) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 796 (1989)). And for intermediate scrutiny, narrow tailoring means the law must not "burden substantially more [protected conduct] than is necessary to further the government's legitimate interests." *Id.* (quoting *Ward*, 491 U.S. at 799). "The burden of justification is demanding, and it rests entirely on the State." *United States v. Virginia*, 518 U.S. 515, 533 (1996). And the State cannot "get away with shoddy data or reasoning." *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 438 (2002) (plurality op.). Intermediate scrutiny requires the Court to perform a fact-based analysis and assess the evidence supporting the Ban's justification. *See McCutcheon*

*v. Federal Election Comm'n*, 572 U.S. 185, 221 (2014) (plurality op.) (stating a restriction must avoid "unnecessary abridgment" of a constitutional right).

The Ban is not narrowly tailored because it restricts the purchase of all firearms from any source by all 18-to-20-year-old adults for any lawful use, including self-defense in the home. The Ban, by its very nature, infringes upon the constitutional right at the core of the Second Amendment to purchase firearms for self-defense and other lawful purposes and lacks the tailoring required even under intermediate scrutiny. *McCullen*, 573 U.S. at 490 (holding "buffer zones" invalid because they burden substantially more speech than is necessary).

Again, the only justification offered for the Ban is found in the text of the bill itself: to "comprehensively address the crisis of gun violence, including . . . on school campuses." S.B. 7026 § 2. There is no other reference in the legislative record to the considerations the Florida Legislature made at the time it debated the Ban or the purposes behind it, or even any evidence of how the ban might operate to achieve that interest.

Neither is there empirical evidence in the legislative record suggesting the Ban will advance public safety or reduce gun violence. There is no evidence that the Florida Legislature conducted or even referred to any sort of empirical analyses studying the prevention of gun violence, particularly that related to school campuses, and the effect the Ban would have on that violence. *See, e.g., Ezell*, 651 F.3d at 709

("[T]he government must supply actual, reliable evidence to justify restricting" protected conduct "based on secondary public-safety effects . . . .").

Only the speculative illegal use of firearms by this age group could implicate the government's asserted public safety interests. But the government may not flatly ban constitutionally protected activity on the ground that it could lead to abuses. *See, e.g.*, *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 245 (2002) (government cannot ban virtual child pornography on the ground that it might lead to child abuse because "[t]he prospect of crime" "does not justify laws suppressing protected speech"). "[A] free society prefers to punish the few who abuse [their] rights . . . after they break the law than to throttle them and all others beforehand." *Se. Promotions Ltd. v. Conrad*, 420 U.S. 546, 559 (1975).

Further, the Ban is not like the federal regulation of FFL handgun sales to those under 21, 18 U.S.C. § 922(b)(1), (c)(1), which the Fifth Circuit upheld in *BATFE I*, 700 F.3d at 185. As the Fifth Circuit noted, Congress conducted empirical research suggesting that regulation "would deter violent crime," 700 F.3d at 203, and evidence before Congress "confirmed a 'causal relationship between the easy availability of *firearms other than a rifle or a shotgun . . .* and youthful criminal behavior.'" *Id*. at 199 (citations omitted) (emphasis added). Finally, the court relied on the narrow tailoring of the restriction, noting it only applied to commercial sales of handguns by FFLs and left open the option to purchase long-guns from dealers

26

and both handguns and long-guns from private sources. *Id*. at 206–07, 209. Because the federal statute left open the options to purchase long-guns from all sellers and handguns from private sellers, the court found the burden was slight, selected intermediate scrutiny, and upheld that regulation as narrowly tailored. *Id*. at 205. That narrow tailoring and relatively modest burden were critical to the outcome of that case.

The Ban's complete prohibition on the commercial or private purchase of any type of firearm—long-gun or handgun, from any source—is not fairly comparable to the more narrowly tailored restriction on the commercial sale of handguns at issue in *BATFE I*. Florida's Ban prohibits 18-to-20-year-old citizens access to the entire legal firearms market.

Additionally, to survive intermediate scrutiny, there must be evidence that the means chosen will advance the law's stated goals; and the government is entitled no deference in this assessment. *Duncan*, 2020 WL 4730668, at *25. Here, there is no evidence in the legislative record showing a causal link between firearms purchases by 18-20-year-old adults and a crisis of gun violence, particularly in schools. Instead, the empirical evidence strongly shows the Ban will be ineffective or even counterproductive. Violent crime among 18-to-20-year-old adults is low. (*See* Declaration of Expert Professor Gary Kleck, ECF No. 108-6 ¶ 7; *see also* English Dec., ECF No. 108-4 ¶ 8.) More than 98% of the 18-to-20-year-old adults who are

subject to the Ban will never commit a violent crime, with or without a gun. (Kleck Dec., ECF No. 108-6 ¶ 7.) Approximately 90% of firearms used in crime are not obtained through regulated sales involving background checks; instead, the vast majority are obtained through illegal means. (*See* English Dec., ECF No. 108-4 ¶ 8.) Additionally, the Ban prohibits 18-to-20-year-olds from purchasing long-guns. Long-guns are rarely used in crime; they are implicated in only 14.5% of gun crime and fewer than 7.5% of homicides. (*Id.*)

Available statistical evidence strongly suggests "age-based restrictions on purchase and possession of firearms . . . have no detectable crime-reducing effect," including the federal handgun ban upheld in *BATFE I*. (Kleck Dec., ECF No. 108-6 ¶ 11; *see also* English Dec., ECF No. 108-4 ¶ 8.) *See* Gary Kleck, *Regulating Guns Among Young Adults*, Am. J. of Crim. Just. 44:689–704, 699 ("The federal ban on 18–20-year-olds purchasing handguns from licensed dealers . . . does not appear to have reduced the 18–20-year-old share of violent crime . . . . the ban was apparently ineffective in reducing criminal violence."). Nor will the Ban likely have an effect on suicide rates or accidental deaths from long-guns among 18-to-20-year-old adults because those rates are already very low. (English Dec., ECF No. 108-4 ¶ 9.)

Far from reducing violent crime, there is a strong likelihood the Ban will result in more victimization of Floridians age 18 to 20 by burdening their ability to acquire the most-effective means of self-defense: firearms. Statistics also show adults in this

age group are most susceptible to violent crime. (Kleck Dec., ECF No. 108-6 ¶¶ 8–10.) Adults between the ages of 18 and 24 are the most frequent victims of violent crime, suffering 25.3% of violent crime incidents. (English Dec., ECF No. 108-4 ¶ 11.) By removing the ability to purchase firearms, the Ban removes the primary—and most effective—means American citizens choose to engage in self-defense. (Kleck Dec., ECF No. 108-6 ¶ 10) *See also* Kleck, *supra*, at 695 ("[T]he deterrent and defensive effects of gun carrying and defensive use among crime victims and prospective victims had crime-reducing effects that counterbalanced any crime-increasing effects of young adults carrying concealed guns.") In addition to self-defense, the Ban prohibits the purchase of firearms by 18-to-20-year-old adults for other lawful purposes, including hunting and recreation. Tens of thousands of Floridians in this age demographic use firearms for sporting purposes each year. (English Dec., ECF No. 108-4 ¶ 12.)

The Ban does not prohibit the possession or use of firearms by 18-to-20-year-old adults. They may still obtain firearms from others as a gift or loan, though such gift and loans cannot possibly make up for the loss of access to firearms from commercial and private sales. The result is that 18-to-20-year-old adults may only exercise their Second Amendment rights if a parent, guardian, or some other person gives or loans them firearms. This alternative market offers no consolation to those 18-to-20-year-old adults who do not have parents or legal guardians, do not have

parents or legal guardians with the means to gift or loan them a firearm, do not have parents or legal guardians who live in Florida, or do not otherwise have anyone willing to gift or loan a firearm to them. The Ban effectively eliminates the lawful possession of firearms as to those individuals. *See Planned Parenthood of Southeastern PA v. Casey*, 505 U.S. 833, 894 (1992) (plurality op.) ("The proper focus of constitutional inquiry is the group for whom the law is a restriction, not the group for whom the law is irrelevant.").

It is no answer to say the Ban meets constitutional scrutiny when it leaves open only a very slim channel for a limited portion of the affected age group to obtain firearms through the beneficence of others. It operates as a flat ban as to almost all of the targeted age group.

There is at most a speculative relationship between the purpose of the Ban, enhancing public safety, particularly in schools, and the means chosen to achieve it: a wholesale prohibition on the purchase of firearms by all 18-to-20-year-old adult citizens. The Ban is neither limited to 18-to-20-year-old adults who are still in some form of schooling nor does it contain any school-related provision whatsoever. Instead, it applies to an age group that is entirely beyond compulsory schooling.

The fit between the Ban and the stated goal of reducing gun violence, particularly on school campuses, is not reasonable. Because there is no reasonable "fit" between the asserted interests and the Ban, and because the Ban burdens

significantly more protected conduct than necessary to advance public safety, it is unconstitutional.

## II. Florida's Ban Denies 18-to-20-Year-Old Adult Citizens Equal Protection of the Law.

Because the Ban uses an age classification to impermissibly burden the right of 18-to-20-year-olds to purchase firearms in the exercise their fundamental Second Amendment rights, it violates the Equal Protection Clause of the Fourteenth Amendment. U.S. Const. amend. XIV.

The Equal Protection Clause requires the government to treat similarly situated persons in a similar manner. *Gary v. City of Warner Robins, Ga.*, 311 F.3d 1334, 1337 (11th Cir. 2002) (citations omitted). In Florida, as demonstrated, *supra* Part I(B), but for the Ban, 18-to-20-year-old adults are similarly situated to those over 21 in virtually all respects under the law—serving on a jury, entering into contracts, suing and being sued, getting married, owning property. And, when "legislation classifies persons in such a way that they receive different treatment under the law, the degree of scrutiny the court applies depends upon the basis for the classification." *Gary*, 311 F.3d at 1337 (citations omitted). "If a fundamental right or a suspect class is involved, the court reviews the classification under strict scrutiny." *Id.*; *Morrissey v. United States*, 871 F.3d 1260, 1268 (11th Cir. 2017) (holding legislative classifications that interfere with the exercise of a fundamental right demand strict scrutiny) (citations omitted); *Leib v. Hillsborough County Pub.*

*Transp. Com'n*, 558 F.3d 1301, 1306 (11th Cir. 2009) (holding if a law "impinges on a fundamental right, it is subject to strict scrutiny").

Here, there can be no doubt that the Second Amendment right to keep and bear arms is fundamental. *McDonald*, 561 U.S. at 778. And there is no dispute the Ban interferes with a fundamental right based on an age classification. The Court should apply strict scrutiny—a test the Ban must fail.

Even if the Court were to apply a rational basis test to this equal protection claim, the Ban fails because it has no rational relationship to its stated purpose. *Leib*, 558 F.3d at 1306 ("whether there is a rational relationship between the government's objective and the means it has chosen to achieve it."). As shown, *supra* Part I(D)(2), the fit between the Ban and the achievement of its stated purpose is not reasonable. The Ban should be struck under the Equal Protection Clause.

## CONCLUSION

By prohibiting law-abiding, responsible 18-to-20-year-old adult citizens from purchasing any type of firearm from any source, Florida's age-based Ban imposes a severe, unequal, and impermissible burden on the exercise of their fundamental right to keep and bear arms. For the reasons set forth above, the Ban violates the Second and Fourteenth Amendments. Plaintiffs respectfully request the Court grant summary judgment to them on all counts.

Respectfully submitted,

/s/ *John Parker Sweeney*
John Parker Sweeney
James W. Porter, III
Marc A. Nardone
BRADLEY ARANT BOULT CUMMINGS LLP
1615 L Street, NW
Washington, DC 20036
Tel: (202) 393-7150
jsweeney@bradley.com
(Admitted *Pro Hac Vice*)

Eliot B. Peace (FBN: 124805)
BRADLEY ARANT BOULT CUMMINGS LLP
100 N. Tampa Street, Suite 2200
Tampa, FL 33602
Telephone: (813) 559-5500
epeace@bradley.com

*Counsel for Plaintiffs*

## Local Rule 7.1(F) Certificate of Compliance

Pursuant to Local Rule 7.1(F), I certify the foregoing pleading contains 7,631 words.

/s/*Eliot B. Peace*
*Counsel for Plaintiffs*

## Local Rule 7.1(K) Request for Oral Argument

Pursuant to Local Rule 7.1(K), Plaintiffs request oral argument. This Motion for Summary Judgment presents important questions related to the application of the Second Amendment. Plaintiffs estimate that each side will need 30 minutes for argument.

/s/*Eliot B. Peace*
*Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on September 3, 2020, I filed the foregoing with the Clerk of the Court using the CM/ECF system, which will provide electronic notification to all counsel of record, as follows:

AMIT AGARWAL (FBN 125637)
Solicitor General

JAMES H. PERCIVAL (FBN 1016188)
Chief Deputy Solicitor General

ELIZABETH TEEGEN (FBN 833274)
Chief Assistant Attorney General

TIMOTHY NEWHALL (FBN 391255)
Senior Assistant Attorney General

Office of the Attorney General
The Capitol, PL-01
Tallahassee, FL 32399
Tel: (850) 414-3681
amit.agarwal@myfloridalegal.com
james.percival@myfloridalegal.com
elizabeth.teegen@myfloridalegal.com
barbara.throne@myfloridalegal.com
timothy.newhall@myfloridalegal.com

CHRISTOPHER J. BAUM (FBN 1007882)
Deputy Solicitor General
Office of the Attorney General
State of Florida
1 SE 3rd Ave Suite 900
Miami, FL 33131
(786) 792-6269
christopher.baum@myfloridalegal.com

/s/ *Eliot B. Peace*
*Counsel for Plaintiffs*

35