# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA

NATIONAL RIFLE ASSOCIATION
OF AMERICA, Inc., *et al.*,

    *Plaintiffs*,

    v.                           CASE NO.: 4:18-cv-137-MW/CAS

RICK SWEARINGEN, in his official
capacity as Commissioner of the
Florida Department of
Law Enforcement,

    *Defendant*.

_____/

## PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND INCORPORATED MEMORANDUM OF LAW

Plaintiffs National Rifle Association of America, Inc. (the "NRA") and

Radford Fant ("Fant") oppose Defendant's Motion for Summary Judgment (ECF

No. 107) and respectfully request the Court deny Defendant's motion.

## INTRODUCTION

In *District of Columbia v. Heller*, the Supreme Court held that courts are to

assess the constitutionality of laws infringing rights protected by the Second

Amendment in light of that Amendment's text, history, and tradition because "rights

are enshrined with the scope they were understood to have when the people adopted

them." 554 U.S. 570, 605, 634–35 (2008); *accord GeorgiaCarry.org, Inc. v.*

*Georgia,* 687 F.3d 1244, 1261 (11th Cir. 2012) ("*Heller* commands that, in passing on a Second Amendment claim, courts must read the challenged statute in light of the historical background of the Second Amendment."); *see also McDonald v. City of Chicago*, 561 U.S. 743, 768–770 (2010) (conducting a historical analysis focusing on Founding Era sources).

Defendant argues that Florida's ban on all firearm purchases by 18-to-20-year-old adults, Section 790.065(13), Fla. Stat. (the "Ban"), does not violate the Second Amendment because these young adults have no Second Amendment rights, and, even if they do, the Ban survives an interest balancing analysis. As Plaintiffs demonstrated in their Motion for Summary Judgment (ECF No. 109), however, these young adults enjoy all of the protections of the Second Amendment. The Ban is unconstitutional because it infringes on the core individual right to keep and bear arms for self-defense and has no relevant analog in the text, history, and tradition of the Second Amendment.

Defendant ignores *Heller*'s command to evaluate Second Amendment challenges using the text, history, and tradition of the Second Amendment, with a focus on the law at the time of ratification. Rather than focusing on that relevant history, Defendant conducts a faux historical analysis based on a smattering of inapposite post-ratification statutes. (ECF No. 107 at 6–17.) Defendant relies on later enactments that have little resemblance to the Ban and little relevance to the

historical analysis required here, and none of which support his argument. Defendant does not—and cannot—point to a historical tradition of obliterating the right of 18-to-20-year-olds to purchase firearms as Florida has done. Defendant cannot refute the historical evidence of the scope of the right at the Founding and hundreds of years of post-ratification tradition that make clear young adults cannot be prohibited from purchasing firearms in the exercise of their fundamental right of self-defense.

Failing to demonstrate any historical basis on which to uphold the Ban, Defendant urges the Court to engage in an interest balancing approach, which he argues the Ban passes. (ECF No. 107 at 5–6, 19–29.) This approach has been expressly rejected twice by the Supreme Court. *Compare Heller*, 554 U.S. at 634 (rejecting the interest balancing test advanced by Justice Breyer in dissent) *with id.* at 690 (Breyer, J., dissenting) (advancing an interest balancing test based on *Turner Broadcasting Sys., Inc. v. FCC*, 520 U.S. 180 (1997), which applied a deferential form of intermediate scrutiny); *see also McDonald,* 561 U.S. at 785 ("In *Heller*, however, we expressly rejected the argument that the scope of the Second Amendment right should be determined by judicial interest balancing."). Even if the Court were to apply this approach, however, the Ban fails any level of scrutiny traditionally applied to fundamental rights.

**ARGUMENT**

## I. Florida's Ban violates the Second Amendment.

### A. Defendant is wrong; 18-to-20-year-old law-abiding, responsible adult citizens have Second Amendment rights.

Defendant first argues that this Court should deny all law-abiding, responsible adult citizens between the ages of 18 and 21—who are part of the militia (10 U.S.C. § 246), can own homes, can be compelled into military service, and can be sentenced to any constitutionally permissible punishment, including death—their right to purchase firearms in the exercise of their right to keep and bear arms by holding that they do not have Second Amendment rights. This argument has no basis in the text, history, and tradition of the Second Amendment, and Defendant's inapposite citations to irrelevant, isolated statutes enacted long after ratification of the Second Amendment cannot cure this deficiency.

#### 1. Defendant fails to refute the evidence establishing the historical understanding that 18-to-20-year-old adults were fully protected by the Second Amendment.

Defendant fails to refute the historical understanding at the time of the Second Amendment's ratification that these young adults were permitted to keep and bear arms in connection with militia service and to acquire arms for that purpose. Defendant attempts instead to distinguish this evidence, stating: "[A]t the time of the founding, 18-to-20-year-olds were not uniformly permitted to serve in the militia." (ECF No. 107 at 11.) Even if true, that point would not be a compelling refutation;

4

but in any event it is false. During the Founding Era, which includes the Second Amendment's ratification, every colony and state militia included 18-to-20-year-old males. David B. Kopel & Joseph G.S. Greenlee, *The Second Amendment Rights of Young Adults*, 43 S. Ill. U. L.J. 495, 533–595 (2019) (analyzing the Founding Era militia enactments).[1] The minimum age in these statutes for militia service ranged from 16 to 18, and the militia "'comprised all males physically capable of acting in concert for the common defense.'" *Heller*, 554 U.S. at 595 (quoting *United States v. Miller*, 307 U.S. 174, 179 (1939)). That includes the federal militia as well; in 1792, mere months after the ratification of the Second Amendment, Congress enacted the

---

[1] New Jersey (1780 N.J. Laws 42–43); Maryland (203 <u>Hanson's Laws of Maryland</u> 1763–1784 at 279 (1787); North Carolina (An Act for Establishing a Militia in this State, 1787 N.C. Sess. Laws 813); South Carolina (9 <u>The Statutes at Large of South Carolina: Containing the Acts Relating to Roads, Bridges and Ferries, with an Appendix, Containing the Militia Acts Prior to 1794</u> at 617 (David J. McCord, ed., 1841)); New Hampshire (5 <u>Laws of New Hampshire, First Constitutional Period</u> 177 (Henry Harrison Metcalf, ed., 1916)); Delaware (An Act for Establishing a Militia, 1785 Del. Acts. May Adjourned Sess. 11); Pennsylvania (10 <u>The Statutes at Large of Pennsylvania from 1682 to 1801</u> at 144–146 (1904)); New York (1 <u>Laws of the State of New York: Comprising the Constitution, and the Acts of the Legislature, Since Revolution, from the First to the Fifteenth Session, Inclusive</u> 227 (Thomas Greenleaf 1792)); Rhode Island (An Act for the better forming, regulating and conducting the military Force of this State, 1779 R.I. Laws, Oct. Regular Sess. 29); Vermont (1787 Vt. Acts Feb. & Mar. Sess. 94); Virginia (12 <u>William Waller Hening, the Statutes at Large: Being a Collection of all the Laws of Virginia, From the First Session of the Legislature, In the Year 1619</u> at 9 (1823)); Massachusetts (I. Thomas & E.T. Andrews, <u>The Perpetual Laws of the Commonwealth of Massachusetts from the Establishment of its Constitution in the Year 1780 to the End of the Year 1800</u> at 339 (1801)); Georgia (19 (pt. 2) <u>The Colonial Records of the State of Georgia</u> 348 (Allen D. Candler ed., 1911)); Connecticut (<u>Acts and Laws of the State of Connecticut in America</u> 144 (1786)).

first Militia Act, which enrolled male citizens 18 and older in the militia. 1 Stat. 271 (1792). There can be no dispute that these individuals were eligible, that is, "permitted," to serve in the militia.

Defendant quickly moves past the historical understanding at the time that the Second Amendment was ratified, dwelling instead on a handful of later-enacted statutes and isolated statements of individual legislators about loaning firearms. (ECF No. 107 at 9–11; ECF No. 106-2.) Defendant's blithe dismissal of the federal Militia Act demonstrates his misapprehension of the relevant inquiry.

Defendant states that "[t]he Militia Act allowed states to exempt those under 21 from militia service." (ECF No. 107 at 10). Defendant argues that this historical evidence supports his conclusion that those under 21 were not treated as full adults for purposes of militia service. *Id.* In reality, however, this supports the opposite conclusion: the historical tradition in this nation is that those over 18 are eligible for military service, but a handful of outlier states *permitted* those between 18 and 21 years of age to be excused. Thus, contrary to Defendant's argument, individuals over the age of 18 were always permitted, and usually required, to serve in the militia.

Defendant's exhibits purporting to set out historical support for the Ban suffer similar deficiencies. For example, Defendant cites the statutes in his Exhibit 2 purportedly to support his argument that those under 21 could not serve in the militia.

Exhibit 2, however, is only a list of statutes from 2 states, New Jersey and Virginia, which do not support his argument. (ECF 106-2.)

The New Jersey statute explicitly states that those between 16 and 21 can serve in the militia, contrary to the representations of Defendant. (*See* ECF No. 106-2 ("That nothing herein contained shall be construed to prevent employing Officers, and enlisting non-commissioned Officers and Privates between the Age of sixteen and twenty-one years.") The series of Virginia statutes cited by Defendant in this exhibit further shows that Defendant's interpretation is incorrect. Defendant lists a series of Virginia militia-authorizing statutes from 1705 through 1784 demonstrating that by 1784, all males over the age of 18 were part of the militia: "Be it enacted, That all free male persons between the ages of eighteen and fifty years . . . shall be enrolled in companies." (ECF No. 106-2.) Given that the Bill of Rights was debated in 1788, *Heller*, 554 U.S. at 598, and ratified in 1791, it is indisputable that, at the time of debates on the Second Amendment and its ratification, Virginia required males over the age of 18 to serve in the militia. Thus, the very statutes on which Defendant relies demonstrate that he is incorrect.

Defendant identifies seven other states that purportedly enrolled only those 21 or older in the militia: Delaware (1807); Georgia (1861); Kansas (1859); New Jersey (1829); North Carolina (1868); Ohio (1843); Pennsylvania (1793); and Pennsylvania (1864). (ECF No. 107 at 11.) Of these seven states, two explicitly enrolled those age

18 and older in the militia, contrary to Defendant's assertion: Delaware (1807)[2] and Pennsylvania (1793).[3] The New Jersey statute from 1829 only exempted those under 21 during times of peace.[4] The remaining five statutes were all enacted well after the Founding Era; the earliest came in 1843 in Ohio. (ECF No. 106-3 at 3.) Accordingly, Defendant's list of statutes provides little, if any, probative value about the Second Amendment rights of 18-to-20-year-olds at the time of ratification. What these statutes do demonstrate, however, is that the traditional notion of the militia included those over the age of 18. That these few outlier statutes were created specifically to exclude individuals 18-to-20-years-old strongly supports the evidence demonstrating the historical understanding that the militia included these young adults. If 18-to-20-year-old adults were not traditionally understood to be part of the

---

[2] ECF No. 106-3 at 1 ("Be it enacted, . . . That each and every free able-bodied white male citizen of this State, or any of the United States, residing in this State, who is or shall be, of the age of eighteen years, and under the age of forty-five years, except as hereinafter excepted, shall severally and respectively be enroled [sic] in the militia.").

[3] ECF No. 106-3 at 4 ("Be it enacted. . . That each and every free, able-bodied, white, male citizen of this or any other of the United States, residing in this commonwealth, who is or shall be of the age of eighteen years and under the age of forty-five years, except as hereinafter excepted, shall severally and respectively be enrolled in the militia."). As Defendant notes, Pennsylvania amended this statute nearly 100 years later to include only those over the age of 21.

[4] ECF No. 106-3 at 3 ("Be it enacted *by the Council and General Assembly of this State, and it is hereby enacted by the authority of the same*, That from and after the passing of this act, all persons under the age of twenty-one years be, and they are hereby, exempt from militia duty in time of peace.").

militia, there would have been no need to enact statutes excepting them.

Finding little support in the Founding Era statutes for Defendant's position that young adults 18-to-20-years of age were not permitted to join the militia, Defendant seeks further support in a few mid-19th-century statutes requiring parental consent for enlisting. (ECF No. 106-4.) These three statutes, from Michigan (1863), Missouri (1865), and New York (1818), were all enacted well after the Founding Era and therefore offer little probative value of the Second Amendment's meaning at the time of ratification. Further undermining their support for Defendant's cause, the 1863 Michigan statute only required parental consent for those under 18 (ECF No. 106-4), and the New York statute only applied to the "cavalry, artillery, or flying artillery." (*Id.*) Defendant could muster only one outlier statute requiring consent of a parent that did not arise until the Civil War era. Rather than demonstrating any historical tradition of excluding these individuals, Defendant's citations confirm that the American tradition was to include those over the age of 18 in the militia. Defendant does not even attempt to explain how requiring parental consent to join the militia in these limited examples, years after the Founding Era, means 18-to-20-year-olds were not afforded Second Amendment rights at the time of ratification.

Defendant next contends that parents were required to furnish arms for militia members under 21, citing statutes from six states, and implying that this somehow

demonstrates that no one under age 21 had Second Amendment rights. (ECF No. 107 at 12; ECF No. 106-6.) Obviously, a statute requiring parents to furnish arms to their militia-age children does not demonstrate that those children were prohibited from acquiring firearms. The most logical explanation is that parents were required to furnish arms in the event that their children lacked the means to afford them. Regardless of the reason, Defendant's straw man argument does not inform at all the historical inquiry regarding whether 18-to-20-year-old adults were permitted to acquire and bear arms and serve in the militia because it rests on statutes related only to regulating parents. As demonstrated above, citizens over the age of 18 were permitted to serve in the militia, usually were required to do so, and were understood to bring with them for militia service the lawful arms they kept at home.

The statutes cited by Defendant actually support Plaintiffs' position on the historical understanding that young adults aged 18 through 20 were understood to be included in the Second Amendment's protections. All of the statutes cited by Defendant presuppose that those "minors" would be compelled into militia service, confirming that those under 21 were expected to serve in the militia. The only other point that these statutes support is that if someone under the age of 21 were to be called to militia service but not in possession of a firearm, his or her parents would supply this equipment. This in no way supports Defendant's argument that those under 21 were unable to acquire and possess arms—that is simply a bridge too far.

Defendant makes much of the notion that, at common law, the age of "majority" was 21, but the relevant question under the *Heller* analysis is whether there was a historical tradition of "people" aged 18-to-20-years-old keeping and bearing arms. None of the statutes cited by Defendant has any age provision. Rather, they refer to "minors." Defendant blithely asserts that this must have meant those under 21, but none of the statutes cited actually limits their interpretation this way. (ECF No. 106-6). Regardless, it is undisputed that those over the age of 18 are not considered minors in Florida. Historical analog statutes applying to minors would not apply to young adults.

Defendant fails to cite any Founding Era statute that prohibited the purchase of firearms by 18-to-20-year-old adults. This alone demonstrates that there is no historical support for the Ban. The Supreme Court has held that the Founding Era statutes are most probative in *Heller*'s text, history, and tradition analysis because: "Constitutional rights are enshrined with the scope they were understood to have when the people adopted them …." *Heller*, 554 U.S. at 634–35; *see also id.* at 614 (stating "discussions [that] took place 75 years after the ratification of the Second Amendment . . . do not provide as much insight into its original meaning as earlier sources"). The text, history, and tradition of the Second Amendment demonstrates that its protections extend to 18-to-20-year-old adults and that there is no historical tradition of denying them the right to purchase arms. (ECF No. 109 at 6–19.)

**2. Defendant relies on two opinions from other Circuits upholding very different laws that cannot overcome the historical record evidence.**

In support of his contention that the Second Amendment does not protect the right of 18-to-20-year-old adults to purchase firearms for self-defense or other lawful purposes, Defendant relies on panel decisions from the Fifth Circuit in *Nat'l Rifle Ass'n, Inc. v. Bureau of Alcohol, Tobacco, Firearms & Explosives* ("*BATFE I*"), 700 F.3d 185 (5th Cir. 2012), and the First Circuit in *United States v. Rene E.*, 583 F.3d 8 (1st Cir. 2009). (ECF No. 107 at 7–19.) *BATFE I*, however, involved a much narrower restriction prohibiting federally licensed dealers from selling handguns to anyone under 21. *BATFE I*, 700 F.3d at 185 (reviewing 18 U.S.C. § 922(b)(1), (c)(1)). And *Rene E.* involved the federal ban on possession of handguns by those under 18. *Rene E.*, 583 F.3d at 9 (reviewing 18 U.S.C. § 922(x)(2)(A)). Neither came close to a complete prohibition on all firearm purchases by 18-to-20-year-old adults that Florida enacted in Section 790.065(13), Fla. Stat. As Defendant's own historical evidence implies, there is no tradition of excluding law-abiding, responsible, 18-to-20-year-old adults from exercising Second Amendment rights. And neither *BATFE I* nor *Rene E.* compel a different conclusion here.

Defendant's attempt to use the analyses in *Rene E.* and *BAFTE I* to cure his inability to find historical support for his position is unavailing. The evaluation in *Rene E.* is simply inapplicable. There, the court reviewed a prohibition on possessing

a handgun by those under the age of 18. Eighteen has historically been the age at which militia service was expected. The *Rene E.* "under 18" analysis is irrelevant here because the Ban applies to those over the age of 18.

The Court in *BAFTE I*, reviewing the federal prohibition on the commercial sale of handguns, ignored the Founding Era evidence of the right of those 18-to-20-years-old to possess firearms, relying instead upon a tenuous implication from the dissenting viewpoint of the Pennsylvania anti-federalists that those who present a "real danger of public injury" could be prohibited from possessing firearms. *See* David B. Kopel & Joseph G.S. Greenlee, *History and Tradition in Modern Circuit Cases on the Second Amendment Rights of Young People*, 43 S. Ill. U. L.J. 119, 134 (2018) (setting forth the full historical context of the quotations selected by the Fifth Circuit and demonstrating that the quoted positions were in the minority). The Fifth Circuit broadly inferred from this narrow authority a historical tradition excluding entirely anyone under 21 from Second Amendment protection. That individuals presenting a danger to society can be dispossessed of their firearms merely confirms *Heller*'s statement that there is a longstanding tradition of prohibiting felons and the mentally ill from possessing firearms. It does not support Defendant's contention that young adults under the age of 21 can be denied their Second Amendment rights based solely on their age.

The statutes reviewed in those cases were very different as well. In *Rene E.*, the court reviewed statutes banning transfer of handguns only. *See Rene E.*, 583 F.3d at 14 (listing statutes enacted from 1858 to 1921 in eight states prohibiting the transfer of pistols to minors). This simply has no bearing on the issue before this Court because Florida's Ban prohibits purchase of all firearms, whether from federal dealers or from private sources.

In *BATFE I*, the Fifth Circuit listed in a footnote a series of statutes that it claimed supported its position that those under 21 did not have Second Amendment rights. 700 F.3d at 202 (listing statutes enacted from 1856 to 1923 in 22 states and the District of Columbia prohibiting the purchase of undefined "particular firearms"). These laws, however, did not go as far as the Fifth Circuit implied and cannot bear the weight even the Fifth Circuit, let alone the Defendant, places on them. The vast majority of these statutes applied only to certain limited arms and did not bar the purchase of all firearms as the Ban does. *See Kopel & Greenlee*, 43 S. Ill. U. L.J. at 137-42 (analyzing the text of all of the statutes cited by the Fifth Circuit and explaining that they were of much more limited applicability than the Fifth Circuit implied). In fact, the laws cited by the Fifth Circuit applied almost exclusively to certain types of weapons (like dirk knives or only handguns[5]) or to

---

[5] *E.g.* 1856 Ala. Acts §17 ("That anyone who shall sell or give or lend, to any male minor, a bowie knife, or knife or instrument of the like kind or description, by whatever name called, or air gun or pistol, shall, on conviction be fined not less than

concealed carry. *Id.* These limited laws applying to only certain types of arms, most of which were not even firearms, do not demonstrate a historical tradition of banning the possession of arms by those under 21. Rather, they are exceptions that prove the general rule: 18-to-20-year-old adults were generally permitted to acquire and possess most arms in most places.

All of the statutes reviewed and relied on by the court in *BATFE I* were enacted long after ratification. *See id.* (setting forth the dates of enactment, all of which were 1856 or later). As *Heller* explained, these later enactments "do not provide as much insight into [the Second Amendment's] original meaning as earlier sources," 554 U.S. at 614, because "the Second Amendment, like the First and Fourth Amendments, codified a pre-existing right." *Id*. at 592; *id*. at 634–35 (holding the Second Amendment rights are "enshrined with the scope they were understood

---

three hundred, nor more than one thousand dollars."); 27 Stat. 116-17, § 5 (1892) (District of Columbia) ("That any person or persons who shall, within the District of Columbia, sell, barter, hire, lend or give to any minor under the age of twenty-one years any such weapon as hereinbefore described [deadly or dangerous weapons, such as daggers, air-guns, pistols, bowie-knives, dirk knives or dirks, blackjacks, razors, razor blades, sword canes, slung shot, brass or other metal knuckles] shall be deemed guilty of a misdemeanor, and shall, upon conviction thereof, pay a fine or penalty of not less than twenty dollars nor more than one hundred dollars, or be imprisoned in the jail of the District of Columbia not more than three months."); 1890 La. Acts 39, § 1 ("That, hereafter, it shall be unlawful, for any person to sell, or lease or give through himself or any other person, any pistol, dirk, bowie-knife or any other dangerous weapon, which may be carried concealed to any person under the age of twenty-one years."); *see also Kopel & Greenlee*, 43 S. Ill. U. L.J. at 137-42 & n.90-116.

to have when the people adopted them"); *see also Ezell v. City of Chicago*, 651 F.3d 684, 700 (7th Cir. 2011) ("*Heller* focused almost exclusively on the original public meaning of the Second Amendment, consulting the text and relevant historical materials to determine how the Amendment was understood at the time of ratification.").

Defendant also argues that statutes of a more modern vintage, restricting, for example, concealed carry by those under 21, constitute historical justification for the Ban. (ECF No. 107 at 15.) These references are irrelevant to the considerations before the Court. The Ban here eliminates the right of 18-to-20-year-old adults to purchase firearms for self-defense and other lawful purposes—which is the core of the Second Amendment according to *Heller*. 554 U.S. at 628. The challenged Ban does not relate to carrying a concealed firearm outside the home.

Finally, Defendant notes that two states (Hawaii and Illinois) and the District of Columbia have enacted bans on handgun or long gun possession by those under 21. (ECF No. 107 at 15.) These laws do not go so far as Defendant argues, as Illinois explicitly permits purchasing of firearms by those under 21 with parental permission, 430 ILCS 65/4 (a)(2)(i), and Hawaii makes exceptions for some persons under 21, Haw. Rev. Stat. § 134-2(d) (excepting non-Hawaiian individuals under 21 for hunting with a valid permit). Regardless, Defendant's examples show just how

extreme the Ban is: only two States in the country have even remotely similar laws, and those are much less extensive prohibitions.

Defendant cannot demonstrate a tradition of denying Second Amendment rights to 18-to-20-year-old adults because there is none.

**B.** **Defendant asks this Court to reject *Heller* to adopt an inappropriate analysis.**

As Plaintiffs explained in their motion for summary judgment, *Heller* requires only a consideration of the text, history, and tradition of the Second Amendment. Because there is no historical tradition of excluding law-abiding, responsible citizens between the ages of 18 and 21 from the protections of the Second Amendment, *Heller* precludes the Ban. (ECF No. 109 at 6–19.)

Unable to find refuge in the text, history, and tradition of the Second Amendment, Defendant nevertheless argues that this Court should apply intermediate scrutiny to the Ban, based on inapplicable Eleventh Circuit precedent. This Court should decline Defendant's invitation to error.

The Eleventh Circuit has never applied the second part of the two-step analysis because it has determined, in each case, that the litigant or activity was not protected by the Second Amendment. *United States v. Rozier*, 598 F.3d 768 (11th Cir. 2010) (upholding statute disqualifying felons from possessing firearms); *United States v. White*, 593 F.3d 1199 (11th Cir. 2010) (upholding statute disqualifying domestic abusers from possessing firearms); *GeorgiaCarry.Org,*

687 F.3d at 1244 (upholding statute barring unrestricted carrying of firearms in specific locations, including houses of worship, against property owner's consent); *GeorgiaCarry.Org, Inc., v. U.S. Army Corps of Engineers*, 788 F.3d 1318 (11th Cir. 2015) (upholding regulation prohibiting carrying of firearms on Corps of Engineers property); *United States v. Focia*, 869 F.3d 1269 (11th Cir. 2017) (upholding statute prohibiting dealing in firearms without a license).

None of these plaintiffs demonstrated they were protected by the Second Amendment. Once the court determines that the Second Amendment applies, however, the analysis must be guided by *Heller*. Under the proper analysis, as shown above, the Ban cannot stand. *Heller*, 554 U.S. at 635-36 (holding that a ban on handguns was unconstitutional under the text, history, and tradition of the Second Amendment despite the government interest in reducing handgun crimes).

Even if this Court were to adopt a level of heightened scrutiny to apply in this instance, only strict scrutiny would be appropriate. There can be no question that the Ban cuts to the heart of the interests protected by the Second Amendment: the ability to acquire and possess a firearm within the home for self-defense and other lawful purposes. Because the Ban infringes on the core of the Second Amendment's protections, only strict scrutiny would be appropriate. *Duncan v. Becerra*, 970 F.3d 1133, 1152 (9th Cir. 2020); *Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Attorney Gen. New Jersey*, 910 F.3d 106, 117 (3d Cir. 2018); *BATFE I*, 700 F.3d

at 195; *Ezell,* 651 F.3d at 708; *United States v. Masciandaro*, 638 F.3d 458, 470 (4th Cir. 2011).

Regardless, under either strict or intermediate scrutiny, the Ban cannot survive because it is not narrowly tailored, as required by Supreme Court precedent.

### 1. Defendant erroneously contends intermediate scrutiny applies to the Ban.

Because law-abiding, responsible 18-to-20-year-old adult citizens have rights protected by the Second Amendment, under the two-part approach Defendant urges, this Court must proceed to step two and select the appropriate analysis to determine the constitutionality of the Ban. Defendant paints this as a foregone conclusion: only intermediate scrutiny can be appropriate. But the Eleventh Circuit has not spoken on this issue, and the Supreme Court's Second Amendment precedent makes clear that either text, history, and tradition or strict scrutiny must apply.

In *Heller* and *McDonald*, the Supreme Court reviewed whether bans on the possession of handguns were constitutional. In striking down each of those bans, the Court undertook no evaluation other than a review of the text of the Second Amendment, the history of interpretations of the right to keep and bear arms for self-defense, and the historical tradition of banning, or permitting, the handguns at issue. The Court never employed, or even countenanced, an analysis like intermediate or

strict scrutiny. Like the handgun ban in *Heller*, Florida's Ban directly infringes the core right and is without historical precedent. This Court should review the text, history, and tradition to conclude that the Ban cannot stand.

If this Court does decide to apply one of the tests lifted from First Amendment jurisprudence, only strict scrutiny can apply. The Ban infringes the core right to acquire firearms for the home, where the need to defend oneself is most acute. *Heller*, 554 U.S. at 628. *See also Teixeira v. County of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017) (en banc) ("[T]he core Second Amendment right to keep and bear arms for self-defense 'wouldn't mean much' without the ability to acquire arms."); *Illinois Ass'n of Firearms Retailers v. City of Chicago*, 961 F. Supp. 2d 928 (N.D. Ill. 2014) (striking a Chicago ordinance banning the transfer of firearms); *United States v. Marzzarella*, 614 F.3d 85, 92 n.8 (3d Cir. 2010) ("[P]rohibiting the commercial sale of firearms … would be untenable under *Heller*."). Because it applies broadly to all firearms and applies in the home, where the Second Amendment "guarantees are within their zenith," *Kachalsky v. Cnty. of Westchester*, 701 F.3d 81, 89 (2d Cir. 2012), the Ban must face strict scrutiny.

Defendant's argument that intermediate scrutiny applies again relies on the panel's misguided decision in *BATFE I*. (ECF No. 107 at 20.) He likens the Ban to a "qualification" on the commercial sale of firearms, but this ignores what the Ban actually does. It does not merely impose a "qualification" on the commercial sale of

arms. Rather, it eliminates the sale of all firearms to Plaintiffs (and, therefore, Plaintiffs' right to acquire those firearms by purchasing them). This is a severe restriction, amounting to destruction of the right, that mandates strict scrutiny. *See Ezell*, 651 F.3d at 690, 708, 711. Additionally, unlike the federal handgun ban at issue in *BATFE I*, which prohibits the purchase of handguns from licensed firearm dealers only, Florida's Ban goes much further than that: prohibiting purchase by young adults of all firearms from all sources. In contrast, *BATFE I* upheld the much narrower restriction on federal dealer sales of handguns to those under 21 precisely because of its narrowness. *See* 700 F.3d at 209 (explaining that the ban in that case was properly tailored because it was limited only to handguns and only to the easiest method of acquisition of handguns: licensed dealers).

Defendant next argues that the Ban is a mere "qualification" because these young adults can exercise their Second Amendment rights upon turning 21. (ECF No. 107 at 21.) This makes no sense. The Bill of Rights provides protections against government intrusion into certain activities. If the government were able to extinguish these rights at any time, for any amount of time, simply because it promises that the rights will be restored, then the Bill of Rights is meaningless. The argument advanced by Defendant would permit the government to prohibit all criticism of the government during election years, for example, because citizens would regain their rights as soon as the year ends. This is not how constitutional

rights work. If such an intrusion on the interests protected by the First Amendment were enacted, it would be struck down under strict scrutiny because the target of the law would be the core of the First Amendment: political speech. *E.g., Citizens United v. FEC*, 558 U.S. 310, 340 (2010) ("Laws that burden political speech are subject to struct scrutiny . . . ." (internal quotation marks omitted)). Because the Ban targets the core of the Second Amendment, this Court should apply strict scrutiny and strike down the Ban.

Finally, Defendant argues intermediate scrutiny applies because 18-to-20-year-old adults can still obtain firearms via an amorphous gift/loan loophole. (ECF No. 107 at 22, 29.) Defendant ignores the fact that this makes the exercise of Second Amendment rights continent on the largesse of others. This Court would never uphold a law that provided indigent representation in criminal matters only where a family member was a lawyer, and it should not uphold this law, which permits the exercise of a fundamental right only if a family member effectuates it. Furthermore, there is no mention in the legislative history of this loophole, and Defendant has not provided any empirical evidence supporting his contention that any constitutional infirmity is cured by the availability of gifts or loans. It appears to be nothing more than a post-hoc invention by counsel during litigation that is insufficient to uphold the law. *Bourgeois v. Peters*, 387 F.3d 1303, 1323 (11th Cir. 2004) (explaining, in

the context of a First Amendment case, that post-hoc rationalizations for government intrusions on protected interests are not sufficient to carry the government's burden).

Defendant makes no attempt to meet his burden under strict scrutiny to demonstrate that the law is constitutional. For good reason. There can be no doubt that this Ban is not the least restrictive means of achieving the asserted government interest. Therefore, it is unconstitutional. Defendant's decision not to even attempt to meet its burden under strict scrutiny implies strongly that Defendant agrees.

### 2. The Ban fails even intermediate scrutiny.

Defendant bases his argument that the Ban meets the intermediate scrutiny standard on the single government objective of "protecting the community from crime." (ECF No. 107 at 22–23.) Even under intermediate scrutiny, Defendant cannot meet his burden to demonstrate that the Ban is appropriately tailored to achieve that asserted interest.

Defendant fails to even acknowledge that, under intermediate scrutiny analysis, a law affecting a fundamental right must "be narrowly tailored to serve a significant government interest." *McCullen v. Coakley*, 573 U.S. 464, 486 (2014). (*See* Def's Mot. at 22–29.) For intermediate scrutiny, narrow tailoring requires that the law not "burden substantially more [protected conduct] than is necessary to further the government's legitimate interests." *McCullen,* 573 U.S. at 486.

Defendant's silence on this requirement is not surprising. The Ban here is not tailored at all. It prohibits the purchase of all firearms from any source by all 18-to-20-year-old adults for any lawful use, including self-defense in the home. It lacks the tailoring required even under intermediate scrutiny, *McCullen*, 573 U.S. at 490 (holding "buffer zones" invalid because they burden substantially more speech than is necessary), because it has no tailoring to preserve protected conduct at all.

Other than citing the alleged "purpose" from the legislation itself, Defendant offers no discussion of the considerations made by the Florida Legislature at the time it enacted the Ban. While he may identify justifications cited by other courts in other jurisdictions considering challenges to very different statutes, Defendant offers no evidence considered by the Florida Legislature for this Ban. (ECF No. 107 at 23–24.) Under intermediate scrutiny, the burden of justification is demanding, and it rests entirely on the State. *United States v. Virginia*, 518 U.S. 515, 533 (1996). With respect to the asserted government interest, Defendant fails to present any evidence that the Florida Legislature conducted, or even reviewed, studies on the prevention of gun violence, particularly that related to school campuses, and the effect the Ban would have on that violence. *See, e.g., Ezell*, 651 F.3d at 709 ("[T]he government must supply actual, reliable evidence to justify restricting" protected conduct "based on secondary public-safety effects . . . ."). Defendant's failure to provide any

material considered by the Legislature when enacting this law to justify its significant infringement of Second Amendment rights is fatal.

Defendant's expert opinion cannot cure this deficiency. (ECF No. 107 at 24–25.) Lacking anything in the legislative record supporting this unprecedented infringement of the fundamental rights of young adults, Defendant's counsel procured an expert opinion never considered by the Legislature to substitute somehow for the Legislature's failure to consider any relevant evidence. Defendant advances Dr. Bhide's opinion that "[s]electing those between 18 and 21 for differential treatment 'is thoroughly justified from the perspective of neuroscience.'" (ECF No. 107 at 24.) Yet the research he relies on in his expert report does not support his conclusions.

In the studies he cites, 18-to-20-year-old adults are not actually included in the adolescent age group to whom the conclusions apply; they are either classified as adults or not included in the research. (*See* Dec. of Gary Kleck, ECF No. 108-6 ¶ 12.) None of Dr. Bhide's cited studies support his claim that persons in the age group affected by the Ban have underdeveloped or immature brains. (*See id*.) Thus, the facts (studies) upon which Defendant's expert based his opinions are not reasonably related to his opinion or the facts of this case, and this Court should decline to

consider his opinion under Fed. R. Evid. 702 (a) & (d).[6] Dr. Bhide's opinion is of no import or relevance here because the studies upon which he has relied do not demonstrate anything about 18-to-20-year-old adults.

Further exemplifying the lack of fit, Defendant presents no evidence that *all* 18-to-20-year-olds are even supposedly irresponsible and thus undeserving of Second Amendment rights. This alone demonstrates the lack of tailoring in Florida's Ban. The government has decided that the abhorrent, aberrant misdeeds of some irresponsible, criminal individuals justify the wholesale stripping of constitutional rights from countless law-abiding, responsible citizens. This the government may not do. *Heller*, 554 U.S. at 636 ("We are aware of the problem of handgun violence in this country, and we take seriously the concerns raised by the many *amici* who believe that prohibition of handgun ownership is a solution. . . . But the enshrinement of constitutional rights takes certain policy choices off the table. These include the absolute prohibition of handguns held and used for self-defense in the home.").

Actual, relevant, empirical evidence was presented by Plaintiffs and shows that the Ban will have little if any effect on reducing violent gun crime. Gun crime is low in this age group, especially compared to the next older age group where firearm purchasing becomes legal. (Kleck Dec., ECF No. 108-6 ¶ 7.) Not only does

---

[6] (*See also* Dep. of Pradeep Bhide, ECF No. 115-1, at 30:24–31:6 (confirming that Defendant's expert witness has never studied the relationship between neuroscience and firearm misuse).)

the evidence confirm that Florida has targeted an age group that does not disproportionately engage in firearm crime, it also shows that the vast majority of firearms used in crime are obtained through illegal means, which the Ban does not affect. (Dec. of William English, ECF No. 108-4 ¶ 8.)

Finally, Defendant has failed to consider the fact that the Ban effectively extinguishes the most common and effective form of self-defense for everyone in the age group. It is almost certain that Ban will increase the likelihood of victimization among these 18-to-20-year-old adults because it eliminates the availability of defensive firearms use for most of these persons. (Kleck Dec., ECF No. 108-6 ¶¶ 8–10; English Dec., ECF No. 108-4 ¶ 11.) The empirical evidence demonstrates that the impact of the law will be to increase victimizations from violent crime among those in the age group without any corresponding evidence of any decrease in crime generally or firearm crime specifically. The Ban is not narrowly tailored to achieve the government's interest in "protecting the community from crime;" rather, it is certain to expose 18-to-20-year-olds to crime victimizations without providing any concomitant benefits.

Resorting once again to *BATFE I*, 700 F.3d at 209–10, Defendant argues studies and data regarding those under 21 and violent crime considered by Congress in passing the federal law involved there, 18 U.S.C. § 922(b)(1), (c)(1), justify the Ban. (ECF No. 107 at 26–27.) Yet, the data considered by Congress prior to passing

the federal handgun ban is now more than 52-years-old, was related only to handgun crime not to long gun crime, and did not take Second Amendment issues into consideration that were first illuminated in *Heller* decades later. Quite simply, the half-century-old data relied on by a different legislature enacting legislation of a different scope dealing with a different topic does not provide support for the Ban.

Regardless, there is no evidence in the record—and Defendant does not identify any—indicating the Florida Legislature considered these studies or any more recent ones. Defendant's references to crime statistics (ECF No. 107 at 25–26) cannot save the Ban. "The justification [for the law] must be genuine, not hypothesized or invented post hoc in response to litigation." *United States v. Virginia*, 518 U.S. at 533. The only justification advanced is just that: invented post hoc in response to litigation.

Defendant's cited statistics are not limited to crimes involving firearms or crimes involving legally obtained firearms and can have little to no bearing on the Court's evaluation. Moreover, statistics regarding crime generally do not offer any information about the likely efficacy of the Ban. Defendant has offered no evidence that the Ban will likely achieve its stated purpose.

Instead, Defendant relies on the heinous crime committed at Marjory Stoneman Douglas High School as the sole motivation behind the Legislature's actions. (ECF No. 107 at 1–2.) Yet Defendant has not identified any evidence—

before the Legislature or presently—showing how often 18-to-20-year-olds commit crimes with legally purchased firearms, particularly long guns, especially given that this age group is not required to attend school. As held in *Heller*, even if criminal misuse of firearms is a problem, the wholesale prohibition on the acquisition of firearms by law-abiding, responsible 18-to-20-year-old adults is a policy choice that is "off the table." *Heller.* 554 U.S. at 636.

## II. Florida's Ban violates the Equal Protection Clause of the Fourteenth Amendment.

Defendant argues that rational basis review applies because the law does not run afoul of the Second Amendment and age is not a suspect classification requiring heightened scrutiny. (ECF No. 107 at 30–32.) Defendant concludes that the Ban clears the low bar of rationality.

Defendant fails to even address the caselaw requiring a court to apply strict scrutiny if a fundamental right is involved. *Gary v. City of Warner Robins, Ga.*, 311 F.3d 1334, 1337 (11th Cir. 2002). The Supreme Court held in *McDonald* that the Second Amendment right to keep and bear arms is fundamental. 561 U.S. at 791. Thus, strict scrutiny applies. And because the ban is not narrowly tailored and otherwise fails even intermediate scrutiny, Part II(B)(2), *supra*, it necessarily fails strict scrutiny review.

Even if this Court were to apply only rational review, which is incorrect for all the reasons set forth in Plaintiffs' motion for summary judgment, the Ban fails

even that because it has no rational relationship to its stated purpose where the fit is not reasonable. *See* Part I(B)(2) *supra*.

## CONCLUSION

For the foregoing reasons and those in Plaintiffs' memorandum in support of their motion for summary judgment, Plaintiffs respectfully request the Court deny Defendant's Motion for Summary Judgment and enter judgment in favor of Plaintiffs.

Respectfully submitted,

/s/*John Parker Sweeney*
John Parker Sweeney
James W. Porter, III
Marc A. Nardone
BRADLEY ARANT BOULT CUMMINGS LLP
1615 L Street, NW
Washington, DC 20036
Tel: (202) 393-7150
jsweeney@bradley.com
(Admitted *Pro Hac Vice*)

Eliot B. Peace (FBN: 124805)
BRADLEY ARANT BOULT CUMMINGS LLP
100 N. Tampa Street, Suite 2200
Tampa, FL 33602
Telephone: (813) 559-5500
epeace@bradley.com

*Counsel for Plaintiffs*

**<u>Local Rule 7.1(F) Certificate of Compliance</u>**

Pursuant to Local Rule 7.1(F), I certify the foregoing pleading contains 7,315 words.

/s/*Eliot B. Peace*
*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on September 24, 2020, I filed the foregoing with the Clerk of the Court using the CM/ECF system, which will provide electronic service to all counsel of record, as follows:

AMIT AGARWAL (FBN 125637)
Solicitor General

JAMES H. PERCIVAL (FBN 1016188)
Chief Deputy Solicitor General

ELIZABETH TEEGEN (FBN 833274)
Chief Assistant Attorney General

TIMOTHY NEWHALL (FBN 391255)
Senior Assistant Attorney General

Office of the Attorney General
The Capitol, PL-01
Tallahassee, FL 32399
Tel: (850) 414-3681
amit.agarwal@myfloridalegal.com
james.percival@myfloridalegal.com
elizabeth.teegen@myfloridalegal.com
barbara.throne@myfloridalegal.com
timothy.newhall@myfloridalegal.com

CHRISTOPHER J. BAUM (FBN 1007882)
Deputy Solicitor General
Office of the Attorney General
State of Florida
1 SE 3rd Ave Suite 900
Miami, FL 33131
(786) 792-6269
christopher.baum@myfloridalegal.com

/s/*Eliot B. Peace*
*Counsel for Plaintiffs*