UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

NATIONAL RIFLE ASSOCIATION
OF AMERICA, Inc., *et al.*,

    *Plaintiffs*,

    v.                                    Case No. 4:18-CV-137-MW-MAF

RICK SWEARINGEN, in his official
capacity as Commissioner of the Florida
Department of Law Enforcement,

    *Defendant*.
_____/

## DEFENDANT'S REPLY IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT

## INTRODUCTION

Plaintiffs' opposition suffers from the same flaws as their motion for summary judgment. Plaintiffs continue to (1) urge the Court to set aside the Eleventh Circuit's two-step inquiry for Second Amendment challenges; (2) ignore *Heller*'s teaching that post-ratification evidence may be consulted to determine the public understanding of the Second Amendment and that inquiring into such evidence "is a critical tool of constitutional interpretation"; (3) rely solely on a selective and erroneous history of the militia; (4) insist that recent laws changing the age of majority for purposes other than purchasing firearms retroactively alter the meaning of the Second Amendment; (5) argue that the Court must not consider

expert or empirical evidence showing that Section 790.065(13) furthers the Legislature's objectives; and (6) misstate the law regarding whether rational-basis review applies to their Equal Protection claim.

## ARGUMENT

**I.     FLA. STAT. § 790.065(13) DOES NOT VIOLATE THE SECOND AMENDMENT.**

Plaintiffs spend pages arguing either that the Court need not apply the Eleventh Circuit's "two-step inquiry" in assessing the constitutionality of Section 790.065(13) or that it is inapplicable here. Pls. Opp., DE116, at 17-20. Plaintiffs are wrong on both counts. The Eleventh Circuit "use[s] a two-step inquiry when deciding a Second Amendment issue." *United States v. Bolatete*, No. 18-14184, --- F.3d ---, 2020 WL 5784153, at *9 (11th Cir. Sept. 29, 2020); *accord United States v. Focia*, 869 F.3d 1269, 1285 (11th Cir. 2017) (same); *GeorgiaCarry.Org, Inc. v. U.S. Army Corps of Eng'rs*, 788 F.3d 1318, 1324 (11th Cir. 2015) (same); *GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244, 1260 n.34 (11th Cir. 2012) (same).

Despite this precedent, Plaintiffs insist that "[o]nce the [C]ourt determines that the Second Amendment applies, . . . the analysis must be guided" by a "text, history, and tradition" analysis that they divine from *Heller*. Pls. Opp., DE116, at 18. That the Eleventh Circuit has never reached the second step does not, however, mean that it does not exist. Pls. Opp., DE116, at 17. Instead, the Court should

apply the approach articulated by the Eleventh Circuit in multiple published opinions, including as recently as the week of this filing. *See Bolatete*, 2020 WL 5784153, at *9 ("First, we ask if the restricted activity is within the scope of protection of the Second Amendment in the first place. If it is, we apply 'an appropriate form of means-end scrutiny.'" (quoting *Focia*, 869 F.3d at 1285)).

Next, Plaintiffs repeatedly characterize the second step of the Eleventh Circuit's framework as an "interest balancing approach." As explained previously, though, applying the appropriate level of scrutiny is not the "interest balancing approach" previously rejected by the Supreme Court. *See* Def. Opp., DE114, at 4 n.1. Nor has the Supreme Court rejected the application of an appropriate level of scrutiny, which explains why most of the circuits have adopted and applied the two-step approach since *Heller* and *McDonald* were decided.[1]

### A.   Fla. Stat. § 790.065(13) does not burden conduct protected by the Second Amendment as historically understood.

1. As in their motion for summary judgment, Plaintiffs suggest that the Court should heavily discount any historical evidence that postdates the Second Amendment's ratification. *E.g.*, Pls. Opp., DE116, at 11, 15. But as explained in

---

[1] *E.g.*, *Gould v. Morgan*, 907 F.3d 659, 668-69 (1st Cir. 2018); *Young v. Hawaii*, 896 F.3d 1044, 1051 (9th Cir. 2018), *reh'g en banc granted*, 915 F.3d 681 (9th Cir. 2019); *Nat'l Rifle Ass'n v. BATFE*, 700 F.3d 185, 194-95 (5th Cir. 2012); *United States v. Greeno*, 679 F.3d 510, 518 (6th Cir. 2012); *Heller v. District of Columbia*, 670 F.3d 1244, 1252 (D.C. Cir. 2011) ("*Heller II*"); *Ezell v. City of Chicago*, 651 F.3d 684, 701-04 (7th Cir. 2011); *United States v. Chester*, 628 F.3d 673, 680 (4th Cir. 2010); *United States v. Reese*, 627 F.3d 792, 800-01 (10th Cir. 2010); *United States v. Marzzarella*, 614 F.3d 85, 89 (3d Cir. 2010).

Defendant's opposition, *Heller* stands for the opposite proposition. Def. Opp., DE114, at 5-6.

In response, Plaintiffs point to only a single sentence in *Heller*, where the Court explained that post-Civil War discussions regarding how to secure constitutional rights for newly free slaves "do not provide as much insight into [the Second Amendment's] original meaning as earlier sources." 554 U.S. at 614. But even that sentence does not help Plaintiffs. When read in context, the sentence and the surrounding discussion underscore that historical evidence postdating the Second Amendment's ratification is critical to the analysis.

The sentence is contained within the Court's extended discussion of "how the Second Amendment was interpreted from immediately after its ratification through the end of the 19th century." *Id.* at 605. That discussion furthered "a critical tool of constitutional interpretation": the "examination of a variety of legal and other sources to determine *the public understanding* of a legal text in the period after its enactment or ratification." *Id.* at 605 (relying heavily on interpretations of the Second Amendment "in the century after its enactment"). The Court viewed as relevant (1) post-ratification commentary, *id.* at 605-610; (2) pre-Civil War case law, *id.* at 610-14; (3) post-Civil War legislation, *id.* at 614-16; and even (4) post-Civil War commentators, *id.* at 616-19. And although the Court said that the post-Civil War discussions in Congress and public discourse did not

4

provide as much insight as "earlier sources"—which the Court did not limit to ratification-era sources—the Court nevertheless relied on those discussions as "instructive." *Id.* at 614. All of this is to say that Plaintiffs' request that the Court set aside all post-ratification historical evidence, based solely on this sentence, fundamentally misapprehends *Heller*.

Relatedly, Plaintiffs' misreading of *Heller* dooms their argument that a failure to "cite any Founding Era statute that prohibited the purchase of firearms by 18-to-20-year-old[s] . . . alone demonstrates that there is no historical support" for Florida's age qualification. Pls. Opp., DE116, at 11. The Supreme Court expressly refused to limit itself to evidence from the time of ratification in determining the scope of the Second Amendment. 554 U.S. at 605; *see also* Def. Opp., DE114, at 5-6. If accepted, moreover, Plaintiffs' rationale would doom, for example, any ban on felons possessing firearms, because "scholars have not identified eighteenth or nineteenth century laws depriving felons of the right to bear arms." *Kanter v. Barr*, 919 F.3d 437, 462 (7th Cir. 2019) (Barrett, J., dissenting); *see also id.* at 447 n.8.

2. Plaintiffs' attempt to dispute the substantial historical evidence of restrictions on those under 21 from owning or possessing firearms falls short. In their view, the historical evidence shows that "18-to-20-year-old adults were *generally* permitted to acquire and possess *most* arms in *most* places." Pls. Opp., DE116, at 15 (emphases added). In other words, the historical record *does* show

that 18-to-20-year-olds *were* restricted from purchasing or possessing firearms in some states—a fact that contradicts Plaintiffs' categorical position that "young adults cannot be prohibited from purchasing firearms." Pls. Opp., DE116, at 3. That is dispositive under *Heller*: that some restrictions on 18-to-20-year-olds have always existed means that such restrictions are "longstanding." *See Heller*, 554 U.S. at 626 ("[N]othing in our opinion should be taken to cast doubt on longstanding prohibitions.").

Evidence that many of the statutes restricting minors under the age of 21 from purchasing firearms singled out handguns undercuts, rather than supports, Plaintiffs' argument. *See* Pls. Opp., DE13-15. After all, "the American people have considered the handgun to be the quintessential self-defense weapon." *Heller*, 554 U.S. at 629. And if, as *Heller* provides, "a complete prohibition of their use is invalid," *id.*, then the substantial evidence that many states prohibited those under 21 from purchasing them supports the historical understanding that the scope of the Second Amendment right did not fully extend to minors.

Plaintiffs' militia-based argument retains its flaws. By allowing states to exempt those under 21 in the Militia Act, the federal government recognized that minors were not universally expected to serve in the militia. Although Plaintiffs argue that "there would have been no need to enact statutes excepting them" from serving in the militia if 18-to-20-year-olds "were not traditionally understood to be

6

part of the militia" (Pls. Opp., DE116, at 8-9), that the age for required militia service (or service without parental consent) was, in many states, 21 shows that the historical understanding was not uniform. Put differently, some states' militias included 18-year-olds, others didn't, and still others required parental consent. The historical evidence thus contradicts Plaintiffs' assertion that the universal understanding during this Nation's early history was that everyone over 18 was subject to militia service.[2] And that minors were not universally expected to furnish their own arms for militia service shows that their militia service, alone, does not establish that minors were permitted to *purchase* firearms.

Finally, Plaintiffs repeat their refrain that "those over the age of 18 are not considered minors in Florida" for some purposes. Pls. Opp., DE116, at 11. That continues to be irrelevant. "If a representative citizen of the founding era conceived of a 'minor' as an individual who was unworthy of the Second Amendment guarantee, and conceived of 18-to-20-year-olds as 'minors,' then it stands to reason that the citizen would have supported restricting an 18-to-20-year-old's right to keep and bear arms." *BATFE*, 700 F.3d at 202.

---

[2] Plaintiffs also point out that "[th]e minimum age in these statutes for militia service ranged from 16 to 18," Pls. Opp., DE116, at 5. But they do not argue that because 16- and 17-year-olds served in the militia in some states that Florida may not restrict those individuals from purchasing firearms.

7

**B.     Even if Fla. Stat. § 790.065(13) burdens conduct protected by the Second Amendment, the statute satisfies the applicable standard of review.**

1.  *Intermediate scrutiny applies.*

Plaintiffs rehash their argument that strict scrutiny applies; for the reasons in Defendant's motion for summary judgment and opposition, intermediate scrutiny applies. *See* Def. MSJ, DE107, at 19-22; Def. Opp., DE114, at 10-11.

Citing a First Amendment case, Plaintiffs also maintain (incorrectly) that intermediate scrutiny requires the Court to assess whether Section 790.065(13) is "narrowly tailored to serve a significant government interest." *McCullen v. Coakley*, 573 U.S. 464, 486 (2014). They have not identified any case applying the narrow tailoring requirement in a Second Amendment challenge subject to intermediate scrutiny. Instead, courts ask whether the government can "show a reasonable fit between the law and an important government objective." *BATFE*, 700 F.3d at 205.[3]

2.  *Fla. Stat. § 790.065(13) satisfies intermediate scrutiny.*

As in their motion for summary judgment, Plaintiffs repeatedly suggest that the Court is limited to assessing "evidence considered by the Florida Legislature." Pls. Opp., DE116, at 24; *see id.* at 24-28. But as Defendant has explained, that is not the case. Def. Opp., DE114, at 12. Moreover, Plaintiffs confuse "post

---

[3] In any event, Section 790.065(13) is narrowly tailored for the same reasons that a reasonable fit exists.

8

hoc . . . justification[s]" (Pls. Opp., DE116, at 28) with evidence showing that Section 790.065(13) furthers the Legislature's goal of promoting public safety. In other words, Defendant has not invented a different justification for Section 790.065(13) than the Legislature had in mind; the expert and empirical evidence instead shows that Section 790.065(13) serves to promote the Legislature's objective and thus passes intermediate scrutiny. That is why, for example, in *United States v. Virginia*, 518 U.S. 515, 540-45 (1996), the Court considered expert testimony on whether the Commonwealth's asserted justification would be furthered by the regulation there. *See also* Def. Opp., DE114, at 12.

The unrebutted expert and empirical evidence on which Defendant relies establishes a reasonable fit between Section 790.065(13) and the Legislature's public safety objective. *See* Def. MSJ, DE107, at 24-29.

Contrary to Plaintiffs' suggestion, Dr. Bhide's conclusions are amply supported by the research on which he relied. For example, the Mills 2014 study[4] shows that the amygdala, nucleus accumbens, and frontal cortex of an average 18-year-old are at an earlier stage of the developmental trajectory than those of an average 21-year-old. And the Cohen 2016 study[5] compared 18-to-21-year-old

---

[4] *See* Def. Ex. 1, DE106-1, at 22.

[5] *See* Def. Ex. 1, DE106-1, at 23.

9

"young adults" to 22-to-25-year-old adults and found significant differences between the two age groups.

In attempting to rebut Dr. Bhide's expert opinion, Plaintiffs rely on a declaration from Professor Kleck, an "Emeritus Professor of Criminology and Criminal Justice," who holds a "doctorate in Sociology." DE108-6, at 12. Professor Kleck is not a neuroscientist, and is not qualified to rebut Dr. Bhide's expert opinion or to draw his own conclusions regarding the brain development of those between 18 and 21. Further, his representation concerning the studies on which Dr. Bhide relied is inaccurate: for example, in the Spear 2000 study,[6] 18-year-olds are expressly considered to be "adolescents," rather than adults. In short, Plaintiffs have not provided any evidence rebutting Dr. Bhide's expert opinion that "on average 18-year old individuals are more likely to engage in behaviors that are impulsive, emotional, risky and that offer immediate or short-time reward compared to 21-year old individuals." Def. Ex. 1, DE106-1, at 21.

Plaintiffs again suggest that "Florida has targeted an age group that does not disproportionately engage in firearm crime," but the evidence is to the contrary. *See* Def. MSJ, DE107, at 25-27. Plaintiffs also quarrel with the additional statistical evidence relied on by the Fifth and Seventh Circuits, ignoring that the Seventh Circuit observed that "more recent data reflects similar trends" as those in

---

[6] *See* Def. Ex. 1, DE106-1, at 23.

the data relied on by Congress. *See id.* at 27; *Horsley v. Trame*, 808 F.3d 1126, 1133 (7th Cir. 2015).

At bottom, Plaintiffs take issue with the Legislature's policy judgment that prohibiting 18-to-20-year-olds from purchasing firearms is an appropriate way to address the serious problem of gun violence. But "[i]n the context of firearm regulation, the legislature is far better equipped than the judiciary to make sensitive public policy judgments (within constitutional limits) concerning the dangers in carrying firearms and the manner to combat those risks." *Kanter*, 919 F.3d at 451 (citation omitted). Rather than being "off the table," as Plaintiffs suggest, the Legislature's choice to establish an age qualification is carefully targeted at an age group that is both more likely to commit violent crime and historically considered to be minors for the purposes of the Second Amendment.

## II.   PLAINTIFFS' EQUAL PROTECTION CLAIM FAILS AS A MATTER OF LAW.

Plaintiffs continue to maintain that strict scrutiny applies to their Equal Protection claim, asserting that because "the Second Amendment right to keep and bear arms is fundamental . . . strict scrutiny applies." Pls. Opp, DE116, at 29. In Plaintiffs' view, courts must "apply strict scrutiny if a fundamental right is involved." *Id.* The case law on which Plaintiffs rely, however, belies their argument.

In *Gary v. City of Warner Robins*, the Eleventh Circuit explained that because age "is not a suspect class," unless the challenged regulation "infringes upon a fundamental right, it will be scrutinized under the rational basis test." 311 F.3d 1334, 1337 (11th Cir. 2002). There, the plaintiff asserted that an ordinance infringed her rights to freedom of association and freedom of movement. Both rights, the Eleventh Circuit explained, were fundamental. *Id.* at 1338. Thus, *Gary* "involved" two undisputedly fundamental rights to the same extent that this case "involves" the Second Amendment right—in that the plaintiff asserted a violation of those rights—but because the ordinance did not *infringe* on those rights, the court applied rational-basis review. In other words, despite Plaintiffs' suggestion to the contrary, that a case merely includes a challenge based on a fundamental right does not mean that strict scrutiny applies. Instead, the challenged regulation must *infringe* on those rights. And because Section 790.065(13) does not infringe on Plaintiffs' Second Amendment rights, rational-basis review applies. *See, e.g., Mass. Bd. of Ret. v. Murgia*, 427 U.S. 307, 312 (1976) ("[E]qual protection analysis requires strict scrutiny of a legislative classification only when the classification impermissibly interferes with the exercise of a fundamental right or operates to the peculiar disadvantage of a suspect class.").

Plaintiffs again misstate the standard for rational-basis review, asserting that Section 790.065(13) fails because it "has no rational relationship to its stated

12

purpose where the fit is not reasonable." Pls. Opp., DE116, at 30. As explained in Defendant's opposition, a "reasonable fit" is required only under intermediate scrutiny, and Plaintiffs again fail to carry their burden to identify how Section 790.065(13)'s "presumptively rational" age classification "is so unrelated to the achievement of any combination of legitimate purposes that [the court] can only conclude that the [government's] actions were irrational." *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 84 (2000).

## CONCLUSION

For these reasons, and for those in Defendant's motion for summary judgment and opposition to Plaintiffs' motion for summary judgment, the Court should grant judgment for Defendant on both claims in Plaintiffs' Second Amended Complaint.

    Respectfully submitted.

    ASHLEY MOODY
    ATTORNEY GENERAL

    */s/ Christopher J. Baum*
    CHRISTOPHER J. BAUM (FBN 1007882)
    Senior Deputy Solicitor General

                                                                                                                                           AMIT AGARWAL (FBN 125637)
Solicitor General
JAMES H. PERCIVAL (FBN 1016188)
Chief Deputy Solicitor General
ELIZABETH TEEGEN (FBN 833274)
Chief Assistant Attorney General
TIMOTHY NEWHALL (FBN 391255)
Senior Assistant Attorney General

Office of the Attorney General
State of Florida
1 SE 3rd Ave Suite 900
Miami, FL 33131
(786) 792-6269
(850) 410-2672 (fax)
christopher.baum@myfloridalegal.com


*Counsel for Defendant*

## CERTIFICATE OF SERVICE

I certify that on this 1st day of October, 2020, a copy of the foregoing was served on all counsel of record through the Court's CM/ECF Notice of Electronic Filing System.

/s/ *Christopher J. Baum*
Christopher J. Baum

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 56.1(D) of the Local Rules of the Northern District of Florida, I certify that the foregoing Reply contains 2,810 words.

/s/ *Christopher J. Baum*
Christopher J. Baum