# IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| **NATIONAL RIFLE ASSOCIATION OF AMERICA**, *et al.*, | |
| *Plaintiffs,* | |
| v. | Case No. 18-cv-137-MW/MAF |
| **RICK SWEARINGEN, in his official capacity as Commissioner of the Florida Department of Law Enforcement**, | |
| *Defendant.* | |

## DEFENDANT'S MOTION TO EXCLUDE THE TESTIMONY OF WILLIAM ENGLISH, PH.D., AND MEMORANDUM OF LAW IN SUPPORT

Defendant moves to exclude the testimony of Plaintiffs' proposed expert William English, Ph.D., in whole or in part. Dr. English's testimony is inadmissible under Rule 702 and *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993).

## MEMORANDUM OF LAW

Plaintiffs proffer Dr. English to opine on whether Section 790.065(13), Florida Statutes, "is likely to have a significant impact on crime, safety, and public health" and to instruct this Court on "the moral and political principles that animate our understanding of" the Constitution. English Rep., Ex. A at 3–4. But Dr. English is not competent to opine on how a firearm regulation will impact crime and public safety; his opinions are unreliable and speculative; and his discussion of how the

Court should analyze the Constitution is not proper expert testimony—it is closing argument.

## BACKGROUND

### A. DR. ENGLISH'S BACKGROUND

Dr. English is an assistant professor at Georgetown University's McDonough School of Business, where he teaches classes on "ethical leadership," the "ethical values of business," and the "social responsibility of businesses." English Bio, Ex. B; English Course Catalog, Ex. C. Dr. English has master's degrees in ethics and political science and a Ph.D. in political science. Ex. B. He wrote his dissertation "on the nature of ethical persuasion and its role in institutional change," Ex. B, and his recent publications include, "The origin of wealth matters: Equity norms trump equality norms in the ultimatum game with earned endowments"; "Varieties of Citizenship and the Moral Foundations of Politics"; and "Paying People to Make Healthy Choices," Ex. A at 16.

Dr. English has published no articles on topics related to crime or firearm regulation, Ex. A at 16–18, and he does not consider himself an expert in criminology, although he believes he is "equipped to evaluate claims made in the criminology literature," *see* English Dep., Ex. D at 21:16–22:1 (stating that he would not call himself a criminologist or "put [criminology] on [his] business card as [his] first area of expertise").

## B. Dr. English's Report

Dr. English muses on a range of subjects, from remarking that "it is interesting to consider" that 21-to-25-year-olds are arrested for "violent crimes" more than 18-to-20-year-olds, to asserting that "it is arguably unclear" what Section 790.065(13) prohibits, to commenting on "[t]he moral essence of due process." Ex. A at 4, 6, 10. But he relies on none of his own studies or research, save one reference to a previous expert report that he authored. Instead, he plucks information from different databases, law review articles, and websites; performs a few basic calculations; and advances legal and policy arguments.

1. Dr. English first considers whether Section 790.065(13) will "have a significant impact on crime, safety, and public health." Ex. A at 3. He begins his analysis by comparing arrest rates among 18-to-20-year-olds with rates among 21-to-25-year-olds. According to Dr. English, 21-to-25-year-olds are arrested for more "violent crimes," so Section 790.065(13) would probably "be better tailored if it prohibited" that group "from purchasing firearms." Ex. A at 4. Dr. English, however, does not explain why he uses arrest data to compare 18-to-20-year-olds with 21-to-25-year-olds, as opposed to, for example, victim surveys or conviction data, Ex. A at 4; nor does he address whether 18-to-20-year-olds and 21-to-25-year-olds who commit crimes are detected and arrested at the same rates; Ex. A at 4; nor does he explain why he chose to use data that does not include rape as a "violent crime" even

though the FBI defines "violent crime" as including rape, *compare* Ex. A at 4 n.2 (relying on a source that defines "violent crime" as "murder and nonnegligent manslaughter, robbery, and aggravated assault"), *with* Crime in the United States, FBI, https://ucr.fbi.gov/crime-in-the.u.s/2018/crime-in-the.u.s.-2018/topic-pages/violent-crime (last accessed Dec. 2, 2020) ("[V]iolent crime is composed of . . . murder and nonnegligent manslaughter, rape, robbery, and aggravated assault").

Next, Dr. English contrives "a rough estimate of the kind of impact" Section 790.065(13) could have if it "prevented criminals aged 18-20 from accessing firearms." Ex. A at 5. He first opines that, based on U.S. Department of Justice data, "the arrest rate for violent crime for those aged 18, 19, and 20 is about 382 per 100,000, which would translate to about 3,000 arrests . . . in Florida per year." Ex. A at 5. Then, he pivots to Florida Department of Law Enforcement arrest data, asserting that based on the data, "about a third of violent crime in Florida involves firearms." Ex. A at 5. When taken together with the Department of Justice data, that statistic, he asserts, "suggest[s] that around 1,000" 18-to-20-year-olds are arrested each year in Florida for "firearm involved violent crime." Ex. A at 5. According to Dr. English, that is not a significant amount of crime because "in 2016 over 400 people died in Florida by accidentally drowning." Ex. A at 5.

Dr. English then argues that it is "likely" that Section 790.065(13) will not even reduce "crime and homicide" because, in his view, it will not prevent "young

criminals from obtaining firearms." Ex. A at 5. In reaching that conclusion, he switches back to Department of Justice data and departs from his focus on "violent crime." He asserts that "90% of criminals who" possess or use a firearm during an offense (any offense, not just violent crimes) "did not obtain" the firearm directly from "a retail source," so "there is little reason to believe that" prohibiting 18-to-20-year-olds from buying firearms in Florida will impact crime. Ex. A at 5. Dr. English does not address whether 18-to-20-year-olds make up a disproportionate percentage of the 10% of criminals who use a firearm that they purchased, nor does he address the extent to which 18-to-20-year-olds serve as straw purchasers for peers who engage in criminal activity. *See* Ex. A at 5. He merely recites statistics that he cobbled together and performs a few calculations. *See* Ex. A at 5.

After that, Dr. English argues that Section 790.065(13) is unlikely to reduce crime in Florida given "the kinds of gun sales [it] will effectively prohibit in practice." Ex. A at 6. According to him, "the most significant impact of Section 790.065(13)" will "be to prohibit licensed sales of long guns to" 18-to-20-year-olds, and in his opinion, long guns are "implicated in only 14.5% of gun crime" and "less than 7.5% of homicides." Ex. A at 6. (Dr. English does not explain what "gun crime" refers to.)

Dr. English reaches his conclusion that Section 790.065(13) will primarily impact long guns in three steps. He first presumes that Section 790.065(13) will

affect only purchases from licensed dealers, even though it bars purchases from *both* licensed dealers and private sellers. *See* Ex. A at 6. Then, he notes that the federal Gun Control Act of 1968 already prohibits 18-to-20-year-olds from buying handguns from licensed dealers. Ex. A at 6. Finally, based on those assertions, he concludes that Section 790.065(13) will mainly impact "licensed sales of long-guns to" 18-to-20-year-olds. Ex. A at 6.

Next, he asserts that Section 790.065(13) is bad policy because it "effectively den[ies]" law-abiding citizens "the ability to obtain guns for both sporting uses and self-defense." Ex. A at 6. As to "sporting uses," he asserts that Section 790.065(13) will significantly impact hunting in Florida because "tens of thousands of Florida residents age 18-20" who hunt will be unable to purchase firearms, and "it is arguably unclear" whether Section 790.065(13) will allow them to receive firearms as gifts. Ex. A at 6. In asserting that "tens of thousands" of Floridians will be impacted, Dr. English relies on a 2011 U.S. Fish & Wildlife Service survey which states that 329,000 Florida residents hunt "both inside and *outside* Florida" each year. Survey, Ex. E at 4 (emphasis added). Dr. English, however, ignores that the survey includes residents who hunt outside Florida, where Section 790.065(13) is inapplicable. *See* Ex. A at 6.

As to self-defense, Dr. English argues that "the costs" of Section 790.065(13) to 18-to-20-year-olds "who desire to purchase a firearm for self-defense are likely

to be significant." Ex. A at 7. Section 790.065(13), he reasons, will not prevent criminals from obtaining firearms, but it will prevent law-abiding 18-to-20-year-olds from obtaining them, so it is "likely . . . to increase the number of people successfully victimized." Ex. A at 7. He reaches that conclusion without performing any analysis of the extent to which law-abiding 18-to-20-year-olds can access firearms through means other than purchasing them in-state. *See* Ex. A at 7.

In the final part of his analysis, Dr. English wades into whether Section 790.065(13) will have an impact on suicides and "accidental firearms deaths." Ex. A at 7–8. He notes that the question whether Section 790.065(13) will reduce suicides is "an empirical question that can only be answered using data that is not yet publicly available," but he nevertheless barrels ahead and speculates on the issue, musing that "there are reasons to expect that the impact of" Section 790.065(13) "will be minimal." Ex. A at 8. Then, he opines that Section 790.065(13) will have no meaningful impact on accidental firearm deaths because only around two "individuals in Florida age 18-20 die each year from a firearms accident." Ex. A. at 8.

Dr. English concludes his analysis by stating that he "would not recommend" Section 790.065(13) "as a method for improving public safety." Ex. A at 9.

2. In the second section of his report, Dr. English offers his thoughts on whether "enfranchised citizens [can] be deprived of basic rights and liberties based

on age." Ex. A at 9. He contends that, "as a political theorist and student of American political development," he has insights into the "normative considerations" that this Court should "take[] into account in evaluating" Section 790.065(13). Ex. A at 9.

He begins his analysis by describing how, in his view, courts should determine whether a constitutional right has been violated. Ex. A at 10. The government, he asserts, "is not entitled to violate" a constitutional right "simply because it can show that some public benefit will result; "[r]ather, rights require the [government] to meet a much higher bar." Ex. A at 10. That is particularly so, Dr. English argues, when the right to due process is at stake since that right is "fundamental to modern political legitimacy." Ex. A at 10.

Dr. English then contends that there is only one "class of individuals in the U.S. who, on the basis of age, do not fully enjoy equal rights, namely minors." Ex. A at 11. And he argues that minority ends at age 18 under the Constitution, claiming that "the question of who qualifies to be a fully enfranchised citizen has been clearly settled by the 26th Amendment," which was ratified in 1971 and affords 18-year-olds the right to vote. Ex. A at 11. Dr. English cites no authority in support of that contention; he relies only on his purported knowledge as a "student of American political development." *See* Ex. A at 9, 11.

Next, Dr. English turns to Section 790.065(13), opining that it is "inconsistent with legal and moral equality." Ex. A at 13. He asserts that no "compelling state

interest" supports Section 790.065(13) because "any arguments that young adults" are impulsive or otherwise high-risk are "immediately faced with two devastating counterarguments." *See* Ex. A at 11–12.

The first, according to Dr. English, is that 18-to-20-year-olds "have historically used firearms responsibly each year for hunting." Ex. A at 12. In support, he references the 2011 U.S. Fish & Wildlife Service survey, even though the survey is a one-time snapshot of how many Floridians hunted in a particular year and includes no historical analysis of 18-to-20-year-olds, let alone an analysis of whether they have historically hunted responsibly. Ex. A at 12.

The second counterargument he marshals is that 18-to-20-year-olds have historically served in the military. Ex. A at 12. He asserts that any claim that 18-to-20-year-olds are at risk of using firearms irresponsibly "is wholly inconsistent with th[at] fact." Ex. A at 12. Dr. English does not, however, acknowledge, much less take into account, that the military provides extensive firearms training and offers a controlled, supervised environment. *See* Ex. A at 12.

## LEGAL STANDARD

Rule 702 and *Daubert* require the district court to "serve as a gatekeeper to the admission of" expert evidence. *Quiet Tech. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1340 (11th Cir. 2003). The court's "role is to [exclude] unreliable and irrelevant [expert testimony] because of its inability to assist in factual

determinations, its potential to create confusion, and its lack of probative value." *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1311–12 (11th Cir. 1999).

The party offering expert testimony "always bears the burden to show that" it satisfies *Daubert* and Rule 702. *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (en banc) (quotations omitted). The party must establish that (1) the expert is "qualified to testify competently regarding the matter he . . . intends to address"; (2) his methodology is "reliable," and (3) his testimony will "assist the trier of fact through the application of expertise to understand the evidence or determine a fact in issue." *Adams v. Lab. Corp.*, 760 F.3d 1322, 1328 (11th Cir. 2014) (quotations omitted).

## ARGUMENT

**I. DR. ENGLISH'S TESTIMONY ON THE POTENTIAL IMPACT OF SECTION 790.065(13) ON CRIME AND PUBLIC SAFETY IS INADMISSIBLE.**

### A. Dr. English is not competent to offer the testimony.

Analyzing how a law will impact crime and public safety requires more than just the ability to perform mathematical calculations. It requires expertise in criminal science—that is, expertise on crime statistics, the "causes of crime," "the effects of environment" on crime, "effective methods of reducing crime," and the "social phenomena" surrounding criminal activity. *See* Black's Law Dictionary 457 (10th ed. 2014) (defining "criminal science" and "criminology," which is a branch of criminal science); *Lanning v. Se. Penn. Transp. Auth.*, 2000 WL 1790125, at \*19

(E.D. Pa. Dec. 7, 2000) (concluding that, "determining the efficacy of certain activities . . . on [crime] deterrence" requires expertise in criminology); *cf.* Kleck Expert Rep., Doc. 93-1 at 8 (highlighting his expertise in criminology in setting forth his qualifications to opine on how Section 790.065(13) will impact crime).

Such expertise is necessary to discern the range of ways in which a law like Section 790.065(13) might affect criminal behavior; to identify the social, economic, and geographic variables that could influence how individuals respond to the law; to identify data that is reliable and appropriate for assessing the law's effects on crime; and to properly interpret the data (i.e., weigh countervailing effects, account for alternative explanations of trends in the data, identify and address deficiencies in the data, and control for the relevant social, economic, and geographic variables). Yet Dr. English has no expertise in criminal science or criminology. He has a degree in political science and teaches at a school of business. Ex. B.

His testimony on the potential impact of Section 790.065(13) on crime and public safety is therefore inadmissible. *See Arevalo v. Coloplast Corp.*, 2020 WL 3958505, at *1 (N.D. Fla. July 7, 2020) ("[T]he subject matter of [an expert's] testimony must be within the scope of his or her expertise." (citing *Maiz v. Virani*, 253 F.3d 641, 665 (11th Cir. 2001))).

**B. In any event, Dr. English's testimony on the potential impact of Section 790.065(13) is unreliable.**

"Rulings on admissibility under *Daubert* inherently require the trial court to conduct an exacting analysis of the proffered expert's methodology." *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1257 (11th Cir. 2002). The court can admit expert testimony only if it "find[s] that it is properly grounded, well-reasoned, and not speculative." *Frazier*, 387 F.3d at 1262 (quoting Fed. R. Evid. 702 Adv. Comm. Note (2000)). If the testimony lacks "intellectual rigor" or relies on a "leap of faith," it is inadmissible. *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1292 (11th Cir. 2005) (quotations omitted).

Dr. English's testimony on the potential impact of Section 790.065(13) lacks intellectual rigor. First, he jumps to conclusions without analysis, relies on flawed assumptions, and speculates. Examples abound:

- His conclusion that Section 790.065(13) will "likely" increase "the number of people successfully victimized" is based on his erroneous contention that under Section 790.065(13), it might be illegal to gift a law-abiding 18-to-20-year-old a firearm. *See* Ex. A at 6–7.

- He focuses on "violent crime" during much of his analysis but then, without explanation, switches to statistics for all crimes when arguing that most 18-to-20-year-old criminals who use firearms do not obtain them from licensed dealers. *See* Ex. A at 5. At best, that abrupt, unexplained pivot suggests that Dr. English lacks a coherent methodology, and at worst, it suggests that he "contrived [his methodology] to reach a particular result." *See Rink*, 400 F.3d at 1293 n.7.

- He misconstrues the findings in the U.S. Fish & Wildlife Service survey on which he relies. The survey states that 329,000 Florida residents hunt both

inside and outside Florida each year, yet Dr. English cites the survey for the proposition that 329,000 Floridians hunt in-state each year. *See* Ex. A at 6.

- He states that there is insufficient data to opine on how Section 790.065(13) will impact suicide rates, but he then speculates on the issue. Ex. A at 8.

- When analyzing how Section 790.065(13) will impact crime, he leaps to a conclusion without accounting for "significant" variables. *See Phillips v. Am. Honda Motor Co.*, 238 F. App'x 537, 541–42 (11th Cir. 2007) (finding expert testimony unreliable because he "fail[ed] to control or account" for "significant" variables). He concludes that banning 18-to-20-year-olds from purchasing firearms will not reduce crime because, according to him, few criminals use firearms that they bought from a licensed dealer. *See* Ex. A at 5–6. But he does not consider the extent to which such a ban will reduce crime by preventing 18-to-20-year-olds from (1) buying firearms from private sellers and (2) serving as straw purchasers for their peers.

Second, Dr. English does not identify "any technical methodology used to arrive at [his] conclusions." *See Cordoves v. Miami-Dade Cty.*, 104 F. Supp. 3d 1350, 1363 (S.D. Fla. 2015) (excluding expert testimony because the expert failed to identify a methodology). He pulls from a mishmash of sources and performs basic calculations without identifying any principles or methods that he used in selecting the sources, in deciding how to analyze the data in the sources, or in weighing the effects of Section 790.065(13). Dr. English, for example, derides Section 790.065(13) as potentially saving less lives than those lost in bicycle accidents, accidental drownings, and drug and alcohol overdoses, Ex. A at 8, but he never explains why he chose those comparators. Indeed, he admits that his analysis does not rely on a technically sound method, noting that the analysis amounts to a "rough estimate." Ex. A at 5.

Lacking a technical methodology, Dr. English appears to have cherrypicked sources. For example, in arguing that arrest rates for "violent crimes" are higher for 21-to-24-year-olds than 18-to-20-year-olds, he cites three years of data from the Office of Juvenile Justice and Delinquency Prevention (OJDDP), Ex. A at 4 n.2, while ignoring OJDDP data showing that, for most of the past 30 years, arrest rates have been higher for 18-to-20-year-olds. *See* Juvenile Justice Statistics at 9, OJDDP, https://ojjdp.ojp.gov/sites/g/files/xyckuh176/files/pubs/252713.pdf (last accessed Dec. 2, 2020). He also ignores data cited by Plaintiffs' other expert, Dr. Gary Kleck, "indicat[ing] that [in 2017] the single ages with the highest rates of arrest for murder were 18, 19, and 20 years old." Kleck 2019 Article at 1, attached as Ex. D to Defendant's Motion to Limit the Testimony of Kleck.

To the extent that Dr. English has a methodology, it appears to be wrapped up in his own political philosophy and constitutional analysis. As he admits, both his "empirical" and "normative" analysis "inform [his] evaluation of" Section 790.065(13), which is why his conclusions do not rest on his "empirical" analysis alone. *See* Ex. A at 3. But a methodology that is derived in part from Dr. English's "subjective" political "belief[s]" is not a reliable methodology. *See Daubert*, 509 U.S. at 590.

## II. DR. ENGLISH'S TESTIMONY ON HOW THIS COURT SHOULD ANALYZE THE CONSTITUTION IS INADMISSIBLE.

An expert's testimony is admissible only if he applies scientific, technical, or specialized expertise. *Quiet Tech.*, 326 F.3d at 1340–41. The testimony must "concern[] matters that are beyond the understanding of the average lay person." *Frazier*, 387 F.3d at 1262. Expert testimony "will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments." *Id.* at 1262–63. Experts "may not explain the law to the" factfinder "or attempt to apply any law to the facts"—that is counsel's job. *Schultz v. Gov't Emps. Ins. Co.*, 2016 WL 8861701, at *1 (N.D. Fla. Aug. 12, 2016).

Yet all of Dr. English's testimony in the second part of his report is closing argument. He offers his views on what the Constitution requires, Ex. A at 9–10, and he applies his constitutional rules to the facts, concluding that, in his opinion, Section 790.065(13) is inconsistent with the Second Amendment and due process, *see* Ex. A at 12–13. That is not proper expert testimony. *See Williams v. First Advantage LNS Screening Sols.*, 2015 WL 9690018, at *4 (N.D. Fla. Mar. 31, 2015) (Walker, C.J.) (excluding expert testimony because the expert opined "on the intent of the drafters of [the relevant statute] and purpose of the" statute); *Washington v. City of Waldo*, 2016 WL 3545909, at *4 (N.D. Fla. Mar. 1, 2016) (Walker, C.J.) (excluding expert testimony because the expert opined on whether a particular constitutional standard was satisfied).

## CONCLUSION

Dr. English's testimony is inadmissible under Rule 702 and *Daubert*. It should be excluded.

## LOCAL RULE 7.1(B) CERTIFICATION

Counsel for Defendant "attempt[ed] in good faith to resolve" the issues raised in this motion "through a meaningful conference with" Plaintiffs' counsel, but the parties could not reach a resolution. L.R. 7.1(B).

Respectfully submitted,

ASHLEY MOODY
ATTORNEY GENERAL

/s/ *Kevin A. Golembiewski*
KEVIN A. GOLEMBIEWSKI (FBN 1002339)
Deputy Solicitor General
kevin.golembiewski@myfloridalegal.com

ELIZABETH TEEGEN (FBN 833274)
Chief Assistant Attorney General
Elizabeth.Teegen@myfloridalegal.com
CHRISTOPHER J. BAUM (FBN 1007882)
Senior Deputy Solicitor General
Christopher.Baum@myfloridalegal.com
AMIT AGARWAL (FBN 125637)
Solicitor General
Amit.Agarwal@myfloridalegal.com
JAMES H. PERCIVAL (FBN 1016188)
Chief Deputy Solicitor General
James.Percival@myfloridalegal.com
TIMOTHY L. NEWHALL (FBN 391255)
Senior Assistant Attorney General
Timothy.Newhall@myfloridalegal.com
Office of the Attorney General
PL-01, The Capitol
Tallahassee, Florida 32399
(850) 414-3300

*Counsel for Defendant*

Date: December 3, 2020

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 7.1(F) of this Court's Local Rules, I certify that the foregoing

Motion and Incorporated Memorandum contain 3,664 words.

/s/ *Kevin A. Golembiewski*
Kevin A. Golembiewski
DEPUTY SOLICITOR GENERAL

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing was filed with the Court's

CM/ECF system, which provides notice to all parties, on this 3rd day of December,

2020.

/s/ *Kevin A. Golembiewski*
Kevin A. Golembiewski
DEPUTY SOLICITOR GENERAL