# IN THE UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| NATIONAL RIFLE ASSOCIATION OF AMERICA, *et al.*, <br><br> *Plaintiffs,* <br> v. <br><br> RICK SWEARINGEN, in his official capacity as Commissioner of the Florida Department of Law Enforcement, <br><br> *Defendant.* | Case No. 18-cv-137-MW/MAF |

## DEFENDANT'S RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION TO EXCLUDE THE TESTIMONY OF PRADEEP BHIDE, PH.D., AND MEMORANDUM OF LAW IN SUPPORT

Throughout his 37-year career as a developmental neuroscientist, Dr. Bhide has "focus[ed] . . . on the study of brain development from the embryonic period through adolescence to adulthood." Bhide Rep., Doc. 106-1 at 3. In his report, he opines on that exact subject. He describes the different regions of the brain and their functions, discusses "[t]he differences in the chronological sequence of maturation of the cortical and subcortical brain regions," and explains how the differences impact an average 18-year-old's, as compared to an average 21-year-old's, ability to "exercise cognitive control" over her behavior. Doc. 106-1 at 12–20. That testimony bears on whether 18-to-20-year-olds—the group that Section 790.065(13) is tailored to—are more likely to engage in risky behavior than older groups.

Plaintiffs' request to exclude Dr. Bhide's testimony is based on a strawman. They misapprehend his testimony, claiming that he opines on whether "young adults age 18 to 20 are more likely to commit criminal violence with a purchased firearm than other adults." *See* Mot. 2. Then, after erecting that strawman, they assert that his testimony is inadmissible because he is not a criminologist and because in his report he does not cite studies on crime. Mot. 4, 9. But Dr. Bhide does not opine on the likely effect of Section 790.065(13) on crime. He opines on brain development from adolescence to adulthood, relying on peer-reviewed academic studies and his expertise as a developmental neuroscientist who has studied and taught brain development for decades.

Dr. Bhide's testimony is admissible. The Court should deny Plaintiffs' motion.[1]

## MEMORANDUM OF LAW

According to Plaintiffs, Dr. Bhide's testimony satisfies none of the *Daubert* requirements. They assert that he is not qualified to testify, that his methodology is

---

[1] Under the Court's pretrial order, the parties must respond to motions in limine within five days. Doc. 97 at 7. Plaintiffs filed their motion on December 3, 2020, making today, December 8, 2020, the deadline for Defendant to respond. In an abundance of caution, Defendant therefore submits this response despite the Court's order this morning "cancel[ling] the trial scheduled for January 11, 2021 . . . and all deadlines associated with the pretrial conference." Doc. 128 at 2.

unreliable, and that his testimony will not help the trier of fact. Plaintiffs' sweeping attack on Dr. Bhide's testimony fails.

## ARGUMENT

I. **DR. BHIDE IS QUALIFIED TO TESTIFY ON THE MATTERS THAT HE INTENDS TO ADDRESS.**

An expert must be "qualified to testify competently regarding the matters he intends to address." *City of Tuscaloosa v. Harcros Chem.*, 158 F.3d 548, 562 (11th Cir. 1998). He can be qualified "by virtue of his . . . knowledge, skill, experience, training, or education." *Quiet Tech. DC-8 v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1342 (11th Cir. 2003) (quoting Fed. R. Evid. 702).

Dr. Bhide intends to testify as a developmental neuroscientist, addressing the process of brain development and the brain development of an average 18-year-old as compared to an average 21-year-old. He is qualified to testify on those matters by virtue of not only his education but also his knowledge and experience:

- He has a Ph.D. in Neuroscience from Scotland's University of Aberdeen, which he obtained in 1983. Doc. 106-1 at 26.

- His "doctoral research was in the field of developmental neuroscience" ("the scientific study of the development of the structure and function of the brain"). Doc. 106-1 at 2, 4.

- He conducted his postdoctoral research at University College London, Yale, and Harvard, concentrating on developmental neuroscience. Doc. 106-1 at 27–28.

- He is currently a Professor and Eminent Scholar in the Department of Biomedical Sciences at the FSU College of Medicine, where he "hold[s] the

3

- Jim and Betty Anne Rodgers Chair in Developmental Neuroscience." Doc. 106-1 at 2.

- He serves as the Director of FSU's Center for Brain Repair, which comprises neuroscientists who conduct research on the brain, including research that involves MRI scans of the brain. Doc. 106-1 at 26; Bhide Depo., Doc. 125-2 at 33:2–33:10, 36:23–37:10.

- He serves on the editorial board of the peer-reviewed journal Developmental Neuroscience. Doc. 125-2 at 46:14–46:23. Developmental Neuroscience "is a multidisciplinary journal publishing papers covering all stages of invertebrate, vertebrate, and human brain development." Developmental Neuroscience, Karger, https://www.karger.com/Journal/Details/224107 (last accessed Dec. 8, 2020).

- He teaches several courses at FSU, including "Human Nervous System and Behavior" and "Neuroscience and Behavior," both of which address brain development. Doc. 125-2 at 15:20–15:25; Doc. 106-1 at 28.

- Before teaching at FSU, he was an Associate Professor of Neurology and an Associate Neuroscientist at Harvard Medical School. Doc. 106-1 at 26–27.

- He has published dozens of peer-reviewed articles on topics related to developmental neuroscience. Doc. 106-1 at 32–43.

- He has served as an editor of three books on brain development: *Teenage Brains: Think Different?*; *Drug Abuse, Addiction, and the Developing Brain*; and *Stem and Progenitor Cells in the Central Nervous System*. Doc. 106-1 at 43; *Stem and Progenitor Cells in the Central Nervous System*, Karger, https://www.karger.com/Book/Home/230660 (last accessed Dec. 8, 2020) (stating that in the book, "[t]he authors, who are leading experts in the field, address topical questions from both basic and clinical neuroscience perspectives").

- He has presented at numerous conferences and symposia, Doc. 106-1 at 43–48, and at "almost every presentation," he discussed brain development, Doc. 125-2 at 24:21–25:3.

Thus, as Plaintiffs' counsel recognized during Dr. Bhide's deposition, Dr. Bhide has a "lengthy . . . and very impressive" resume. Doc. 125-2 at 45:23. And his extensive knowledge of, education on, and experience researching brain development qualify him to testify on the matters in his report—the process of brain development from adolescence to adulthood. Those matters "grow[] naturally and directly out of" Dr. Bhide's decades-long career as a developmental neuroscientist. *See Lebron v. Sec'y of Fla. Dep't of Children & Families*, 772 F.3d 1352, 1369 (11th Cir. 2014) (citing Fed. R. Evid. 702 Adv. Comm. Notes (2000)).

Plaintiffs' arguments that Dr. Bhide is not qualified to testify are misguided. They first assert that he is not qualified to testify on the matters in his report because he opines on whether Section 790.065(13) "is likely to reduce violent crime" even though he is not a criminologist. Mot. 4; *id.* at 6 (asserting that Dr. Bhide "has never studied the subject matter of his report—any link between neuroscience, age, and firearm purchase and criminal use"). But Dr. Bhide does not wade into whether Section 790.065(13) will impact crime or whether a "link" exists between age, firearm use, and crime. He does not mention crime even once in his report, and during his deposition, he underscored that he offers no opinions on firearm use. When Plaintiffs' counsel tried to elicit opinions from him on firearm use, he rebuffed them:

> Counsel: [B]ased on your opinion in this case, you think it is a good policy to give 18- and 21-year-olds the right to use and possess firearms but only deny them the right to purchase?
>
> Dr. Bhide: I don't really know. . . . I can't—that's a very complex matter using a firearm or ability to use a firearm, what consequences might be, so the short answer is I don't know.

Doc. 125-2 at 77:12–77:22.

Next, Plaintiffs assert that Dr. Bhide lacks "expertise in adolescent brain development." Mot. 4. They, however, ignore (1) that Dr. Bhide has for years studied "brain development from the embryonic period through *adolescence* to adulthood," Doc. 106-1 at 3 (emphasis added); (2) that he served as an editor of a developmental-neuroscience book on the teenage brain, Doc. 106-1 at 23; and (3) that he has presented on brain development during adolescence, Doc. 125-2 at 28:2–28:13.

At any rate, Plaintiffs' argument is based on a flawed premise: that an expert with extensive knowledge of brain development cannot opine on how the brain develops during adolescence unless he has researched and published on "adolescent brain development" specifically. Mot. 4. As Plaintiffs themselves recognize in a recent filing, *Daubert* and Rule 702 do not require experts to have such a particularized level of expertise. *See* Resp. to *Daubert* Mot., Doc. 129 at 9 (noting that an expert need not "publish academic books or articles on the precise subject matter of her testimony"). An expert is qualified as long as "[t]he subject matter of h[er] testimony . . . [is] sufficiently within" her general area of expertise. *See Maiz*

*v. Virani*, 253 F.3d 641, 665 (11th Cir. 2001) (rejecting argument that an expert with "a substantial background in estimating damages" was not qualified to opine on the lost value of a real-estate investment because he lacked specific expertise in real estate); *United States v. Hensel*, 711 F.2d 1000, 1006 (11th Cir. 1983) (rejecting argument that an expert who had "experience investigating fires" was not qualified to opine on an "admiralty arson"); *Allen v. Martin Surfacing*, 263 F.R.D. 47, 58 (D. Mass. 2009) ("The level of specialty in the field in which the expert is giving her opinion affects not the admissibility of her opinion but the weight." (quotations and alterations omitted)).[2]

Plaintiffs next contend that Dr. Bhide is not qualified because he has "only studied mice, not humans." Mot. 6. Again, Plaintiffs are mistaken. Dr. Bhide has performed lab experiments on only mice, *see* Doc. 125-2 at 50:5–50:12 (discussing Dr. Bhide's experimental research on the brain), but he has studied and published on human-brain development for decades. He has, for instance, published articles that examine not only the effects of environmental and biological factors on the cellular organization of the developing human brain but also the behavioral consequences of

---

[2] In support of their claim that *Daubert* requires highly particularized expertise, Plaintiffs cite *United States v. Brown*, 415 F.3d 1257 (11th Cir. 2005). They describe the decision as "upholding exclusion of a chemistry consultant in controlled substances because he lacked expertise with the chemical substance at issue." Mot. 4. That is inaccurate. The court affirmed because the expert's "academic work and professional experience related more to plant pathology and botany than to chemistry." *Brown*, 415 F.3d at 1269.

such factors. The articles include, among others: *Is Paternal Smoking at Conception a Risk for ADHD? A Controlled Study in Youth With and Without ADHD*; *Does Exposure to Maternal Smoking During Pregnancy Effect the Clinical Features of ADHD? Results from a Controlled Study*; *Expression of Normal and Mutant Huntingtin in the Developing Brain*; *Early and Progressive Accumulation of Reactive Microglia in the Huntington Disease Brain*; and *A Study of the Neuropsychological Correlates in Adults with High Functioning Autism Spectrum Disorder*. Doc. 106-1 at 34, 36, 39–41; Dr. Pradeep Bhide, FSU Program in Neuroscience, https://neuro.fsu.edu/faculty/bhide (last accessed Dec. 8, 2020). Indeed, Dr. Bhide not only studies human-brain development but also teaches multiple courses on it. Doc. 125-2 at 15:20–15:25; Doc. 106-1 at 28.

Finally, Plaintiffs assert that Dr. Bhide is not qualified because he "cannot pinpoint the age of brain maturity." Mot. 5. That argument is a red herring. "[T]here isn't a single age of brain maturity." Doc. 125-2 at 34:23–35:4. Different regions of the brain are constantly developing, as is the brain as a whole. *See* Doc. 125-2 at 34:23–36:15. At Dr. Bhide's deposition, Plaintiffs' counsel contrived the concept of the brain becoming mature at some precise point and repeatedly asked Dr. Bhide questions about it, but each time, Dr. Bhide explained that the concept is nonsensical. Doc. 125-2 at 30:16–30:21, 34:23–35:4, 35:12–36:15, 39:1–39:8. For example:

> Counsel: And do any of [your presentations] involve pinpointing the age of brain maturity?

> Dr. Bhide: Well, I just want to—if we keep going back to that specific terminology, one cannot pinpoint the age of brain maturity in any species. So I just want to—having to, you know, keep going back to the same thing. I don't really know what that means.

Doc. 125-2 at 39:1–39:8.

To qualify as an expert, a person "must be at least minimally qualified in his field." *Hendrix v. Evenflo Co.*, 255 F.R.D. 568, 578 (N.D. Fla. 2009). Dr. Bhide exceeds that standard—he is a leader in the field of developmental neuroscience. He is qualified to testify. *See, e.g.*, *Meadors v. D'Agostino*, 2020 WL 6342637, at *3 (M.D. La. Oct. 29, 2020) (finding that an expert who had a "30-year career as a neuroscientist" was "highly qualified" to testify as a neuroscientist).

## II. DR. BHIDE'S TESTIMONY IS RELIABLE.

A district court "may consider" a variety of factors in assessing reliability, including whether the expert's methodology has been "subjected to peer review and publication," whether the methodology is "generally accepted in the scientific community," and whether the expert has "extensive, relevant experience" that "contribute[s] to the reliability of her methodology." *Adams v. Lab. Corp.*, 760 F.3d 1322, 1327, 1330 (11th Cir. 2014). "These factors are illustrative, not exhaustive; not all of them will apply in every case, and in some cases other factors will be equally important in evaluating the reliability of [the] expert opinion." *See United States v. Frazier*, 387 F.3d 1244, 1262 (11th Cir. 2004) (en banc).

Dr. Bhide's opinions are derived from a reliable methodology. He formed them by "applying an established body of [scientific] knowledge" and "drawing on h[is] extensive experience in the field" of neuroscience. *See Adams*, 760 F.3d at 1330. He consulted "experimental evidence from neuroscience," including "data from hypothesis-driven neuroimaging experiments"; analyzed the evidence using his expertise as a developmental neuroscientist; and formed his opinions, drawing from both the evidence and his extensive knowledge of brain development. Doc. 106-1 at 6; Doc. 125-2 at 62:3–62:10.

All the evidence that Dr. Bhide relied on, moreover, was "subjected to peer review and publication." *Adams*, 760 F.3d at 1327. He relied on a book that he edited, which included peer-reviewed articles, Doc. 125-2 at 48:6–48:11, and on studies published in various peer-reviewed journals (i.e., Developmental Review, Developmental Neuroscience, Trends in Neurosciences, Annals of Neurology, Neuroscience and Biobehavioral Reviews, Personality and Individual Differences, Developmental Psychology, and Psychological Science), Doc. 106-1 at 23–25; *see also United States v. Gomes*, 279 F. App'x 861, 871 (11th Cir. 2008) (affirming finding that an expert's "methodology was reliable" where the expert "indicated that the principles and methods she used were reliable and had been subjected to peer review, and she identified articles and textbooks on the subject").

Plaintiffs contend that Dr. Bhide's testimony is not reliable because "his report is a recitation of the conclusions reached by others"; "he never actually applie[d]" brain-scanning technology "to the facts of the case"; and "the studies [he cites] do not support" his conclusions." Mot. 7–9. Those arguments, too, are misguided.

First, Dr. Bhide did not merely recite the conclusions of others. He formed his opinions by drawing from both his own expertise and peer-reviewed articles, and he explained the basis for his opinions in detail. *See* Doc. 106-1 at 11–20. Plaintiffs do not identify any specific conclusions that he simply regurgitated; they just make a sweeping claim that Dr. Bhide—who has been a neuroscientist for 37 years and who is highly regarded in his field—mindlessly copied and pasted others' conclusions into his report. *See* Mot. 7.

Nor is Dr. Bhide's use of others' studies problematic. Plaintiffs appear to assert that Dr. Bhide lacked a methodology because he relied on the studies, Mot. 7–8, but "review[ing] [data], appl[ying] [specialized] knowledge and experience," and "form[ing] [an] opinion" is a methodology. *See Adams*, 760 F.3d at 1331 n.13 (rejecting argument that "'there is no methodology' where the expert's opinion involves only 'the *application* of [medical] knowledge'").

Second, it is inapposite that Dr. Bhide did not conduct studies specifically for this case. *See Maiz*, 253 F.3d at 665 (rejecting claim that an expert's testimony was

unreliable because he "conducted no original research" for the case). The peer-reviewed articles that Dr. Bhide relied on and his expertise provide a proper foundation for his testimony. In fact, the studies discussed in the articles used the brain-scanning technology that Plaintiffs claim is missing from Dr. Bhide's analysis; the authors of the articles conducted "neuroimaging experiments" that examined brain development during adolescence and adulthood. *See* Doc. 106-1 at 6. For example, in *The Developmental Mismatch in Structural Brain Maturation During Adolescence*, the authors used MRI scans to analyze the brain during "three developmental periods: late childhood, adolescence, and early adulthood." *The Developmental Mismatch in Structural Brain Maturation During Adolescence*, Nat'l Library of Med., https://pubmed.ncbi.nlm.nih.gov/24993606/ (last accessed Dec. 8, 2020).

Finally, Plaintiffs' argument that the articles do not support Dr. Bhide's testimony bears on weight, not admissibility, and in any event, the argument is unfounded. In *When Is an Adolescent an Adult? Assessing Cognitive Control in Emotional and Nonemotional Contexts*, for example, the study "showed diminished cognitive performance under . . . negative emotional arousal in 18-to-21-year-olds relative to adults over 21," and the diminished performance "was paralleled by" (1) "decreased activity in fronto-parietal circuitry, [which is] implicated in cognitive control," and (2) "increased sustained activity in the ventromedial prefrontal cortex,

[which is] involved in emotional processes." *When Is an Adolescent an Adult? Assessing Cognitive Control in Emotional and Nonemotional Contexts*, Psychological Sci., https://journals.sagepub.com/doi/10.1177/0956797615627625 (last accessed Dec. 8, 2020). That, of course, is consistent with Dr. Bhide's opinion that, "[i]n an average 18-year-old, the frontal cortex has not yet matured, but the nucleus accumbens and the amygdala are not only immature but also are 'more active' than they would be in an average 21-year-old." Doc. 106-1 at 15.

### III. DR. BHIDE'S TESTIMONY IS HELPFUL.

Expert testimony is helpful if it "concerns matters that are beyond the understanding of the average layperson," *Frazier*, 387 F.3d at 1262, and it "logically advances a material aspect" of the case, *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1312 (11th Cir. 1999) (quotations omitted). Helpfulness is a "commonsense inquiry" in which the district court considers "whether the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute." Fed. R. Evid. 702 Adv. Comm. Notes (1972).

Dr. Bhide's testimony is helpful. First, it concerns developmental neuroscience—a matter beyond the understanding of the average layperson. Dr. Bhide explains which "brain regions regulate" behavior and decision-making; the typical developmental timelines for those regions; the differences in development

between an average 18-year-old and an average 21-year-old; and how such differences affect behavior and decision-making. *See* Doc. 106-1 at 12–20.

Second, Dr. Bhide's testimony is relevant to a "subject involved in th[is] dispute": whether a reasonable fit exists between Section 790.065(13) and public safety. *See* Fed. R. Evid. 702 Adv. Comm. Notes (1972); Doc. 107 at 19, 24 (explaining that, if the Court concludes that Section 790.065(13) burdens conduct protected by the Second Amendment, it must determine whether such a fit exists). Dr. Bhide's testimony bears on whether 18-to-20-year-olds are more likely to engage in risky behavior than other groups, so it is relevant to the question whether Section 790.065(13) is reasonably tailored to advance public safety.

Plaintiffs assert that Dr. Bhide's testimony is unhelpful because "none of the data upon which he relie[s] actually relates to th[e] issue" he opines on, which Plaintiffs contend is whether "young adults are more likely to commit criminal violence with a purchased firearm." Mot. 9. Once again, however, Plaintiffs misapprehend Dr. Bhide's testimony. He does not opine on a link between young adults and crime. He opines on the brain development of an average 18-year-old as compared to an average 21-year-old, and the research upon which he relies bears on that issue. His testimony, and the research underlying it, are relevant.

**CONCLUSION**

Dr. Bhide's testimony is admissible under Rule 702 and *Daubert*. Plaintiffs' motion should be denied.

Respectfully submitted,

ASHLEY MOODY
ATTORNEY GENERAL

/s/ *Kevin A. Golembiewski*
KEVIN A. GOLEMBIEWSKI (FBN 1002339)
Deputy Solicitor General
Kevin.Golembiewski@myfloridalegal.com

ELIZABETH TEEGEN (FBN 833274)
Chief Assistant Attorney General
Elizabeth.Teegen@myfloridalegal.com
CHRISTOPHER J. BAUM (FBN 1007882)
Senior Deputy Solicitor General
Christopher.Baum@myfloridalegal.com
AMIT AGARWAL (FBN 125637)
Solicitor General
Amit.Agarwal@myfloridalegal.com
JAMES H. PERCIVAL (FBN 1016188)
Chief Deputy Solicitor General
James.Percival@myfloridalegal.com
TIMOTHY L. NEWHALL (FBN 391255)
Senior Assistant Attorney General
Timothy.Newhall@myfloridalegal.com
Office of the Attorney General
PL-01, The Capitol
Tallahassee, Florida 32399
(850) 414-3300

*Counsel for Defendant*

Date: December 8, 2020

# CERTIFICATE OF COMPLIANCE

Pursuant to Rule 7.1(F) of this Court's Local Rules, I certify that the foregoing Motion and Incorporated Memorandum contain 3,291 words.

/s/ *Kevin A. Golembiewski*
Kevin A. Golembiewski
DEPUTY SOLICITOR GENERAL

# CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing was filed with the Court's CM/ECF system, which provides notice to all parties, on this 8th day of December, 2020.

/s/ *Kevin A. Golembiewski*
Kevin A. Golembiewski
DEPUTY SOLICITOR GENERAL