### IN THE UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF FLORIDA
### TALLAHASSEE DIVISION

**NATIONAL RIFLE ASSOCIATION**
**OF AMERICA, INC., et al.,**

      *Plaintiffs,*

**v.**                          **Case No.:  4:18cv137-MW/MAF**

**RICK SWEARINGEN, in his official**
**capacity as Commissioner of the**
**Florida Department of Law**
**Enforcement,**

      *Defendant.*
_____/

## ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

This case asks whether Florida can constitutionally ban the sale of firearms to those between the ages of eighteen and twenty-one. The Second Amendment secures an individual right to bear arms for self-defense. But that right—like all others—has limits. And the Supreme Court has sketched those limits only in passing, leaving the Second Amendment's reach largely undefined. As a result, this case falls squarely in the middle of a constitutional no man's land.

Both parties agree that the threshold issue here is whether the Second Amendment protects 18-to-20-year-olds' right to purchase firearms at all. Arguing that the Second Amendment guarantees 18-to-20-year-olds the right to purchase firearms, Plaintiffs look to Founding-Era militia laws, which they argue show that

18-to-20-year-olds have always had the right to buy firearms. By contrast, emphasizing the Supreme Court's approval of other gun control laws traceable to the early twentieth century, Defendant points to laws from roughly the same period restricting the transfer of firearms to minors—historically, those under twenty-one. These laws, he claims, show that restrictions on the purchase of firearms by those under twenty-one fall outside the Second Amendment.

Because it is bound by Eleventh Circuit precedent to do so, this Court agrees with Defendant that the Second Amendment does not protect the sale of firearms to 18-to-20-year-olds. Accordingly, Defendant's motion for summary judgment, ECF No. 107, is **GRANTED**, and Plaintiffs' motion for summary judgment, ECF No. 109, is **DENIED**.

## I.  Background

### A. The Marjory Stoneman Douglas High School Public Safety Act

On February 14, 2018, a 19-year-old former student took an Uber to Marjory Stoneman Douglas High School. Marjory Stoneman Douglas High Sch. Pub. Safety Comm'n, *Initial Report Submitted to the Governor, Speaker of the House of Representatives and Senate President* 7 (2019). The student carried with him a legally purchased Smith and Wesson model MP-15—a semi-automatic rifle—and hundreds of rounds of ammunition. *Id.* at 7, 262–64. Once at the school, he slipped in through an unlocked door and walked across the campus "firing into classrooms

2

and hallways." *Id.* at 7. In roughly six minutes, he killed or wounded 34 students and faculty members. *Id.* at 7, 25–33. The attack was "one of the deadliest school massacres in the United States' history." *Id.* at 7.

In the massacre's wake came massive public outcry. Students organized rallies, nationwide school walkouts, and the "March for Our Lives" in Washington, D.C. *See* Emily Plakon, *Reactionary Legislation: The Marjory Stoneman Douglas High School Public Safety Act*, 49 Stetson L. Rev. 679, 696 (2020).

Less than a month after the shooting, the Florida Legislature passed the Marjory Stoneman Douglas High School Public Safety Act (the Act). *See* Fla. H.R. Jour. 1037 (Reg. Sess. 2018). As the Act explained, the Legislature sought "to comprehensively address the crisis of gun violence, including, but not limited to, gun violence on school campuses." Ch. 2018-3, § 2, Laws of Fla.

Relevant here, the Act amends section 790.065, Florida Statutes, to prohibit— with a few narrow exceptions—persons younger than twenty-one from purchasing firearms and prohibit licensed firearms dealers from selling or facilitating the transfer of a firearm to anyone under twenty-one.[1] § 790.065(13), Fla. Stat. Put

---

[1] The amended statute now provides:

A person younger than 21 years of age may not purchase a firearm. The sale or transfer of a firearm to a person younger than 21 years of age may not be made or facilitated by a licensed importer, licensed manufacturer, or licensed dealer. A person who violates this subsection commits a felony of the third degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084. The prohibitions of this subsection do not apply to the purchase of a rifle or shotgun by a law

3

another way, for most 18-to-20-year-olds, the Act is a total ban on the purchase of any firearm from any source. Anyone who violates the ban is subject to imprisonment for up to five years, a fine of up to $5,000, or both. §§ 775.082–83, Fla. Stat. Two days after the Legislature passed the Act, then-Governor Rick Scott signed it into law. The same day, the NRA filed this lawsuit. ECF No. 1.

## B. The NRA's Lawsuit

Naming as defendants Florida Department of Law Enforcement Commissioner Rick Swearingen and Florida Attorney General Pam Bondi[2]—both in their official capacities—the NRA's Complaint brought facial and as-applied challenges to the Act under the Second and Fourteenth Amendments. *See id.*

Soon after filing that initial Complaint, the NRA moved for leave to amend to add new plaintiffs and defendants. ECF No. 18. At the same time, the NRA moved this Court to grant the new plaintiffs leave to proceed under pseudonyms. ECF No. 19. Though this Court sympathized with the new plaintiffs' desire to proceed anonymously, it found that the law compelled it to deny their motion. ECF No. 32 at 17 ("[T]he law unfortunately directs that the NRA's motion must be denied.").

---

enforcement officer or correctional officer, as those terms are defined in s. 943.10(1), (2), (3), (6), (7), (8), or (9), or a servicemember as defined in s. 250.01.

§ 790.065(13), Fla. Stat.

[2] Attorney General Ashley Moody was later substituted as a Defendant. ECF No. 47.

The NRA appealed that decision. ECF No. 34. Then, in November 2019, it voluntarily dismissed its appeal. ECF No. 55-1. At the same time, the NRA filed a Second Amended Complaint. ECF No. 54. The Second Amended Complaint added a plaintiff, Radford Fant. Mr. Fant is a law-abiding Floridian between the ages of eighteen and twenty-one who wishes to purchase both handguns and long guns and, but for the Act, would do so. *Id.* ¶ 19.[3] The Second Amended Complaint also dropped Plaintiffs' as-applied challenges.

With the case back in this Court, Defendants moved to dismiss the Second Amended Complaint. ECF No. 73. This Court granted in part and denied in part Defendants' motion, dismissing Plaintiffs' claims against Attorney General Moody for lack of subject matter jurisdiction. ECF No. 94.[4] Finally, in September 2020, both parties moved for summary judgment, which, along with motions to exclude

---

[3] The NRA and Mr. Fant are collectively referred to as Plaintiffs throughout this Order.

[4] This Court dismissed Attorney General Moody because she was not a proper party under *Ex parte Young*, 209 U.S. 123 (1908). Under *Ex parte Young*, a state officer must possess "at a minimum, . . . some connection with the enforcement of the provision at issue." *Osterback v. Scott*, 782 F. App'x 856, 858–59 (11th Cir. 2019) (quoting *Socialist Workers Party v. Leahy*, 145 F.3d 1240, 1248 (11th Cir. 1998)). Commissioner Swearingen clearly does possess such a connection, and nobody has argued otherwise. Moreover, though the parties have not raised the issue, this Court has an independent obligation to ensure that Plaintiffs have standing. Here, Plaintiff Fant and other young NRA members have "a realistic danger of sustaining a direct injury as a result of the statute's enforcement." *Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289, 298 (1979) (explaining that "it is not necessary that [the plaintiff] first expose himself to actual arrest or prosecution to be entitled to challenge [the] statute that he claims deters the exercise of his constitutional rights." (quoting *Steffel v. Thompson*, 415 U.S. 452, 459 (1974)). That injury is both traceable to Defendant and redressable due to Defendant's enforcement role. *See* § 790.065, Fla. Stat. (tasking the Florida Department of Law Enforcement with regulating all firearm sales by licensed entities in Florida).

expert testimony, became ripe in late December 2020. And it is to those summary judgment motions that this Court now turns.

## II. Summary Judgment Standard

This Court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Cross-motions for summary judgment are no different. This Court must evaluate the cross-motions separately, viewing the evidence in the light most favorable to the non-movant. With that in mind, this Court looks to the substantive law governing Plaintiffs' Second Amendment Claims.[5]

## III.   Plaintiffs' Second Amendment Claims

One point before this Court recites the standard it applies to Plaintiffs' claims; namely, this Court rejects the claim, made by some, that the Supreme Court's decision in *District of Columbia v. Heller* is crystal clear. To be sure, this claim does not stem from *Heller* itself. The *Heller* Court openly rejected the idea that it was "clarify[ing] the entire field" of Second Amendment law. 554 U.S. 570, 635 (2008). And when it comes to what test applies, *Heller* is about as clear as the Suwannee

---

[5] Because the standard this Court applies to Plaintiffs' equal protection claims turns on whether this Court finds that the Act impermissibly burdens Plaintiffs' Second Amendment rights, this Court addresses Plaintiffs' Second Amendment claims first. *See Morrissey v. United States*, 871 F.3d 1260, 1268 (11th Cir. 2017).

6

River,[6] saying only that the District of Columbia's law fell short "under any of the standards of scrutiny that [the Court has] applied to enumerated constitutional rights." *Id.* at 628; *but see Miller v. Bonta*, — F. Supp. 3d — , No. 19-cv-1537-BEN (JLB), 2021 WL 2284132, at *6 (S.D. Cal. June 4, 2021) ("The *Heller* test is a test that any citizen can understand.").

Second Amendment law is not clear; it is a morass of convoluted, competing, and confusing pronouncements. *See Kachalsky v. Cnty. of Westchester*, 701 F.3d 81, 89 (2d Cir. 2012) ("[W]e do not know . . . the scope of [the Second Amendment] right beyond the home and the standards for determining when and how the right can be regulated by a government."). And while it will remain so until the Supreme Court intervenes, this Court cannot duck its responsibility to faithfully apply *Heller* and the Eleventh Circuit's precedents interpreting it. But in doing so, this Court recognizes that this inquiry is not simple or self-evident—reasonable minds can differ. In short, this Court can and must try to extrapolate answers from *Heller* and subsequent circuit authority, but it should not pretend those answers are obvious. With that in mind, this Court turns to the law governing this case.

---

[6] For those not from North Florida, the Suwannee is a blackwater river. Blackwater rivers are "slow-moving waterway[s] flowing through forests, swamps, or wetlands." *Tannins and Blackwater Rivers*, Ogeechee Riverkeeper, (May 29, 2020), https://www.ogeecheeriverkeeper.org /tannins-and-blackwater-rivers/. Stained by tannins—found "in the bark of trees, wood, leaves, buds, stems, fruits, seeds, and roots"—blackwater rivers are "darkly stained, resembling black tea." *Id.*

The Second Amendment provides, "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In *District of Columbia v. Heller*, the Supreme Court held that the Second Amendment "conferred an individual right to keep and bear arms." 554 U.S. at 595. In *McDonald v. City of Chicago*, the Court held that the Fourteenth Amendment incorporated that right against the states. 561 U.S. 742, 750 (2010). So the Second Amendment creates an individual right that applies against the states, but how should courts determine whether a state law limiting that right violates the Constitution?

Almost every circuit has adopted a two-step test for evaluating Second Amendment claims. *See* David B. Kopel & Joseph G.S. Greenlee, *The Federal Circuits' Second Amendment Doctrines*, 61 St. Louis U. L.J. 193, 212 (2017). The Eleventh Circuit is no exception. Under the two-step test, this Court must first "ask if the restricted activity is protected by the Second Amendment in the first place." *GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244, 1260 n.34 (11th Cir. 2012). If the answer to that question is no, the law is constitutional, and the inquiry ends. But if the answer is yes, this Court must "apply an appropriate form of means-end scrutiny." *United States v. Focia*, 869 F.3d 1269, 1285 (11th Cir. 2017). Though the two-step test sounds simple in theory, it can become muddled in practice. *See Bonta*, 2021 WL 2284132, at *8 (recognizing that "[i]n practice the two-step framework is

not particularly simple"). Love it or hate it,[7] however, this Court must apply the two-step test, and it begins with step one.

### A. Step One: Does the Law Burden Activity Protected by the Second Amendment?

Is the purchase of firearms by 18-to-20-year-olds protected by the Second Amendment? A simple question, but difficult to answer. *Heller* did not delineate the Second Amendment's scope. 554 U.S. at 626 (declining to "undertake an exhaustive historical analysis . . . of the full scope of the Second Amendment"). But the Court did say that its decision should not "be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Id.* at 626–27. These longstanding restrictions, *Heller* explained, are "presumptively lawful." *Id.* at 672 n.26. The Court further stated that the Second Amendment does not protect "the carrying of dangerous and unusual

---

[7] Plaintiffs implore this Court to eschew the two-step test and instead adopt a "text, history, and tradition analysis." ECF No. 109 at 18. *See also Rogers v. Grewal*, 140 S. Ct. 1865, 1866, 207 L. Ed. 2d 1059 (2020) (Thomas, J., dissenting) ("Consistent with [the Supreme Court's] guidance, many jurists have concluded that text, history, and tradition are dispositive in determining whether a challenged law violates the right to keep and bear arms."); *Heller v. District of Columbia*, 670 F.3d 1244, 1271 (D.C. Cir. 2011) (*Heller II*) (Kavanaugh, J., dissenting) ("*Heller* and *McDonald* leave little doubt that courts are to assess gun bans and regulations based on text, history, and tradition . . . ."). This Court appreciates Plaintiffs' desire to preserve this issue for appeal. But as Plaintiffs well know, *this* Court is bound to follow the two-step test as set out by the Eleventh Circuit.

weapons." *Id.* at 627 (quotations omitted). Finally, *Heller* suggested restrictions on the concealed carry of firearms also passed constitutional muster. *Id.* at 626.

Some activities, then, obviously fall outside the Second Amendment's scope. Take, for example, dangerous and unusual weapons. *Heller* forecloses the argument that the Second Amendment guarantees the right to possess weapons of war, such as bazookas or landmines. *See United States v. Tagg*, 572 F.3d 1320, 1326 (11th Cir. 2009) (holding that the Second Amendment does not protect pipe bombs). But most scope questions are more complicated. In addressing those questions, "*Heller* commands that . . . courts must read the challenged statute in light of the historical background of the Second Amendment." *GeorgiaCarry*, 687 F.3d at 1261. Put another way, this Court must look to the Second Amendment's history to discern its scope.[8]

---

[8] This Court recognizes, as others have, the limitations of its inquiry. *See NRA v. ATF*, 700 F.3d 185, 204 (5th Cir. 2012) ("[W]e face institutional challenges in conducting a definitive review of the relevant historical record."). Judges are not historians. And this Court has tried to avoid engaging in what Judge Posner referred to as "law office history"—i.e., selectively parsing out pieces of historical evidence supporting a desired conclusion. *See* Richard A. Posner, *In Defense of Looseness: The Supreme Court and Gun Control*, New Republic, Aug. 27, 2008; *see also* David A. Strauss, *The Living Constitution* 20–21 (2010) ("Time and again, judges—and academics, too—have found that the original understandings said pretty much what the person examining them wanted them to say."). This Court has not engaged in independent research, consulting primary sources. Instead, it relies entirely on the historical citations provided by the parties and on secondary sources discussing the Second Amendment's historical background. In so doing, this Court is cognizant of criticisms that judges should "refrain from relying on unfounded historical commentaries" and instead look to primary sources. *Preterm-Cleveland v. McCloud*, No. 18-3329, slip op. at 69 (6th Cir. June 11, 2021) (en banc) (Moore, J., dissenting). But primary sources are no better than commentaries when you lack the training to interpret them. For example, in 2019, a publisher canceled a book deal at the last minute after it emerged that the author had, quite reasonably, misinterpreted the words "death recorded" in nineteenth century English court records to mean that a death sentence had been imposed, when in fact it meant the opposite. *Naomi Wolf:*

And while "[t]he Two-Part Test is conceptually straightforward in most applications," Kopel & Greenlee, *Doctrines*, *supra*, at 215, *Heller*'s list of "longstanding, presumptively lawful regulatory measures" presents an additional wrinkle that is "difficult to map" onto the two-step framework, *NRA*, 700 F.3d at 196 (cleaned up).[9] *See also Tyler v. Hillsdale Cnty. Sheriff's Dep't*, 837 F.3d 678, 689 (6th Cir. 2016) (en banc) ("*Heller*'s dictum bears an uncertain relationship with the two-pronged approach we use to analyze Second Amendment claims.").

The circuits address this complication in myriad ways. Relevant for our purposes, the Eleventh Circuit holds that persons and things subject to *Heller*'s list of "longstanding" prohibitions are categorically outside the Second Amendment's scope. *Focia*, 869 F.3d at 1269 (explaining that longstanding "measures comport with the Second Amendment because they affect individuals or conduct unprotected by the right to keep and bear arms").[10] Plus, the Eleventh Circuit has found that

---

*US Publisher Cancels Book Release After Accuracy Concerns*, BBC (Oct. 23, 2019), https://www.bbc.com/news/entertainment-arts-50153743. The risk that judges—untrained in historical inquiry—looking to primary sources would make the same mistake is quite high. Still, both *Heller* and subsequent Eleventh Circuit precedent direct this Court to look to the Second Amendment's history. And so, that is what this Court has done, ever conscious of its lack of historical expertise.

[9] The parenthetical (cleaned up) seeks to avoid unnecessary "brackets, ellipses, quotation marks, internal citations, and footnote references" by conveying to the reader that "such material has been removed and that none of it matters for either understanding the quotation or evaluating its weight." Jack Metzler, *Cleaning Up Quotations*, 18 J. App. Prac. & Process 144, 147 (2017).

[10] To be sure, not all courts see it this way. Some circuits hold that longstanding regulations such as those listed in *Heller* do not regulate persons, items, or activities outside the Second Amendment's scope but instead "presumptively satisfy some form of heightened means end

regulations analogous to, but not explicitly listed with, *Heller*'s longstanding regulations can also be longstanding. *See United States v. White*, 593 F.3d 1199, 1205–06 (11th Cir. 2010). Although decided before the Eleventh Circuit adopted the two-step framework, *see GeorgiaCarry*, 687 F.3d at 1260 n.34 (adopting the two-step test), *White* upheld the law challenged in that case without further discussion once the court found the law longstanding as defined by *Heller*. *White* is thus consistent with the Eleventh Circuit's later statements that longstanding regulations affect people, things, or conduct that the Second Amendment does not protect. *Focia*, 869 F.3d at 1269.

In sum, at step one, Eleventh Circuit precedent requires this Court to examine the historical support for restrictions like Florida's and ask two related but independent questions. First—looking to sources from before, at, and just after the Founding Era—were 18-to-20-year-olds historically understood to have a right to purchase firearms? If Defendant can show 18-to-20-year-olds lacked the right to purchase firearms, then the inquiry ends. But if Defendant cannot make that showing, then this Court asks the second question—whether, looking to more recent history, regulations like Florida's are longstanding within the meaning of *Heller*. *Cf. Duncan v. Becerra*, 970 F.3d 1133, 1145 (9th Cir. 2020) (explaining that the Ninth

---

scrutiny." *Tyler*, 837 F.3d at 690. This dispute can be characterized as a choice between whether to apply the presumption that applies to a longstanding prohibition at step one or step two. *See* Kopel & Greenlee, *Doctrines*, *supra*, at 221–26.

Circuit asks at step one, among other things, whether the law is "longstanding and thus presumptively lawful," and "whether there is any persuasive historical evidence . . . showing that the regulation affects rights that fall outside the scope of the Second Amendment"); *Lara v. Evanchick*, — F. Supp. 3d — , No. 2:20-cv-1582, 2021 WL 1432802, at *4 (W.D. Pa. Apr. 16, 2021) (recognizing that, at step one, a court must "determine whether the restriction falls within the scope of the Second Amendment or, on the other hand, [is] one of the 'presumptively lawful regulatory measures' that is outside of the Amendment's scope."). Obviously, the two questions overlap significantly. A prohibition with an extensive historical pedigree will be longstanding. On the other hand, a prohibition from the early twentieth century— like several of the "longstanding" prohibitions listed in *Heller*—that conflicts with Founding-Era understandings would not necessarily be entitled to a presumption of validity. With that in mind, this Court turns to the first question under step one; that is, what is the historical scope of 18-to-20-year-olds' Second Amendment rights?

1. *Historical Restrictions on the*
*Second Amendment Rights of 18-to-20-Year-Olds*

Start with Founding-Era understandings.[11] First, this Court has found no case or article suggesting that, during the Founding Era, any law existed that imposed

---

[11] Defendant argues that, because Plaintiffs challenge a state law, the relevant time period is not when the Second Amendment was ratified, but rather when the Fourteenth Amendment was ratified. ECF No. 114 at 6. Several circuits agree. *See, e.g.*, *Ezell v. City of Chicago*, 651 F.3d 684, 702 (7th Cir. 2011) ("*McDonald* confirms that when state- or local-government action is challenged, the focus of the original-meaning inquiry is carried forward in time; the Second

restrictions on 18-to-20-year-olds' ability to purchase firearms. *Cf.* Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487, 505–06 (2004) (cataloging Founding-Era firearms regulations). Given the amount of attention this issue has received, if such a law existed, someone surely would have identified it by now. Thus, this Court proceeds under the assumption that no law restricting the purchase of firearms by 18-to-20-year-olds existed at the Founding.[12]

Since no law directly addresses the issue, the parties' arguments about Founding-Era understandings focus largely on whether, at the Founding, the militia encompassed 18-to-20-year-olds.[13] This Court starts with Plaintiffs' evidence, then turns to Defendant's.

---

Amendment's scope depends on how the right was understood when the Fourteenth Amendment was ratified."). This Court rejects this approach as inconsistent with the Supreme Court's pronouncements on incorporation. *See Timbs v. Indiana*, 139 S. Ct. 682, 687 (2019) ("[I]f a Bill of Rights protection is incorporated, there is no daylight between the federal and state conduct it prohibits or requires."); *but see Mahanoy Area Sch. Dist. v. B.L.*, 594 U.S. __ , __ (2021) (Thomas, J., dissenting) ("I would begin the assessment of the scope of free-speech rights incorporated against the States by looking to 'what ordinary citizens at the time of [the Fourteenth Amendment's] ratification would have understood' the right to encompass.").

[12] Scholars, however, have identified laws from the Founding Era that imposed "race-based" restrictions on the possession of firearms or disarmed those who refused to take loyalty oaths. Cornell & DeDino, *supra*, at 505. And the English Bill of Rights excluded Catholics from the right to bear arms. *Heller*, 554 U.S. at 593. Though repugnant, these laws show that the founding generation knew how to impose such restrictions when they wanted to. On the other hand, that the founders imposed no explicit restrictions on 18-to-20-year-olds does not prove the founding generation thought such laws were unconstitutional.

[13] As Plaintiffs emphasize, *Heller* defines "the militia as all able-bodied men"—even if state or federal law required only a subset of those men to actually serve. 554 U.S. at 596. Of course, "able bodied men" is not an age range. And while 18-to-20-year-olds are now considered

Plaintiffs argue that "[d]uring the Founding Era, including at the time of the Second Amendment's ratification, every colony and state militia included 18-to-20-year-old males." ECF No. 109 at 10 (citing David B. Kopel & Joseph G.S. Greenlee, *The Second Amendment Rights of Young Adults*, 43 S. Ill. L.J. 495, 533–595 (2019)). Plaintiffs also point to a 1792 federal law setting the lower range for militia service at eighteen. *Id.* Plaintiffs argue that "[t]hese enactments reflect a consensus that, at the time of the Founding and ratification of the Second Amendment, 18-to-20-year-old citizens were guaranteed the right to keep and bear arms." *Id.* at 10.

According to the article Plaintiffs rely on, at the time of ratification,[14] the age for militia service in each state was as follows: New Jersey – sixteen to fifty, Kopel & Greenlee, *Young Adults*, *supra*, at 537; Maryland – "sixteen or older," *id.* at 543; North Carolina – "eighteen to fifty," *id.* at 547, South Carolina – eighteen to fifty, *id.* at 550; New Hampshire – sixteen to forty, *id.* at 555–56; Delaware – eighteen to fifty (although in some cases parents were expected to provide arms for those under twenty-one), *id.* at 557; Pennsylvania – eighteen to fifty-three, *id.* at 563; New York – sixteen to forty-five, *id.* at 567; Rhode Island – sixteen to fifty, *id.* at 569; Vermont

---

men, they were not at the Founding. *See NRA*, 700 F.3d at 201. This would suggest that those under twenty-one were not part of the militia. On the other hand, as will soon become clear, those as young as sixteen were often expected to serve in the militia before and during the Founding Era. All this to say, then, that *Heller*'s definition of militia does not supply the answer to the question in this case.

[14] The Bill of Rights was ratified on December 15, 1791.

– sixteen to forty-five, *id.* at 573; Virginia – eighteen to fifty, *id.* at 583; Massachusetts – sixteen to forty, *id.* at 585; Georgia – sixteen to fifty, *id.* at 587; and Connecticut – sixteen to forty-five, *id.* at 589. Thus, when the Second Amendment was ratified, nine states set the threshold for militia service at sixteen, while five set it at eighteen.[15] *But see NRA v. ATF*, 741 F.3d 334, 340 (5th Cir. 2013) (*NRA II*) (Jones, J., dissenting) (arguing that "[a]t the time of the Second Amendment's passage, or shortly thereafter, the minimum age for militia service in every state became eighteen"); *id.* n.8 (collecting statutes).

Plaintiffs also point to the Militia Act, which made all 18-to-45-year-old males part of the militia, unless exempted, and required them to "provide [themselves] with a good musket or firelock." Militia Act of 1792, ch. 33 § 1, 1 Stat. 271 (1792) (repealed 1903); *but see* Patrick J. Charles, *The 1792 Militia Act, the Second Amendment, and Individual Militia Rights*, 9 Geo. J.L. & Pub. Pol'y, 323, 332 (2011) (explaining that the Militia Act "did not prescribe whether the State or the individual was to provide the firearm"). In sum, Plaintiffs argue, these enactments show that 18-to-20-year-olds had both a right and a duty to purchase firearms during the Founding Era.

---

[15] Yes, this adds up to fourteen original states. Vermont is not considered part of the thirteen original colonies. Instead, while claimed by other states, it operated as an independent republic until 1791. Kopel & Greenlee, *Young Adults*, *supra*, at 570–71.

But ratification is just one snapshot in time. And as *Heller* makes clear, evidence from both before and after ratification is relevant in determining the Second Amendment's meaning. 554 U.S. at 605 (explaining that examining "a variety of legal and other sources to determine *the public understanding* of a legal text in the period after its enactment or ratification" is "a critical tool of constitutional interpretation"). To that end, Defendant argues that historical evidence shows that 18-to-20-year-olds were not treated as full adults for the purpose of militia service because some laws either (1) established the minimum age for service in the militia at twenty-one, (2) required parents to arm their children for militia service, or (3) required parental permission for those under twenty-one to serve in the militia.

Starting with the first category, Defendant cites a 1778 New Jersey law that appears to set the age for militia service at twenty-one but allows those as young as sixteen to enlist. ECF No. 106-2 at 2. Defendant also cites a series of Virginia laws, ranging from 1705 to 1784, in which the age for militia service fluctuates between sixteen and twenty-one. *Id.* at 3–5. Plus, Defendant identifies laws from Delaware (1807), Georgia (1861), Kansas (1859), New Jersey (1829), North Carolina (1868), Ohio (1843), and Pennsylvania (1793 and 1864) that appear to enroll only those over twenty-one in the militia—or, in some cases, enroll and then exempt those 18-to-20-years-old. ECF No. 106-3 at 2–4. As for the second category, Defendant cites to laws that appear to require parents to provide arms for their children under twenty-one

17

serving in the militia. These laws come from Maine (1821), Massachusetts (1810), Missouri (1825), New Hampshire (1820), North Carolina (1806), and Vermont (1797). ECF No. 106-6 at 2–5. Accounting for the third category, some laws required parental consent for those under twenty-one to serve in the militia; namely, Michigan (1863), Missouri (1835), and New York (1818). ECF No. 106-4 at 2. That said, New York's law appears to have applied only to certain types of cavalry and artillery units. *See id.*

Defendant also cites a Congressional debate over the 1792 Militia Act, suggesting that Congress expected parents to provide arms for their minor children—at the time, those under twenty-one. *See* ECF No. 106-5. But reading the cited portions of the debate in context, it appears Congress was concerned that (a) minors could not afford firearms and (b) if the federal government provided firearms for them, it could take them back at any time. *See id.*[16] And, Defendant argues, even though the Militia Act included those over eighteen in the militia, the state legislatures remained free to exempt those under twenty-one from service. *See Op. of the Justs.*, 39 Mass. 571, 576 (Mass. 1838) ("Should it be thought expedient, for instance, to exempt all minors, persons between the ages of eighteen and twenty-one, under the general power of exception, we think it may as well be done, as by

---

[16] In full, the passage Defendant cites reads, "as to minors, their parents or guardians would prefer furnishing them with arms themselves, to depending on the United States when they know they were liable to having them reclaimed." ECF No. 106-5 at 3. *See also* Charles, *supra*, at 342–43 (discussing this portion of the debate).

other designations."). So while the federal government set the minimum age for federal militia service at eighteen, the states retained the power to set a higher minimum age. *See* Charles, *supra*, at 332.

In short—again recognizing that this Court lacks historical expertise—the Founding-Era evidence appears muddled and largely unhelpful. *First*, the evidence before this Court suggests that there was no uniform age for militia service. In times of war, the age for service in the militia crept down towards sixteen; in times of peace, it crept up towards twenty-one. *See NRA*, 700 F.3d at 204 (recognizing that "in some colonies and States, the minimum age of militia service either dipped below age 18 or crept to age 21, depending on legislative need"); *Powell v. Tompkins*, 926 F. Supp. 2d 367, 387 (D. Mass. 2013) ("The minimum age for militia service varied wildly across the colonies and early states, ranging from as low as sixteen to as high as twenty-one.").

*Second*, that a group sometimes served in the militia can only tell us so much. *Heller* held that the Second Amendment encompassed a right to possess arms for self-defense that stands outside the militia context. *See Heller*, 554 U.S. at 599 ("The prefatory clause does not suggest that preserving the militia was the only reason Americans valued the ancient right; most undoubtedly thought it even more important for self-defense and hunting."). Thus, whether a select group was considered part of the militia has limited value in determining the scope of the

Second Amendment right. *See NRA*, 700 F.3d at 204 n.17 ("[T]he right to arms is not co-extensive with the duty to serve in the militia."). This is especially so given that the states had "enormous authority over the militia"—including the power to either provide arms or require militia members to provide their own. *See* Charles, *supra*, at 332; *Houston v. Moore*, 18 U.S. 1, 51–52 (1820) (Story, J., dissenting) (agreeing with the majority that, "in the absence of all interfering provisions by Congress on the subject, the States should have authority to organize, *arm*, and discipline their own militia" (emphasis added)); *see also Jones v. Becerra*, 498 F. Supp. 3d 1317, 1327 (S.D. Cal. 2020) (explaining that 18-to-20-year-olds' role in the militia is not inconsistent with regulations on their firearm possession because of the tightly regulated nature of militia service).

*Third* and finally, this Court suspects there is no one "true" Founding-Era understanding. Perhaps the historical record can definitively show that, at the Founding, a broad proposition was widely accepted—for example, that the Second Amendment protects an individual right to bear arms. But it is much less likely that a broad consensus ever existed as to the right's exact boundaries. *See NRA*, 700 F.3d at 204 (recognizing that "[t]he Founders may not even have shared a collective view on such a subtle and fine-grained distinction"). As the events of our own time teach us, while the American public may reach a broad consensus on a general principle,

20

it rarely holds one view on any specific application of that principle. Why should we assume that our forebearers were any different?

At any rate, even assuming the Founding-Era public largely agreed on the scope of 18-to-20-year-olds' Second Amendment rights, given that Founding-Era militia laws vary and offer limited insight on the Second Amendment's scope, this Court cannot say definitively from Founding-Era sources whether the Second Amendment protects the purchase of firearms by 18-to-20-year-olds.

Though the Eleventh Circuit has not addressed the issue, other circuits have explained that "[t]he government bears the burden at step one to conclusively demonstrate that the challenged statute burdens persons historically understood to be unprotected." *Tyler*, 837 F.3d at 688.[17] Thus, if this Court asked at step one only if 18-to-20-year-olds were historically understood to have a right to purchase firearms, because the record is unclear, it would proceed to step two. But, as discussed above, this Court must also ask whether restrictions on 18-to-20-year-olds are longstanding, which, as explained below, requires this Court to look beyond the Founding Era and examine the entire historical background supporting such restrictions.

---

[17] If *Heller*—with its extensive discussion of the Second Amendment's historical background—makes anything clear, it is that this burden is not a factual one. The Second Amendment's scope is a question of law, though defining it requires courts to examine historical facts.

And so we move forward in time. Defendant points to twenty-three laws from the mid-nineteenth and early-twentieth centuries criminalizing giving, lending, or selling handguns to those under twenty-one—the earliest being from 1856.[18] *See* ECF No. 83-8; *but see* C. Kevin Marshall, *Why Can't Martha Stewart Have A Gun?*, 32 Harv. J.L. & Pub. Pol'y 695, 712 (2009) (asserting that "[r]estrictions regarding the condition of being a minor . . . predated World War I somewhat").[19] There is, then, some play in exactly when these laws first emerged. But, by the end of the nineteenth century, they were well established. As one article claims, "[a]s of 1899, there were forty-six states in the Union. Nineteen of them had some sort of law involving handguns and minors and the other twenty-seven had no such laws." David B. Kopel & Joseph G.S. Greenlee, *History and Tradition in Modern Circuit Cases on the Second Amendment Rights of Young People*, 43 S. Ill. U. L.J. 119, 142 (2018). While there were actually forty-five states in 1899,[20] there appears to be a

---

[18] Defendant also cites cases from the Tennessee and Alabama Supreme Courts, as well as Thomas M. Cooley's 1883 *Treatise on Constitutional Limitations*. ECF No. 107 at 13. This Court does not find these authorities persuasive. For one, the Tennessee Supreme Court decision, *State v. Callicut*, 69. Tenn. 714 (1878), relies on another decision, *Aymette v. State*, which *Heller* explicitly denounced. *Heller*, 554 U.S. at 613 ("[*Aymette*'s] odd reading of the right, to be sure, is not the one we adopt . . . ."). Cooley, for his part, relies on *Callicut*, and is thus subject to the same criticism. Finally, the Alabama case, *Coleman v. State*, 32 Ala. 581, 582–83 (1858), never addresses the constitutionality of the state law at issue and can, at best, only lend implicit support.

[19] Some of these laws banned the transfer of weapons to minors without specifying age. Others specifically banned the transfer of weapons to those under twenty-one. *See* ECF No. 83-8.

[20] Oklahoma became the forty-sixth state in 1907. *Oklahoma Statehood, November 16, 1907*, National Archives, https://www.archives.gov/legislative/features/oklahoma (last visited May 19, 2021).

consensus on nineteen restrictions by 1900. *See NRA*, 700 F.3d at 202; *cf. Tompkins*, 926 F. Supp. 2d at 387 ("Case law from jurisdictions across the country confirms that during the late nineteenth and early twentieth centuries, minors' capacity to purchase and own firearms was significantly curtailed."). In other words, by the turn of the century, roughly 41% of states had restrictions involving 18-to-20-year-olds and firearms.

This apparently remained the status quo until the 1960s, when "Congress passed the Omnibus Crime Control and Safe Streets Act . . . in response to [a] nationwide epidemic of crime." Aron J. Estaver, *Dangerous Criminals or Dangerous Courts: Foreign Felonies As Predicate Offenses Under Section 922(g)(1) of the Gun Control Act of 1968*, 38 Vand. J. Transnat'l L. 215, 231 (2005); *see* Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. No. 90-351, 82 Stat. 197. "[T]he overarching purpose of the Safe Streets Act was to keep handguns out of the hands of dangerous or potentially dangerous individuals." Estaver, *supra*, at 231.[21] Amongst its many provisions, the Safe Streets Act prohibited federally licensed firearms dealers from selling handguns to those under twenty-one. Safe Streets Act, §§ 922(b)(1), (c)(1), 82 Stat. at 230. Soon after, the Gun Control Act of

---

[21] As for the timing, Congress appears to have been specifically motivated by the 1968 assassinations of Dr. Martin Luther King Jr. and Robert Kennedy. Reva B. Siegel, *Dead or Alive: Originalism as Popular Constitutionalism in* Heller, 122 Harv. L. Rev. 191, 203 (2008).

1968 further prohibited licensed dealers from selling long guns to those under eighteen. Pub. L. No. 90-618, § 922(b)(1), 82 Stat. 1213, 1218.

So it seems that, at the Founding and throughout the early nineteenth century, neither the states nor the federal government imposed any explicit restrictions on the purchase of firearms by 18-to-20-year-olds. And, setting aside the issue of militia laws' usefulness, while those eighteen and up were generally part of the militia, that was not always the case. Then, starting in the mid nineteenth century and accelerating in the early twentieth century, a significant minority of states imposed some restrictions on the sale of firearms—typically handguns—to 18-to-20-year-olds.[22] Those restrictions became nationwide in the 1960s.

What should we make of this historical record? For one, it is not clear to this Court that the sale of firearms to 18-to-20-year-olds was considered outside of the Second Amendment's scope immediately before, during, or after the Amendment's ratification. But as explained above, that is not the end of the inquiry. *Heller* articulated a non-exhaustive list of "longstanding" and presumptively valid firearms regulations, most of which have no Founding-Era analogue. *See NRA*, 700 F.3d at 196. Thus, even though Florida's restriction finds little support in the Founding Era, this Court still must look to the post-Founding evidence set out above and decide

---

[22] Almost all of the nineteenth century laws provided to this Court do not, or do not appear to, ban the sale of long guns. *See* ECF No. 83-8. And at least one that could plausibly be read to ban long gun sales to minors was interpreted not to do so. *See Parmon v. Lemmon*, 244 P. 227, 233 (Kan. 1925).

whether restrictions on 18-to-20-year-olds' right to purchase firearms are nonetheless longstanding regulations entitled to a presumption of validity.

### 2. Are Prohibitions on the Sale of Firearms to 18-to-20-year-Olds Longstanding?

Restrictions on the purchase of firearms by 18-to-20-year-olds do not burden the Second Amendment provided such transactions "have been the subject of longstanding, accepted regulation." *Fyock v. Sunnyvale*, 779 F.3d 991, 997 (9th Cir. 2015). This, most courts reason, is because the public's longstanding acceptance of a firearms regulation provides strong evidence that the regulation does not burden the Second Amendment. *Heller II*, 670 F.3d at 1253. Although a regulation need not have existed at the Founding to be considered "longstanding," that only begs the question; what, then, makes a firearms regulation longstanding? *See, e.g.*, *Fyock*, 779 F.3d at 997 (recognizing that twentieth-century regulations may be longstanding).

To recap, *Heller* identified as longstanding "prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools or government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." 554 U.S. at 627.[23]

---

[23] The Eleventh Circuit has held that it is bound by this "*Heller* dictum." *White*, 593 F.3d at 1206 (quoting *In re United States*, 578 F.3d 1195, 1200 (10th Cir. 2009)); *United States v. Rozier*, 598 F.3d 768, 771 n.6 (11th Cir. 2010) ("First, to the extent that this portion of *Heller* limits the Court's opinion to possession of firearms by law-abiding and qualified individuals, it is not dicta . . . . Second, to the extent that this statement is superfluous to the central holding of

*Heller* characterized this list as non-exhaustive. *Id.* n.26; *see also United States v. Marzzarella*, 614 F.3d 85, 92–93 (3d Cir. 2010) ("*Heller*'s list of presumptively lawful regulations is not exhaustive . . . and accordingly, the Second Amendment appears to leave intact additional classes of restrictions.").

The Supreme Court has not created a test for determining whether a regulation is longstanding and presumptively lawful. Indeed, *Heller* did "not elaborate on why [the laws it listed] were presumptively lawful, instead promising to provide a historical justification" at a later time. Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249, 250 (2020). For this reason, "few lines from [*Heller*] have been more controversial or consequential" than its passage discussing presumptively lawful regulations. *Id.* at 252. Still, controversial or otherwise, this Court must do its best to follow *Heller*.

Gleaning what we can from *Heller*, a "presumptively lawful" prohibition could be either (1) a law specifically listed in *Heller*, (2) a law that is analogous to the laws listed in *Heller*, or (3) a law that is longstanding in time. Kopel & Greenlee,

---

*Heller*, we shall still give it considerable weight."). And if there were any doubt as to the importance of this passage, the Supreme Court repeated the list in *McDonald*. 561 U.S. at 786 ("We made it clear in *Heller* that our holding did not cast doubt on such longstanding regulatory measures . . . . We repeat those assurances here."); *see also See N.Y. State Rifle & Pistol Ass'n, Inc. v. City of New York*, 140 S. Ct. 1525, 1540–41 (2020) (Alito, J., dissenting) (["H]istory supported the constitutionality of some laws limiting the right to possess a firearm, such as laws banning firearms from certain sensitive locations and prohibiting possession by felons and other dangerous individuals.").

26

*Doctrines*, *supra*, at 215. *Heller* says nothing about prohibitions on the sale of firearms to 18-to-20-year-olds, and thus such restrictions do not fall into the first category.

The question then becomes how the other two categories fit into the inquiry. Some courts have said that a regulation "must be both longstanding and closely match a listed prohibition" before the court will treat it as presumptively lawful. *Teixeira v. Cnty. of Alameda*, 822 F.3d 1047, 1057 (9th Cir. 2016), *on reh'g en banc*, 873 F.3d 670 (9th Cir. 2017). Others appear to ask only if, like the regulations listed in *Heller*, the regulation at issue is roughly a century old. *Heller II*, 670 F.3d at 1254 (finding handgun registration requirement, passed in 1975, longstanding because such requirements have been "accepted for a century in diverse states and cities and [are] now applicable to more than one fourth of the Nation by population"); *Drake v. Filko*, 724 F.3d 426, 432 (3d Cir. 2013) (holding that a New Jersey law limiting public carry of handguns to those who could show a "justifiable need" was longstanding because it "existed in New Jersey in some form for nearly 90 years"); *United States v. Hosford*, 843 F.3d 161, 167 (4th Cir. 2016) (finding dealer licensing requirements longstanding because "[t]he federal government first required dealers to obtain licenses in 1938, nearly eighty years ago"). Still others have suggested that more modern restrictions must, if not boasting a Founding-Era analogue, be at least

27

tied to Founding-Era understandings. *See Mance v. Sessions*, 896 F.3d 699, 714 (5th Cir. 2018) (Owen, J., concurring).

Because, albeit pre-two-step test, the Eleventh Circuit's decision in *White* upheld a 1996 restriction as longstanding by analogy alone, it could be read to require only that a restriction be longstanding in time *or* analogous. *See White*, 593 F.3d 1199, 1205–06. Still, given that the Second Amendment protects a fundamental right, "prudence counsels caution when extending [the] recognized [*Heller*] exceptions to novel regulations unmentioned by *Heller*." *Drake*, 724 F.3d at 432 (quoting *Marzzarella*, 614 F.3d at 93). And so this Court now asks whether restrictions on the purchase of firearms by 18-to-20-year-olds are longstanding in time when compared to the other restrictions listed in *Heller and* are sufficiently analogous to those restrictions.

### a. Longstanding in Time

Are restrictions on the purchase of firearms by those under twenty-one longstanding in time? Because *Heller* did not define "longstanding," this Court must look to the history of the other prohibitions *Heller* found longstanding to make that determination.[24] Accordingly, this Court now looks to the history of the restrictions listed in *Heller*, starting with restrictions on felons.

---

[24] As to the longstanding-in-time inquiry, at least one article has cataloged some "general principles" that appear to be consistent across most circuit cases: (1) restrictions that are "longstanding" are generally traceable to the nineteenth century; (2) restrictions from the nineteenth century may be "buttressed" by twentieth century laws; (3) restrictions can be supported

*Felons* – Looking first to the Founding, "scholars have not been able to identify any" Founding-Era state laws prohibiting felons from possessing firearms. *Kanter v. Barr*, 919 F.3d 437, 454 (7th Cir. 2019) (Barrett, J., dissenting). But some have suggested that this is misleading, arguing that "[u]ntil recently, historically speaking, felons incurred the death penalty; regulations on gun ownership by felons was, therefore, a non-issue." *NRA II*, 714 F.3d at 343 (Jones, J., dissenting). This view is misguided for two reasons. First, "a felony conviction [was] not as categorically severe as [some] suggest." *Kanter*, 919 F.3d at 461 (Barrett, J., dissenting). Often felons were neither executed nor lost all of their rights. *Id.*; *see also Folajtar v. Att'y Gen. of the United States*, 980 F.3d 897, 912 (3d Cir. 2020) (Bibas, J., dissenting) ("Even historically, there is no evidence that all felons were disarmed as part of their punishment."). Second, many crimes that we think of today as felonies were misdemeanors, "such as kidnapping and assault with intent to murder or rape." Allen Rostron, *Justice Breyer's Triumph in the Third Battle Over the Second Amendment*, 80 Geo. Wash. L. Rev. 703, 750 (2012).

---

by laws enacted as late as the 1930s; (4) restrictions need not be widespread to be "longstanding," a few states will do; (5) restrictions must match their historical analogues in scope; and (6) laws that regulate handguns have more historical support than those regulating long guns. David B. Kopel, *Background Checks for Firearms Sales and Loans: Law, History, and Policy*, 53 Harv. J. Legisl. 303, 335 (2015). While these principles do not bind this Court, they can provide some guidance when considering whether restrictions on the purchase of firearms by 18-to-20-year-olds are longstanding in time.

Simply put, there is little evidence that prohibitions on felons possessing arms existed at the Founding. *See* Carlton F.W. Larson, *Four Exceptions in Search of a Theory:* District of Columbia v. Heller *and Judicial Ipse Dixit*, 60 Hastings L.J. 1371, 1374 (2009) ("[S]o far as I can determine, no colonial or state law in eighteenth-century America formally restricted the ability of felons to own firearms."). Nor have "scholars identified eighteenth or nineteenth century laws depriving felons of the right to bear arms." *Kanter*, 919 F.3d at 463 (Barrett, J., dissenting).

Thus, save for one exception, restrictions on the possession of firearms by felons do not appear to have emerged until the early twentieth century. *See* Larson, *supra*, at 1376 (explaining that the earliest state law disarming felons "was enacted in New York in 1897").[25] Following New York, "similar laws were passed by Illinois in 1919, New Hampshire, North Dakota, and California in 1923, and Nevada in 1925." *Id.* at 1376. In 1930, the National Conference of Commissioners on Uniform State Laws adopted the Uniform Firearms Act. *Id.*; *Mai v. United States*, 974 F.3d 1082, 1089 (9th Cir. 2020) (Bumatay, J., dissenting). That law, which prohibited persons convicted of "crime[s] of violence" from possessing a pistol, Larson, *supra*, at 1376, was adopted by Pennsylvania in 1931, "and other states

---

[25] *But see* Marshall, *supra*, at 708 ("[O]ne can with a good degree of confidence say that bans on convicts possessing firearms were unknown before World War I.").

passed similar laws in the following decades," *Mai*, 974 F.3d at 1089 (Bumatay, J.,

dissenting). Thus, it appears, only a handful of states restricted the Second

Amendment rights of felons prior to 1938, when the Federal Firearms Act—

restricting the "receipt" of firearms by persons convicted of "a few violent

offenses"—was introduced. *United States v. Skoien*, 614 F.3d 638, 640 (7th Cir.

2010) (en banc). In sum, the nationwide total ban on felons' possession of firearms

arrived only with 1961 amendments to the Federal Firearms Act and took its modern

form in the Safe Streets Act, codified at 18 U.S.C. § 922(g)(1). *Id.*

 *The Mentally Ill* – As with felons, "[o]ne searches in vain through eighteenth-

century records to find any laws specifically excluding the mentally ill from firearms

ownership." Larson, *supra*, at 1376 (explaining that "[s]uch laws seem to have

originated in the twentieth century"). The earliest restriction on the possession of

firearms by the mentally ill appears to be the 1930 Uniform Firearms Act, which

prohibited giving a pistol to someone of "unsound" mind. *Mai*, 974 F.3d at 1089

(Bumatay, J., dissenting). In short, prohibitions on possession by the mentally ill do

not appear to have become widespread until the Safe Streets Act's passage. *See* 18

U.S.C. § 922(g)(4) (prohibiting any person "who has been adjudicated as a mental

defective or has been committed to a mental institution" from possessing a firearm).

Accordingly, federal prohibitions on the possession of firearms by the mentally ill,

like prohibitions on the possession of firearms by felons, "are of 20th Century vintage." *Skoien*, 614 F.3d at 641.

*Sensitive Places & Commercial Restrictions* – Restrictions on carrying firearms in sensitive places appear to have more historical support, potentially dating back to 1328. *See* Larson, *supra*, at 1378–79. Restrictions on the commercial sale of arms, however, "are . . . almost entirely twentieth-century innovations." *Id.* at 1379. While "some state commercial regulation probably began in the nineteenth century," the earliest federal regulation dates back to 1927. *Id.*

So, compared to *Heller*'s list, are restrictions on the purchase of firearms by 18-to-20-year-olds longstanding in time? Of the "longstanding" regulations listed in *Heller* and *McDonald*, three out of the four arose in the early- to mid-twentieth century. Both the first prohibition on the possession of firearms by felons and the first prohibition on the possession of firearms by the mentally ill came after the first prohibition on the sale of firearms to 18-to-20-year-olds. And all three prohibitions only became widespread in the 1960s.[26] Commercial regulations on the sale of firearms were, likewise, of early twentieth century vintage. In other words, only prohibitions on carrying firearms in sensitive places predate prohibitions on the sale

---

[26] One could argue that restrictions on felons became widespread with the 1938 Federal Firearms Act. But that act only targeted persons convicted of "a few violent offenses" prior to 1961. *Skoien*, 614 F.3d at 640–41.

of firearms to 18-to-20-year-olds. Accordingly, the prohibition at issue here is—at least relative to the other prohibitions listed in *Heller*—longstanding in time.[27]

    b.  Analogous to *Heller*'s Longstanding Prohibitions?

Having determined that restrictions on 18-to-20-year-olds' right to purchase firearms are longstanding in time, this Court next asks whether prohibitions on the sale of firearms to 18-to-20-year-olds are analogous to the prohibitions listed in *Heller*. In answering that question, this Court looks to the Eleventh Circuit's decision in *United States v. White*, 593 F.3d 1199 (11th Cir. 2010). *White* addressed an appeal from a conviction under 18 U.S.C. § 922(g)(9), which prohibits persons convicted of misdemeanor domestic violence from possessing firearms. *Id.* at 1200. In

---

[27] Plaintiffs suggest that history supports restrictions on "minor children," but that, "[i]n the modern era, 18-to-20-year-olds are considered adults for essentially all purposes." ECF No. 109 at 16. Yet 18-to-20-year-olds were considered minors for most of this nation's history. And while 18-to-20-year-olds are surely adults for most purposes, it does not follow that they are adults for all purposes. In rejecting Plaintiffs' argument, this Court need not decide that the definition of adult for Second Amendment purposes is set in stone and cannot change as society's view on the issue changes. That is because society's view on this issue has not changed. 18-to-20-year-olds are still prohibited from purchasing handguns from federally licensed firearms dealers. And besides Florida, California (Cal. Penal Code §§ 2750(a), 27510(a)), Hawaii (Haw. Rev. Stat. Ann. § 134-2(a), (d)), Illinois (430 Ill. Comp. Stat. 65/3(a), 65/4), New York (N.Y. Penal Law § 400.00(1)(a)), Vermont (Vt. Stat. Ann. tit. 13, § 4020), and Washington (Wash. Rev. Code Ann. § 9.41.240) all restrict the purchase of both handguns and long guns by minors. Plus, Connecticut (Conn. Gen. Stat. § 29-34(b)), Delaware (Del. Code Ann. tit. 24, § 903), the District of Columbia (D.C. Code Ann. § 22-4507), Iowa (Iowa Code § 724.22(2)), Maryland (Md. Code Ann., Pub. Safety § 5-134(d)), Massachusetts (Mass. Gen. Laws ch. 140 §§ 130, 131E(a)), Nebraska (Neb. Rev. Stat. §§ 69-2403, 69-2404), New Jersey (N.J. Stat. Ann. §§ 2C:58-3.3c, 2C:58-6.1a, 2C:58-3c(4)), Ohio (Ohio Rev. Code Ann. § 2923.21(B)), Rhode Island (R.I. Gen. Laws §§ 11-47-35(a)(1), 11-47-37), and Wyoming (Wyo. Stat. § 6-8-404(d)(i)(A)) all restrict the ability of those under twenty-one to purchase handguns—and, in some cases, certain long guns. In short, at the turn of the century, nineteen states placed restrictions on the purchase of firearms by those under twenty-one. Now, eighteen states and the federal government impose such restrictions. This Court is hard pressed to say there has been a sea change on this issue.

challenging his conviction, the defendant argued, among other things, that section 922(g)(9) violated the Second Amendment. *Id.* at 1205.

In framing its Second Amendment decision, the court limited its holding to one issue; namely, "whether § 922(g)(9) may be properly included as a presumptively lawful 'longstanding prohibition[] on the possession of firearms.' " *Id.* (alterations in the original). Although Congress passed section 922(g)(9) in 1996, the court reasoned that section 922(g)(9) was designed to close a "dangerous loophole" through which violent criminals could possess firearms. *Id.* The court pointed out that the ban on felons was even broader, encompassing both violent and nonviolent criminals, whereas section 922(g)(9) only denied firearms to violent criminals. *Id.* at 1205–06. In closing, the court explained, "§ 922(g)(9) addresses . . . a problem Congress recognized was not remedied by 'longstanding' felon-in-possession laws" and there was therefore "no reason to exclude [it] from the list of longstanding prohibitions on which *Heller* does not cast doubt." *Id.* at 1206. Because it found section 922(g)(9) longstanding, the court affirmed the defendant's conviction without further discussion. *Id.* In other words, it seems that because the prohibition on domestic violence misdemeanants, like the prohibition on felons, was designed to keep guns from dangerous criminals, it was sufficiently analogous and therefore longstanding.

With *White* in mind, look again to section 922. It contains prohibitions on the sale of handguns to those under twenty-one; prohibitions on the possession of firearms by felons, the mentally ill, fugitives, drug addicts, illegal aliens, those dishonorably discharged from the armed forces, persons who have renounced their U.S. citizenship, those subject to domestic violence injunctions, and those convicted of domestic violence misdemeanors. *See* 18 U.S.C. §§ 922(g)(1)–(9), (b)(1), (c)(1). Most cases addressing these provisions have found them longstanding and presumptively valid.

For example, like the Eleventh Circuit in *White*, other circuits have held that the 1996 addition to section 922 prohibiting the possession of firearms by persons convicted of misdemeanor domestic violence is a presumptively valid longstanding prohibition. *See United States v. Booker*, 644 F.3d 12, 24–25 (1st Cir. 2011) ("§ 922(g)(9) fits comfortably among the categories of regulations *Heller* suggested would be 'presumptively lawful.'").

Some courts have also upheld the prohibition on the possession of firearms by drug abusers, section 922(g)(3), as a longstanding prohibition. *See, e.g.*, *United States v. Seay*, 620 F.3d 919, 925 (8th Cir. 2010) (collecting cases) (explaining that, because the prohibition on the possession of firearms by drug abusers is longstanding, "we reject Seay's facial challenge"); *United States v. Dugan*, 657 F.3d 998, 999–1000 (9th Cir. 2011) ("Because Congress may constitutionally deprive

35

felons and mentally ill people of the right to possess and carry weapons, we conclude that Congress may also prohibit illegal drug users from possessing firearms."). And at least one court has suggested, without holding, that persons dishonorably discharged from the military fall outside the Second Amendment as well. *United States v. Jimenez*, 895 F.3d 228, 232 (2d Cir. 2018) ("There is some reason to think the Second Amendment does not apply to Jimenez.").

Other courts, however, have been more cautious in equating restrictions to those listed in *Heller*. *United States v. Chester*, 628 F.3d 673, 680 (4th Cir. 2010) (declining to uphold section 922(g)(9) as presumptively valid); *United States v. Chovan*, 735 F.3d 1127, 1137 (9th Cir. 2013) ("First, it is not clear that such prohibitions [on the possession of firearms by domestic violence misdemeanants] are so longstanding.").

The unifying theme of these cases is that courts generally find restrictions analogous when they target groups thought to be especially dangerous with firearms.[28] And though it has tried, this Court can identify no meaningful difference between prohibitions listed in *Heller*, other restrictions courts have found analogous, and restrictions on the purchase of firearms by 18-to-20-year-olds.

---

[28] It is not lost on this Court that this explanation is deeply unsatisfying. "The government could quickly swallow the right [to bear arms] if it had broad power to designate any group as dangerous and thereby disqualify its members from having a gun." *Kanter*, 919 F.3d at 465 (Barrett, J., dissenting). But this Court can draw no other conclusion from *White* and similar cases from other circuits.

While not dispositive, this Court notes that courts generally find restrictions in section 922, typically from subsection (g), longstanding. That said, one argument against finding restrictions on 18-to-20-year-olds analogous might be that other categorical prohibitions—those on felons or the mentally ill—require some individualized determination that the persons prohibited from exercising full Second Amendment rights fall into a category of persons society considers especially dangerous. On the other hand, no adjudication is necessary to determine that someone is between the ages of eighteen and twenty-one. Another argument could be that only a small subset of 18-to-20-year-olds are actually dangerous. But not all felons, mentally ill persons, or persons dishonorably discharged from the military are dangerous—nor are all drug addicts. Plus, one could argue that, unlike felons, 18-to-20-year-olds are not culpable. But while felons might be considered culpable, mentally ill persons certainly are not.[29]

In short, *Heller*'s listed regulations are similar to restrictions on the purchase of firearms by 18-to-20-year-olds; all target specific groups that are thought to be

---

[29] Some "[s]cholars have proposed that at the time of the founding, the right to arms was inextricably and multifariously linked to that of civic virtu." *NRA*, 700 F.3d at 201. This assertion is the subject of hot debate in legal academia. *See* Greenlee, *Historical Justification*, *supra*, at 275–86. Some scholars instead contend that historically only those who were considered dangerous could be disarmed. *See generally id.* This debate is relevant, for example, to felon in possession laws. Under a virtue theory, all felons can be constitutionally disarmed; under a dangerousness theory, only some subset of felons who are actually dangerous can be constitutionally disarmed. At least that is the argument. Here, however, it does not matter whether those 18-to-20-years-old were historically targeted because they were thought to lack civic virtue or because they were considered dangerous. What matters is that restrictions on 18-to-20-year-olds are similar to restrictions on felons and the mentally ill, which *Heller* found longstanding.

especially dangerous with firearms. *See Dugan*, 657 F.3d at 999 (finding restrictions on drug users longstanding because the court saw "the same amount of danger in allowing habitual drug users to traffic in firearms as . . . in allowing felons and mentally ill people to do so."). Given the close match, this Court finds restrictions on the purchase of firearms by 18-to-20-year-olds analogous to the restrictions on *Heller*'s list.

\* \* \*

Considering the above, restrictions on 18-to-20-year-olds' right to purchase firearms are both longstanding in time in relation to *Heller*'s list and analogous to other restrictions on that list. And this Court therefore finds, as many others have, that age-based restrictions on the purchase of firearms are longstanding.[30] *See NRA*, 700 F.3d at 203 (finding age based restrictions on handgun purchases "consistent

---

[30] As Plaintiffs correctly point out, while almost all of the nineteenth and early-twentieth century regulations on the sale of firearms to 18-to-20-year-olds targeted only handguns—as does the Safe Streets Act—Florida's law also targets long guns. Is Florida's law then longstanding as to handguns but not as to long guns? At least one court would say yes. *Heller II*, 670 F.3d at 1255 ("[W]e hold the basic registration requirements are constitutional only as applied to handguns. With respect to long guns they are novel, not historic."). But *Heller* described the right to self-defense as "central to the Second Amendment right" and called handguns the arm "overwhelmingly chosen . . . for that lawful purpose." 554 U.S. at 628. And because it found handguns to be America's self-defense weapon of choice, *Heller* went on to reject the argument that it is constitutional to ban handguns when long guns remain permitted. *Id.* at 629. The point being, if the government historically had the power to restrict 18-to-20-year-olds' right to purchase the one arm at the very core of the Secondment Amendment, should it not also be able to restrict arms even incrementally closer to the periphery? To say otherwise would seem to turn *Heller* on its head. *See Kolbe v. Hogan*, 849 F.3d 114, 145 (4th Cir. 2017) (explaining that "the handgun's status as 'the quintessential self-defense weapon' " was "obviously and unquestionably important to the *Heller* Court.").

38

with a longstanding, historical tradition"); *NRA v. McCraw*, 719 F.3d 338, 347 (5th Cir. 2013) (finding restrictions on 18-to-20-year-olds publicly carrying handguns longstanding); *Becerra*, 498 F. Supp. 3d at 1327 (finding restrictions on the sale of handguns and long guns to 18-to-20-year-olds longstanding); *Hirschfeld v. ATF*, 417 F. Supp. 3d 747, 755 (W.D. Va. 2019) (holding that "prohibitions on the use or possession of handguns by those under a given age" are longstanding); *Mitchell v. Atkins*, 483 F. Supp. 3d 985, 993 (W.D. Wash. 2020) (holding that prohibition on selling semiautomatic assault rifles "to 18- to 20-year-olds comports with . . . longstanding laws"); *People v. Mosley*, 33 N.E.3d 137, 155 (Ill. 2015) (finding a "restriction on [the possession of firearms outside the home by] persons under the age of 21 . . . historically rooted"); *cf. United States v. Rene E.*, 583 F.3d 8, 12 (1st Cir. 2009) (recognizing "a longstanding tradition of prohibiting juveniles from both receiving and possessing handguns"); *In re J.M.*, 144 So. 3d 853, 862 (La. 2014) (holding that prohibiting juvenile handgun possession is a "long-standing limitation on the right to keep and bear arms" because, as early as 1890, Louisiana banned the transfer of "any . . . dangerous weapon" to someone under twenty-one).

In short, "the established consensus of federal [and state] appellate and district courts from around the country is that age-based restrictions limiting the rights of 18-[to-]20-year-old adults to keep and bear arms fall under the 'longstanding' and 'presumptively lawful' measures recognized by the Supreme Court in *Heller* as

evading Second Amendment scrutiny." *Lara*, 2021 WL 1432802, at *10 (addressing 18-to-20-year-olds' right to carry arms in public). Indeed, even the one case Plaintiffs identify that held restrictions on the sale of firearms to those under twenty-one unconstitutional, albeit under the Virginia Constitution, suggested that restrictions on the purchase of firearms by minors were longstanding, and instead took issue with the definition of minor. *See Elhert v. Settle*, 105 Va. Cir. 326, 336 (Va. Cir. Ct. 2020). A presumption of validity therefore applies to the Act. But the question remains, how does the presumption apply?

### 3.  *How Does the Presumption Apply?*

Having determined that restrictions such as Florida's are longstanding within the meaning of *Heller*, this Court must now determine how that affects its analysis. The circuits vary wildly on how to address a regulation falling into a longstanding category. But as discussed above, the Eleventh Circuit has held that longstanding prohibitions fall outside the Second Amendment.

That said, some courts that consider longstanding restrictions outside the Second Amendment's scope nonetheless allow as-applied challenges to longstanding regulations. *See, e.g.*, *Folajtar*, 980 F.3d at 901 ("We do, however, permit Second Amendment challenges to § 922(g)(1) as applied to individuals . . . ."). Others allow a plaintiff to rebut the presumption of legality by showing that the law in question does in fact burden a Second Amendment right. *See*

*Heller II*, 670 F.3d at 1253 (explaining that longstanding regulations "are presumed not to burden conduct within the scope of the Second Amendment," but that "[a] plaintiff may rebut this presumption by showing the regulation does have more than a de minimis effect upon his right"); *N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 257 n.73 (2d Cir. 2015) (same); *see also Booker*, 644 F.3d at 25 ("While the categorical regulation of gun possession by domestic violence misdemeanants thus appears consistent with *Heller*'s reference to certain presumptively lawful regulatory measures, . . . some sort of showing must be made to support the adoption of a new categorical limit on the Second Amendment right."). Intuitively, this seems like the right approach. *See Presumption*, Black's Law Dictionary (11th ed. 2019) ("[a] presumption shifts the burden of production or persuasion to the opposing party, who can then attempt to overcome the presumption.").

But for better or worse, the Eleventh Circuit has treated the presumption as insurmountable. As the Fourth Circuit observed, *White* treats longstanding status "for all practical purposes, as a kind of 'safe harbor' for unlisted regulatory measures . . . which [the Eleventh Circuit] deem[s] to be analogous to those measures specifically listed in *Heller*." *Chester*, 628 F.3d at 679 (discussing *White*, 593 F.3d at 1206). In short, in the Eleventh Circuit, a longstanding regulation is a constitutional one—end of story. *See United States v. Rozier*, 598 F.3d 768, 771

(11th Cir. 2010) (holding that "statutes disqualifying felons from possessing a firearm under any and all circumstances do not offend the Second Amendment"); *Focia*, 869 F.3d at 1286–87 (finding restriction on licensed firearms dealers selling to persons residing in another state longstanding and ending inquiry); *Flick v. Att'y Gen.*, 812 F. App'x 974, 975 (11th Cir. 2020) (rejecting as-applied challenge to felon-in-possession prohibition).

Accordingly, having decided restrictions such as the one at issue here are longstanding, this Court can only reject Plaintiffs' challenge at step one. And because any potential factual disputes in this case implicate the Act's "fit" at step two, there are no material facts in dispute for the purpose of the parties' motions. Defendant's motion for summary judgment is therefore **GRANTED** as to Count I of Plaintiffs' Second Amended Complaint.

## IV.   Plaintiffs' Equal Protection Claims

Having determined that the Act does not violate the Second Amendment, this Court now turns to Plaintiffs' claims under the Fourteenth Amendment's Equal Protection Clause. Plaintiffs argue that the Act violates the Equal Protection Clause because it impermissibly discriminates based on age.

The standard of review in an equal protection case turns on the basis for the challenged classification, and "[w]here no fundamental right or suspect class is implicated, courts evaluate equal protection claims under the rational basis test."

42

*Morrissey*, 871 F.3d at 1268. Age is not a suspect class. *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 83 (2000). Plus, this Court has already determined the Act does not violate the Second Amendment. Thus, this Court must review the Act under the rational basis test. Under that standard, this Court must uphold the Act "unless the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that [it] can only conclude that the [government's] actions were irrational." *Id.* at 84 (citation omitted). Accordingly, even if the Act relies "on broad generalizations with respect to age" it will "not violate the Equal Protection Clause." *Id.* at 84–85.

Plaintiffs argue the Act fails even rational basis review, but this Court cannot agree. The Act's stated purpose is "to comprehensively address the crisis of gun violence, including, but not limited to, gun violence on school campuses." Ch. 2018-3, § 2, Laws of Fla. Defendant argues that, although the overall violent crime rate among 18-to-20-year-olds is low, compared to other age groups, 18-to-20-year-olds are far more likely to commit violent crimes. ECF No. 107 at 26. Thus, restricting 18-to-20-year-olds' access to firearms will reduce gun violence by making it more difficult to obtain weapons until a person ages out of this high-risk group. Even if the Act is a blunt instrument to achieve Florida's legitimate end, this Court cannot say that its connection to Florida's stated purpose is so tenuous as to render Florida's actions irrational. *See, e.g.*, *Horsley v. Trame*, 808 F.3d 1126, 1133 (7th Cir. 2015)

("The goal of protecting public safety is supported by studies and data regarding persons under 21 and violent and gun crimes.").

And whatever factual disputes might arise regarding how narrowly tailored the Act is under strict scrutiny, none are implicated under the vastly more lenient rational basis review. *See FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315 (1993) ("[A] legislative choice is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data."). In other words, even if this Court accepted Plaintiffs' experts' testimony that the Act is unsupported—or contradicted—by empirical evidence, "[s]o long as there is some rational basis that might conceivably support the" Act, Plaintiffs' challenge fails. *Cook v. Stewart*, 28 F. Supp. 3d 1207, 1213 (N.D. Fla. 2014). Defendant's motion for summary judgment is therefore **GRANTED** as to Count II of Plaintiffs' Second Amended Complaint.

## V. Conclusion

After Florida suffered one of the worst school shootings in our nation's history, its Legislature faced a colossal challenge, forced to make difficult decisions while under tremendous time pressure. This Court does not envy the difficult balance the Legislature had to strike.

That said, this Court has grave concerns about the balance the Legislature struck. While the Act appears broad on its face, as Defendant argues, many 18-to-

20-year-olds who wish to obtain a firearm will be able to do so through parents or other relatives. Whether this is an effective check on rash decision-making, this Court cannot say. But it is clear that this law will have little impact on many, if not most, 18-to-20-year-old Floridians. In short, then, it is not clear how much the Act does to prevent tragedies like the one at Marjory Stoneman Douglas High School.

Equally troubling to this Court is that, as Plaintiffs point out, "to those 18-to-20-year-olds who do not have parents or legal guardians . . . or do not otherwise have anyone willing to gift or loan a firearm to them," the Act functions as a total ban.[31] ECF No. 30 at 108–09. Worse still, it is likely that these particular 18-to-20-year-olds are the ones who actually need firearms to defend themselves: they are likely independent, likely to live in dangerous neighborhoods, and likely to have families and children of their own. Why should the 20-year-old single mother living on her

---

[31] And it is to these 18-to-20-year-olds that this Court must look. Defendant is mistaken in arguing that Plaintiffs cannot bring a facial challenge to the Act because the Act will not affect most 18-to-20-year-olds' access to firearms, and thus is not unconstitutional in all applications. True, as the Supreme Court has explained, a law is facially invalid only when it "is unconstitutional in all of its applications." *City of Los Angeles v. Patel*, 576 U.S. 409, 418 (2015) (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008)). "But when assessing whether a statute meets this standard, the Court has considered only applications of the statute in which it actually authorizes or prohibits conduct." *Id.* Put another way, "[l]egislation is measured for consistency with the Constitution by its impact on those whose conduct it affects. . . . The proper focus of the constitutional inquiry is the group for whom the law is a restriction, not the group for whom the law is irrelevant." *Id.* (quoting *Planned Parenthood of Se. Penn. v. Casey*, 505 U.S. 833, 894 (1992)). So too here, the question is not whether some 18-to-20-year-olds can circumvent Florida's law by having somebody purchase a gun for them. In that case, the law does not apply. Instead, the question is whether the law is constitutional in all situations in which an 18-to-20-year-old attempts to purchase a gun but cannot.

own be unable to obtain a firearm for self-defense when a 20-year-old living with their parents can easily obtain one?

In addition to its concerns over who suffers the burdens imposed by the Act, this Court has grave doubts about a Second Amendment framework that finds certain persons or activities either protected or entirely unprotected. *See Kanter*, 919 F.3d at 452 (Barrett, J., dissenting) (explaining that thinking of people as either protected or unprotected by the Second Amendment "is an unusual way of thinking about rights."). For example, although "the constitutional rights of students in public school are not automatically coextensive with the rights of adults in other settings," *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 682 (1986), students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate," *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969). This Court sees no reason why the Second Amendment, unlike other fundamental rights, should be an all or nothing affair.

Finally, while this Court agrees that Florida can enact gun control legislation, perhaps even sweeping and categorical legislation, when the state designates entire classes of persons as too irresponsible to exercise their rights, it "must be able to justify its designation." *Kanter*, 919 F.3d at 465–64 (Barrett, J., dissenting). Under the Eleventh Circuit's current body of caselaw, Florida escapes that responsibility

46

altogether. If this Court were writing on a "blankish" slate—accepting *Heller*, as it must—it would subject the Act to a more searching inquiry.

But these concerns presuppose that the Second Amendment applies at all. And given the Eleventh Circuit has found restrictions with much less historical support longstanding, this Court must conclude that restrictions on the purchase of firearms by 18-to-20-year-olds are also longstanding. And because the Eleventh Circuit has held that longstanding prohibitions categorically fall outside the Second Amendment, this Court holds that the Second Amendment does not apply to the purchase of firearms by 18-to-20-year-olds.

Accordingly,

**IT IS ORDERED**:

1. Defendant's motion for summary judgment, ECF No. 107, is **GRANTED**.

2. Plaintiffs' motion for summary judgment, ECF No. 109, is **DENIED**.

3. All pending motions *in limine*, ECF Nos. 125, 126, and 127, are **DENIED as moot**.[32]

4. The Clerk is directed to enter judgment stating "Plaintiff Fant and National Rifle Association of America, Inc.'s claims against Defendant Rick Swearingen are dismissed with prejudice." The Clerk must close the file.

---

[32] The motions *in limine* would only become relevant at step two. Because this Court is deciding this case at step one, the motions are moot.

**SO ORDERED on June 24, 2021.**

**s/Mark E. Walker**
**Chief United States District Judge**